# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 8:19-MJ-419 |
| Ten Digital Devices in the Custody of the Internal Revenue Service – Criminal Investigation | ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

IRS-CI Special Agent Remoun Karlous
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   May 24, 2019

**DOUGLAS F. McCORMICK**
_____
*Judge's signature*

City and state:   Santa Ana, CA

United States Magistrate Judge Douglas F. McCormick
_____
*Printed name and title*

AUSAs: Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES") or forensic images thereof, which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Los Angeles and Santa Ana, California:

1.   Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

2.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

3.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

4.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

5.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

6.     HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

7.     A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019 ("SUBJECT DEVICE 7");

8.     A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

9.     A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from VENATTI on March 25, 2019.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 9"); and

10.    A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019.  The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

## ATTACHMENT B

**I.  ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); Avenatti & Associates, APC ("A&A"); and Augustus LLP (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to Michael J. Avenatti's ("AVENATTI") control or management of any of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

c.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

d.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

e.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

f.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

g.    Records, documents, programs, applications, or materials from January 201 through March 25, 2019, relating to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities, and/or AVENATTI.

h.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any payments, checks, credits, wire transfers, commodities,

services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities.

i.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or F.M. on the other hand.

j.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to financial decisions AVENATTI and/or J.R. made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

k.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to communications between AVENATTI and/or J.R. and any financial institution regarding the transfer of funds to or from any account associated with AVENATTI and/or any of the Subject Entities.

l.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

m.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the federal, state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to attorneys' fees or costs earned or collected by EA LLP, A&A, and/or AVENATTI, including attorney-client fee contracts, engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence

regarding the cancellation or modification of contracts and/or agreements.

r.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.    Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the physical whereabouts of AVENATTI, and/or J.R., including calendars and calendar entries.

t.    Records, documents, programs, applications, or materials from April 1, 2011, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 1, including the approximately $4 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2015.

u.    Records, documents, programs, applications, or materials from December 2016 to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 2, including the approximately $2.75 million settlement payment that was transferred to one of EA LLP's California Bank & Trust attorney trust account in or around January 2017.

v.    Records, documents, programs, applications, or materials relating to an agreement to purchase and the purchase of a private Honda jet from Honda Aircraft Company LLC and/or the funds used to purchase the private Honda jet.

w.   Records, documents, programs, applications, or materials from January 1, 2014, to March 25, 2019, relating to AVENATTI and/or EA LLP's representation of Client 3, including the approximately $1.6 million settlement payment that was transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

x.   Records, documents, programs, applications, or materials from January 1, 2017, to March 25, 2019, relating to AVENATTI's, EA LLP's, X-Law Group, and/or F.M.'s representation of Client 4 and Client 5, including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

y.   Non-privileged records, documents, programs, applications, or materials from March 7, 2013, to March 25, 2019, relating to the settlement of litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation"), including documents reflecting settlement payments, attorney fees, costs, expenses, and the distribution of settlement proceeds to EA LLP, AVENATTI, and any of EA LLP or AVENATTI's clients in the Super Bowl Litigation.

z.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

aa.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

bb.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

cc.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

dd.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to the value of GBUS or GB LLC.

ee.   Records, documents, programs, applications, or materials from January 2013 through March 25, 2019, relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

ff.   Records, documents, programs, applications, or materials from January 2018 through March 25, 2019, relating to creation, formation, business purpose, ownership agreement, finances, of Augustus LLP.

gg.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

hh.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

ii.   Records, documents, programs, applications, or materials from January 2011 through March 25, 2019, relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

jj.   Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

kk.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

          ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials"

include records, documents, correspondence, programs,
applications, and materials created, modified, or stored in any
form, including in digital form on any digital device and any
forensic copies thereof.

## II.  SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION ON THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (including the
forensic copies thereof), the following procedures will be
followed at the time of the search in order to avoid unnecessary
disclosures of any privileged attorney-client communications or
attorney work product.

4.    Law enforcement personnel conducting the investigation
and search and other individuals assisting law enforcement
personnel in the search (the "Investigation Team") have already
obtained custody of the SUBJECT DEVICES, which are capable of
containing evidence of the Subject Offenses, or capable of
containing data falling within the scope of the items to be
seized.  The Investigation Team shall facilitate the transfer of
the SUBJECT DEVICES to the "Privilege Review Team" (previously
designated individuals not participating in the investigation of
the case).  The Privilege Review Team, including a Privilege
Review Team Assistant United States Attorney ("PRTAUSA") or
PRTAUSAs, will then review the SUBJECT DEVICES as set forth
herein.  The Investigation Team will review only data from the
SUBJECT DEVICES that has been released by the Privilege Review
Team to the Investigation Team.

5.    The Privilege Review Team will, in their discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Investigation Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[29] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct an initial review of the SUBJECT DEVICES using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

_____

[29] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

be maintained under seal and not further reviewed absent subsequent authorization.

8.   The Investigation Team will also provide the Privilege Review Team with a list of "privilege key words" to search for among the documents and data that are identified by the initial review and quality check described above as appearing to fall within the scope of the warrant, to include specific words associated with AVENATTI, J.R., F.M., and any of the following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d) Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n) Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky Markle Attorneys at Law.  The privilege key words shall also include the above referenced law firms' domain names and lawyers' email addresses, and generic words such as "privileged," "work product."  The Privilege Review Team will conduct a review of these documents and data using the privilege key words, and by using search protocols specifically chosen to identify documents and data containing potentially privileged information. Documents or data which are identified by this review as not potentially privileged may be given to the Investigation Team.

9.   Documents or data that the privilege key word searches identify as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain

potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

     10.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as
Relativity or Eclipse, that remains inaccessible to the

Investigation Team.  The Privilege Review Team's access to this separate document review platform database shall cease upon expiration of the warrant.  However, litigation support personnel from the United States Attorney's Office, United States Department of Justice, and/or the investigating agency may continue to access this separately-maintained document review database for the purpose of database maintenance.

11.  The Investigation Team will search only the documents and data that the Privilege Review Team provides to the Investigation Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Investigation Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient.  This second "scope" review is intended only to ensure that the initial scope key word review successfully eliminated data outside the scope of the search warrant from seizure.

12.  The Privilege Review Team will segregate any identifiable documents and/or data that it discovers during the search of the Subject Devices relating to Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), the representation of Stephanie Clifford, and/or the representation of Julie Swetnick.  Such documents and/or data will be maintained under seal by the investigating agency without

further review as set forth in paragraphs 7 and 10 above absent subsequent authorization from the Court.  This provision, however, shall not preclude the Privilege Review Team or Investigation Team from reviewing financial and accounting records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above, which reference the representations of Ms. Clifford or Ms. Swetnick.

13.  To the extent that any documents and/or data covered by paragraph 1.p above, such as attorney-client fee contracts, engagement letters, and client billing records, contain information that is potentially protected by the attorney-client privileged or the attorney-work-product doctrine, the Privilege Review Team shall redact all such potentially privileged information from the documents or data before releasing the documents and/or data to the Investigation Team unless the specific client agrees to waive the attorney-client privilege.

14.  If, upon review, a member of the Investigation Team determines that a document or data appears to contain potentially privileged information, the Investigation Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Investigation Team member may record identifying information regarding the potentially privileged document or data that is reasonably necessary to identify the document or data for the Privilege Review Team.  The Investigation Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege

Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

15.  In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

a.  search for and attempt to recover deleted,
"hidden," or encrypted data;

b.  use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

c.  use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

16.  If either the Privilege Review Team or the
Investigation Team, while searching a SUBJECT DEVICE encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

17.  If the search determines that a SUBJECT DEVICES does
contain data falling within the list of items to be seized, the
government may make and retain copies of such data, and may
access such data at any time.

18.   The government may retain the SUBJECT DEVICES
(including any forensic copy thereof), which have already been
obtained by the Investigation Team, but may not access data
falling outside the scope of the other items to be seized (after
the time for searching the device has expired) on the SUBJECT
DEVICES absent further court order.

19.   After the completion of the search of the SUBJECT
DEVICES, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

20.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**III.  <u>REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER</u>**

21.   To the extent that AVENATTI, EA LLP, or any other
party intends to request that a special master be appointed to
handle the review of any potentially privileged information
seized during the execution of this Search Warrant, such a
request must be filed with this Court within seven days of the
execution of this Search Warrant.  The government will then have
seven days to file any opposition to such a request.

22.   Any request for the appointment of a special master
must, at a minimum, address the following issues:  (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review

procedures to be followed by the special master, should one be appointed; (d) proposed procedures for the selection of a special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

## <u>AFFIDAVIT</u>

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.   <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is made in support of an application for a warrant to search the following digital devices or forensic images thereof, which are currently held in the custody of IRS-CI in Los Angeles and Santa Ana, California:[1]

a.   Dell PowerEdge R410, bearing serial number 52RKCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for Eagan Avenatti LLP ("EA LLP") on or about April 4, 2019 ("SUBJECT DEVICE 1");

---

[1] SUBJECT DEVICES 1 through 6 are currently held in the custody of IRS-CI in Los Angeles, California.  SUBJECT DEVICES 7 through 10 are currently held in the custody of IRS-CI in Santa Ana, California.

b.   Dell PowerEdge R710, bearing serial number 2GMPCK1, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 2");

c.   HP ProLiant DL380 G7, bearing serial number A1979827, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 3");

d.   HP ProLiant DL380 G7, bearing serial number A1979828, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 4");

e.   HP ProLiant DL380 G7, bearing serial number A1884814, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 5");

f.   HP ProLiant DL160 G6, bearing serial number MXQ9520ABM, obtained by IRS-CI from MixinIT via consent from the court-appointed receiver for EA LLP on or about April 4, 2019 ("SUBJECT DEVICE 6");

g.   A black USB drive marked "27989," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the United States Attorney's Office for the Southern District of New York ("SDNY USAO") on or about May 22, 2019  ("SUBJECT DEVICE 7");

2

      h.   A blue and silver USB drive marked "RAEN," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019 ("SUBJECT DEVICE 8");

      i.   A silver and purple USB drive marked "8025328," which was seized by law enforcement agents from AVENATTI on March 25, 2019, upon his arrest.  IRS-CI obtained the forensic image of the digital device from the SDNY USAO on or about May 22, 2019  ("SUBJECT DEVICE 9"); and

      j.   A compact disc containing scanned copies of miscellaneous documents that were seized by law enforcement agents from AVENATTI's briefcase on March 25, 2019, upon his arrest.  The SDNY USAO scanned the documents and placed them on the disc and provided the disc to IRS-CI on or about May 17, 2019 ("SUBJECT DEVICE 10") (collectively, the "SUBJECT DEVICES").

     3.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets and false oaths and declarations in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C.

§ 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18
U.S.C. § 1957 (money laundering) (the "Subject Offenses"), and
any SUBJECT DEVICE which is itself or which contains evidence,
contraband, fruits, or instrumentalities of the Subject
Offenses, and forensic copies thereof.

    4.   The SUBJECT DEVICES are identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

    5.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

    6.   AVENATTI was and is an attorney licensed to practice
law in the State of California.  AVENATTI practiced law through
Avenatti & Associates, APC ("A&A") and EA LLP in Newport Beach
and Los Angeles, California.  AVENATTI was the sole owner of
A&A, which owned at least 75 percent of EA LLP.

    7.   AVENATTI was also the principal owner and Chief
Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"),
which operated Tully's Coffee ("Tully's") stores in Washington

and California.  In 2013, AVENATTI's company, Global Baristas
LLC ("GB LLC"), acquired TC Global Inc., which previously
operated Tully's, out of bankruptcy for approximately $9.15
million.  AVENATTI's company, A&A, owned 100 percent of Doppio
Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly
owned GBUS, which handled the day-to-day business operations of
Tully's.

    8.   As set forth herein and in the affidavits that I
submitted in February 2019 (attached hereto as Exhibit 1) and
March 2019 (attached hereto as Exhibit 3) in support of prior
search warrant applications, there is probable cause to believe
that between approximately 2011 and March 2019 AVENATTI engaged
in the following criminal conduct: (a) wire fraud and money
laundering offenses relating to millions of dollars AVENATTI
embezzled from his legal clients; (b) tax offenses relating to
GBUS's payroll tax obligations and AVENATTI's efforts to
obstruct an IRS collection action; (c) tax offenses relating to
the tax obligations of EA LLP and A&A, including the payroll tax
obligations of EA LLP; (d) tax offenses relating to AVENATTI's
personal tax obligations; (e) bank fraud and aggravated identity
theft offenses relating to loans AVENATTI and his companies
obtained from The Peoples Bank in Mississippi; and
(f) bankruptcy fraud offenses relating to false statements
AVENATTI made in federal bankruptcy proceedings involving
AVENATTI and EA LLP.

    9.   First, between as early as January 2015 and continuing
through at least March 2019, AVENATTI executed a scheme to

defraud and embezzle money from clients to whom AVENATTI had
agreed to provide legal services.  AVENATTI's scheme to defraud
his victim-clients generally operated in the following manner:
(a) AVENATTI would negotiate a settlement on behalf of a victim-
client that would require the payment of funds to the victim-
client; (b) AVENATTI would cause the settlement proceeds to be
deposited in or transferred to attorney trust accounts AVENATTI
controlled; (c) AVENATTI would misrepresent, conceal, and
falsely describe to the victim-client the true terms of the
settlement and/or make false statements regarding the
disposition of the settlement proceeds; (d) AVENATTI would
embezzle and misappropriate settlement proceeds to which he was
not entitled; and (e) AVENATTI would lull the victim-client to
prevent the victim-client from discovering the embezzlement and
misappropriation by, among other things, falsely denying the
settlement proceeds had been paid, sending funds to the victim-
client under the false pretense that such funds were "advances"
on the purportedly yet-to-be received settlement proceeds, and
falsely claiming that payment of the settlement proceeds to the
victim-client had been delayed for legitimate reasons and would
occur at a later time.

     10.  Specifically, there is probable cause to believe that
AVENATTI defrauded and embezzled funds from the following
victim-clients:

a.   <u>Client 1</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented Client 1[2] in connection with a lawsuit against the County of Los Angeles and others. Between in or about January 2015 and the present, AVENATTI defrauded Client 1 out of Client 1's portion of an approximately $4,000,000 settlement payment from the County of Los Angeles.

b.   <u>Client 2</u>:  Beginning as early as in or about December 2016, AVENATTI and EA LLP represented Client 2 in connection with potential litigation against an individual with whom Client 2 had a personal relationship ("Individual 1"). Between in or about December 2016 and the present, AVENATTI defrauded Client 2 out of Client 2's portion of an approximately $2,750,000 settlement payment from Individual 1.

c.   <u>Client 3</u>:  Beginning as early as in or about July 2014, AVENATTI and EA LLP represented Client 3[3] in connection with an intellectual property dispute against a Colorado-based company ("Company 1").  Between in or about December 2017 and

---

[2]   As noted herein, on April 10, 2019, a federal grand jury returned a 36-count indictment against AVENATTI in <u>United States v. Avenatti</u>, SA CR No. 19-061-JVS (the "Indictment," Exhibit 4, attached).  The Indictment refers to the victim-clients by number (<u>e.g.</u>, "Client 1") rather than by the victim-clients' initials or other identifiers.  In the interest of protecting the client-victims' right to privacy should this affidavit later be unsealed, as well as to maintain consistency with the Indictment, the government is referring to the individuals in this affidavit in the same manner as the Indictment.  The privilege review team and other agents executing the search will be provided with the names of the relevant client-victims before conducting a search of the SUBJECT DEVICES.

[3]   In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 3 is referred to as G.B.

the present, AVENATTI defrauded Client 3 out of Client 3's portion of an approximately $1,600,000 settlement payment from Company 1.

    d.  <u>Client 4 and Client 5</u>:  Beginning as early as in or about August 2017, AVENATTI and/or EA LLP represented Client 4 and Client 5[4] in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").  (<u>See</u> Ex. 1, ¶ 50.h. n.31; Ex. 3, § VI.)  Between in or about March 2018 and the present, AVENATTI defrauded Client 4 out of $4,000,000 of Client 4's funds.

    e.  <u>Super Bowl Clients</u>:  Beginning as early as in or about 2012, AVENATTI and EA LLP represented approximately 200 individuals (the "Super Bowl Clients") in connection with litigation against the National Football League ("NFL") relating to the 2011 Super Bowl (the "Super Bowl Litigation").  The evidence IRS-CI has collected to date demonstrates that AVENATTI embezzled substantial portions of the settlement proceeds from the Super Bowl Litigation intended for clients, which AVENATTI received in or about May 2017.

    11.  <u>Second</u>, between the fourth quarter of 2015 and the third quarter of 2017, inclusive, GBUS failed to timely file employment tax returns (IRS Forms 941) and pay approximately $3,207,144 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from

---

    [4] In the affidavits I submitted in support of the February 2019 and March 2019 search warrant applications, Client 4 is referred to as M.P. and Client 5 is referred to as L.T.

GBUS employees' paychecks.  AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

12.  Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI: (a) made false statements to an IRS Revenue Officer regarding GBUS's payroll taxes and AVENATTI's involvement in GBUS's finances; (b) directed GBUS employees to deposit the cash receipts from Tully's stores into a bank account associated with a different entity AVENATTI controlled; (c) changed the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts; (d) changed the company name on various contracts with The Boeing Company; and (e) caused significant amounts of GBUS's funds, which could and should have been used to pay GBUS's payroll taxes, to be transferred to other entities AVENATTI controlled, including EA LLP and A&A.

13.  Third, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed

the IRS a total of approximately $850,438, plus interest and
penalties.  AVENATTI, however, did not pay the IRS the amounts
he owed for those tax years.[5]  AVENATTI then failed to file
personal tax returns for the 2011 through 2017 tax years.
During these tax years, AVENATTI generated substantial income
and lived lavishly, yet largely failed to pay any federal income
tax.

14.  <u>Fourth</u>, AVENATTI's other companies, EA LLP and A&A,
repeatedly failed to meet their tax obligations despite
generating substantial revenues.  Between 2015 and 2017, EA LLP
failed to file payroll tax returns and pay approximately $2.4
million in payroll taxes, including approximately $1,279,001 in
trust fund taxes that had been withheld from EA LLP employees'
paychecks.  Additionally, EA LLP did not file partnership tax
returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017
tax years.  Similarly, A&A did not file corporate tax returns
(IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or
2017 tax years.

15.  <u>Fifth</u>, between approximately January 2014 and December
2014, AVENATTI obtained three separate loans from The Peoples
Bank, a federally insured bank in Mississippi: (1) a $850,500
loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP
in March 2014; and (3) a $500,000 loan to EA LLP in December
2014.  In connection with these loans, AVENATTI provided The

---

[5] The tax due and owing to the IRS for the 2009 and 2010 tax
years was not paid until November 2015, when AVENATTI sold his
residence in Laguna Beach, California, upon which there was an
IRS tax lien.

Peoples Bank with false federal individual income tax returns
for the 2011, 2012, and 2013 tax years.  AVENATTI, however,
never filed individual income tax returns for the 2011, 2012,
and 2013 tax years, and did not make any estimated tax payments
during the 2012 and 2013 tax years, as claimed on the returns
submitted to The Peoples Bank.  In addition, in March 2014,
AVENATTI provided The Peoples Bank with a 2012 federal tax
return for EA LLP which differed materially from the federal tax
return EA LLP actually filed with the IRS in October 2014.

    16.  Sixth, in March 2017, AVENATTI, as the managing member
of EA LLP, consented to EA LLP being placed in Chapter 11
bankruptcy (the "2017 EA Bankruptcy").  Among other things, the
Chapter 11 bankruptcy guidelines and requirements: (a) required
AVENATTI to close all pre-petition bank accounts controlled by
EA LLP, immediately open debtor-in-possession ("DIP") bank
accounts, and deposit all business revenues into the DIP
operating account; and (b) required AVENATTI to file monthly
operating reports ("MOR") for EA LLP and report all of EA LLP's
financial information for the reporting period.  From
approximately March 2017 through March 2018, AVENATTI failed to
report, among other information, all revenues of EA LLP and
payments and distributions AVENATTI, as an insider, received
from EA LLP funds.  Additionally, between March 2017 and March
2018, AVENATTI defrauded the bankruptcy court, the Office of the
United States Trustee, and the creditors of EA LLP, by
concealing bank accounts controlled by EA LLP, the true revenues
generated by EA LLP, and the sources of revenue to EA LLP.

17.   On March 25, 2019, federal agents arrested AVENATTI in New York pursuant to a criminal complaint and arrest warrant issued in this district in case number 8:19-MJ-241, as well as pursuant to a separate criminal complaint and arrest warrant issued in the Southern District of New York in case number 19MAG2927.  Simultaneously with AVENATTI's arrest, IRS-CI executed search warrants issued in this district in case numbers 8:19-MJ-243, 8:19-MJ-244, and 8:19-MJ-247 at three locations associated with AVENATTI and EA LLP.  Upon AVENATTI's arrest, federal agents in New York seized several digital devices, forensic copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICES 7 through 9), and miscellaneous documents found in AVENATTI's briefcase, scanned copies of which have been provided to IRS-CI (i.e., SUBJECT DEVICE 10).[6]  There is probable cause to believe that the digital devices and miscellaneous document found on AVENATTI at the time of his arrest (i.e., SUBJECT DEVICES 7 through 10) will contain evidence of the Subject Offenses, including business records, financial documents, and emails.

18.   Following AVENATTI's arrest and the execution of the March 2019 search warrants, IRS-CI learned that in or about November 2018 AVENATTI caused computer servers belonging to EA

_____

[6] Federal agents in New York also seized a black Apple iPhone X, a silver Apple MacBook Pro, and a black and grey Apple iPad from AVENATTI upon his arrest.  Currently, the agents in New York are still attempting to gain access to the contents of these three digital devices.  If they are able to access these additional devices, we anticipate receiving forensic images of them and seeking a warrant to search the contents of these devices as well.

LLP (i.e., SUBJECT DEVICES 1 through 6) to be moved to a data
center in Orange County, California, operated by MixinIT.  On
April 3, 2019, the court-appointed receiver for EA LLP consented
to IRS-CI taking physical custody of the EA LLP servers so that
IRS-CI could create forensic images of the EA LLP servers.
There is probable cause to believe that the EA LLP servers
(i.e., SUBJECT DEVICES 1 through 6) will contain additional
evidence of the Subject Offenses, including business records,
financial documents, and emails.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   February 2019 Warrant to Search GBUS Digital Devices

19.  On February 22, 2019, in case number 8:19-MJ-103, I
submitted an affidavit in support of an application for a
warrant to search seven digital devices, which had been produced
by former GBUS employees, in the custody of IRS-CI in Laguna
Niguel, California (the "February 2019 affidavit").  The
Honorable Douglas F. McCormick, United States Magistrate Judge,
issued the warrant that same day (the "February 2019 search
warrant").  The application for a search warrant in case number
8:19-MJ-103, as well as my February 2019 affidavit in support
thereof, are attached hereto as Exhibit 1 and incorporated
herein by reference.

### B.   March 2019 Criminal Complaint

20.  On March 22, 2019, in case number 8:19-MJ-241, I
submitted an affidavit in support of a criminal complaint and
arrest warrant against AVENATTI (the "complaint affidavit").
The criminal complaint charged AVENATTI with one count of bank

fraud, in violation of 18 U.S.C. § 1344(1), relating to AVENATTI's fraudulent scheme to obtain a $500,000 loan from The Peoples Bank on or about December 12, 2014, and one count of wire fraud, in violation of 18 U.S.C. § 1343, relating to AVENATTI's fraudulent scheme to embezzle clients' funds, specifically the $1.6 million settlement on behalf of Client 3. The Honorable Douglas F. McCormick, United States Magistrate Judge, issued the arrest warrant that same day.  The criminal complaint in case number 8:19-MJ-241, as well as my complaint affidavit in support thereof, are attached hereto as Exhibit 2 and incorporated herein by reference.[7]

## C.   March 2019 Warrants to Search Locations Associated with AVENATTI and EA LLP

21.   On March 24, 2019, in case numbers 8:19-MJ-242, 8:19-MJ-243, and 8:19-MJ-244, I submitted an affidavit in support of applications for warrants to search AVENATTI's residence in Los Angeles and two other locations (the "March 2019 affidavit"). The Honorable Douglas F. McCormick, United States Magistrate Judge, issued the warrants that same day (the "March 2019 search warrant").  The March 2019 affidavit in support for the search warrants in case numbers 8:19-MJ-242,[8] 8:19-MJ-243, and 8:19-MJ-

---

[7] A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, were also incorporated by reference and attached to the criminal complaint in case number 8:19-MJ-241.  Accordingly, I have not included a duplicate copy of the February 2019 search warrant application, as part of Exhibit 2 to this affidavit.

[8] On March 25, 2019, to execute the warrant issued in case number 8:19-MJ-242, IRS-CI agents went to 10000 Santa Monica Boulevard, Unit 2205 in Los Angeles, California, the location identified as the premise to be search in case number 8:19-MJ-

244, is attached hereto as Exhibit 3 and incorporated herein by reference.[9]

22.   The items to be seized set forth in Attachment B to this search warrant application are largely identical to the items to be seized set forth in Attachments B-1 through B-3 of the March 2019 search warrants.   The items to be seized in Attachment B to this search warrant application principally differ from items to be seized set forth in Attachments B-1 through B-3 of the March 2019 warrants in that Attachment B to this search warrant application includes items pertaining to Client 1, Client 2, the private jet AVENATTI purchased using Client 2's settlement funds, the Super Bowl Clients, and a separate entity controlled by AVENATTI called "Augustus LLP." (See Attachment B ¶¶ 1.a, 1.t, 1.u, 1.v, 1.y, 1.ff.)

23.   The privilege review protocols set forth in Attachment B to this search warrant application are also largely identical to the privilege review protocols set forth in Attachments B-1 through B-3 of the March 2019 search warrants.   The principal

---

242, and learned that AVENATTI moved from Unit 2205 to Unit 2107.   As a result, IRS-CI SA Leia R. Bellis presented a new application for search warrant with an affidavit that she swore out for Unit 2107, to Judge McCormick on March 25, 2019, in case number 8:19-MJ-247.   As the facts and circumstances related to the change in apartment numbers were the only different facts presented in that affidavit and warrant, I have not attached that warrant as an exhibit.

[9] A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, and the criminal complaint, were also incorporated by reference and attached to the March 2019 search warrant applications and the affidavits attached thereto in case numbers 8:19-MJ-242, 8:19-MJ-243, and 8:19-MJ-244.   Accordingly, I have not included a duplicate copy of the February 2019 search warrant application or the criminal complaint, as part of Exhibit 3 to this affidavit.

difference is that the privilege review protocol set forth in
Attachment B to this search warrant application does not address
the search of physical locations and non-digital evidence
because the instant search warrant application only covers the
search of digital devices that are already in IRS-CI's custody.

**D.   Additional Evidence Regarding AVENATTI's Scheme to Defraud His Legal Clients**

24.   As noted above, evidence establishing probable cause
to believe AVENATTI committed all of the Subject Offenses is set
forth in my February 2019 (Ex. 1) and March 2019 affidavit
(Ex. 3).  This evidence includes evidence that AVENATTI
embezzled funds from at least two sets of his legal clients,
namely, Client 3 (Ex. 1, § IV.G; Ex. 3, § VI.C), and Clients 4
and 5 (Ex. 3, § VI.D).  In this section of the instant
affidavit, I set forth additional evidence that IRS-CI has
discovered since the execution of the March 2019 search warrants
regarding the embezzlement offenses.  This additional evidence
shows that AVENATTI embezzled from additional victim-clients
beyond those discussed in the February 2019 and March 2019
affidavits.

**1.   *Evidence Regarding AVENATTI's Embezzlement of Client 1's Settlement Funds***

25.   There is probable cause to believe that in or about
January 2015 AVENATTI embezzled Client 1's portion of a
$4,000,000 settlement payment from the County of Los Angeles.
As set forth in greater detail below, the evidence collected to
date demonstrates that AVENATTI: (a) negotiated a $4,000,000
settlement with the County of Los Angeles on behalf of Client 1;

(b) made false representations to Client 1 regarding the terms
of the settlement agreement; (c) embezzled Client 1's portion of
the $4,000,000 settlement payment; (d) provided Client 1 with
periodic payments of $1,000 to $1,900, which AVENATTI falsely
described as "advances" on the yet-to-be-received $4,000,000
settlement payment, in order to lull Client 1 and prevent Client
1 from discovering that AVENATTI embezzled Client 1's portion of
the $4,000,000 settlement payment.

> a.   The $4,000,000 Settlement Agreement with the
>      County of Los Angeles

26.  Based on my review of publicly available court
documents and records obtained from Hurrell Cantrall LLP, which
represented the County of Los Angeles in litigation involving
Client 1, I have learned the following:

a.   In or about October 2012, EA LLP and AVENATTI
filed a lawsuit against the County of Los Angeles and others on
behalf of Client 1 (the "L.A. County Lawsuit").

b.   In or about June 2013, the L.A. County Lawsuit
was removed to the United States District Court for the Central
District of California.

c.   The L.A. County Lawsuit alleged that the County
of Los Angeles violated Client 1's constitutional rights,
causing Client 1 to suffer severe emotional distress and severe
physical injuries, including paraplegia.

d.   On or about November 7, 2014, the parties
appeared in federal court for a status conference in connection

17

with the L.A. County Lawsuit.  During the status conference,
AVENATTI stated the following:

> Your Honor, for the last week or two, we've been in
> active settlement discussions involving a retired
> judge, Louis Meisinger. The good news is is [sic] that
> the parties have reached a tentative settlement
> relating to all material terms with the exception of
> one material term, which is providing some angst and
> for which Mr. Hurrell and I decided yesterday that
> perhaps the Court, based on Your Honor's experience,
> could assist us with resolving.
>
> And that one material term is mainly when the settlement
> dollars are to be paid to [Client 1], who, as the Court
> knows, is a paraplegic and is in need of the funds.

AVENATTI further stated:  "[Client 1] would like the moneys paid
within 60 days, namely today or Monday so that he can utilize
the money for his living expenses and other needs."

    e.   On or about December 11, 2014, the parties filed
a status report regarding the settlement of the L.A. County
Lawsuit, which settlement required approval from the Los Angeles
County Board of Supervisors.  In the status report, the parties
stated they expected the settlement to be approved by the Board
of Supervisors and funded by March 6, 2015.

    f.   On or about January 6, 2015, AVENATTI sent an
email to counsel for the County of Los Angeles regarding the
settlement agreement.  AVENATTI stated:  "Can you please provide
an update on the schedule?  We are trying to get [Client 1]
taken care of."

    g.   On or about January 13, 2015, the Board of
Supervisors approved the settlement agreement for the L.A.
County Lawsuit.

h.   On or about January 21, 2015, AVENATTI emailed counsel for the County of Los Angeles the signature page for the settlement agreement with the County of Los Angeles.

i.   On or about January 22, 2015, counsel for the County of Los Angeles sent AVENATTI via email and U.S. mail the fully executed settlement agreement.  The settlement agreement stated:

> In exchange for a complete resolution of the [L.A. County] Lawsuit, Defendants, by and through the County of Los Angeles, shall pay to Plaintiff **Four Million Dollas ($4,000,000)** (the "Settlement Funds"), subject to approval by the Los Angeles County Board of Supervisors.  The parties acknowledge that the Court in this matter has issued an order outlining a time table to present this settlement for approval by the Los Angeles County Board of Supervisors, and thereafter issuance of a settlement draft.  It is understood by the parties that if the time table is not complied with, this settlement agreement may be revoked by either party.
>
> The Parties expressly agree that the Lawsuit shall not be dismissed until five (5) business days following receipt by Eagan Avenatti of the Settlement Funds as provided above.

(Emphasis in original.)  The executed settlement agreement was signed by a representative for the County of Los Angeles, counsel for the County of Los Angeles, and AVENATTI, and purportedly signed by Client 1.[10]  The settlement agreement did not contain any confidentiality provisions.  Additionally, the settlement agreement was not dependent on the creation of any sort of trust for Client 1.

---

[10]   When IRS-CI interviewed Client 1, he indicated that the signature on the settlement agreement looked funny to him, but that it could possibly have been his signature.

j.   On or about January 22, 2015, AVENATTI sent an email to counsel for the County of Los Angeles instructing the County to make the check for the settlement payable to "Eagan Avenatti, LLP Client Trust Account."

k.   On or about January 29, 2015, the Count of Los Angeles sent to AVENATTI and EA LLP via messenger: (1) a letter enclosing the "settlement check" of $4,000,000; (2) check number TS 0021400949, dated January 26, 2015, to "Eagan Avenatti, LLP Attorney Client Trust Account" in the amount of $4,000,000; and (3) a stipulation to dismiss the L.A. County Lawsuit and corresponding proposed order.

l.   On or about February 10, 2015, the parties filed a stipulation to dismiss the L.A. County Lawsuit with prejudice. The order dismissing the L.A. County Lawsuit was entered later that same date.

b.   Bank Account Records Relating to the $4,000,000 Settlement and Client 1

27.   Based on my review of bank records, I have learned the following regarding the disposition of the $4,000,000 settlement payment from the County of Los Angeles:

a.   On or about January 29, 2015, the $4,000,000 settlement check (check number TS 0021400949) from the County of Los Angeles to EA LLP's attorney client trust account was deposited into EA LLP's California Bank & Trust ("CB&T") attorney trust account ending in 8541 ("EA Trust Account 8541"). Prior to the $4,000,000 deposit, EA Trust Account 8541 had an account balance of $0.00.

b.    Between on or about January 30, 2015, and on or about March 30, 2015, a total of approximately $3,125,898 was transferred from EA Trust Account 8541 to a EA LLP's CB&T operating account ending in 2851 ("EA Account 2851").

c.    Between on or about January 30, 2015, and on or about March 30, 2015, approximately $1,721,000, the vast majority of which derived from the $4,000,000 settlement payment, was transferred from EA Account 2851 to A&A's CB&T account ending in 0661 ("A&A Account 0661").[11]  Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes.[12]  For example, during this time period, AVENATTI made the following payments from A&A Account 0661 for his personal purposes:

i.    Between on or about January 30, 2015, and on or about February 27, 2015, A&A paid approximately $505,000 to GBUS.

ii.    Between on or about January 30, 2015, and on or about March 27, 2015, A&A paid a total of approximately

---

[11]    Prior to the transfer of approximately $3,125,898 from EA Trust Account 8541 to EA Account 2851, EA Account 2851 had an account balance of approximately $25,318.  Between January 30, 2015, and March 30, 2015, approximately $84,161 was transferred to EA Account 2851 from other sources, and approximately $50,000 that had originally been transferred from EA Account 2851 to A&A Account 0661 was transferred back to EA Account 2851.

[12]    Prior to the transfer of approximately $450,000 from EA Account 2851 to A&A Account 0661 on or about January 30, 2015, A&A Account had an account balance of approximately $17,491. Between January 30, 2015, and March 30, 2015, the only deposits into A&A Account 0661 came from EA Account 2851.

$315,000 to GB Autosport LLC, which managed AVENATTI's car racing team.

   iii. Between on or about February 20, 2015, and on or about March 30, 2015, A&A paid approximately $220,000 to AVENATTI's personal Bank of America account.

   iv.  Between on or about January 30, 2015, and on or about February 6, 2015, A&A paid a total of approximately $200,000 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.[13]

   v.   Between on or about February 3, 2015, and on or about March 18, 2015, A&A paid a total of approximately $82,236 to Porsche, including an approximately $79,800 payment on March 18, 2015.

   vi.  Between on or about January 30, 2015, and on or about March 9, 2015, A&A paid a total of approximately $36,500 to AVENATTI's ex-wife, C.C.

   vii. On or about February 3, 2015, A&A paid approximately $80,372 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[14]

---

[13] During a Judgment Debtor examination on March 15, 2019, AVENATTI testified under oath and admitted that the payments from the A&A Account 0661 to Gallo Builders were personal expenses of AVENATTI at his personal residence and not business expenses of A&A.

[14]  Bank records reflect that on or about January 29, 2015, a prior payment to Chase Home Finance of approximately $80,372 was returned to A&A Account 0661 due to insufficient funds in A&A Account 0661.

d.   By no later than July 6, 2015, the entire
$4,000,000 settlement payment from the County of Los Angeles for
Client 1 had been drained from EA Trust Account 8541.[15]

e.   IRS-CI has yet to identify any direct payments
from EA Trust Account 8541 to Client 1 of money that was
traceable to the $4,000,000 settlement payment EA LLP received
from the County of Los Angeles to hold in trust on Client 1's
behalf.

28.   Rather than transfer Client 1's portion of the
$4,000,000 settlement to Client 1, AVENATTI made relatively-
small periodic payments to Client 1, which AVENATTI described as
advances on the purportedly yet-to-be-received settlement
payment.  (See infra ¶ 30.i.)  Specifically, based on IRS-CI's
review of records for bank accounts AVENATTI controlled, I
understand that between in or about July 2015 and in or about
December 2018, AVENATTI caused EA LLP or A&A to make at least 69
payments, each ranging from approximately $1,000 to $1,900 and
totaling approximately $122,200, to Client 1.  The $122,200
total, however, does not currently include any purported
"advance" payments AVENATTI made to Client 1 between December
2018 and March 2019, as IRS-CI is still in the process of
analyzing bank records for that time period.

29.   AVENATTI also appears to have paid for Client 1's rent
at various assisted living facilities.  Specifically, based on

_____

[15] On March 31, 2015, approximately $3,034,514 was deposited
into EA Trust Account 8541 from another source.  This
intervening deposit makes it more difficult for IRS-CI to trace
the disposition of the remaining portions of the $4,000,000
settlement payment.

IRS-CI's review of bank records, I understand that between in or about February 2015 and in or about December 2018, AVENATTI caused a total of at least approximately $72,000 to be paid from bank accounts AVENATTI controlled to assisted living facilities where Client 1 resided.[16] This total, however, does not currently include any rent payments AVENATTI made on Client 1's behalf between December 2018 and March 2019, as IRS-CI is still in the process of analyzing bank records for that time period.

c.   Information Client 1 Provided to IRS-CI

30.   On or about March 31, 2019, IRS-CI SA Gerry Carmona and IRS-CI SA James Kim participated in an interview of Client 1.  Client 1 was accompanied by his personal attorney.  Based on my review of a memorandum summarizing the interview with Client 1 and discussions with SA Carmona and SA Kim, I understand that Client 1 provided, in substance and in part, the following information:

a.   EA LLP and AVENATTI represented Client 1 in connection with a lawsuit against the County of Los Angeles. Client 1's parents and sister helped Client 1 select EA LLP and AVENATTI to represent Client 1.

b.   Client 1 did not recall signing an engagement letter or contract with AVENATTI or EA LLP, but assumed a contract was signed.

---

[16]   I understand that EA LLP also paid for Client 1's rent at assisted living and/or rehabilitation facilities prior to the execution of the settlement agreement with the County of Los Angeles in January 2015. Although additional financial analysis is necessary, IRS-CI currently believes that the total amount EA LLP paid prior to the execution of the January 2015 settlement agreement was between approximately $350,000 and $400,000.

c.   Client 1 reviewed the signature page of the
January 21, 2015, settlement agreement with the County of Los
Angeles.  Client 1 thought his signature looked "funny" to him,
but said that he may have signed the document.  Client 1 said
that he was never presented with the full settlement agreement
and never saw the $4,000,000 settlement amount.

d.   AVENATTI told Client 1 that a settlement had been
reached with the County of Los Angeles.  AVENATTI may have told
Client 1 the amount Client 1 would receive after fees and
expenses, but Client 1 did not recall ever being told the
settlement was for $4,000,000.

e.   AVENATTI told Client 1 that under the terms of
the settlement agreement, he would receive approximately $46,000
per quarter for 10 years.  AVENATTI told Client 1 that the
County of Los Angeles does not pay settlements in a lump-sum and
would only pay the settlement in quarterly payments over a
certain period of time.  AVENATTI also told Client 1 that the
settlement proceeds could not be paid until the County of Los
Angeles approved a Special Needs Trust[17] for Client 1.

f.   Prior to the interview with IRS-CI, Client 1 had
never seen the $4,000,000 settlement payment from the County of
Los Angeles.  AVENATTI never told Client 1 that EA LLP had
received a $4,000,000 settlement payment from the County of Los
Angeles in January 2015.

_____

[17] A "Special Needs Trust" is a specialized trust that
allows for a person living with disabilities to maintain his or
her eligibility for public assistance benefits.  (See infra
¶ 32.)

g.    Client 1 never authorized AVENATTI to use any of the settlement funds intended for Client 1 for AVENATTI's personal or business purposes.  AVENATTI never told Client 1 that Client 1's portion of the settlement funds would be used for AVENATTI's own personal or business purposes.

h.    Had Client 1 known that EA LLP received the $4,000,000 settlement payment, Client 1 would have wanted a lump-sum payment and would have put the money into a Special Needs Trust.  Client 1 had been advised by various people to create a Special Needs Trust so he would not lose his Supplemental Security Income ("SSI") or Medi-Cal benefits. AVENATTI told Client 1 that AVENATTI would create a Special Needs Trust for Client 1 and that he had created Special Needs Trusts for other clients in the past.

i.    Client 1 was shown a spreadsheet detailing approximately 69 payments, each ranging from $1,000 to $1,9000, to Client 1 from EA LLP or A&A between July 2015 and December 2018.  During this time period, Client 1 was told that the settlement had not been finalized, but that AVENATTI would "advance" Client 1 money against the settlement amount.  Client 1 said that he last received a payment from AVENATTI on or about March 18, 2019, while Client 1 was visiting family.

j.    Client 1 also said that AVENATTI paid Client 1's rent at various assisted living facilities.  Client 1 said that recently Client 1's rent had not been paid for a period of approximately six months, resulting in late fees.

k.   In approximately 2017, Client 1 told AVENATTI he wanted to buy a house.  AVENATTI told Client 1 buying a house would be a good investment and agreed to help Client 1. AVENATTI found a real estate broker ("Broker 1") to represent Client 1.  AVENATTI, however, wanted Client 1 to deal with AVENATTI instead of dealing with Broker 1 directly.

l.   Client 1 eventually went into escrow on a property in the Canoga Park area.  While in escrow, AVENATTI told Client 1 that there was a problem and the County of Los Angeles still needed to approve Client 1's Special Needs Trust. AVENATTI told Client 1 he had a meeting with the County of Los Angeles to resolve the issue, but the story from AVENATTI went on and on and the house eventually fell out of escrow.

m.   Client 1 is no longer receiving SSI benefits. Client 1 said that, sometime in the three months prior to the interview with IRS-CI, Client 1 received a letter from SSI indicating that Client 1's SSI benefits would be stopped.[18] AVENATTI told Client 1 that this was a mistake and that AVENATTI would take care of it.

n.   In or about February or March 2019 (approximately one month before the interview with IRS-CI), AVENATTI told Client 1 that the County of Los Angeles was still not making the settlement payments because the Special Needs Trust still had not been approved.

---

[18]   Client 1's counsel subsequently provided IRS-CI with the documents Client 1 received from the Social Security Administration ("SSA").  (See infra ¶ 31.e.i.)

o.   On Friday, March 22, 2019, AVENATTI called Client 1 and told Client 1 that AVENATTI was in Client 1's neighborhood and wanted to stop by Client 1's residence. AVENATTI told Client 1 that the Special Needs Trust had been approved and asked Client 1 what kind of payment plan Client 1 wanted.

p.   The next day, Saturday, March 23, 2019, AVENATTI returned to Client 1's residence with a document for Client 1 to sign.  AVENATTI told Client 1 that the Special Needs Trust was done and that once Client 1 signed the document he would start receiving the settlement payments.  Client 1 did not read the document.  Rather, AVENATTI pointed out the highlights of the document to Client 1 and then had Client 1 sign the document. AVENATTI had the document open to the specific page for Client 1 to sign.  AVENATTI did not have Client 1 date the document and Client 1 did not recall there being a line for the date on the signature page.  Client 1 did not receive a copy of the document from AVENATTI.  AVENATTI instead told Client 1 that J.R., AVENATTI's office manager, would send Client 1 a copy of the document at a later time.  AVENATTI also told Client 1 not to discuss the matter with anyone or Client 1 would lose the money.

q.   During the March 23, 2019, meeting there was also discussions regarding Client 1's portion of the settlement. Based on these discussions, Client 1 understood that he was to receive approximately $1.9 million.  AVENATTI told Client 1 that AVENATTI's share had already been deducted or factored into the $1.9 million settlement amount.

r.    On Sunday, March 24, 2019, AVENATTI returned to Client 1's residence again.  During this meeting, AVENATTI wanted Client 1 to initial the document that Client 1 had signed on March 23, 2019.  AVENATTI told Client 1 that J.R. would be mad at AVENATTI if AVENATTI did not get Client 1's initials on the document.

s.    Client 1 also recalled signing a second document during the meetings on March 23 and March 24, 2019, which document stated that AVENATTI had done a diligent job representing Client 1.  AVENATTI told Client 1 that AVENATTI wanted to put the document on AVENATTI's website to show what a great job AVENATTI had done on Client 1's case.[19]  Client 1 also recalled AVENATTI asking Client 1 about Client 1's medication.

t.    Client 1 trusted AVENATTI with everything. AVENATTI was involved in any big decisions involving Client 1.

u.    Client 1 was asked whether any of Client 1's mental health issues affected his memory.  Client 1 said that his mental health issues have no impact on his memory, he has never had memory issues, and he does not take any medication for memory issues.

v.    SA Carmona and SA Kim both indicated that Client 1 appeared to be in full possession of his faculties throughout the interview and that Client 1 appeared to them to be intelligent and articulate.

---

[19]  On April 11, 2019, shortly after the Indictment was publicly disclosed, AVENATTI posted what appeared to be a copy of this document on Twitter.com in support of his claim that he is innocent of the charges.  I understand that AVENATTI has since deleted this message from his Twitter account.

31.  Client 1 allowed IRS-CI to take photographs of text messages between Client 1 and AVENATTI and/or J.R., which were dated between April 2017 and March 2019.  Client 1 also provided a copy of a text message with a family friend, B.P.  Client 1's text messages, including the following, appear to be consistent with Client 1's statements to IRS-CI regarding the purported "advance" payments Client 1 received from AVENATTI and Client  1's attempt to purchase a house in 2017:

a.   Between in or about May 2017 and in or about June 2017, Client 1 sent AVENATTI and J.R. multiple text messages regarding Client 1's attempted purchase of a house.  For example, on or about May 24, 2017, Client 1 sent AVENATTI a text message asking if there was "[a]ny word from the seller on our latest offer?"  AVENATTI responded the next day and provided Client 1 with the details of the seller's counter offer and AVENATTI's planned response.

b.   On or about August 14, 2017, Client 1 sent a text message to B.P. stating: "House didn't close move is off for tomorrow."  The next day, on or about August 15, 2017, B.P. asked Client 1: "Any problem with close other than a delay?"  Client 1 responded:  "Waiting for the county to approve the special needs trust."

c.   Between 2017 and March 2019, Client 1 sent AVENATTI and/or J.R. numerous text messages asking AVENATTI and/or J.R. to deposit funds into Client 1's bank account.  Client 1 often had to make repeated requests for funds before AVENATTI or J.R. made a deposit into Client 1's bank account.

For example, on or about October 6, 2018, Client 1 sent AVENATTI

two text messages stating:

> Just FYI I asked for a deposit last Friday to take
> place this past thurs. two days ago.  That is a weeks
> notice.  [J.R.] didn't do it till yesterday so the
> deposit is not available.  I now have no money over
> the weekend.  I literally have no money for food.
> This is really hard on me Michael, I don't know what
> to do.
>
> And it's a holiday weekend so the funds are not
> available at the earliest till Tuesday.  That is if I
> can convince them to take off the hold.

      d.    Between September 2017 and March 2019, Client 1

sent a number of text messages to AVENATTI and/or J.R. in which

Client 1 indicated that his rent at his assisted living facility

was late and requested that AVENATTI and/or J.R. send payment to

his landlord.  For example, on or about February 15, 2019,

Client 1 sent AVENATTI and J.R. a text message stating that

Client 1's landlord "just gave me a notice saying I have three

days to pay the rent or else I have to move out."

      e.    Between in or about October 2018 and in or about

March 2019, Client 1 sent multiple text messages to AVENATTI

and/or J.R. regarding Client 1's SSI benefits, including the

following:

      i.    On or about November 10, 2018, Client 1

appears to have sent J.R. photographs of a letter Client 1

received from SSA regarding Client 1's SSI benefits.[20]  Client 1

---

[20]  Although the photographs associated with this text
message were no longer available on Client 1's phone when
Client 1 met with IRS-CI, based on the date of the letter from
SSA, the date of the text message to J.R., and Client 1's
subsequent text messages to AVENATTI and/or J.R. regarding the
SSA issue, I believe that photographs of the SSA letter were
likely attached to this particular text message.

subsequently provided, through his counsel, a copy of this letter to IRS-CI.  The letter from SSA stated that SSA needed additional information in order to further evaluate Client 1's eligibility for SSI benefits, including information regarding: (1) Client 1's rental agreement; (2) the "settlement award letter" from the County of Los Angeles; (3) disbursements from the settlement since October 2016; (4) verification that the "trust has or has not been established"; and (5) a letter from Client 1's attorney about "monthly loan amounts" since October 2016.

ii.  On or about November 26, 2018, Client 1 sent a text message to AVENATTI stating:  "I sent that letter [from] SSI that is requesting docs from you to [J.R.] a week and a half ago.  I included a doc you don't have which u will need to send along with the rest, my rental agreement with [Client 1's landlord].  I think it needs to be sent this week."  AVENATTI responded that same day, "We will handle."

iii. On or about January 21, 2019, Client 1 sent a text message to AVENATTI and J.R. stating:  "I received a letter from SSI on Saturday.  They have stopped my SSI as of February because they did not receive the requested documents. I will text the letter to [J.R.] as soon as I get up in my chair."  AVENATTI responded that same day:  "This is in error. We will fix it forthwith.  Don't worry."

f.  On or about March 22, 2019, at approximately 7:00 p.m., after meeting with AVENATTI, Client 1 sent AVENATTI a text

message telling him that he would be available to meet with
AVENATTI again from 1:00 p.m. to 5:30 p.m. on March 23, 2019.

        d.   Information Regarding the Purported Special Needs
           Trust for Client 1

    32.  As noted above, between in or about January 2015 and
in or about March 2019, AVENATTI falsely represented to Client 1
that the County of Los Angeles could not make the settlement
payment until a Special Needs Trust for Client 1 had been
approved.  (See supra ¶¶ 30.e., 30.n.)  Based on my review of
publicly available information and discussions with a
representative from the California Department of Health Care
Services ("CA DHCS"), I have learned the following regarding
Special Needs Trusts:

        a.   A Special Needs Trust is a specialized trust that
allows for a person living with disabilities to maintain his or
her eligibility for public assistance benefits despite having
assets that would make the person ineligible for those benefits.

        b.   According to CA DHCS's website, there are two
different types of Special Needs Trusts: (1) a first party
Special Needs Trust; and (2) a third party Special Needs Trust.
First party Special Needs Trusts are "funded with assets that
belong to the trust beneficiary or to which the beneficiary was
legally entitled (e.g., assets from an award or settlement,
etc.).  Third party Special Needs Trusts are funded with "assets
belonging to a person other than the trust beneficiary, and to
which the beneficiary never had possession or legal interest."

It appears that any Special Needs Trust for Client 1 would have needed to be a first party Special Needs Trust.

c.   First party Special Needs Trusts typically require notice and payback to the State of California upon the death of a beneficiary or earlier termination of the trust. Based on my discussions with a CA DHCS representative, I understand that such notice would typically need to be provided to CA DHCS and to Medi-Cal through the Los Angeles County Department of Public Social Services ("LA DPSS").

33.  IRS-CI's investigation to date has not discovered any evidence suggesting that AVENATTI made a legitimate effort to establish a Special Needs Trust for Client 1, let alone that AVENATTI submitted to the County of Los Angeles for approval a Special Needs Trust for Client 1.

a.   First, on or about April 5, 2019, after a thorough search of Cal DHCS's records, CA DHCS's Special Needs Trust Unit advised IRS-CI that it does not possess any documents or records relating to an actual or proposed Special Needs Trust for Client 1.

b.   Second, on or about April 9, 2019, after searching LA DPSS's case records from June 2015 to the present, LA DPSS advised IRS-CI that it was unable to locate any Special Needs Trust records relating to Client 1.  LA DPSS also conducted a search for conservatorship/authorized representative documents and found no such records for Client 1.

e.   Information Regarding Client 1's SSI Benefits

34.   As noted above, AVENATTI told Client 1 that AVENATTI would respond on Client 1's behalf to a request that Client 1 provide SSA information that SSA requested to evaluate Client 1's continued eligibility for SSI benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from AVENATTI.  (See supra ¶ 31.e.)  Based on discussions with Special Agents with SSA's Office of Inspector General, I have learned the following:

a.   On or about April 13, 2016, AVENATTI and EA LLP submitted a letter to SSA on behalf of Client 1.  In this letter, AVENATTI stated:

> From February 2014 to the present, this law firm has been advancing [Client 1] approximately $1,250 a month.  As of this time, the court has not entered an "award letter" to Client 1.

AVENATTI's statements to SSA appear to be consistent with the false statements that AVENATTI made to Client 1.

b.   On or about April 8, 2019, SSA advised IRS-CI that it had searched its files and was unable to locate any other letters from AVENATTI relating to Client 1.  SSA was also unable to locate any records of calls to SSA from AVENATTI or EA LLP.

f.   Information Regarding AVENATTI's Meetings with Client 1 on March 22, 23, and 24, 2019

35.   The evidence IRS-CI has collected to date demonstrates that, after AVENATTI was accused of stealing Client 1's money during a public judgment debtor examination on March 22, 2019,

AVENATTI met with Client 1 in an attempt to lull Client 1 and prevent Client 1 from discovering that AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment.

a.   First, on or about March 22, 2019, AVENATTI testified under oath during a judgment debtor examination in In re: Eagan Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.), in Courtroom 8A of the United States Courthouse in Los Angeles. Based on my review of a transcript of those proceedings, I learned that AVENATTI was questioned regarding Client 1.  For example, AVENATTI was directly asked whether he stole Client 1's money and responded, "Absolutely not."

b.   Second, as noted above, Client 1 told IRS-CI that AVENATTI met with Client 1 at Client 1's residence on March 22, 2019, and that AVENATTI then returned to Client's residence on March 23 and March 24, 2019, to have Client 1 sign two documents.

c.   Third, cell-site and GPS information[21] for AVENATTI's cellular telephone confirmed that AVENATTI visited Client 1's residence on March 22, March 23, and March 24, 2019. Specifically, based on IRS-CI's review of the cell-site and GPS information, I have learned the following:

i.   On March 22, 2019, at approximately 6:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

---

[21]  On March 7, 2019, in case number 8:19-MJ-151, the Honorable Douglas F. McCormick issued a warrant for historical cell-site and prospective cell-site and GPS information relating to the cellular telephone used by AVENATTI.

ii.  On March 23, 2019, at approximately 1:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

iii. On March 24, 2019, at approximately 2:30 p.m., AVENATTI's cellular telephone was in the vicinity of Client 1's residence.

### 2. *Evidence Regarding AVENATTI's Embezzlement of Client 2's Settlement Funds*

36.  There is probable cause to believe that in or about January 2017, AVENATTI embezzled Client 2's portion of a $2,750,000 settlement payment from Individual 1.  As set forth in greater detail below, the evidence collected to date demonstrates that AVENATTI: (a) negotiated a $3,000,000 settlement with Individual 1 on behalf of Client 2; (b) made numerous false representations to Client 2 regarding the terms of the settlement agreement; (c) embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1 and used the funds to purchase a private jet; (d) provided Client 2 with monthly payments of approximately $16,000, which AVENATTI falsely described as monthly settlement payments from Individual 1, in order to lull Client 2 and prevent Client 2 from discovering that AVENATTI embezzled Client 2's portion of the initial $2,750,000 settlement payment.

a.  Client 2's $3,000,000 Settlement Agreement with Individual 1

37.  Based on my review of documents IRS-CI obtained through the investigation, I have learned the following:

a.   Between in or about December 2016 and in or about January 2017, EA LLP and AVENATTI represented Client 2 in connection with potential legal claims against Individual 1.

b.   On or about January 7, 2017, during a confidential mediation proceeding in Los Angeles, California, AVENATTI negotiated a settlement agreement between Client 2 and Individual 1.  Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.

c.   Between on or about January 16, 2017, and on or about January 25, 2017, AVENATTI sent Individual 1's lawyer multiple emails regarding the status of the initial $2,750,000 settlement payment.  AVENATTI also left Individual 1's lawyers a number of voicemails regarding the status of the settlement payment and expressing concern that the initial $2,750,000 settlement payment had yet to be received.

d.   On or about January 25, 2017, Individual 1 wired approximately $2,750,000 to EA LLP's CB&T attorney trust account ending in 8671 ("EA Trust Account 8671").

b.   <u>Bank Account Records Relating to the $2,750,000 Settlement Payment and Client 2</u>

38.  Based on IRS-CI's review of bank account records, I have learned the following information regarding the disposition of the initial $2,750,000 settlement payment from Individual 1:

a.   As of on or about January 1, 2017, the account balance in EA Trust Account 8671 was approximately $0.23.

b.   On or about January 25, 2017, EA Trust Account 8671 received an approximately $2,750,000 wire transfer from Individual 1.

c.   On or about January 26, 2017, AVENATTI caused approximately $2,500,000 to be transferred from EA Trust Account 8671 to a Chase Bank attorney trust account for The X-Law Group ending in 7608 ("X-Law Account 7608").  That same day, at the direction of AVENATTI, The X-Law Group wired approximately $2,500,000 from X-Law Account 7608 to Honda Aircraft Company LLC.  I understand that these funds were applied to the purchase of a private Honda jet.

d.   On or about January 26, 2017, AVENATTI also caused the remaining $250,000 of the $2,750,000 settlement payment to be transferred from EA Trust Account 8671 to EA Account 2851 and then from EA Account 2851 to A&A Account 0661.

e.   Between on or about March 15, 2017, and on or about June 18, 2018, defendant AVENATTI caused approximately 11 payments totaling approximately $194,000 to be deposited into Client 2's bank account.  These payments were made from a variety of bank accounts controlled by AVENATTI, including A&A Account 0661, EA LLP's CB&T attorney trust account ending in 4613 ("EA Trust Account 4613"), EA LLP's CB&T attorney trust account ending in 3714 ("EA Trust Account 3714"), and a City National Bank account in the name of "Michal Avenatti Esq." ending in 3504 ("Avenatti Account 3504").  As noted below,

AVENATTI falsely represented to Client 2 that these 11 payments constituted monthly settlement payments from Individual 1.  (See infra ¶ 39.f.)

   c. <u>Information Provided by Client 2</u>

 39. On or about April 2, 2019, I participated in an interview with Client 2.  I also participated in a follow-up interview with Client 2 on or about April 8, 2019.  During these interviews, Client 2 provided, in substance and in part, the following information:

   a. In or about December 2016, Client 2 retained EA LLP and AVENATTI to represent her in connection with potential claims against Individual 1.  Under the terms of the attorney-client fee contract Client 2 signed, a copy of which was provided to IRS-CI, EA LLP was entitled to 33 percent of any recovery obtained prior to the filing of a lawsuit or arbitration claim, and 40 percent of any recovery obtained after the filing of a lawsuit or arbitration proceeding.

   b. In or about January 2017, Client 2 and AVENATTI attended a mediation with Individual 1 in Los Angeles, California.  At the conclusion of the mediation, AVENATTI told Client 2 that they had reached a settlement with Individual 1.

   c. Client 2 told IRS-CI she believed that the total settlement amount was $3,600,000.  AVENATTI did not provide Client 2 with an opportunity to read the settlement agreement before Client 2 signed the agreement.  AVENATTI also did not give Client 2 a copy of the settlement agreement.

d.    AVENATTI falsely represented to Client 2 that, under the terms of the settlement agreement, Individual 1 would make an initial lump-sum payment, the entirety of which would be used to pay EA LLP's attorney fees (i.e., 33 percent of the total settlement amount) and costs, and then make approximately 96 monthly payments of approximately $20,000 over the course of the next eight years by which the remaining settlement funds would be paid to Client 2.  Client 2, however, understood that the first 12 monthly payments from Individual 1 would be approximately $16,000 per month because approximately $4,000 per month would be deducted to pay for Client 2's rent.[22]

e.    AVENATTI never disclosed to Client 2 that in January 2015 Individual 1 had wired an initial payment of $2,750,000 to EA Trust Account 8671.  AVENATTI never disclosed to Client 2 that AVENATTI used Client 2's portion of the $2,750,000 settlement payment for his own purposes, including to purchase a private jet.

f.    Client 2 confirmed that between March 2017 and June 2018 she received approximately 11 monthly payments totaling approximately $194,000.  AVENATTI falsely represented to Client 2 that these monthly payments were coming from Individual 1 in accordance with the terms of the settlement agreement.

g.    After Client 2 stopped receiving the purported monthly settlement payments in or about July 2018, AVENATTI

---

[22] On or about January 24, 2017, AVENATTI also caused a cashier's check to be purchased from EA Account 2851 for $51,935, which represented one year's rent for Client 2.

represented to Client 2 that Individual 1 was not complying with
the settlement agreement.  Between July 2018 and March 2019,
AVENATTI repeatedly told Client 2 that AVENATTI would work on
obtaining the missing monthly settlement payments from
Individual 1.  Among other things, AVENATTI and Client 2
discussed the possibility of publicly attempting to garnish
Individual 1's wages if Individual 1 did not make the monthly
payments.

      h.  On or about March 24, 2019, AVENATTI met with
Client 2 in Los Angeles, California.  During this meeting,
AVENATTI told Client 2 that Client 2 would soon be receiving a
payment from Individual 1 to make up for the purportedly missing
monthly settlement payments from Individual 1 for July 2018
through March 2019.

    40.  Client 2 also produced documents to IRS-CI, including
text message and email communications between Client 2 and
AVENATTI.  The documents Client 2 produced to IRS-CI appear to
be consistent with Client 2's statements to IRS-CI.  For
example:

      a.  On or about July 31, 2018, Client 2 sent AVENATTI
a text message stating:  "[S]orry to catch up so late but I have
not received my deposit.  Is there anything we can do about the
time, it's become a pattern of them not sending it unless you
reach out."  AVENATTI responded:  "Still?  Let me see as this is
not right.  I'm on it."

      b.  On or about September 25, 2018, Client 2 sent
AVENATTI a text message stating:  "I wanted to follow up on the

deposits and let you know I haven't received anything from them." AVENATTI responded: "???? I will find out what the hell is going on."

        c.   On or about February 24, 2019, Client 2 sent AVENATTI an email regarding a number of topics, including the settlement with Individual 1.  The email stated, in part:

> Maybe we can settle the agreement for a lump sum rather than the monthly. From my understanding the original lump sum from the agreement was 33% which covered legal fees the additional to be paid to me stretched over 8 years (2 of which have passed).  They are currently 8 months behind on payments totaling $160,000 with the rest of this year and the additional 5 years we are looking at 1.4 Million for a total $1,560,000. Maybe we can find a median to settle for a lump sum payout.

The email also referenced "filing publicly" against Individual 1.

      **3.**   ***Evidence Regarding AVENATTI's Embezzlement of Settlement Funds from the Super Bowl Litigation and Concealment of the Receipt of Funds from the Super Bowl Litigation During the 2017 EA Bankruptcy***

    41.   There is probable cause to believe that in or about May 2018 AVENATTI embezzled a portion of a $1.55 million settlement received on behalf of the Super Bowl Clients, who were represented by EA LLP in the Super Bowl Litigation.  As set forth in greater detail below, the evidence collected to date demonstrates that: (a) on or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs), the litigation that resulted in this settlement was initiated in the Northern District of Texas on or about March 7, 2013; (b) on or about May

15, 2017, AVENATTI requested that approximately $408,724 of the settlement proceeds be transferred to EA Account 2851 and approximately $952,995 be transferred to an attorney client trust account at City National Bank ("CNB"); (c) between July 2017 and October 2018, AVENATTI caused payments totaling approximately $145,222 to be made to approximately 31 of the Super Bowl Clients; (d) AVENATTI used the remainder of the approximately $1.31 million dollars AVENATTI and his law firm received from the settlement of the Super Bowl Litigation for AVENATTI's own personal and business purposes.  There is also probable cause to believe that AVENATTI concealed the receipt of settlement proceeds and attorneys' fees from the Super Bowl Litigation during the 2017 EA Bankruptcy.

42.  On March 25, 2019, I participated in an interview with J.R., EA LLP's office manager.  In response to a question as to whether she was aware of AVENATTI taking money from client funds, J.R. said that the plaintiffs in the Super Bowl Litigation had not all been paid out.  When asked how she knew, J.R. stated because some of the Super Bowl Clients called her asking for their portion of the settlement money.  When the Super Bowl Clients called, J.R. referred them to AVENATTI.  J.R. stated that she knew the settlement funds had come into the firm approximately two years earlier, however, AVENATTI did not authorize her to pay the Super Bowl Clients, even though there had been money available to pay them.

43.   Based on my review of records obtained from EA LLP's co-counsel in the Super Bowl Litigation, C.A., I have learned the following:

a.   On or about May 11, 2018, AVENATTI and EA LLP negotiated a $1,550,000 settlement with the defendants in the Super Bowl Litigation on behalf of the Super Bowl Clients (approximately 200 individual plaintiffs).

b.   On or about May 15, 2017, AVENATTI sent C.A. an email requesting that C.A. transfer approximately $408,725 of the settlement proceeds to EA Account 2851 and transfer approximately $952,995 of the settlement proceeds to an attorney client trust account at CNB ending in 3512 ("Avenatti Trust Account 3512").

44.   Based on IRS-CI's review of bank account records and other records obtained during the investigation, I have learned that between July 2017 and October 2018, AVENATTI caused payments totaling approximately $145,222 to be made to approximately 31 of the approximately 200 Super Bowl Clients.

45.   Based on IRS-CI's review of bank account records, I have learned the following regarding AVENATTI's use of the settlement proceeds from the Super Bowl Litigation, which were transferred from C.A.'s law firm to EA Account 2851 and Avenatti Trust Account 3512:

a.   After C.A.'s law firm wired approximately $408,725 into EA Account 2851 on or about May 17, 2017, AVENATTI used nearly all of the money to pay expenses of EA LLP,

45

including salary to EA LLP employees, rent, and payments to the IRS, among others.

      b.   Avenatti Trust Account 3512 was opened on or about May 17, 2017. C.A.'s law firm wired approximately $952,995 of the settlement proceeds to Avenatti Trust Account 3512 that same day. AVENATTI then caused the following financial transactions:

      i.   Between May 17 and May 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $640,000, which cashier's checks were then deposited into Avenatti Account 3504. Avenatti Account 3504 was also opened on or about May 17, 2017.

      ii.   Between May 17 and May 23, 2017, AVENATTI caused three wires transfers totaling $640,000 to be made from Avenatti Account 3504 to A&A Account 0661. Substantial portions of the funds transferred to A&A Account 0661 were then used for AVENATTI's own purposes, including a $40,000 wire transfer to C.C., AVENATTI's ex-wife; a $60,000 wire transfer to a bank account in the name of AVENATTI and L.S.A. (AVENATTI's wife at the time); and a $150,000 wire transfer to a GBUS bank account.

      iii.   Between June 6 and June 23, 2017, AVENATTI caused the purchase of three cashier's checks from Avenatti Trust Account 3512 totaling $300,000, which cashier's checks were then deposited into Avenatti Account 3504. During this same time period, AVENATTI caused three wire transfers totaling approximately $310,000 to be made from Avenatti Account 3504 to A&A Account 0061.

46.   I have also participated in telephonic interviews of two of the Super Bowl Clients in the Super Bowl Litigation, who provided in substance and in part the following information:

a.   On March 27, 2019, I participated in an interview of D.W.  D.W. retained EA LLP to represent him against the NFL in D.W.'s attempt to obtain a refund for the tickets he purchased and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.W. provided EA LLP with all of his receipts regarding his expenses, which totaled $7,045.  D.W. stated that J.R. was his contact at EA LLP, and after D.W. learned that there was a settlement with the NFL, D.W. called at least fifteen to twenty times in an attempt to find out what money he would be receiving.  He did not recall the exact date, but a few months prior to the telephonic interview with IRS-CI, D.W. stated that AVENATTI had contacted D.W. and told D.W. that he would get his money back.  To date, D.W. had not received any settlement money.

b.   On April 17, 2019, I participated in an interview of D.B.  D.B. retained EA LLP to represent him against the NFL in D.B.'s attempt to obtain a refund for the tickets and other expenses related to his experience attending the 2011 Super Bowl in Dallas.  D.B. had correspondence with at least two people at EA LLP, but had no contact with AVENATTI.  D.B. recalled receiving information from J.R. that a settlement had been reached with the NFL for about 200 victims, and that D.B. fell within one of the three types of victims that would be receiving settlement funds, but that D.B. needed to wait a few weeks for

all of the settlement funds to be worked out.  D.B. called and
emailed EA LLP numerous times about his settlement money, but he
never got responses.  D.B. stated that his claim against the NFL
was for $5,269, but he still has yet to receive a dime in
settlement money.

47.  I have reviewed the Confidential Settlement Agreement
and Release in the Super Bowl Litigation, which was a settlement
on behalf of the approximately 200 plaintiffs listed in Exhibit
A of the settlement agreement (i.e., the Super Bowl Clients").
The agreement provided, among other things, that "The NFL shall
pay to the plaintiffs an aggregate total sum of $1,550,000.00
("Settlement Consideration") on or before May 18, 2017."
AVENATTI signed the settlement agreement on behalf of the Super
Bowl Clients on or about May 11, 2017.  Both D.W. and D.B. are
listed in Exhibit A of the settlement agreement as plaintiffs
entitled to the benefit of the settlement consideration.[23]

48.  Based on my review of documents from the 2017 EA
Bankruptcy, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB, and
other evidence IRS-CI has collected during this investigation, I
have learned the following:

a.  AVENATTI failed to disclose on the MOR for EA LLP
for the period May 1, 2017, through May 30, 2017 (the "May 2017
MOR") the funds AVENATTI received from the Super Bowl

---

[23] The privilege review team and other agents executing the
search will be provided with the names of the Super Bowl Clients
from the Super Bowl Litigation before conducting a search of the
SUBJECT DEVICES for non-privileged material.

Litigation.  AVENATTI signed the May 2017 MOR on behalf of EA LLP under the penalty of perjury.

b.   AVENATTI failed to disclose to the Bankruptcy Court and the U.S. Trustee the existence of Avenatti Trust Account 3512 and Avenatti Account 3504, both of which appear to have been used to conceal the receipt of the settlement funds from the Super Bowl Litigation.

c.   On or about June 12, 2017, defendant testified under oath at the Section 341(a) debtor's examination in the 2017 EA Bankruptcy and stated "no" when asked whether the debtor, EA LLP, had received any counsel fees from the Super Bowl Litigation.  In truth and in fact, as discussed above in paragraphs 43 to 44, AVENATTI knew that AVENATTI and EA LLP had received fees from the Super Bowl Litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

**E.   Evidence Relating to Augustus LLP**

49.  Based on my review of the evidence IRS-CI has collected during this investigation to date, I have learned the following regarding Augustus LLP:

a.   On March 25, 2019, during the interview with J.R., the office manager for EA LLP, J.R. stated that "Augustus LLP" is the name of a new company and/or law firm AVENATTI was starting.

b.   I have reviewed Union Bank records that show that on or about February 13, 2019, AVENATTI caused business bank accounts at Union Bank to be opened under Augustus LLP.  The

application to open the accounts listed AVENATTI's home address
at 10000 Santa Monica Blvd, Unit 2107, Los Angeles, California,
as the mailing address for Augustus LLP.  On the forms submitted
to Union Bank regarding the accounts, AVENATTI was listed as the
owner/partner of the business and had signature authority over
the accounts, as did J.R., who was listed as the office manager.
The Augustus LLP bank records at Union Bank further reveal:

　　　　　i.　On or about March 19, 2019, at least twelve
cashier's checks were purchased from Union Bank from the
Augustus LLP accounts, including several made payable to
individuals who were previously employed by EA LLP, as well as a
$22,400 cashier's check made payable to SM10000 Property LLC,
the property management company of AVENATTI's personal
residence, for February and March rent.

　　　　　ii.　On or about March 21, 2019, AVENATTI caused
a wire transfer in the amount of $1,398 to be paid to an
assisted living facility for Client 1's rent;

　　　　　iii.　On or about March 22, 2019, AVENATTI caused
a wire transfer in the amount of $6,000 to be paid to Client 2;

　　　　　iv.　AVENATTI also caused checks and cashier's
checks to be written from the Augustus LLP bank account at Union
Bank to attorneys that have represented AVENATTI in various
legal matters.

　　　　　c.　I know from my review of IRS records based on
information submitted to the IRS regarding Augustus LLP, that
AVENATTI was listed as the general partner of Augustus LLP and
AVENATTI's personal residence was listed as the business's

address.  In addition, the records indicate that Augustus LLP
was established in December 2018 and is required to file Form
1065 partnership returns on an annual basis.

      d.    Based on my training and experience and the
investigation to date, I believe that Augustus LLP is the latest
in the line of companies that AVENATTI has used and is using to
pay for both personal and business expenses and possibly launder
the proceeds of his prior wire fraud scheme.

**F.**   **Probable Cause to Search the SUBJECT DEVICES**

      ***1.***   ***SUBJECT DEVICES 1 through 6 Obtained from MixinIT***

     50.  During the interview with IRS-CI on March 25, 2019,
J.R., the office manager for EA LLP, stated, among other things,
that EA LLP had previously maintained its computer servers at EA
LLP's offices at 520 Newport Center Drive, in Newport Beach,
California.  J.R. further said that, when EA LLP received notice
that it would be evicted from its offices in or around October
or November 2018, AVENATTI caused the EA LLP servers to be moved
to MixinIT, a company in Orange County that stored and managed
computer servers.

     51.  On March 28, 2019, MixinIT provided records in
response to a subpoena showing that EA LLP had contracted with
MixinIT to store EA LLP's servers starting on November 19, 2018.

     52.  On April 3, 2019, the court-appointed receiver[24] for EA
LLP authorized agents from IRS-CI to take possession of the EA

_____

     [24] EA LLP is currently a Judgment Debtor in a litigation
with a former partner of EA LLP that arose from the 2017 EA LLP
Bankruptcy.  On February 12, 2019, the former partner filed a

LLP servers from MixinIT, house the servers at IRS-CI's forensic lab, and create a forensic image of the servers.

53. On April 4, 2019, based on the consent of the court-appointed receiver, IRS-CI SA Nshan Tashchyan and SA John Weeks obtained SUBJECT DEVICES 1 through 6, which comprised the EA LLP servers, from MixinIT. After bringing SUBJECT DEVICES 1 through 6 to IRS-CI's forensic lab in Laguna Niguel, California, IRS-CI began making a forensic image of SUBJECT DEVICES 1 through 6. The forensic image of SUBJECT DEVICES 1 through 6 was completed on April 19, 2019.

54. Based on the evidence collected during the course of this investigation, there is probable cause to believe that evidence of the Subject Offenses will be found on SUBJECT DEVICES 1 through 6, which comprise the EA LLP servers. For example:

a. During March 25, 2019, interview with IRS-CI, J.R. stated that she can work on EA LLP matters remotely using a desktop connection, which allows her to use her EA LLP email as well as to access QuickBooks and excel spreadsheets. J.R. stated that the EA LLP emails were backed up on the EA LLP

---

motion in the litigation seeking the appointment of a receiver for EA LLP and accusing AVENATTI of bankruptcy fraud. On February 13, 2019, AVENATTI acting on behalf of EA LLP, stipulated to the appointment of Brian Weiss as the EA LLP Receiver and consented to the jurisdiction of the Honorable Karen E. Scott, United States Magistrate Judge, to enter an order appointing the EA LLP Receiver. Judge Scott entered the order appointing the EA LLP Receiver later that same day. The order stated, among other things, that the EA LLP Receiver shall have the power to take possession of and manage the business of EA LLP. The order further required that EA LLP and AVENATTI immediately turn over all EA LLP property to the EA LLP Receiver and provide access to all EA LLP computer systems.

servers stored at MixinIT.  J.R. stated when she logged into the
servers remotely, she had access to emails and could download EA
LLP documents like a virtual desktop.  J.R. stated in or around
December 2018, around the time EA LLP was evicted from its
offices, EA LLP obtained a service, Voice Nation, to answer the
phone calls and the service sent the voicemails for AVENATTI to
MA@augustusLLP.com and other voicemails to JR@augustusLLP.com.

b.   During the course of this investigation, I have
reviewed evidence relating to the Subject Offenses including
emails sent to and from AVENATTI and J.R. in which AVENATTI and
J.R. used their EA LLP email addresses.  Many of the emails that
I have reviewed that were sent to and from AVENATTI and J.R.
also contained attachments that related to the Subject Offenses.

c.   I have reviewed under oath testimony that
AVENATTI provided during the EA LLP Bankruptcy proceedings, as
well as during judgment debtor examinations relating to
litigation with his former partner.  In response to various
questions about where AVENATTI kept financial documents and
contracts, among other items, AVENATTI testified that they would
have been kept at his offices.  During a judgment debtor
examination on March 15, 2019, AVENATTI testified that he
sometimes connects to a server when working on his computer.

55.   In addition to the foregoing facts, based my training
and experience and discussions with other law enforcement agents
who have investigated tax offenses and complex fraud schemes, as
described more fully in my March 2019 affidavit (see Ex. 3,

§ VII),[25] I believe SUBJECT DEVICES 1 through 6, namely, the EA LLP servers, will contain evidence of the Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

### 2. *SUBJECT DEVICES 7 Through 10 Obtained During AVENATTI's Arrest*

56. On March 25, 2019, federal agents arrested AVENATTI in New York and found several digital devices among his personal belongings, including the original digital devices from which SUBJECT DEVICES 7 through 9 were forensically imaged.  In addition, federal agents seized miscellaneous documents from AVENATTI's briefcase upon his arrest, and these documents were scanned and saved on SUBJECT DEVICE 10.  On or about May 17, 2019, and May 22, 2019, the SDNY USAO provided to IRS-CI SUBJECT DEVICE 10, and SUBJECT DEVICES 7 through 9, respectively, which are currently held in the custody of IRS-CI in Santa Ana, California.

57. Based on the evidence set forth herein and in my prior affidavits, and my training and experience and discussions with other law enforcement agents who have investigated tax offenses and complex fraud schemes, which is described more fully in my March 2019 affidavit (see Ex. 3, § VII), I believe SUBJECT DEVICES 7 through 10 will likely contain other evidence of the

---

[25] The March 2019 affidavit included a section detailing my training, experience, and knowledge of tax offenses and fraud schemes (see Ex. 3, § VII), which is incorporated by reference herein.

Subject Offenses, including, among other items, emails and attachments that AVENATTI and J.R. sent and received from their EA LLP email addresses, financial documents and records, and other personal and business records.

58.   Additionally, SUBJECT DEVICES 7 through 9, are the forensic images of three USB drives that were found on AVENATTI's person upon arrest, while AVENATTI was in New York on March 25, 2019.   SUBJECT DEVICE 10 contains miscellaneous documents AVENATTI had on his person at the time of his arrest. As stated above, AVENATTI met with Client 1 and Client 2 on March 22, 23, and 24, 2019 (see supra ¶¶ 35, 39.h), prior to travelling to New York on the evening of March 24, 2019.   I therefore believe documents, correspondence, and records relating to AVENATTI's meetings with these two clients in the days immediately prior to his arrest, as well as documents relating to AVENATTI's and EA LLP's representation of Client 1 and Client 2, are likely to be found on SUBJECT DEVICES 7 through 10.

## G.   **The April 10, 2019, Indictment**

59.   On April 10, 2019, a grand jury in the Central District of California returned a thirty-six count indictment against AVENATTI, which included the following charges: (a) ten counts of wire fraud, in violation of 18 U.S.C. § 1343, involving AVENATTI's embezzlement of his clients' funds; (b) eight counts of willful failure to collect and pay over withheld taxes, in violation of 26 U.S.C. § 7202, relating to AVENATTI's and GBUS's failure to pay over to the IRS payroll

taxes that had been withheld from GBUS employee' paychecks;
(c) one count of endeavoring to obstruct the administration of
the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a),
relating to AVENATTI's attempt to obstruct and impede the IRS's
attempts to collect the payroll taxes GBUS owed to the IRS;
(d) ten counts of willful failure to file tax returns, in
violation of 26 U.S.C. § 7203, relating to AVENATTI's failure to
file individual tax returns for 2014 through 2017, failure to
file partnership tax returns for EA LLP for 2015 through 2017,
and failure to file corporate tax returns for A&A for 2015
through 2017; (e) two counts of bank fraud, in violation of 18
U.S.C. § 1344(1), relating to two loans AVENATTI obtained from
The People's Bank in 2014; (f) one count of aggravated identity
theft, in violation of 18 U.S.C. § 1028A(a)(1), relating to the
use of another person's means of identification in furtherance
of the bank fraud offense; (g) three counts of false declaration
in a bankruptcy, in violation of 18 U.S.C. § 152(3), relating to
AVENATTI's failure to disclose all of EA LLP's receipts on EA
LLP's monthly operating reports; and (h) one count of false oath
in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2),
related to AVENATTI's false testimony at a Section 341(a)
hearing during EA LLP's bankruptcy.  A copy of the indictment in
United States v. Michael John Avenatti, SA CR 19-61-JVS, is
attached hereto as Exhibit 4 and incorporated herein by
reference.

## V.   <u>POTENTIAL PRIVILEGE ISSUES</u>

60.   As noted in my March 2019 affidavit, and above, AVENATTI is a licensed attorney and EA LLP and A&A are  law firms.  (<u>See</u> Ex. 3, § VII.)  I also understand that at various times AVENATTI, EA LLP, and/or A&A may have had attorney-client relationships with other attorneys, including the following law firms: (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP; (h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley & Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle Attorneys at Law.  (<u>See</u> <u>id.</u>)

61.   Although the proposed search warrant primarily seeks financial records and non-privileged information, there is a significant likelihood that the SUBJECT DEVICES will contain documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine.  Accordingly, Attachment B to the proposed search warrant contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

62.   The privileged information sought by the proposed search warrant is limited to the following former clients or potential clients of AVENATTI, EA LLP, and A&A:  (a) GBUS; (b) Client 1; (c) Client 2; (d) Client 3; and (e) Client 4 and Client 5.  Each of these former clients or potential clients,

however, has already executed a written waiver of the attorney-client-privilege.

a.    First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b.    Second, on April 4, 2019, Client 1 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 1 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 1 also consented to the government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 1.  A redacted copy of Client 1's written waiver of the attorney-client privilege is attached hereto as Exhibit 5.

c.    Third, on April 8, 2019, Client 2 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to legal advice Client 2 sought or received from EA LLP, AVENATTI, F.M. (an attorney with the X-Law Group), and any other current or former EA LLP officers, directors, employees, or agents.  Client 2 also consented to the

government's search of any of EA LLP's or AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 2. A redacted copy of Client 2's written waiver of the attorney-client privilege is attached hereto as Exhibit 6.

d.   Fourth, on March 18, 2019, Client 3 executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice Client 3 sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  Client 3 also consented to the government's search of any of EA LLP's and AVENATTI's files relating to EA LLP's and AVENATTI's representation of Client 3.  A redacted copy of Client 3's written waiver of the attorney-client privilege is attached hereto as Exhibit 7.

e.   Fifth, on April 4, 2019, Client 4 and Client 5 executed written waivers of the attorney-client privilege and attorney-work-product protections as to legal advice Client 4 and Client 5 sought or received from EA LLP, AVENATTI, F.M., and/or any other current or former officers, directors, employees, or agents of EA LLP.  Client 4 and Client 5 also consented to the government's search of the files of EA LLP, AVENATTI, and F.M. relating to the representation of Client 4 and Client 5.  A redacted copy of Client 4's and Client 5's written waivers of the attorney-client privilege are attached hereto as Exhibit 8.

63.  I am aware that AVENATTI represented the plaintiff in Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM

(C.D. Cal.), a lawsuit against the President of the United States.[26]  I am also aware that AVENATTI represented Julie Swetnick, an individual who accused United States Supreme Court Justice Brett Kavanaugh of sexual assault in connection with Justice Kavanaugh's confirmation hearing in or around September 2018.  Attachment B to the proposed search warrant specifically requires, in addition to the procedures to avoid unnecessary disclosure of attorney-client privileged materials and attorney-work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachment B, be segregated and not further reviewed absent subsequent authorization from this Court.[27]

64.  Attachment B to the proposed search warrant also sets forth a procedure to allow EA LLP, AVENATTI, and/or others to seek the appointment of a special master within seven days of

---

[26]  On May 22, 2019, AVENATTI was indicted in the Southern District of New York for wire fraud and aggravated identity theft, in connection with a scheme to defraud Ms. Clifford out of approximately $148,000.  Although we are not seeking to seize information relating to AVENATTI's representation of Ms. Clifford at this time, such information could be relevant to this investigation at a later date or to the SDNY USAO's investigation.

[27]  Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records.  Nevertheless, due the nature of these representations and the parties at issue therein, the privilege review protocols set forth in Attachment B to the proposed warrant calls for any such records to be segregated and not further reviewed once identified.

the execution of the proposed search warrants.[28]  Although the
government does not believe that the appointment of a special
master would be necessary in this investigation, the government
has included this provision to ensure that any such request is
handled in a timely manner and does not unnecessarily delay IRS-
CI's ongoing criminal investigation.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

65.   The March 2019 affidavit also included a section
detailing my training experience on digital devices (see Ex. 3,
§ IX), which is incorporated by reference herein.

66.   The search of the SUBJECT DEVICES will likely take a
considerable amount of time for multiple reasons.  First, I
understand that the SUBJECT DEVICES contain approximately 10-15
terabytes of data.  Second, the search of the SUBJECT DEVICES
will require the use of a Privilege Review Team and the search
protocols set forth in Attachment B to the search warrant
application.

67.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. REQUEST FOR SEALING

68.   I request that the search warrant, the search warrant
application, and this affidavit be kept under seal to maintain
the integrity of this ongoing investigation until further order

---

[28] An identical provision was included in Attachments B-1
through B-3 of the March 2019 warrants.  To date, no request for
the appointment of a special master has been made following the
execution of the March 2019 warrants on March 25, 2019.

of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel.

a. <u>First</u>, this criminal investigation is ongoing and not all aspects of the investigation are public or known to AVENATTI and other potential subjects of the investigation. Although the government anticipates producing the search warrant, the search warrant application, and this affidavit to defense counsel for AVENATTI shortly after the execution of the search warrants, public disclosure of these materials could cause other subjects of the government's ongoing investigation to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

b. <u>Second</u>, IRS-CI is still in the process of interviewing additional witnesses and subjects as part of its ongoing investigation.  This affidavit and the March 2019 Affidavit, which remains sealed and is attached as an exhibit hereto, contain information regarding additional areas of investigation and certain facts regarding the pending charges against AVENATTI that are not publicly known at this time. Public disclosure of such information provide witnesses and other subjects of the investigation an opportunity to coordinate their statements prior to being interviewed by IRS-CI.

c.   <u>Third</u>, this Affidavit and the sealed March 2019
Affidavit contain detailed information regarding AVENATTI's
victim-clients and cooperating government witnesses.  Although
the identities of some of AVENATTI's victim-clients and some of
the government's witnesses have now been reported in the press,
the government is concerned that premature public disclosure of
this affidavit will unnecessarily impact the victim-clients and
witnesses right to privacy.  This is particularly true given the
high-profile nature of the prosecution against AVENATTI.

### VIII.     CONCLUSION

69.  For the reasons described above, I respectfully submit
there is probable cause to believe that evidence, fruits, and
instrumentalities of the Subject Offenses, as described with
particularity in Attachment B, will be found on the SUBJECT
DEVICES, as described with particularity in Attachment A.


/s/
_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation


Subscribed to and sworn before me
this 24th day of May, 2019.

## DOUGLAS F. McCORMICK
_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

AO 106 (Rev. 04/10) Application for a Search Warrant
Case 8:19-mj-00419-DUTY   Document 4-1   Filed 05/24/19   Page 88 of 330   Page ID #:594
Case 8:19-mj-00419-DUTY   Document 2   Filed 03/22/19   Page 5 of
184   Page ID #:235

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 8:19-MJ-103 |
| Seven Digital Devices in the Custody of the Internal Revenue Service –Criminal Investigation in Laguna Niguel, California | ) ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 

                                                    /s/

                                      *Applicant's signature*

                IRS CI Special Agent Remoun Karlous

Sworn to before me and signed in my presence.      *Printed name and title*

Date: __February 22, 2019__

                                  **DOUGLAS F. McCORMICK**

                                       *Judge's signature*

City and state: __Santa Ana, CA__         __United States Magistrate Judge Douglas F. McCormick__

                                     *Printed name and title*

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 90 of 330 Page ID #:596
Case 8:19-mj-00403-DUTY *SEALED* Document 3-1 Filed 05/24/19 Page 91 of 330 Page ID #:
184   Page ID #:237

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

Forensic images of the following digital devices (the "SUBJECT DEVICES"), which are currently maintained in the custody of the Internal Revenue Service-Criminal Investigation ("IRS-CI") in Laguna Niguel, California:

1.    Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E. on or about October 22, 2018 ("SUBJECT DEVICE 1");

2.    Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

3.    Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

4.    Samsung flash drive  provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

5.    Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

6.    Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

7.    Seagate Hard Drive, bearing serial number 5VJC1GXV provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7").

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.     The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

    a.     Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

i

b. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the sale or purchase of TC Global, Inc. or Tully's Coffee.

c. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the purchase or sale of GBUS, GB LLC, or Doppio.

d. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to AVENATTI's control or management of any of the Subject Entities.

e. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the organizational or management structure of any of the Subject Entities.

f. Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the finances of any of the Subject Entities, including assets, liabilities, accounts receivable, and accounts payable.

g. Records, documents, correspondence, programs, applications, or materials from January 2013 through September

2018 that evidence, discuss, reflect, or relate to value of GBUS or GB LLC.

     h.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the accounting records for GBUS and GB LLC, including any Microsoft Dynamics NAV accounting data, files, or records.

     i.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to GBUS employee handbooks or manuals, employment contracts, compensation records, and employee lists.

     j.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the personal finances of Michael J. Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

     k.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any financial transactions, including any proposed or potential financial transactions, involving any of the Subject Entities and/or AVENATTI.

l.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to financial decisions AVENATTI made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

m.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any loans or other financing agreements, including any proposed or potential loans or other financing agreements, involving any of the Subject Entities and/or AVENATTI.

n.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, correspondence, programs, applications, or materials evidencing, discussing, reflecting, or relating to changes in the payroll and tax services to be provided by Ceridian.

o.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to the federal,

state, and/or local tax obligations, tax returns, tax liabilities, or tax payments of any of the Subject Entities and/or AVENATTI.

       p.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any liens, levies, garnishments, judgments, encumbrances, or tax-related investigations or actions associated with any of the Subject Entities and/or AVENATTI.

       q.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

       r.   Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

s.    Records, documents, correspondence, programs, applications, or materials from January 2013 through September 2018 that evidence, discuss, reflect, or relate to changes in any of the Subject Entities' and/or AVENATTI's bank account information.

t.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses and forensic copies thereof.

u.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

        iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "correspondence," "programs," "applications," and "materials" include records, documents, correspondence, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 98 of 330 Page ID #:604
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 98 of 330 Page ID #:604
184   Page ID #:245

II.   <u>SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED
      INFORMATION ON THE SUBJECT DEVICES</u>

3.    In searching the SUBJECT DEVICES (including the
forensic copies thereof), the following procedures will be
followed at the time of the search in order to avoid unnecessary
disclosures of any privileged attorney-client communications or
attorney work product.

4.    Law enforcement personnel conducting the investigation
and search and other individuals assisting law enforcement
personnel in the search (the "Search Team") have already
obtained custody of the SUBJECT DEVICES, which are capable of
containing evidence of the Subject Offenses, or capable of
containing data falling within the scope of the items to be
seized.  The Search Team shall facilitate the transfer of the
SUBJECT DEVICES to the "Privilege Review Team" (previously
designated individuals not participating in the investigation of
the case).  The Privilege Review Team, including a Privilege
Review Team Assistant United States Attorney ("PRTAUSA") or
PRTAUSAs, will then review the SUBJECT DEVICES as set forth
herein.  The Search Team will review only data from the SUBJECT
DEVICES that has been released by the Privilege Review Team to
the Search Team.

5.    The Privilege Review Team will, in their discretion,
either search each SUBJECT DEVICE where it is currently located

Case 8:19-mj-00419-DUTY SEALED Document 4-1 Filed 05/24/19 Page 99 of 330 Page ID #:605
Case 8:19-mj-00419-DUTY SEALED Document 1 Filed 05/24/19 Page 99 of 330 Page ID #:605
184   Page ID #:246

or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

6.    The Privilege Review Team and the Search Team shall complete the search discussed herein as soon as is practicable but not more than 180 days from the date of execution of the warrant.  The government will not search the SUBJECT DEVICES beyond this 180-day period without obtaining an extension of time order from the Court.

7.    The Search Team will provide the Privilege Review Team and/or appropriate litigation support personnel[55] with a list of "privilege key words" to search the SUBJECT DEVICES for communications, data, or documents relating to the following law firms:  (a) Foster Pepper PLLC; (b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d) Talmadge/Fitzpatrick/Tribe, PPLC; and (e) Brager Tax Law Group.  Such "privilege key words" shall include specific words like "Foster Pepper," "Osborn," "Machler," "Eisenhower," "Carlson," "Talmadge," "Fitzpatrick," "Tribe," "Brager," as well as other email addresses and domain names associated with those individuals and law firms.  Because the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") has executed a waiver of the attorney-client privilege as to all

---

[55] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Search Team in processing, filtering, and transferring data contained on the SUBJECT DEVICES.

Case 8:19-mj-00419-DUTY  *SEALED*  Document 4-1  Filed 05/24/19  Page 100 of 330  Page ID #:606
Case 8:19-mj-00419-DUTY  *SEALED*  Document 1-1  Filed 05/22/19  Page 109 of
184   Page ID #:247

communications between GBUS's officer, directors, employees, and
agents, and any lawyer acting on GBUS's behalf (see Affidavit
¶ 83.a, Ex. 1), including AVENATTI, the "privilege key words"
need not include specific words designed to capture all
communications with AVENATTI or his law firms, EA LLP and A&A,
or standard privilege terms.

8.   The Privilege Review Team will segregate and will not
search or review the contents of AVENATTI's GBUS email accounts,
including:  (1) MichaelA@globalbaristas.com; and
(2) MAvenatti@globalbaristas.com.  Such data will be maintained
under seal by the investigating agency without further review
absent subsequent authorization as set forth in paragraph 12
below.

9.   The Privilege Review Team will conduct an initial
review of the data on the SUBJECT DEVICES using the "privilege
key words," and by using search protocols specifically chosen to
identify documents or data containing potentially privileged
information.  The Privilege Review Team may subject to this
initial review all of the data contained in the SUBJECT DEVICES
capable of containing any of the items to be seized.  Documents
or data that are identified by this initial review as not
potentially privileged may be given to the Search Team.

10.  All documents or data that the initial review
identifies as containing any of the "privilege key words" will

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 101 of 330 Page ID #:607
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 101 of 330 Page ID #:607
184  Page ID #:248

be reviewed by a Privilege Review Team member to confirm that the documents or data contain potentially privileged information.  Documents or data that are determined by this secondary review not to be potentially privileged may be given to the Search Team.  Documents or data that are determined by this review to be potentially privileged or privileged will be given to the United States Attorney's Office for further review by the PRTAUSA(s).  Documents or data identified by the PRTAUSA(s) after further review as not potentially privileged may be given to the Search Team.  If, after further review, the PRTAUSA(s) determines it to be appropriate, the PRTAUSA may apply to the Court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Search Team.  In such an instance, the PRTAUSA(s) shall conduct a review of the documents or data to determine whether they fall within the scope of the items to be seized prior to applying to the Court for relief. Documents or data identified by the PRTAUSA(s) after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization as set forth in paragraph 12 below.

11.  The Privilege Review Team may, in its discretion, also use "scope key words" to search any documents or data that were

identified as potentially privileged using the "privilege key words" if the Privilege Review Team determines that such a procedure would allow the Privilege Review Team to complete its review of potentially privileged documents more effectively and efficiently. The Privilege Review Team may also, in its discretion, apply the "scope key words" to a subset of the potentially privileged data. At the Privilege Review Team's request, the Search Team may provide the Privilege Review Team and/or appropriate litigation support personnel with a list of "scope key words" designed to search for data relating to the items to be seized. These "scope key words" may then be applied to the potentially privileged data identified by using the "privilege key words." The Privilege Review Team may conduct a detailed quality check on any data that did not contain the "scope key words" to ensure that the scope key word search is effective. Additional "scope key words" designed to locate the items to be seized may also be applied at the discretion of the PRTAUSA(s). Any data or documents that contain both any of the "privilege key words" and any of "scope key words" shall be then reviewed by the Privilege Review Team and the PRTAUSA(s) in accordance with the procedures set forth in paragraph 9 above. Documents and data that are identified by the "scope key word" searches and quality checks as falling outside the scope of the warrant will be maintained under seal as set forth in paragraph

12 below and not further reviewed absent subsequent
authorization.

12.   Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Search Team at any time absent
authorization of the Court.  However, the Privilege Review Team
may, in its discretion, store the privileged and potentially
privileged data and documents in a folder or a set of folders in
a document review platform database, such as Relativity or
Eclipse, that remains inaccessible to the Search Team.  The
Privilege Review Team's access to this separate document review
platform database shall cease upon expiration of the warrant.
However, litigation support personnel from the United States
Attorney's Office, United States Department of Justice, and/or
the investigating agency may continue to access this separately-
maintained document review database for the purpose of database
maintenance.

13.   The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.   The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data within the scope of the search warrant.   The Privilege Review Team may also conduct the search for documents and data within the scope of the search warrant if that is more efficient, but is not required to do so.   In conducting its review, the Search Team may, in its discretion, use key word searches and other searches to determine whether documents or data fall within the scope of the search warrant.   Data that is identified after these scope reviews as outside the scope of the items to be seized will be maintained under seal by the Search Team and not further reviewed absent subsequent authorization from the Court.

14.   All members of the Search Team shall be advised that AVENATTI may hold an individual attorney-client relationship with the law firms identified in paragraph 7 above or other law firms and lawyers not previously identified, and that communications with or records involving those law firms and lawyers may not be covered by GBUS Trustee's waiver of the attorney-client privilege.   If, upon review, a member of the Search Team determines that a document or data from the SUBJECT

DEVICES appears to contain potentially privileged information that may not be covered by GBUS's limited waiver of the attorney-client privilege, such as communications with the lawyers and law firms identified in paragraph 7 above or other law firms and lawyers not previously identified, the Search Team member shall discontinue its review of the document or data and shall immediately notify a member of the Privilege Review Team. The Search Team member may record identifying information regarding the potentially privilege document or data that is reasonably necessary to identity the document or data for the Privilege Review Team.  The Search Team shall not further review any documents or data that appears to contain such potentially privileged information until after the Privilege Review Team has completed its review of the additional potentially privileged information discovered by the Search Team member.

15.  In performing the reviews, both the Privilege Review Team and the Search Team may:

a.   search for and attempt to recover deleted, "hidden," or encrypted data;

b.   use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c.   use forensic examination and searching tools, such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,

Relativity, and Eclipse, which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Search Team, while searching a SUBJECT DEVICE encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a SUBJECT DEVICES does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

18. The government may retain the SUBJECT DEVICES (including any forensic copy thereof), which have already been obtained by the Search Team, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) on the SUBJECT DEVICES absent further court order.

19. After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling

Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 107 of 330 Page ID #:613
Case 8:19-mj-00419-DUTY *SEALED* Document 1 *SEALED* Filed 05/24/19 Page 107 of 330 Page ID #:254
184   Page ID #:254

outside the scope of the items to be seized absent further order
of the Court.

20.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## <u>AFFIDAVIT</u>

### TABLE OF CONTENTS

I.    INTRODUCTION..........................................1

II.   PURPOSE OF AFFIDAVIT.................................1

III. SUMMARY OF PROBABLE CAUSE...........................3

IV.  STATEMENT OF PROBABLE CAUSE........................12

      A.    Federal Tax Obligations........................12

           1.    Federal Payroll Tax Obligations...........12

           2.    Federal Income Tax Obligations for
                  Corporations, Partnerships, and Limited
                  Liability Companies.......................14

           3.    Federal Income Tax Obligations for
                  Individuals..............................14

      B.    Background Information.........................15

      C.    Tax Offenses Relating to Global Baristas US LLC
           (GBUS) and Global Baristas LLC (GB LLC).........18

           1.    Tax Information Regarding GBUS and GB LLC..18

           2.    The IRS Payroll Tax Collection Case.......21

           3.    GBUS Employee Interviews..................38

           4.    Information Regarding TSYS Merchant
                  Solutions.................................81

           5.    Information Regarding The Boeing Company...86

           6.    Preliminary Review of GBUS and GB LLC Bank
                  Account Information.......................93

           7.    GBUS Bankruptcy Proceedings...............95

      D.    Tax Offenses Relating to Eagan Avenatti LLP (EA
           LLP) and Avenatti & Associates, APC (A&A).......97

           1.    The IRS Payroll Tax Collection Case.......97

           2.    EA LLP Bankruptcy Proceedings............101

           3.    Information Obtained from Paychex Regarding
                  EA LLP's Payroll Taxes...................104

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 109 of 330 Page ID #:615
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 109 of 330 Page ID #:615
184  Page ID #:256

4. Other Tax Information Regarding EA LLP and A&A..........................................105

5. Preliminary Review of EA LLP's and A&A's Bank Account Information..................107

E. Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations......................108

1. Information Regarding AVENATTI's Personal Income Tax Obligation.....................109

2. Preliminary Review of AVENATTI's Bank Records..................................111

3. Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach.....115

a. The Laguna Beach Residence..........115

b. The Newport Beach Residence.........119

4. Information from AVENATTI's Divorce Proceedings...............................120

5. AVENATTI's Statements Regarding His Net Worth..................................122

F. Fraud Offenses Relating to The Peoples Bank....123

1. $850,000 Loan to GB LLC in January 2014...124

2. $2,750,000 Loan to EA LLP in March 2014...126

3. $500,000 Loan to EA LLP in December 2014..128

G. Fraud Offenses Relating to the $1.6 Million G.B. Settlement..................................135

V. ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES..........................................142

A. Collection of the Subject Devices.............142

B. The SUBJECT DEVICES Are Unlikely to Contain Attorney-Client Privileged Communications or Records.......................................147

VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES..........150

VII. REQUEST FOR SEALING................................156

VIII. CONCLUSION.....................................158

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 110 of 330 Page ID #:616
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 110 of 330 Page ID #:257
184   Page ID #:257

## **AFFIDAVIT**

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.    I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II.  **PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of an application for a warrant to search the forensic images of the following digital devices, which are currently held in the custody of IRS-CI in Laguna Niguel, California:

a.    Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M.E.[1] on or about October 22, 2018 ("SUBJECT DEVICE 1");

---

[1]  Although the government has requested that this affidavit, as well as the search warrant and application, be filed under seal, I have referred to victims and witnesses by their initials throughout the affidavit to protect their privacy in the event the affidavit is later unsealed by the Court.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 111 of 330 Page ID #:617
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 111 of 330 Page ID #:258
184  Page ID #:258

b.   Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S.F. on or about October 21, 2018 ("SUBJECT DEVICE 2");

c.   Seagate External Hard Drive, model number SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M.G. on or about October 22, 2018 ("SUBJECT DEVICE 3");

d.   Samsung flash drive provided to IRS-CI by V.S. on or about October 31, 2018 ("SUBJECT DEVICE 4");

e.   Seagate Hard Drive, bearing serial number 5VJC1GXV, provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 5");

f.   Veeam 2GB flash drive provided to IRS-CI by A.G. on or about November 13, 2018 ("SUBJECT DEVICE 6"); and

g.   Seagate Hard Drive, bearing serial number 5VJC1GXV, provided to IRS-CI by A.G. on or about November 20, 2018 ("SUBJECT DEVICE 7")[2] (collectively, the "SUBJECT DEVICES").

3.   The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence, contraband, instrumentalities, and/or fruits of violations of: 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18

---

[2] As discussed in paragraphs 81-82 below, A.G. used the same hard drive to produce to IRS-CI two different sets of data. IRS-CI created two separate forensic images of the hard drive, each of which is identified herein as a separate SUBJECT DEVICE, namely SUBJECT DEVICE 5 and SUBJECT DEVICE 7.

U.S.C. § 157 (bankruptcy fraud); 18 18 U.S.C. § 371
(conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C.
§ 1014 (false statement to a bank or other federally insured
institution); 18 U.S.C. § 1028A (aggravated identity theft); 18
U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and
18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"),
and any SUBJECT DEVICE which is itself or which contains
evidence, contraband, fruits, or instrumentalities of the
Subject Offenses, and forensic copies thereof.

4.    The SUBJECT DEVICES are identified in Attachment A to
the search warrant application.  The list of items to be seized
is set forth in Attachment B to the search warrant application.
Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6.    Michael J. Avenatti ("AVENATTI") was and is an
attorney licensed to practice law in the State of California.
AVENATTI practiced law through Avenatti & Associates, APC
("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach,

California.  AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

7.  AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.  As set forth herein, there is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including the following: (a) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (c) tax offenses relating to AVENATTI's personal tax obligations; (d) fraud-related offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; and (e) wire fraud, money laundering, and bankruptcy fraud offenses relating to an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018, but failed to transfer to EA LLP's client or disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP.

9.    <u>First</u>, between the fourth quarter of 2015 and the fourth quarter of 2017, inclusive, GBUS failed to file employment tax returns and pay approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes, which had been withheld from GBUS employees' paychecks.  Multiple former GBUS employees have said that AVENATTI was responsible for all of GBUS's significant financial and business decisions, including the decision not to pay the payroll and trust fund taxes that GBUS owed to the IRS.  Indeed, AVENATTI was well aware of GBUS's outstanding tax obligations, yet repeatedly refused to authorize the required tax payments to the IRS.

10.    Although GBUS failed to pay to the IRS its payroll taxes between the fourth quarter of 2015 and the fourth quarter of 2017, AVENATTI caused substantial amounts of money to be transferred from GBUS's or GB LLC's bank accounts during this same time period.  For example, a preliminary analysis of GBUS's and GB LLC's bank account records shows that between 2015 and 2017 AVENATTI caused a net of approximately $1.7 million to be transferred from GBUS's or GB LLC's bank accounts to bank accounts associated with A&A or EA LLP.  This money could have and should have been used to pay GBUS payroll tax obligations.

11.    Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade

5

collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI took the following steps to evade the collection of payroll taxes due to the IRS and obstruct the IRS collection action:

      a.   In October 2016, when first contacted by an IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll taxes, AVENATTI falsely stated that a third-party payroll company was responsible for filing GBUS's payroll tax returns and making GBUS's federal tax deposits.  AVENATTI, however, knew that GBUS's third-party payroll company, Ceridian HCM Inc. ("Ceridian"), had discontinued the tax services it had previously provided to GBUS and was, therefore, no longer responsible for filing GBUS's payroll tax returns and making the necessary federal tax deposits.  AVENATTI was well aware that GBUS was not paying its payroll taxes.  GBUS employees repeatedly asked him to authorize the payment of GBUS's payroll taxes to the IRS, yet he refused to do so.

      b.   In September 2017, after IRS RO 1 advised GBUS of the possibility of criminal proceedings and levied multiple GBUS bank accounts, including a GBUS account at KeyBank, AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into the account at KeyBank.  Instead, in order to avoid the levies, AVENATTI directed GBUS employees to deposit all cash receipts from Tully's stores into a little-used bank account at Bank of America associated with his car racing entity, GB Autosport, LLC ("GB Auto").  Between September 2017

and December 2017, approximately $859,784 in cash was deposited into the GB Auto account at AVENATTI's direction.

c.  In late-September and early-October 2017, in order to avoid IRS levies issued to the sponsoring bank for GBUS's merchant credit card processing accounts ("merchant accounts"), AVENATTI directed GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name and Employer Identification Number ("EIN") associated with the merchant accounts from GBUS to GB LLC.  AVENATTI also directed TSYS to have all credit card receipts paid to a new bank account under the name of GB LLC, which AVENATTI had opened that same day in Orange County, California, instead of the bank accounts associated with GBUS, which were already subject to the IRS levies.

d.  In November 2016, approximately one month after the IRS RO first contacted AVENATTI, AVENATTI changed the name of the party to a contract with The Boeing Company ("Boeing") from GBUS to "GB Hospitality LLC," a company which does not appear to have ever been registered with any government agency or operated.  Later, in September 2017, after the IRS had issued levies to Boeing and a number of banks with which GBUS had accounts, Boeing cancelled the contract because GBUS had failed to make the required commission payments.  In connection with the cancellation of the contract, Boeing agreed to purchase two existing Tully's "kiosks" at Boeing facilities and other Tully's equipment in exchange for a total of $155,010 and the forgiveness of GBUS's debt to Boeing.  Although all of the

Tully's locations were operated by GBUS, AVENATTI told an
attorney at Boeing to use the name GB LLC on the two bills of
sale for the kiosks and equipment, and instructed Boeing to wire
the $155,010 payment to an attorney trust account associated
with EA LLP rather than any of the bank accounts associated with
GBUS.  Had the Boeing contract and subsequent bills of sale been
under the name GBUS, Boeing would not have made the $155,010
payment due to the existing GBUS tax lien.  After receiving the
$155,010 payment from Boeing, AVENATTI transferred the $155,010
to an A&A bank account, from which he then transferred $15,000
to his personal checking account, paid approximately $13,073 for
rent at his residential apartment in Los Angeles, California,
and paid approximately $8,459 to Neiman Marcus.  Indeed, out of
the $155,010 Boeing transferred to the EA LLP trust account, it
appears that only approximately half ever ended up in GBUS's
bank accounts.

        12.  Second, AVENATTI's other companies, EA LLP and A&A,
have repeatedly failed to meet their tax obligations despite
generating substantial revenues.  Between 2015 and 2017, EA LLP
failed to file payroll tax returns and pay approximately $2.4
million in payroll taxes, including approximately $1,279,001 in
trust fund taxes that had been withheld from EA LLP employees'
paychecks.  Just as he did in connection with GBUS, AVENATTI
lied to the IRS when initially contacted regarding EA LLP's
failure to pay its payroll taxes, and falsely claimed that a
third-party payroll company, Paychex, was responsible for making
the required tax payments even though the payroll company had

notified AVENATTI in January 2015 that it was discontinuing
various payroll tax services.  Additionally, EA LLP has not
filed partnership tax returns (IRS Form 1065) for the 2013,
2014, 2015, 2016, and 2017 tax years, even though EA LLP appears
to have received approximately $137,890,016 of deposits into its
bank accounts during these tax years.  Indeed, AVENATTI's
personal website claims that AVENATTI has recovered over one
billion dollars in verdicts and settlements for his clients.
Similarly, A&A has not filed corporate tax returns (IRS Form
1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax
years, even though A&A appears to have received approximately
$37,961,633 of deposits into its bank accounts during these tax
years, including net payments of approximately $23,820,816 from
EA LLP.

13.  _Third_, AVENATTI filed federal personal income tax
returns for the 2009 and 2010 tax years indicating that he owed
the IRS a total of approximately $850,438, plus interest and
penalties.  AVENATTI, however, did not pay the IRS the amounts
he owed for those tax years.  AVENATTI then failed to file
personal tax returns for the 2011 through 2017 tax years.
During these tax years, AVENATTI generated substantial income
and lived lavishly, yet largely failed to pay any federal income
tax.  A preliminary analysis of AVENATTI's personal bank
accounts reflects that AVENATTI received net payments of
approximately $8,464,064 from A&A and EA LLP between 2011 to
2017.  AVENATTI also repeatedly used money that had been
transferred from GBUS, GB LLC, and EA LLP to A&A to pay for

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 119 of 330 Page ID #:625
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 119 of 330 Page ID #:
184  Page ID #:266

personal expenses.  Further, AVENATTI received proceeds of
approximately $5.4 million when he sold his home in Laguna
Beach, California in 2015.  Finally, in connection with recent
divorce proceedings, AVENATTI's wife said that AVENATTI told her
that he earned $3.7 million dollars in 2016.  His wife also said
that their family's monthly expenses were over $200,000 per
month.  Financial and escrow company records show that from
approximately September 2015 to September 2016, AVENATTI and his
wife rented a home in Newport Beach for $100,000 per month,
after making a $1,000,000 deposit.

14.  <u>Fourth</u>, between approximately January 2014 and
December 2014, AVENATTI obtained three separate loans from The
Peoples Bank, a federally insured bank in Mississippi: (1) a
$850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan
to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in
December 2014.  In connection with these loans, AVENATTI
provided The Peoples Bank with false federal personal income tax
returns for the 2011, 2012, and 2013 tax years.  In these
purported tax returns, AVENATTI claimed that he earned
$4,562,881 in adjusted gross income in 2011, $5,423,099 in
adjusted gross income in 2012, and $4,082,803 in adjusted gross
income in 2013.  He also claimed that he had paid to the IRS
$1,600,000 in estimated tax payments in 2012, and $1,250,000 in
estimated tax payments in 2013.  However, AVENATTI never filed
personal income tax returns for the 2011, 2012, and 2013 tax
years, and did not make any estimated tax payments during the
2012 and 2013 tax years.  In fact, as noted above, at the time,

AVENATTI still owed the IRS approximately $850,438 in unpaid
personal income taxes, plus interest and penalties, from the
2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI
provided The Peoples Bank with a 2012 federal tax return for EA
LLP which claimed total income of $11,426,021 and ordinary
business income of $5,819,456.  However, the 2012 federal tax
return EA LLP actually filed with the IRS in October 2014
claimed total income of only $6,212,605 and an ordinary business
loss of $2,128,849.

15.  Fifth, between January 2018 and November 2018,
AVENATTI defrauded one of EA LLP's client, G.B., out of the
client's portion of an approximately $1.6 million settlement
payment.  Specifically, in January 2018, AVENATTI arranged for
the $1.6 million settlement payment to be transferred to one of
his attorney trust accounts.  Rather than transfer his client's
portion of the settlement proceeds to his client, AVENATTI used
the entire $1.6 million for his own purposes, including to pay
for expenses relating to GBUS.  He then lied to his client and
claimed that the settlement payment was not due until March
2018.  When the fake March 2018 deadline passed, AVENATTI led
his client to believe that the $1.6 million payment had never
been received.  Additionally, AVENATTI failed to disclose in
federal bankruptcy proceedings involving AVENATTI and EA LLP
that he had received the $1.6 million settlement payment,
despite being aware that he was required to do so.

16.  Judy Regnier ("REGNIER") has been described by
AVENATTI as his office manager, chief paralegal, and bookkeeper.

11

She appears to have worked for EA LLP in an administrative capacity since at least 2010. At various times, REGNIER was a signatory on bank accounts associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A. REGNIER was personally involved in many of the events described herein, including directing or executing the transfer of funds between various entities associated with AVENATTI, directing the actions of GBUS employees, and transmitting signed contracts and agreements on behalf of GBUS, GB LLC, EA LLP, or A&A to other parties.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

#### A. Federal Tax Obligations

##### *1. Federal Payroll Tax Obligations*

17. Based on my training and experience, as well as discussions with other IRS-CI SAs and IRS revenue agents, I have learned the following regarding federal payroll taxes:

a. The Internal Revenue Code imposes four types of tax with respect to wages paid to employees: (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

b. Income tax is imposed upon employees based upon the amount of wages they receive.

c. Social Security tax and Medicare tax are imposed by the Federal Insurance Contributions Act, and are collectively referred to as "FICA" taxes. FICA taxes are imposed separately on employees and on employers.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 122 of 330 Page ID #:628 184 Page ID #:269

d.    Federal unemployment tax is imposed under the Federal Unemployment Tax Act ("FUTA").  FUTA taxes are imposed solely on employers.

e.    Employers are required to withhold employee FICA taxes and income taxes from the wages paid to their employees, and to pay over the withheld amounts to the United States.  The employers duty to pay over income taxes required to be collected exists even if the taxes are not actually withheld from the employees' wages.  The employee FICA taxes and income taxes that employers are required to withhold and pay over to the United States are commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

f.    Employers are required to file an Employer's Quarterly Federal Tax Return ("IRS Form 941") quarterly.  On IRS Form 941, the employer is required to report the income tax, Social Security tax, and Medicare tax withheld from employees' paychecks.  The employer is also required to report and pay the employer's portion of Social Security and Medicare tax for its employees.

g.    Employers are required to file an Annual Federal Unemployment (FUTA) Tax Return ("IRS Form 940") yearly.  In connection with the IRS Form 940, the employer is required to report its FUTA tax liability for each quarter.

### 2. Federal Income Tax Obligations for Corporations, Partnerships, and Limited Liability Companies

18.  Based on my training and experience, as well as discussions with other IRS-CI SAs and IRS revenue agents, I have learned the following regarding federal income tax obligations for corporations, partnerships, and limited liability companies, such as GBUS, GB LLC, EA LLP, and A&A:

a.  Under 26 U.S.C. § 6012(a)(1)(A), corporations and partnerships are required to file tax returns yearly, irrespective of their income.  Similarly, the general rule is that every partnership shall file a return for each taxable year.  Single-member LLCs are treated as disregarded entities for tax purposes unless they affirmatively elect to be treated as corporations.

### 3. Federal Income Tax Obligations for Individuals

19.  Based on my training and experience, as well as discussions with other IRS-CI SAs and IRS revenue agents, I have learned the following regarding federal income tax obligations for individuals:

a.  Under 26 U.S.C. § 6012, "every individual having for the taxable year gross income which equals or exceeds the exemption amount" is required to file a federal tax return.  The receipt of a specified amount of gross income generally determines whether an income tax return must be filed.  The threshold gross income amount for a married person filing

14

separately for the 2011 to 2017 tax years ranged from $3,700 to $4,050.[3]

      b.   Gross income is defined as all income from whatever source derived, including, but not limited to, the following items: (1) compensation for services, including fees, commissions, fringe benefits, and similar items; (2) gross income derived from business; (3) gains derived from dealings in property; and (4) distributive shares of partnership gross income.

**B.   Background Information**

20.  Based on publicly available information and other information obtained during the course of this investigation, I have learned the following information regarding AVENATTI and his various companies:

      a.   AVENATTI is a plaintiff's attorney in Southern California.  At all relevant times, AVENATTI lived and worked in Orange County and Los Angeles County, within the Central District of California.

      b.   In 2006, AVENATTI incorporated A&A, a California subchapter S corporation.  In 2007, AVENATTI formed the law firm Eagan O'Malley & Avenatti LLP.  In approximately December 2010, O'Malley left the partnership and the firm changed its name to Eagan Avenatti LLP.  As recently as January 2019, AVENATTI was still practicing law under the name Eagan Avenatti LLP. According to AVENATTI's website, www.avenatti.com, he has

---

[3] Although AVENATTI was married to L.S. during the 2011 to 2017 tax years, based on my review of IRS tax records I know that L.S. filed separate tax returns during each of these years.

obtained over "$1 billion in verdicts and settlements as lead counsel" in cases throughout the country. AVENATTI has become a well-known public figure due to his representation of the plaintiff in Stephanie Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D. Cal.), a lawsuit against the President of the United States,[4] and frequent appearances on cable news shows.

     c.    EA LLP's office was located in Newport Beach, California until at least in or around November 2018.

     d.    AVENATTI has been since at least July 2013 the principal owner and CEO of GBUS, which operated Tully's stores in Washington and California.[5] GBUS's corporate offices were located in Seattle, Washington. In 2013, AVENATTI's company, GB LLC, acquired TC Global Inc., which previously operated Tully's, at a bankruptcy auction for approximately $9.2 million.

     e.    During civil depositions taken in October 2016 and July 2017 in connection with Bellevue Square LLC v. Global Baristas US, LLC et al, Case No. 15-2-27043-5-SEA (the "Bellevue Square Litigation"), which was pending in the Superior Court of

---

[4] I understand that the Clifford lawsuit was filed on March 6, 2018, well-after the EA LLP IRS collection case began in September 2015 and the GBUS IRS collection case began in September 2016. Indeed, IRS RO 1 first discussed a fraud referral to IRS-CI in connection with the GBUS collection case with his manager in September 2017, approximately six months before the Clifford lawsuit was filed.

[5] In or around October 2018, AVENATTI made press statements indicating that he was no longer the owner of GB LLC or GBUS and had recently sold the company for close to $28 million. To date, the government has been unable to locate any information confirming that AVENATTI sold GB LLC or GBUS. To the contrary, based on the information available to the government, it appears these statements were false.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 126 of 330 Page ID #:632
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 126 of 330 Page ID #:632
184   Page ID #:273

the State of Washington for King County, AVENATTI admitted the following:

> i.   A&A owns Doppio;
>
> ii.  Doppio owns at least 80% of GB LLC; and
>
> iii. GB LLC wholly owns GBUS, which handled "most of the day-to-day activities" of Tully's.

f.   Since approximately March 2017, EA LLP has been involved in bankruptcy proceedings; first in the Middle District of Florida and then transferred in April 2017 to the Central District of California, In re Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the "EA Bankruptcy"). (See infra § IV.D.2.) In connection with the EA Bankruptcy, AVENATTI admitted the following:

> i.   AVENATTI owns 100 percent of A&A.
>
> ii.  A&A owns 75 percent of EA LLP, and Michael Eagan owns the remaining 25 percent of EA LLP.

g.   In documents publicly filed with the Washington Secretary of State, AVENATTI is listed as the sole officer and director of Doppio, the sole governor and president of GB LLC, and the sole manager of GBUS.

h.   AVENATTI was also a competitive racecar driver from at least 2007 to 2015. The website www.driverdb.com indicates that AVENATTI competed in 34 races during that time period. AVENATTI is also the sole governor of GB Auto, a Washington Limited Liability Company that was formed in 2013 shortly after AVENATTI's company GB LLC purchased TC Global Inc., the operator of Tully's.

i.   In connection with the EA Bankruptcy, AVENATTI described REGNIER as his office manager, chief paralegal, and bookkeeper.

**C.   Tax Offenses Relating to Global Baristas US LLC (GBUS) and Global Baristas LLC (GB LLC)**

21.   As discussed below, there is probable cause to believe that AVENATTI committed a variety of tax offenses in connection with his ownership and control of GBUS.  Specifically, the investigation to date has revealed that AVENATTI intentionally failed to pay over to the IRS approximately $3,121,460 in payroll taxes, including approximately $2,390,048 in trust fund taxes that had been withheld from GBUS employees' paychecks. AVENATTI also took a number of steps to obstruct the IRS collection action and evade the collection of GBUS's payroll taxes by, among other things, lying to IRS RO 1, changing GBUS's merchant accounts to avoid IRS tax levies, instructing employees to deposit over $800,000 in cash from Tully's Coffee shops into a bank account associated with a separate entity to avoid IRS levies, and changing the company name on contracts involving GBUS and Boeing.

### 1.   Tax Information Regarding GBUS and GB LLC

22.   Based on my review of IRS tax records and discussions with IRS revenue officers and IRS revenue agents, I have learned the following regarding GBUS's payment of federal payroll taxes, including trust fund taxes (i.e., employee withholdings):

a.   Between July 2013 and September 18, 2015, GBUS paid its federal tax deposits, including trust fund tax

18

payments, to the IRS on a bi-weekly basis. During this time period, GBUS also filed its IRS Forms 941 each quarter.

    b.    After the third quarter of 2015, GBUS stopped filing its IRS Forms 941 and paying its federal tax deposits to the IRS.

    c.    On March 27, 2017, in connection with the IRS collection case, the IRS prepared substitute quarterly payroll tax returns for the fourth quarter of 2015 through the third quarter of 2016.

    d.    On October 18, 2017, in connection with the IRS collection case, GBUS filed IRS Forms 941 for the fourth quarter of 2015 through the second quarter of 2017, and an IRS Form 940 for 2016.

    e.    As detailed in the below chart, GBUS has failed to pay over approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes:[6]

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|---|---|---|---|---|---|
| 2015, Q4 | $466,215 | $292,724 | $173,489 | $292,725 | $292,724 |
| 2016, Q1 | $556,290 | $382,100 | $0 | $556,290 | $382,100 |
| 2016, Q2 | $437,336 | $297,791 | $0 | $437,336 | $297,791 |
| 2016, Q3 | $487,296 | $333,969 | $88,170 | $399,126 | $333,969 |
| 2016, Q4 | $405,440 | $277,681 | $0 | $405,410 | $277,681 |
| 2017, Q1 | $455,289 | $309,702 | $0 | $455,289 | $309,702 |

---

[6]    The tax figures included throughout this affidavit are approximate figures based on my preliminary review of IRS tax records, information provided to me by IRS revenue officers, and/or discussions with an IRS revenue agent.  IRS-CI is still in the process of completing its tax calculations.

| Period | Payroll Tax Assessed | Trust Fund Tax Assessed | Payments | Payroll Tax Owed | Trust Fund Tax Owed |
|---|---|---|---|---|---|
| 2017, Q2 | $502,969 | $345,094 | $0 | $502,969 | $345,094 |
| 2017, Q3 | $421,648 | $291,222 | $263,678 | $157,969 | $150,989 |
| 2017, Q4 | Unknown | Unknown | $85,684 | -$85,684 | Unknown |
| 2018, Q1 | Unknown | Unknown | $0 | Unknown | Unknown |
| TOTALS | $3,732,483 | $2,530,281 | $611,023 | $3,121,460 | $2,390,048 |

f.    Although the IRS received approximately $611,023 in payroll tax payments during the IRS collection case, such payments only account for a small portion (approximately 16 percent) of the total amount of payroll taxes GBUS owed to the IRS.  Moreover, approximately $261,661 of the payroll tax payments the IRS received was attributable to money received from financial institutions in response to the IRS levies, and approximately $349,362 is attributable to payments GBUS or EA LLP made to the IRS during the IRS collection case.[7]

g.    GBUS, GB LLC, and Doppio did not file federal corporate or partnership income tax returns for the 2013, 2014, 2015, 2016, or 2017 tax years.  In fact, GBUS, GB LLC, and Doppio have never filed federal corporate or partnership income tax returns.

---

[7] Bank records show that on or about October 31, 2017, EA LLP sent the IRS two wire transfers totaling approximately $263,660 as partial payment for GBUS's outstanding payroll tax liability.

20

### 2.    The IRS Payroll Tax Collection Case

23.    In or about September 2016, the IRS initiated a
collection action against GBUS due to its failure to file IRS
Forms 941 and pay its payroll taxes.  I have reviewed the
collection case file, including the ICS History.[8]  I also
participated in an interview with IRS RO 1 on September 26,
2018.  Based on my review of the collection case file and the
interview with RO 1, I have learned, among other things, the
following information:

a.    On September 24, 2016, the IRS opened a
collection case against GBUS based on a federal tax deposit
alert ("FTDA").  A FTDA is generated when a company that was
paying quarterly payroll taxes to the IRS stops making such
payments.

b.    On September 26, 2016, the collection case was
assigned to RO 1.  RO 1 ran an initial compliance check on GBUS
and determined that GBUS had already missed filing several
quarters of payroll tax returns.

c.    On October 7, 2016, RO 1 made a field visit to
GBUS's corporate offices in Seattle, Washington.  RO 1 met with
GBUS's Human Resources Director, M.E., and GBUS's Controller,
V.S.  RO 1 told M.E. and V.S. that the purpose of his visit was
to verify federal tax deposits, and that a FTDA had been

---

[8]  Based on my training and experience, I know that the ICS
History is a chronology of events that occurred during the
collection case.  During his interview, RO 1 explained that not
all of the information he receives is included in the ICS
History.  The ICS History is not meant to document every
statement, but is instead just a log of events.

generated based on the possibility that the company had fallen behind in its federal tax deposit payments.  Neither M.E. nor V.S. appeared surprised by RO 1's visit.  M.E. and V.S. both told RO 1 that AVENATTI was the corporate officer responsible for all of GBUS's business affairs.  RO 1 attempted to obtain payroll information from M.E. and V.S., but they did not want to give RO 1 any additional information until RO 1 had spoken with AVENATTI.  M.E. and V.S. gave RO 1 AVENATTI's contact information.

        d.    Later on October 7, 2016, RO 1 called AVENATTI and left a voicemail asking AVENATTI to call him back immediately.  When AVENATTI called RO 1, RO 1 stated the purpose of his visit to GBUS's corporate headquarters was to verify GBUS's federal tax deposits.  RO 1 also confirmed that AVENATTI was the corporate officer for GBUS.  AVENATTI appeared shocked and did not appear to understand how payroll taxes worked. AVENATTI said that he was not personally involved in the company's finances, and that his payroll staff and a third-party payroll company handled the company's payroll responsibilities and payroll taxes.  AVENATTI did not tell RO 1 the name of the third-party payroll company, but said that he would provide the information to RO 1 later.  RO 1 told AVENATTI that since September 2015 GBUS had not filed any payroll tax returns or made any federal tax deposit payments.  AVENATTI said he was very confused about this as well, and that he would talk to his accountant to see if the business had changed payroll companies in late-2015.  AVENATTI asked to speak to his accountant and

said he would call RO 1 back by October 13, 2016.  RO 1 also told AVENATTI that GBUS owed a balance of $7,758 for the 2015 third-quarter federal tax deposits, and was delinquent for the fourth quarter of 2015 and the first and second quarters of 2016.

    e.    On October 14, 2016, AVENATTI called RO 1 and said that he had talked to his accountant, M.H. (a certified public accountant in Los Angeles, California), who would be handling the collection case as the Power of Attorney ("POA") for GBUS because AVENATTI did not have time.

    f.    On October 20, 2016, RO 1 spoke with M.H.  M.H. did not have any information regarding GBUS's payroll taxes at the time.  M.H. said she had just been hired, and would need to obtain information regarding the business from AVENATTI.  RO 1 told M.H. that by November 14, 2016, GBUS needed to pay the remaining balance of $7,758 for the third-quarter of 2015, and file the delinquent quarterly payroll returns for the fourth-quarter of 2015 and the first three quarters of 2016.  RO 1 also requested that GBUS provide 12 months of bank statements, a 2016 profit and loss statement, and a fully completed IRS Form 433B (collection information statement for business).  RO 1 further told M.H. that he would need to set up an appointment for an IRS Form 4180 trust fund interview, the purpose of which is the determination of which corporate officers are responsible for making the federal tax deposits.  RO 1 explained to M.H. the consequences that would result if GBUS did not meet these deadlines, including the possibility of levies, summonses, and

seizures.  At no point during the call, did M.H. suggest that
AVENATTI was not the responsible party for GBUS's payroll tax
liabilities.

g.   On November 18, 2016, M.H. called RO 1 to request
an extension of the November 14, 2016, deadline to pay the
$7,758 remaining balance, file the delinquent returns, and
provide the requested financial information and IRS Form 433B.
M.H. told RO 1 that AVENATTI, GBUS's managing member, had been
out of the country for work and M.H. had not been able to have a
meaningful discussion with him regarding the status of the
business or its taxes.  M.H. said that AVENATTI was coming home
for the holidays and that she planned to meet with him
"intensely" to discuss the issues with the business.  RO 1
agreed to extend the deadline to December 19, 2016, and again
explained to M.H. the consequences that would result if GBUS did
not meet this deadline.

h.   As of the December 19, 2016, deadline, RO 1 had
not heard back from GBUS, M.H., or AVENATTI.  The IRS had not
received from GBUS any additional payments, the delinquent
returns, or the requested financial information.  As a result,
RO 1 mailed to GBUS and M.H. via certified U.S. Mail completed
substitute returns prepared by the IRS ("IRS Form 6020B"); IRS
Publication 5, which detailed appeal rights; blank IRS Form 940
and IRS Form 941 returns; and IRS Letter 1085, detailing the
proposed assessment and advising GBUS that the IRS had prepared
tax returns on the company's behalf and providing GBUS with 30
days to contest the assessment or file its own returns.  Based

on the IRS Form 6020B substitute returns, GBUS owed the IRS a balance of approximately $4.8 million in unpaid payroll taxes.

       i.   On or about December 22, 2016, GBUS paid the $7,758 balance due for the 2015 third quarter federal tax deposits.

       j.   On or about February 9, 2017, RO 1 filed IRS Form 6020B substitute returns with the IRS for the fourth quarter of 2015, and the first three quarters of 2016.

       k.   As of March 13, 2017, GBUS still had not filed its delinquent returns or provided any of the requested financial information. RO 1 attempted to contact M.H., but was unable to reach her. RO 1 left M.H. a message informing her that liens would be filed for all balances due from the IRS Form 6020B assessments. RO 1 also mailed out an IRS Form 9297 to GBUS and M.H., which stated that GBUS had until April 10, 2017, to file the delinquent returns and to provide the requested financial information and IRS Form 433B. GBUS did not comply with the April 10, 2017, deadline.

       l.   Because RO 1 had not heard back from GBUS or M.H. as of June 22, 2017, RO 1 began the process of filing notices of liens against GBUS for all amounts due to the IRS. On June 26, 2017, the IRS filed a federal tax lien against GBUS for approximately $4,998,227 with King County in Washington.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 135 of 330 Page ID #:641
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 03/22/2 Page 135 of 330 Page ID #:641
184   Page ID #:282

  m. On August 16, 2017, at RO 1's request, IRS levies[9] were issued to a number of financial institutions and companies associated with GBUS, including: (1) Bank of America ("BofA"); (2) California Bank & Trust ("CB&T"); (3) JP Morgan Chase Bank NA ("Chase"); (4) HomeStreet Bank ("HomeStreet"); (5) KeyBank; (6) Heartland Payment Systems ("Heartland"); (7) First National Bank of Omaha ("FNB Omaha"); and (8) Boeing.  The levy notices indicated that GBUS owed the IRS a total of approximately $5,210,769.  The levy notices were simultaneously mailed to GBUS's corporate offices.  As noted in paragraph 29.q below, funds provided to the IRS by the recipient financial institutions as a result of the levies were routinely noted on the monthly financial statements provided to GBUS and AVENATTI by the financial institutions.  RO 1 continued to issue additional levy notices to financial institutions and companies associated with GBUS throughout January 2018.  Because IRS levies only apply to funds in the accounts at the time the levy is issued, RO 1 issued levies on a nearly daily basis at various points in time.  In total, RO 1 issued approximately 125 levy notices.

  n. On or about August 21, 2017, RO 1 began the process of bypassing GBUS's representative, M.H.  Before

---

 [9] Based on my training and experience, I know that an IRS levy is used to collect money that a taxpayer owes to the IRS. The levy requires the recipient to turn over to the United States Treasury the taxpayer's property and rights to property, such as money, credits, and bank deposits, that the recipient of the levy has or is already obligated to pay to the taxpayer. Banks, savings and loans, and credit unions are obligated to hold any funds subject to the levy for 21 days before sending payment to the United States Treasury.

bypassing a taxpayer's representative, RO 1 was first required to issue a warning to M.H.  RO 1 called M.H. and left her a message stating that three separate attempts had been made to obtain information from her regarding GBUS, but that no information had been provided, and his calls had not been returned.  RO D.L also said that he would be bypassing M.H. if she made no further contact.  RO 1 did not receive a response.

> o.  On September 1, 2017, RO 1 visited GBUS's corporate headquarters.  RO 1 spoke to a GBUS employee, S.F., who confirmed that AVENATTI was the sole person responsible for GBUS's finances and served as both the CEO and Chief Financial Officer ("CFO").  S.F. also confirmed that the various notices the IRS sent to GBUS had been received by GBUS, and that the notices were being scanned and then emailed to AVENATTI.  S.F. said that AVENATTI was a practicing attorney in California. When asked for AVENATTI's email address, S.F. said she could not give that out.  S.F. did not appear surprised that RO 1 was visiting GBUS.  S.F. said she was aware of the IRS levies.  RO 1 also provided S.F. with a copy of IRS Letter 903, which stated that the Department of Justice was considering initiating a civil suit or criminal prosecution due to GBUS's failure to make its required trust fund payments to the IRS.  RO 1 also read the letter to S.F., who confirmed that she understood the letter. As noted in paragraph 32.f below, during a subsequent interview, S.F. confirmed that she told AVENATTI about RO 1's visit and provided him with a copy of the IRS 903 Letter.

p.   On September 1, 2017, upon returning to his office, RO 1 consulted with his general manager about a possible fraud referral to IRS-CI due to GBUS's non-compliance. RO 1's justification for the potential fraud referral was that GBUS had not provided any documents; RO 1 had been attempting to collect the taxes owed for one year and had only received one payment of approximately $7,000; the POA, M.H., had been dismissed; and Tully's stores were still operating.

q.   On September 5, 2017, Dennis Brager ("Brager"), an attorney from the Brager Tax Law Group, contacted RO 1. Brager said we would serve as the new POA for GBUS.  Brager told RO 1 that the payroll tax issues were all due to a financial error and that GBUS had gone through staffing changes in the financial or accounting department that had caused the payroll tax issue.  Brager also told RO 1 that AVENATTI knew nothing about the IRS issues until the delivery of the 903 Letter "last Friday" (i.e., September 1, 2017).  RO 1 explained to Brager that the case was a year old, he had been unable to get any information from the prior POA, M.H., and that liens and levies had already been issued.  Brager told RO 1 that the left hand did not know what the right hand was doing, that AVENATTI was busy, and that employees were not doing their jobs.  RO 1 told Brager that the balance due to the IRS was currently at $5,274,460.  Brager told RO 1 that GBUS would file original returns and correct all balances due.

r.   On September 6, 2017, S.F. contacted RO 1 and said she wanted to provide information to him confidentially due

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 138 of 330 Page ID #:644
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 138 of 330 Page ID #:644
184   Page ID #:285

to fear of reprisal from AVENATTI if he learned she had spoken

to the IRS.  RO 1 asked S.F. why she changed her mind and wanted

to talk to him.  S.F. said that after hearing RO 1 read the 903

Letter she became uncomfortable with AVENATTI's response to the

situation and the scramble she had had to go through to pay

vendors because of the filed levies.

>   s.   On September 15 and September 25, 2017, RO 1

called Brager's office, but was unable to reach him.  During the

call on September 25, RO 1 told the receptionist that he would

be faxing Brager a number of forms, and also mailing the forms

to Brager via certified mail.  Among other things, RO 1 sent

Brager a Form 9297, summary of contact letter, requesting full

payment of the approximately $5.3 million balance due, and

setting a deadline of October 16, 2017, for GBUS to file

original returns to correct the Form 6020B substitute returns.

The Form 9297 letter also advised GBUS that the IRS would seize

corporate assets from a number of Tully's locations if GBUS were

unable to pay the balance due.

>   t.   On September 26, 2017, RO 1 conducted a IRS Form

4180 trust fund interview with A.H., a former GBUS employee.

A.H. confirmed that she had been a payroll clerk and bookkeeper

at GBUS.  A.H. told RO 1 that AVENATTI was in charge of GBUS and

made all of the financial decisions for the company.

>   u.   On September 26, 2017, RO 1 also attempted to

conduct an IRS Form 4180 trust fund interview with T.M., GBUS's

former CFO and Chief Operating Officer ("COO"), at his home.  RO

1 eventually spoke with T.M. via telephone.  T.M. said he needed

to speak with counsel before speaking to RO 1.  Subsequently, on
or about November 3, 2017, RO 1 received a letter from T.M.'s
attorney attaching the completed Form 4180, a signed declaration
from T.M., and a copy of T.M.'s September 24, 2015, resignation
email to AVENATTI.  In the Form 4180, T.M. stated that AVENATTI
was the sole corporate officer for GBUS and was responsible for
GBUS's financial decisions.  The letter from T.M.'s attorney
also argued that T.M. was not personally liable for any of
GBUS's tax liabilities.

      v.   On October 3, 2017, RO 1 spoke with Brager.
Brager expressed shock that levies had been issued.  RO 1 told
Brager that the levies were issued because no federal tax
deposits had been received from GBUS and that GBUS was an
"egregious pyramider."[10]  RO 1 told Brager that RO 1 would agree
not to issue additional levies against GBUS until October 16,
2017, so that GBUS could take steps to make immediate federal
tax deposits.  Brager asked RO 1 for a "levy release," which RO
1 declined to provide because GBUS had not been in compliance
and had failed to provide any financial information.  When
Brager said that GBUS would not be able to make any federal tax
deposits due to the levies in place, RO 1 told Brager that GBUS
had not made any federal tax deposits since the fourth-quarter
of 2015, that the levies did not start until August 2017, and
that GBUS therefore had almost two years of payroll taxes
stashed away.  When asked what happened to the payroll taxes

---

      [10] RO 1 explained during his September 2018 interview that a
"pyramider" is a business that is accumulating payroll taxes
every quarter without making the required payments to the IRS.

that had been withheld from the employees from October 2015 to July 2017, Brager told RO 1 that he did not know and that he needed to talk to AVENATTI.

w.     On October 13, 2017, Brager contacted RO 1 and told him that GBUS had made a federal tax deposit payment for its payroll taxes.  Brager also said that GBUS had filed its original payroll tax return.

x.     On October 18, 2017, RO 1 received four payroll tax returns from GBUS for processing and four payroll tax returns for 6020B reconsideration.  As of October 18, 2017, however, the IRS still had not received any federal tax deposits from GBUS.  RO 1 left a message for Brager informing him that there had "still been no FTDS!"  In the message, RO 1 told Brager that the payment of the federal tax deposits needed to be immediate and retroactive since the last federal tax deposit payment had been made on November 2, 2015.

y.     On October 20, 2017, having still not received federal tax deposit payments from GBUS, RO 1 again began issuing daily levies to the financial institutions associated with GBUS, including KeyBank, CB&T, and FNB Omaha.  RO 1 also noted in the ICS History that the case was being considered for a fraud referral to IRS-CI.

z.     On October 26, 2017, the IRS received a $23,763 payment from GBUS.

aa.    In late October 2017, RO 1 noticed that the levies issued were not producing the expected amount of seized

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 141 of 330 Page ID #:647
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 141 of 330 Page ID #:288
184   Page ID #:288

funds.  This raised a red flag for RO 1 regarding GBUS's financial arrangements.

bb.  On November 2, 2017, Brager called RO 1 and faxed over two copies of federal tax deposits made by GBUS.  Brager requested that the IRS enter into an installment agreement with GBUS.  RO 1, however, told Brager that GBUS did not qualify for an installment agreement because GBUS had never provided the IRS with any financial information.  RO 1 told Brager that he believed the request for an installment agreement was merely a stall tactic and attempt to delay collection.[11]  During the call, Brager repeatedly told RO 1 that AVENATTI had relied on the payroll service provider to make payments but the provider had failed to make the deposits.  RO 1 responded that GBUS should have had the money at issue readily available since the federal tax deposits were never made.  Brager said he didn't know the financial information for GBUS, but would get together with AVENATTI and provide RO 1 with all the financial information within 10 days.  RO 1 told Brager that enforcement (i.e., additional levies) would continue during that time period.

cc.  On November 6, 2017, the IRS received a Form 941 payroll return for GBUS for the third-quarter of 2017.  The payroll return was signed by M.E.

dd.  On November 14, 2017, RO 1 spoke with a FNB Omaha employee.  RO 1 wanted to know why there had been no funds from the latest levies issued to FNB Omaha.  The FNB Omaha employee

---

[11]  RO 1's general manager reviewed the installment agreement request and agreed with RO 1's assessment that it was merely a delay tactic.

told RO 1 that GBUS had changed merchant accounts and was no longer using FNB Omaha as the sponsoring bank.  The employee said that GBUS might still be using TSYS as its credit card processor, but a different sponsoring bank.  RO 1 considered the change in merchant accounts to be a red flag.

  ee.  On November 14, 2017, a GBUS employee told RO 1 that: (1) the merchant account IDs had been changed in all of the Tully's stores on October 5, 2017; (2) FNB Omaha had requested the GBUS accounts be closed due to risk; (3) the account into which cash from the Tully's stores was deposited had been changed from a KeyBank account to a subsidiary account under the name of GB Auto; (4) cash was being deposited into a BofA account ending in 7412 ("GB Auto BofA Account 7412"); and (5) cash was retrieved from the coffee shops twice a week on Monday and Thursday mornings.  At this point, RO 1 believed that GBUS was actively placing assets out of the reach of the government.

  ff.  On November 17, 2017, M.G. called RO 1 to say that M.G. wanted to cooperate and remain anonymous due to fear of reprisal.  M.G. was the Director of Retail Operations for GBUS.[12]  M.G. said she was responsible for daily cash deposits and setting up merchant credit card processing services for all of the Tully's stores.  M.G. told RO 1 that GBUS's corporate headquarters and one of the Tully's retail locations had been closed due to non-payment of the lease.  M.G. said that she had

---

[12] Based on interviews of M.G. and S.F. conducted in September 2018, I know that M.G. and S.F. are sisters.

been instructed by V.S., GBUS's controller, to make numerous changes to the cash deposits and the merchant accounts, which made her feel uneasy and suspicious as to whether fraud was occurring.  M.G. said she had all the financial information and correspondence from AVENATTI regarding changes to the merchant accounts.  RO 1 told her that he would be summonsing her into the office to provide the documents.  He also asked M.G. to let him know if AVENATTI changed the bank accounts or merchant accounts again.

gg.  Later, on November 17, 2017, two GBUS employees, M.G. and V.S. were served with IRS summonses requiring them to appear before RO 1 and produce relevant GBUS business records.

hh.  On November 28, 2017, M.E. appeared for an interview in response to the collection summons RO 1 issued. During the interview, M.E. filled out a Form 4180.  M.E. said that since April 2016 she prepared, reviewed, signed, and authorized the transmission of payroll tax returns.  M.E., however, confirmed that AVENATTI was the owner and operator of GBUS, and that all financial obligations, if paid, were paid at the direction of AVENATTI.

ii.  On November 29, 2017, M.G. appeared for an interview in response to the collection summons RO 1 issued. M.G. provided RO 1 with bank account information for GBUS, GB LLC, and GB Auto.  M.G. confirmed that GBUS had changed both its credit card processing and cash deposit accounts.  M.G. said that cash from the Tully's stores were previously being deposited into a KeyBank account, but was now being deposited

34

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 144 of 330 Page ID #:650
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 144 of 330 Page ID #:291
184  Page ID #:291

into an account for GB Auto.  M.G. said that the entity name for the merchant accounts had been changed from GBUS to GB LLC. M.G. said that REGNIER, from EA LLP, had set up the new bank account for GB LLC.  M.G. also provided RO 1 with emails regarding the company's business, including emails regarding the merchant account changes.[13]

   jj.  On November 30, 2017, V.S. appeared for an interview in response to the collection summons RO 1 issued. V.S. told RO 1 that no payments for GBUS were made unless authorized by AVENATTI.  V.S. repeatedly said that AVENATTI refers to himself as the owner, CEO, and sole member of GBUS and that any and all decisions go through him.  V.S. said that funds were frequently transferred between GBUS and EA LLP, and that unreasonable legal fees were being paid to EA LLP.  V.S. also said that GBUS sponsored the International Motor Sports Association ("IMSA"), and spent approximately $200,000 in license fees and other investments relating to AVENATTI's racing team.  V.S. said that T.M., GBUS's former COO/CFO, and B.H., GBUS's former Director of Operations were both aware of the financial irregularities at GBUS.  V.S. also provided RO 1 with email correspondence involving AVENATTI, as well emails regarding the changes to the TSYS merchant accounts.[14]

   kk.  On December 5, 2017, M.G. told RO 1 that AVENATTI had instructed all of the Tully's stores to hold their cash

---

[13] IRS-CI's collection and review of these emails is discussed further in footnote 15 below.

[14]  IRS-CI's collection and review of the emails V.S. provided is discussed further in footnote 15 below.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 145 of 330 Page ID #:651
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 145 of 330 Page ID #:651
184   Page ID #:292

deposits until further notice.  M.G. said AVENATTI was also very curious about what documents were submitted to the IRS in response to the summons and wanted a full account of the documents submitted.

ll.  On or about December 7, 2017, Brager sent a letter to RO 1's general manager complaining about the summonses issued to GBUS employees.  Among other things, Brager's letter claimed that the IRS had provided inadequate notice of the summonses to GBUS.  Brager further claimed that RO 1 may have obtained privileged information from the employees because AVENATTI is both the managing member of GBUS and its general counsel.[15]

mm.  On December 11, 2017, RO 1 contacted A.R.G., a lawyer for Boeing, regarding the sale of the Tully's kiosks while IRS liens were pending.  On December 12, 2017, A.R.G. emailed RO 1 a copy of the Global Baristas contract, and an email exchange with AVENATTI.  A.G. stated that the contract was

---

[15]  In April 2018, following the fraud referral to IRS-CI, RO 1 provided me with PDFs of six documents he had received in response to the summonses.  In May 2018, RO 1 also provided me with a disk containing additional documents he had received in response to the summonses.  I briefly reviewed the six PDFs, but did not review any of the materials on the disk.  Later in May 2018, while reviewing RO 1's case file, I learned of Brager's privilege claim.  I then provided the materials I received from RO 1 to an attorney with the Department of Justice's Tax Division so that a privilege review could be conducted.  I understand that a Privilege Review Team AUSA ("PRTAUSA") subsequently conducted a review of the materials in August 2018.  The PRTAUSA redacted two portions of one email on the basis that GBUS might be able to claim that the redacted portions were protected by the attorney-client privilege, but concluded that none of the other documents RO 1 had provided were protected or potentially protected by the attorney-client privilege.  The redacted email and the remaining documents were then released to IRS-CI and the prosecution team for us to review.

actually with GB Hospitality, LLC.  In the email, A.G. said that AVENATTI "verbally had asked me to use the entity Global Baristas, LLC on the Bill of Sale as he said it was the entity that held title to the equipment."

      nn.  On December 14, 2017, RO 1 spoke with M.G. and S.F.  They told him AVENATTI had instructed the Tully's stores to hold the cash deposits because he was in the process of setting up new accounts to take cash deposits.  They also told RO 1 that GBUS was in the process of finalizing a new merchant credit card account with Chase Bank under the name of GB LLC.

      oo.  On December 14, 2017, RO 1 issued a summons for AVENATTI to appear for a 4180 trust fund interview.  On January 11, 2018, Brager advised RO 1 that AVENATTI would not appear because AVENATTI had not been properly served with the summons.

      pp.  As of January 2018, RO 1 was still issuing levies to known bank accounts associated with GBUS, as well as to bank accounts associated with GB LLC and GB Auto.  These levies typically resulted in the recovery of only $50 to $100.

      qq.  On February 2, 2018, Brager sent RO 1 a protest of the proposed trust fund recovery penalty assessments against AVENATTI and GBUS.  Among other things, Brager claimed that AVENATTI "did not act willfully since he was not involved in the preparation, or calculation of the payroll taxes" and "did not have knowledge of the fact that the taxes were unpaid until after the taxes had accrued."  Brager therefore argued that AVENATTI was not a "responsible person" for GBUS and "cannot be

held personally liable for the trust fund taxes owed by Global Baristas, US LLC."

   rr. On March 12, 2018, RO 1 made field visits to a number of Tully's locations, each of which had signs posted on the door stating that the store was temporarily closed. RO 1 then contacted a GBUS employee, who told him that the closures were in fact permanent.

   ss. On March 19, 2018, the IRS Fraud Technical Advisor's Manager approved a fraud referral to IRS-CI.

### 3. *GBUS Employee Interviews*

 24. As part of its investigation, IRS-CI has interviewed numerous former GBUS employees. At the outset of each interview, Assistant United States Attorneys ("AUSAs") working on this investigation requested that the employee not provide the government with any information that might be covered by the attorney-client privilege. The AUSAs explained that any legal discussions the employee may have had with lawyers acting on behalf of GBUS or any other company the employee worked for could potentially be covered by the attorney-client privileged, and that the company would hold the privilege -- meaning that only the company could decide to disclose privileged communications to the government. The AUSAs further explained that the government understood that GBUS's owner and CEO, AVENATTI, was also a lawyer and may have acted both in a business capacity and a legal capacity on behalf of GBUS. The AUSAs asked the employees to inform the interviewers if at any point the questions might require the employees to disclose

legal discussions they had with AVENATTI, and to not disclose
any legal discussions they may have had with AVENATTI in his
capacity as a lawyer for GBUS.  Each of the employees said they
understood and agreed not to provide any information that they
believed could be potentially privileged.

     25.  On November 13, 2018, I participated in an interview
of T.M., GBUS's former Chief Operating Officer ("COO") and Chief
Financial Officer ("CFO").  T.M. was accompanied by his personal
attorney.  T.M. provided the following information:

          a.   T.M. met AVENATTI in approximately 2011 through
T.M.'s work for Cascade Capital Group ("Cascade").  In 2012,
T.M., AVENATTI, and others were attending a bankruptcy hearing
in connection with the Meridian Mortgage Funds ("Meridian")
bankruptcy case.  Prior to the Meridian hearing, there was a
hearing regarding the auction to purchase TC Global, Tully's
parent company, out of bankruptcy.  During that hearing,
AVENATTI expressed an interest in purchasing TC Global out of
bankruptcy.  AVENATTI then hired Cascade to do due diligence on
TC Global and Tully's.  In January 2013, AVENATTI, through GB
LLC, put in a successful bid of $9.15 million to purchase TC
Global at a bankruptcy auction.  The purchase closed in June
2013.

          b.   T.M. worked as a consultant for GBUS beginning in
July 2013.  In October or November 2013, T.M. took a full-time
position as GBUS's COO and CFO.  T.M worked for GBUS until
September 24, 2015, when he resigned.  Between approximately
January 2015 and September 2015, T.M. worked for GBUS only half-

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 149 of 330 Page ID #:655
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 14 of 03/22/13 of Page 655 of
184   Page ID #:296

time.  T.M.'s base salary was $250,000, with incentives of up to
$150,000 annually.  T.M. was also supposed to receive "phantom
equity" in GBUS, under which T.M. would receive six percent of
the sale proceeds of GBUS equity in excess of $9,150,000.

     c.   AVENATTI's title at GBUS was CEO and he was on
GBUS's payroll as its CEO.  T.M. considered AVENATTI to be the
owner and CEO.  T.M said he "treated this as if I was working
for the owner."  AVENATTI's role was to identify strategy and
make decisions for GBUS.  T.M. said that AVENATTI was the
ultimate decision maker for GBUS and that every important
decision was approved by AVENATTI.  For example, AVENATTI made
all of the hiring decisions for GBUS, and interviewed and vetted
the candidates.

     d.   T.M. said that AVENATTI's default position at
GBUS was not as a lawyer.  When asked whether AVENATTI ever
acted as a lawyer for GBUS, T.M. said he did not know and that
this was a gray area.  T.M., however, said that he did not see
any invoices from EA LLP and was not aware of GBUS ever hiring
EA LLP to do legal work for GBUS.  T.M. considered his
conversations with AVENATTI to be about business matters, not
legal matters.

     e.   T.M. said that for the entire time he worked for
GBUS, Foster Pepper PLLC was GBUS's operational counsel.  T.M.
saw invoices from Foster Pepper to GBUS, which were then routed
to AVENATTI.

     f.   T.M. said that GBUS used a third-party payroll
company, but was not sure of the company's name.  The prior

payroll company had not been allowing direct deposit of wages for employees because of cash flow issues.  When GBUS switched to a new payroll company, GBUS set up direct deposit for its employees.[16]  As cash flow got tighter at GBUS, direct deposit was rolled back.  T.M. discussed rolling back direct deposit and reverting to paper checks with AVENATTI.

   g. T.M. explained that after direct deposit was stopped in 2015, the payroll company would generate payroll checks on GBUS's stock checks.  When GBUS had direct deposit, the payroll company would pull the funds for payroll and payroll taxes out of GBUS's payroll account on the Friday before the Monday payday.  The money for payroll would therefore be gone immediately.  Cancelling direct deposit gave GBUS "float time" until the employees' checks cleared the following week, meaning that the payroll funds would still be in GBUS's bank account and GBUS had more time to make funds available to pay the employees and its payroll taxes.

   h. T.M. resigned his position at GBUS in large part due to payroll tax issues at GBUS and because he was concerned about his personal liability.  Payroll was very tight and GBUS could not always meet its payroll obligations.  On three or four occasions, T.M. loaned GBUS money so that it could cover the gaps in its payroll obligations.  T.M. estimated that he loaned

---

[16] Based on interviews with other GBUS witnesses, I learned that GBUS used Ceridian for its payroll services at all times. While T.M. appears to have been mistaken about GBUS's use of a prior payroll company, T.M.'s statements regarding direct deposit are consistent with statements made by other former GBUS employees.

GBUS $10,000 to $40,000 to meet its payroll obligations.  This money was paid back prior to T.M.'s resignation.

      i.   On September 24, 2015, T.M. had a phone conversation with AVENATTI regarding the outflow of funds for that week.  T.M. told AVENATTI that GBUS needed funds to pay its payroll taxes the next day.  AVENATTI told T.M. not to count on that.[17]  Based on AVENATTI's response, T.M. told AVENATTI that it would be his last day.  He then emailed AVENATTI a resignation letter later that same day.

      j.   T.M. said that AVENATTI was aware that GBUS needed to pay its payroll taxes.  T.M. specifically discussed GBUS's obligation to pay its payroll taxes with AVENATTI on more than one occasion.[18]

      k.   M.D. was the head of Human Resources and Payroll for GBUS.  GBUS's IRS Forms 940 and IRS Forms 941 were normally filed by M.D.  T.M. would be notified when they were filed.

      l.   T.M. was asked whether AVENATTI ever withdrew money from GBUS.  T.M. said that money was flowing out of GBUS as early as August 2013.  AVENATTI was a signer on GBUS's bank accounts, and there were frequent transfers from GBUS to EA LLP

---

[17]  As detailed in paragraph 22.b above, IRS records show that GBUS stopped making federal tax deposit payments to the IRS after the third quarter of 2015.

[18]  During the discussion of GBUS's payroll tax obligations, T.M. began to mention a discussion he and AVENATTI had with a labor lawyer from Foster Pepper in early 2015.  The AUSAs immediately instructed T.M. not to provide any information regarding the substance of his conversations with Foster Pepper. T.M. followed that instruction and did not provide any information regarding the substance of his discussions with GBUS's lawyers.

and from EA LLP to GBUS.  T.M. said that none of the transfers
to EA LLP were for legal services EA LLP provided to GBUS.
AVENATTI would not tell T.M. in advance that he would be taking
money out of GBUS's bank accounts -- the money would just be
gone.  M.B., GBUS's controller at the time, would tell T.M. when
AVENATTI had taken money out of the GBUS bank accounts.  When
T.M. asked AVENATTI if he was going to stop taking money in and
out of GBUS's bank accounts, AVENATTI responded that he did not
foresee that happening.  AVENATTI did not tell T.M. what the
funds AVENATTI was taking out of GBUS's bank accounts were being
used for.  GBUS's accounting team tracked the money AVENATTI
transferred into and out of GBUS.

  m. T.M. initially had authority to sign company
checks, which were cut whenever vendor invoices were due.  By
approximately March 2015, however, this had changed.[19]  T.M.
would provide AVENATTI with a list of vendors' invoices.
Sometimes T.M. would make the decision to pay vendors on his
own, and other times AVENATTI would approve the payments to
vendors.

  n. T.M. said that the daily operations of the
Tully's stores went through GBUS.  All cash receipts came from
GBUS and everything happened under GBUS.  T.M. did not recall
any cash receipts coming from GB LLC.

---

[19] Based on my review of GBUS bank account records, I know
that in February 2015 GBUS opened two new accounts at CB&T.
AVENATTI and REGNIER were the only signatories on these bank
accounts.

o.  T.M. said that the majority of GBUS's profits came from the Tully's stores at Boeing facilities.  The commission payments to Boeing were delayed more than once because of working capital restrictions.  T.M. had never heard of a company called "GB Hospitality," which was the name AVENATTI used on the Boeing contract in November 2016 (see ¶ 39.d).

p.  T.M. is familiar with The Peoples Bank in Mississippi because of litigation that Cascade and AVENATTI worked on involving Mississippi Power.  T.M., however, was not aware of AVENATTI obtaining a loan from The Peoples Bank.  T.M. did not recall seeing any loan documents, and there was no debit or credit item for a loan from The Peoples Bank in GBUS's financial statements.

q.  T.M. was also asked about GB Auto.  T.M. said GB Auto was AVENATTI's racing team in IMSA.  Money that was sent from GBUS to GB Auto would have been tracked by the accounting team.  AVENATTI also signed GBUS up as a coffee sponsor for IMSA.  AVENATTI used the Tully's logo on his race car and an employee would serve Tully's coffee at IMSA events.  T.M. said that the IMSA expenses did not help with GBUS's operations.

r.  T.M. did not know whether corporate tax returns for GBUS had been completed or filed.  T.M. had arranged for GBUS to hire a tax accountant in Tampa, Florida, to prepare GBUS's tax returns.  AVENATTI participated in meetings with the accountants by phone.  The accountants provided GBUS with a list of documents that were needed to prepare the tax returns,

including a number of documents that would have been in AVENATTI's control. T.M. did not know if AVENATTI ever provided the required documents to the accountants.

s.    AVENATTI had a GBUS email address, but T.M. always emailed AVENATTI at his EA LLP email address.

t.    T.M. said that REGNIER was responsible for all of AVENATTI's administrative needs. REGNIER would have been copied on all emails to AVENATTI regarding GBUS's cash needs. T.M. understood that REGNIER had been with AVENATTI for a very long time.

u.    T.M. was asked about a settlement agreement he entered into with AVENATTI and GBUS in 2018 relating to money GBUS still owed T.M. as part of his employment agreement. As part of the settlement, on or about October 2, 2018, T.M. received a $35,000 check from A&A's CB&T bank account, which bounced. T.M. guessed that the check was signed by REGNIER.

v.    Prior to the interview with T.M., I learned that on or about October 31, 2018, T.M. filed a civil lawsuit against AVENATTI in the Superior Court of the State of Washington for King County for wrongful wage withholding; breach of contract; dishonored check; and fraud and misrepresentation. The civil complaint alleges that AVENATTI failed to pay T.M. money he was owed under his employment agreement with GBUS. In addition to the incentive payments mentioned in paragraph 25.b above, the complaint notes that AVENATTI had recently been quoted in a October 24, 2018, Seattle Times article as saying that he sold "Global Baristas . . . for $28 million a long time ago." T.M.

claimed that under the terms of his employment agreement, he
would have been entitled to six percent of the sale proceeds
above $9.15 million.

      w.  T.M. said he had never discussed selling GBUS
with AVENATTI and does not know if AVENATTI ever sold GBUS.

    26.  On October 24, 2018, I participated in an interview of
M.B., GBUS's former Controller.  M.B. provided the following
information:

      a.  In October 2013, M.B. began working at GBUS as
its Controller.  M.B. had been recruited by T.M., and
interviewed for the position with T.M. and AVENATTI.  She
reported to T.M.  M.B. worked full-time at GBUS until December
2015, and part-time at GBUS in January 2016.

      b.  M.B. managed GBUS's accounting department.
M.B.'s role at GBUS included assessing and running the
accounting systems, overseeing the financials, and looking at
the day-to-day accounting figures.

      c.  AVENATTI was the owner and CEO of GBUS.  M.B. did
not know AVENATTI to be the General Counsel of GBUS.

      d.  AVENATTI would authorize payments for GBUS.  M.B.
would email T.M. and AVENATTI to ask what bills to pay.  M.B.
would usually get a response of approval from T.M., and
sometimes from AVENATTI.

      e.  GBUS used Ceridian for its payroll services.
Ceridian was initially responsible for paying the payroll taxes
and preparing and filing the payroll tax returns.  M.B. believed
this was set up by T.M. or AVENATTI.

    f. In the second or third quarter of 2015, AVENATTI
directed Ceridian to stop paying GBUS's payroll tax withholdings
and told Ceridian that GBUS would pay the payroll taxes itself.
This gave GBUS float time for the payroll payments.  M.B.
explained that AVENATTI was the only signatory on GBUS's payroll
account and that no one other than AVENATTI was empowered to pay
the payroll tax withholdings.  After this change, M.D. (GBUS's
Human Resources and Payroll Director) was responsible for filing
the payroll tax returns, and AVENATTI was responsible for paying
the payroll tax withholdings.  M.B. said the decision to change
the payment process for GBUS's payroll tax withholdings with
Ceridian was made by AVENATTI, and went from AVENATTI to T.M.,
and then from T.M. to M.D.  M.B. believes that AVENATTI would
have signed the forms authorizing the change with Ceridian.

    g. For the third-quarter of 2015, Ceridian paid the
net salary to GBUS employees, Ceridian prepared the IRS Form 941
payroll tax return, and GBUS was responsible for paying the
payroll tax withholdings to the IRS.  AVENATTI, however, would
not approve the payment of the payroll tax withholdings.  M.B.
said that AVENATTI directed M.D. not to pay GBUS's payroll taxes
for the third-quarter of 2015.  M.D. was mortified by this
directive and told M.B. about it.

    h. M.B. documented AVENATTI's instruction not to pay
GBUS's payroll taxes and sent AVENATTI an email explaining the
ramifications of not paying the payroll taxes.  AVENATTI did not
respond to her email.  When M.B. asked AVENATTI over the phone
whether he had received her email, he responded that it was

Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 157 of 330 Page ID #:663
Case 8:19-mj-00419-DUTY *SEALED* Document 1 Filed 05/24/19 Page 157 of 330 Page ID #:663
184   Page ID #:304

"mine to deal with."  M.B. did not believe she saved a copy of
this email, and was unable to locate a copy of it in her
personal emails following her interview.

       i.   M.B. remembered seeing emails from M.D. to
AVENATTI requesting that AVENATTI approve the payment of the
payroll tax payments.  M.B. also sent similar requests to
AVENATTI.

       j.   M.B. said that V.S. and B.C. from the accounting
department knew that GBUS's payroll taxes were not being paid
because they had access to GBUS's financials.  M.E. from the
human resources department also knew that the payroll taxes were
not being paid.  In fact, M.B. speculated that everyone in
GBUS's corporate office knew about the payroll tax issues
because the corporate office was small, and the employees were
close on a professional level.

       k.   M.B. said the payroll tax issue was the "nail in
the coffin" as to her decision to leave GBUS.  She left GBUS a
few months later in December 2015, and actually took a pay cut
to leave GBUS.  She said that AVENATTI's "moral compass didn't
point north."

       l.   M.B. thought GBUS spent approximately $750,000 in
connection with its IMSA sponsorship.  GBUS was hemorrhaging
money at the time and M.B. did not think the IMSA sponsorship
was the best use of funds.  Without the IMSA expenses GBUS would
have been cash neutral and in a better financial position.  M.B.
considered the IMSA sponsorship to be a "vanity" decision by
AVENATTI.

m.   M.B. said that AVENATTI would frequently transfer money in and out of GBUS's bank accounts.  This happened for months.  M.B. would login into GBUS's bank accounts and see wires to and from EA LLP or A&A.  M.B. would reconcile the bank accounts every day and tracked the funds deposited or withdrawn by AVENATTI.  M.B. said the amount AVENATTI deposited was likely more than the amount he withdrew, but that if you included the money AVENATTI spent on IMSA he would likely have owed GBUS money.  M.B. said that AVENATTI's deposits and withdrawals from GBUS's bank account had an impact on GBUS's operations.  GBUS was operating with a cash loss and some of the money AVENATTI withdrew could have been used to pay vendors.

n.   AVENATTI would wonder why GBUS was short on cash. In response, M.B. would prepare cash reports and give them to AVENATTI.

o.   M.B. said that AVENATTI's law firm was not an investor in GBUS.  There were no invoices between the law firm and GBUS, and no formal loan documents between GBUS and AVENATTI's law firm.

p.   M.B. would send emails to AVENATTI at his EA LLP email address.  M.B. would typically communicate with AVENATTI via email or by phone.  M.B. only saw AVENATTI a few times a year.

q.   REGNIER was the right hand person for AVENATTI at his law firm.  M.B. dealt with REGNIER a few times when M.B. needed AVENATTI to get something done for GBUS.  REGNIER would get AVENATTI to take action at M.B.'s request.

27.   On October 24, 2018, I participated in an interview with M.D., GBUS's former human resources and payroll director. M.D. provided the following information:

a.   M.D. started working at Tully's in 2000 in the payroll department.  He worked for Tully's when it was sold to TC Global in 2008, and stayed on after AVENATTI bought TC Global out of bankruptcy.  His job duties at GBUS included overseeing payroll, human resources, and facilities.  M.D. resigned from GBUS in November 2015.  M.D., however, worked part-time at GBUS until April 2016 to help with payroll.

b.   GBUS used Ceridian to handle its payroll the entire time that M.D. worked for GBUS.  Payroll was on Mondays, so the funds would need to be available in GBUS's payroll account on the prior Thursday or Friday.  In 2013 and 2014, Ceridian was a full service payroll processor for GBUS. Ceridian's services during this time included direct deposit drawn on Ceridian's bank account, withholding, tax filings, and W-2s, among other things.  These were the services provided for the first year-and-a-half, at which point T.M. instructed M.D. to stop the direct deposit service.   Thereafter, payroll was no longer paid from Ceridian's bank account, but instead from GBUS's payroll bank account.  The checks were still cut by Ceridian, but the money was drawn on GBUS's payroll bank account.

c.   M.D. said another change occurred in the summer of 2015, when the wires to pay the payroll taxes were not approved.  Ceridian requested the payroll tax money and the

payment did not get approved by GBUS.  M.D. recalled telling M.B. that he had been notified by Ceridian about the non-payment of the payroll taxes by GBUS.  M.D. did not know if the payroll tax payments were ever made to Ceridian.

       d.   M.D. said that a couple of times the payroll payments to Ceridian were late.  After a while, Ceridian told M.D. that it was no longer going to make payroll payments due to GBUS failing to pay Ceridian on time.  Ceridian was also no longer filing GBUS's payroll tax returns.  M.D. told M.B. about this, who then told T.M. and AVENATTI.

       e.   M.D. said that bi-weekly payments to the IRS stopped once the Ceridian services and payments were discontinued.  He believed that AVENATTI, not T.M., made the ultimate decision to terminate Ceridian's services.

       f.   In the third quarter of 2015, GBUS's payroll tax payments were not made because AVENATTI did not approve the payments.  M.B. told M.D. that AVENATTI did not approve the tax payments.

       g.   M.D. said he started looking for a new job because of the lack of payroll tax payments.  He thought it was "unethical" that payroll tax payments were not being made even though GBUS was withholding taxes from GBUS employees.  He was concerned someone would blame him so he started looking for a new job.  He described GBUS's failure to pay its payroll taxes as the final straw in his decision to leave GBUS because he believed GBUS had the fiduciary responsibility to pay the IRS. M.D. ultimately took a pay cut to leave GBUS for another job.

h. M.D. did not know if the payroll tax payments for the third or fourth quarter of 2015 were ever paid by GBUS. M.D., however, said that the payroll tax payment requests would have been sent to GBUS's accounting team. M.D. would send check requests for the state and federal tax payments to V.S.

i. M.D. shared his concerns regarding the payroll tax issues with M.B., because T.M. had already left GBUS at the time.

j. M.D. understood that M.B. was speaking to AVENATTI about the payroll taxes that needed to be paid. M.B. told him about her discussions and communications with AVENATTI regarding the payroll tax issues.

k. M.D. believed that he, M.B., and M.E., who worked for him in the human resources and payroll department, were the only employees that knew GBUS was not paying its payroll taxes.

l. M.D. believed that AVENATTI and T.M. were signatories on the GBUS bank accounts. M.D. said that no checks could be cut without AVENATTI's approval.

m. M.D. considered AVENATTI to be the owner, President, and CEO of GBUS. This is how AVENATTI presented himself. M.D. did not consider AVENATTI to be GBUS's General Counsel, and never heard AVENATTI refer to himself as GBUS's General Counsel. M.D. was not aware of GBUS ever hiring EA LLP to perform any legal services for GBUS.

n. M.D. had limited interactions with AVENATTI during his time at GBUS. M.D. had seen AVENATTI only four or five times. He did not recall having any significant

52

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 162 of 330 Page ID #:668
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 162 of 330 Page ID #:668
184   Page ID #:309

conversations with AVENATTI or any one-on-one phone calls with him.  M.D. typically interacted with T.M. and M.B.

      o.  M.D. emailed AVENATTI approximately 10 times at his EA LLP email address.  AVENATTI had a GBUS email address, but did not use it.

      p.  M.D. was scared of AVENATTI when he worked at GBUS because he did not want to be personally sued.  M.D. respected AVENATTI at first, but over time he no longer trusted AVENATTI and became concerned that AVENATTI would sue him for anything.  M.D. also expressed concern that AVENATTI might attempt to retaliate against him if he learned that M.D. was cooperating with the government's investigation.

28.  On October 22, 2018, I participated in an interview of B.H., GBUS's former Director of Operations.  B.H. provided the following information:

      a.  From early 2014 to early 2016, B.H. worked at GBUS as its Director of Operations.  T.M. recruited B.H. for the position because they had previously worked together at Cascade. B.H. met with T.M. and AVENATTI before accepting the position.

      b.  As Director of Operations, B.H. was responsible for overseeing the district managers, dealing with store-related issues, and dealing with IMSA-related issues.  The individual store managers reported to the district managers, and the district managers reported to B.H.  B.H. said 90 percent of their focus was on reaching the stores' revenue goals.

c.   B.H. knew AVENATTI as the owner and head of GBUS. AVENATTI's role at GBUS was to make major decisions, such as decisions regarding finances and lease agreements.

d.   B.H. was aware that AVENATTI was a lawyer. B.H.'s legal experience with AVENATTI related to a dispute between GBUS and Green Mountain.  B.H. said that if there was a legal issue, AVENATTI handled it.  B.H. had no knowledge of AVENATTI's law firm doing any work for GBUS.

e.   B.H. said payroll time was stressful at GBUS because cash was always tight.  B.H. heard rumors around the office that GBUS was not paying payroll taxes.  B.H. thought he heard these rumors from T.M., M.B., and M.D. when he discussed the need to pay bonuses to GBUS's district managers.  B.H. said he did not have first-hand knowledge of GBUS not paying taxes, but stated that not paying taxes went into the "barrel of bad," and believed that AVENATTI would have been aware of such issues.

f.   The Tully's stores at Boeing facilities were a very important part of business for GBUS.  AVENATTI was aware of this.  B.H. dealt with the paperwork for the GBUS stores at Boeing.  B.H. had never heard of the name GB Hospitality, which was the name AVENATTI used on the Boeing contract in November 2016 (see ¶ 39.d).  The only name B.H. was aware of was GBUS.

g.   B.H. spoke with AVENATTI about once or twice a month, and saw AVENATTI once a month at most.  Most of B.H.'s conversations with AVENATTI related to the IMSA sponsorship. B.H. said he never understood why AVENATTI wanted to have GBUS at IMSA when GBUS already had enough problems.  B.H. felt that

GBUS was losing money on the IMSA sponsorship, and said that AVENATTI could have been using the money he spent on IMSA on coffee supply.

      h.   B.H. said he left GBUS because AVENATTI did not follow through on the future plans for GBUS.  AVENATTI did not reinvest into the company and the stores were failing.  B.H. said there was a "steady bleeding" of GBUS and AVENATTI placed "band aids" on it.  The big reason B.H. decided to work for GBUS was AVENATTI's promise of growing the business, but this never happened.  B.H. assumed T.M. left for similar reasons.

      i.   GBUS stored its corporate records on a server hosted by Amazon Web Services ("AWS").

      j.   B.H. would call REGNIER to schedule things with AVENATTI.

    29.  On October 22, 2018, I participated in an interview with V.S.  V.S. provided the following information:

      a.   V.S. started working at Tully's Coffee Inc. in 2003 or 2004.  He worked for Tully's Coffee Inc., TC Global, and then eventually GBUS.  He resigned from GBUS on September 18, 2018.  V.S. stopped working for GBUS because his paycheck bounced.

      b.   V.S. became the Assistant Controller when GBUS bought out TC Global.  V.S. then became the Controller when M.B. left GBUS in 2015 or 2016.

      c.   V.S. knew AVENATTI to be the owner and operator of GBUS.  AVENATTI was the CEO, and T.M. was the CFO.

d.    When he was Assistant Controller, V.S. reported to M.B.  For financial decisions, M.B. reported to T.M., who in turn reported to AVENATTI.  AVENATTI was T.M.'s boss.

e.    V.S. said that AVENATTI was not physically present at GBUS's corporate office, but was actively involved in operating the company.  T.M. would relay messages to AVENATTI regarding the day-to-day operations of the company.

f.    After T.M. left GBUS, AVENATTI communicated with M.B. and B.H. regarding GBUS's day-to-day operations.  Once M.B. left, V.S. reported directly to AVENATTI, who was effectively the head of the financial department.  V.S. communicated with AVENATTI by email 90 percent of the time and by phone 10 percent of the time.  AVENATTI used his EA LLP email address, rather than his GBUS email address.

g.    When T.M. left GBUS, he received bonus and severance pay from GBUS.  AVENATTI authorized those payments, and REGNIER handled the wire transfers.  V.S. saw the wires on the bank account records, but did not have wiring authority for GBUS's bank accounts.

h.    V.S. would email AVENATTI cash reports daily. V.S. said that the accounts payable department wanted bills to be paid weekly, but there was never enough money to pay all of the bills.

i.    AVENATTI moved money in and out of GBUS bank accounts on a regular basis.  This happened from the beginning of GBUS's operations.  V.S. had access to GBUS's bank account

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 166 of 330 Page ID #:672
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 166 of 330 Page ID #:672
184  Page ID #:313

records.  V.S. saw the movement of funds when he would do the
bank account reconciliations for GBUS.

    j.  V.S. said he reported to AVENATTI because
AVENATTI was the CEO and owner of GBUS.  V.S.'s primary
discussions with AVENATTI were about what bills to pay and what
was in the bank account.  V.S. said he often could not tell how
much money was in the bank accounts because money moved in and
out frequently.

    k.  V.S. said he asked AVENATTI for supporting
documents for some bank account activities once or twice.
AVENATTI's response was that he was the CEO and owner, and that
he makes the final decisions.

    l.  V.S. described the accounts payable process.
V.S. said that the invoices were entered into the accounting
system.  A list of invoices that were due soon was sent to
AVENATTI.  AVENATTI would then decide which invoices were to be
paid and which invoices were to have their payments held off.
AVENATTI would tell S.F. to cut a check for the invoice payments
he approved.  For the invoices AVENATTI did not approve, V.S.
would wait another week and then bring the invoices up to
AVENATTI again.  If payment of the outstanding invoices became
more imperative, V.S. would bring the issue to AVENATTI's
attention more quickly.  V.S. said he knew what invoices needed
to be paid, but still needed AVENATTI's approval to pay the
invoices.

    m.  Ceridian handled the payroll for GBUS.  Ceridian
was also responsible for paying the payroll tax withholdings on

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 167 of 330 Page ID #:673
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 167 of 330 Page ID #:673
184   Page ID #:314

behalf of GBUS.  In approximately 2015 or 2016, however, GBUS
had Ceridian stop paying the payroll tax withholdings.  V.S. did
not know why this change occurred.

   n.   V.S. said that GBUS did not pay the payroll tax
withholdings.  Ceridian would calculate the payroll
withholdings, and M.E. would book the accounting entry in
Microsoft Dynamics Nav, GBUS's accounting software.  M.E. would
email AVENATTI, with a copy to V.S., the amount needed to pay
the payroll tax withholdings.  AVENATTI would respond by saying
that he would take care of it.  V.S. said that AVENATTI knew
that the payroll tax withholdings were not being paid to the IRS
before RO 1 first showed up to GBUS's corporate office in
October 2016.  V.S. said AVENATTI made the decision not to pay
the payroll tax withholdings and no one else at GBUS could have
made that decision.

   o.   V.S. said that the State of Washington also
contacted GBUS and AVENATTI regarding GBUS's failure to pay
state tax withholdings.

   p.   IRS notices and levies were received at GBUS's
corporate office, and then emailed to AVENATTI.  V.S. said that
AVENATTI did not respond to the IRS notices or the levies.
Initially, the IRS notices and levies GBUS received were sent to
AVENATTI only, but later the IRS notices and levies were sent to
AVENATTI and REGNIER.

   q.   V.S. said that AVENATTI knew what was levied
because the bank made notations of what money was levied on the

bank account statements.[20]  V.S. also emailed AVENATTI daily cash reports that included the levy notations.

       r.   After GBUS's bank account at KeyBank was levied, AVENATTI told M.G. to hold cash deposits at the stores.  The cash deposits were collected, brought to the office to be counted, and then deposited to a different bank account with a different account name.  M.G. would forward a copy of the deposit slips to AVENATTI.  This made V.S. feel uncomfortable because he thought it was being done to avoid the levies.  V.S. discussed this with M.G., who eventually stopped collecting and depositing cash for GBUS.

       s.   V.S. had never heard of GB Hospitality except seeing it on the November 2016 contract with Boeing.  V.S. had been given a copy of the contract.  There were not separate books and records for GB Hospitality, and V.S. did not think GB Hospitality was registered.  The revenue from the Boeing stores was transferred into a GBUS account, and not to a GB Hospitality account.

       t.   GBUS had to make quarterly commission payments to Boeing.  V.S. said that some of the commission payments were late.  M.G. told V.S. that AVENATTI justified the late payment by saying that the wire transfer had been lost, but V.S. did not see a wire out of the GBUS accounts' payable account that corresponded to when AVENATTI had said the wire to Boeing had been lost.

---

    [20] I have reviewed bank records for GBUS's bank accounts at CB&T and KeyBank, and confirmed that the monthly account statements referenced the IRS levies.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 169 of 330 Page ID #:675
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 169 of 330 Page ID #:316
184 Page ID #:316

     u.   V.S. was aware that there were different company names for Global Baristas on contracts, but V.S. did not want to question AVENATTI about the different company names.  One of the reasons V.S. thought there were different company names listed for Global Baristas on contracts was to avoid liens and levies.

     v.   In September or early-October 2017, GBUS changed its merchant IDs for its merchant accounts with TSYS.  The change was made at AVENATTI's direction.  AVENATTI wanted to make the change fast, and dealt directly with a representative from TSYS ("TSYS Rep. 1") to make the change.

     w.   V.S. reviewed an October 2, 2017, email from TSYS Rep. 1 to V.S. in which TSYS Rep. 1 wrote the following:

> Michael Avenatti called me on Friday.  The accounts should be under Global Baristas LLC, not Global Baristas "US" LLC.  We have to make changes as the IRS with [sic] withholding funds.  Michael has asked that I rush this as much as possible.

After reviewing this email, V.S. said that AVENATTI had instructed V.S. to give him TSYS Rep. 1's contact number.  V.S. also said that AVENATTI knew the purpose of the change was to avoid the IRS liens and levies.  V.S. said that changing the merchant IDs was a big deal because every store had to be changed.  The new merchant IDs was also associated with a different bank account.

     x.   V.S. said that TSYS later dropped GBUS as a client, at which point GBUS changed its merchant accounts from TSYS to Chase.  V.S. reviewed the Chase merchant account application, which listed Doppio Inc. as the parent company of GB LLC.  V.S. did not know the purpose of Doppio, did not

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 170 of 330 Page ID #:676
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 170 of 330 Page ID #:317
184  Page ID #:317

believe Doppio owned GBUS, and said that GBUS had never done any work for Doppio.

       y.  V.S. knew that AVENATTI was a lawyer and owned EA LLP.  V.S. never saw AVENATTI as the General Counsel of GBUS. He only heard from reports in the media that AVENATTI was the General Counsel for GBUS.[21]

       z.  AVENATTI's salary at GBUS was approximately $250,000 a year, and it was the highest salary at GBUS. AVENATTI was paid this salary as the CEO of GBUS.  AVENATTI was not paid as a lawyer.  The money that AVENATTI was transferring in and out of GBUS's bank account was not compensation to AVENATTI or his law firm.  Some money went to EA LLP, but GBUS never received an invoice from EA LLP.  V.S. believed that there was more outflow than inflow of cash from EA LLP into GBUS's bank account.

      aa.  V.S. remembered a $100,000 wire being sent to EA LLP in March 2017.  V.S. said that REGNIER sent the wire from GBUS's bank account to EA LLP.  Based on my review of EA LLP's bank account records, I know that AVENATTI used the proceeds of this $100,000 wire transfer to pay EA LLP's lawyers in connection with the EA LLP bankruptcy.

      bb.  V.S said that the last Tully's stores closed in March 2018.  After that, there was no work to be done.  V.S. was waiting to find out what the next plan of action would be for

---

   [21]  After the <u>Clifford</u> lawsuit was filed, a number of press articles regarding AVENATTI and GBUS appeared.  In some of these articles, AVENATTI or a GBUS spokesperson were quoted as saying that AVENATTI no longer owned GBUS and was only acting as its General Counsel.

GBUS, but never heard from GBUS. M.E. emailed AVENATTI to ask him to lay off the remaining GBUS employees after the last Tully's stores closed, but never heard back from AVENATTI. As a result, M.E. kept the remaining employees on payroll. GBUS's payroll continued to be funded until September 2018, at which point V.S. and the remaining employees' checks bounced.

       cc. GBUS's accounting records were stored in the cloud. In April or May 2017, V.S. asked A.G. to back up GBUS's accounting data from the cloud because 2nd Watch (the company that managed GBUS's cloud-based server from AWS) was discontinuing GBUS's services.

    30. On September 25, 2018, I participated in an interview with M.E., GBUS's former Human Resources Director. M.E. provided the following information:

       a. M.E. started working for Tully's (i.e., TC Global) in 2009 as a temporary employee. M.E. became the human resources coordinator in 2010 and the payroll coordinator at the end of 2013. M.E. was promoted to Human Resources Director in April 2016 after M.D. left GBUS. M.E. resigned from GBUS in September 2018 after her payroll paycheck bounced.

       b. AVENATTI was the owner and manager of GBUS. At one point, AVENATTI said he was the Chairman and CEO. AVENATTI received payroll paychecks in his capacity as the CEO of GBUS. AVENATTI made $250,000 per year as the CEO and Chairman of GBUS.

       c. AVENATTI was the final decision maker for GBUS. M.E. would copy REGNIER on emails to AVENATTI to make sure that

AVENATTI saw the emails.  M.E. emailed payroll figures to
AVENATTI every other week.

d.   M.E. said that S.F. and V.S. would send AVENATTI
emails regarding accounts payable, and AVENATTI would tell them
what they could or could not pay.

e.   M.E. never heard AVENATTI refer to himself as the
General Counsel of GBUS.  M.E. never dealt with AVENATTI as the
company's lawyer.  M.E. said that GBUS was AVENATTI's company
and that AVENATTI happened to be a lawyer.  M.E. read in the
newspaper that AVENATTI said he was the General Counsel of GBUS,
but not the owner.  When M.E. read that statement, she laughed
in disbelief.  No one at GBUS knew or was aware of AVENATTI
being GBUS's General Counsel.

f.   M.E. once dealt with AVENATTI on a tricky
personnel issue.  M.E., however, said that if AVENATTI had not
been a lawyer she would have still brought the issue to him in
his capacity as CEO.  M.E. also believed that AVENATTI may have
given legal advice regarding employee issues, employee policies,
and the employee guidebook for GBUS.  M.E. was not aware of
AVENATTI handling any other legal issues for GBUS.

g.   M.E. knew that GBUS had not been paying its
payroll taxes to the IRS.  M.E. said that AVENATTI did not pay
the payroll withholdings, but still withheld taxes from the
employees' payroll checks.

h.   M.D. told M.E. that Ceridian stopped paying the
payroll withholdings because GBUS did not have the funds to pay
the withholdings.  M.E. thought that M.D. was preparing the

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 173 of 330 Page ID #:679
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 173 of 330 Page ID #:320
184 Page ID #:320

federal payroll tax returns, but not filing them.  M.E. said that M.D. believed that payroll tax returns could not be filed without paying the tax liabilities.

        i.   M.E. found out later that GBUS's federal payroll tax returns for the third-quarter of 2015 and subsequent quarters had not been filed with the IRS.  AVENATTI asked M.E. to sign and file the IRS Forms 940 and IRS Forms 941 for 2015 and 2016.  M.E. did not feel comfortable doing so and thought there might be negative implications for her, but signed the returns because she did not think she was responsible for them. M.E. sent AVENATTI the returns at the same time as she filed them with the IRS.  There were no payments made with the returns.  M.E. informed the accounting team, V.S. and S.F., of the amounts of payroll taxes owed.

        j.   M.E. learned from M.D. and V.S. that M.B. sent AVENATTI an email explaining to him the consequences of GBUS not paying its payroll taxes.

        k.   M.E. spoke with REGNIER twice on the phone in 2017 when she filed GBUS's IRS Forms 940 and IRS Forms 941s with the IRS.  M.E. said that REGNIER knew how to file the forms online, but REGNIER wanted to mail the forms instead.  AVENATTI instructed M.E. to sign the forms.

        l.   M.E. was interviewed by RO 1 in November 2017. M.E. spoke to AVENATTI a few days later, and told AVENATTI everything that she had told RO 1.  When M.E. told AVENATTI that she had told RO 1 that AVENATTI instructed her not to file the tax returns, AVENATTI was shocked.  M.E. then reminded AVENATTI

that he had sent her an email telling her not to file the tax
returns.

    m.    M.G. told M.E. that the merchant accounts had
changed, but M.G. did not understand why the change had been
made.

    n.    V.S. told M.E. that AVENATTI had instructed him
to change the bank account for GBUS.

    o.    M.E. took part in collecting cash deposits from
the Tully's stores.  M.E. would help M.G. count the cash that
had been collected.  Store managers were told to hold all the
cash from the stores, and then the GBUS's district managers were
supposed to collect the cash.  This occurred in late 2017 or
early 2018 when the Tully's stores were being closed down.  M.G.
told M.E. that the directive to hold the cash deposits came from
AVENATTI.  M.E. also said that the IRS liens were common
knowledge throughout GBUS when the stores were holding the cash
deposits.

    p.    When the last Tully's stores closed in
approximately March 2018, M.E. emailed AVENATTI to ask him what
the next step was.  AVENATTI did not respond.  M.E. did not
understand why employees were still being paid until September
2018 or why GBUS was still operating after the stores closed.
M.E. wasn't doing much for GBUS during this time period other
than processing unemployment claims and payroll.  M.E. was on
"autopilot" and was just processing the payroll every week.
This continued until September 2018, when her last paycheck from

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 175 of 330 Page ID #:681
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 175 of 330 Page ID #:322
184   Page ID #:322

GBUS bounced.  M.E. did not know how AVENATTI was paying for
payroll after the stores closed.

31.   On September 26, 2018, I participated in an interview
of M.G., GBUS's former Director of Retail Operations.  M.G.
provided the following information:

a.   M.G. started working at Tully's as a barista in
2004 and became a store manager in 2005.  In approximately 2012,
M.G. became a District Manager and was responsible for the
Tully's stores at Boeing facilities.  In March 2016, M.G. became
the Director of Retail Operations.  M.G. resigned her position
at GBUS in April 2018, after the last of the Tully's stores
closed.  M.G.'s sister, S.F., also worked for GBUS.

b.   AVENATTI was the owner, CEO, and Chairman of
GBUS.  As the Director of Retail Operations, M.G. reported to
AVENATTI.

c.   M.G. never heard AVENATTI referred to as the
General Counsel for GBUS, and did not consider AVENATTI to be
GBUS's General Counsel.  M.G.'s interactions with AVENATTI
involved standard business decisions, and were not legal
discussions.  M.G. was also unaware of AVENATTI's law firm being
hired to represent GBUS.  M.G. said that she asked AVENATTI for
legal advice regarding eviction notices, legal documents, and
the firing of a store manager on one occasion.  She discussed
these issues with AVENATTI because he was the owner of the
company, not because she considered him to be GBUS's General
Counsel.

d.   GBUS was the operating company for the Tully's stores, and GB LLC was GBUS's parent company.

e.   Ceridian handled the payroll for GBUS.  M.E. told M.G. that Ceridian also handled the payment of payroll taxes until there was not enough money in GBUS's accounts to make the tax payments.  At that point, GBUS was responsible for paying its payroll taxes itself.

f.   M.G. had heard that GBUS was not paying its payroll taxes.  M.G. believes that B.H. told her that GBUS's payroll taxes were not being paid.  M.G. also saw an email from M.B. that warned AVENATTI about the consequences of not paying taxes.  M.G. believes that B.H. was copied on this email and that she saw it because she had access to B.H.'s emails after he left GBUS in 2016.

g.   In connection with discussions to renew a lease for GBUS's training facility in 2016, M.G. forwarded an email to AVENATTI about an IRS lien relating to unpaid taxes.  M.G. told AVENATTI that these things needed to be addressed to move forward.  AVENATTI asked her how she learned about the lien, told her that it had nothing to do with GBUS's revenues, and said it was not her concern.

h.   M.G. spoke with M.E. and V.S. about AVENATTI not paying the payroll taxes and withholdings.  M.G. felt that AVENATTI's actions were questionable, and that she needed to make sure she would not be held personally responsible.  M.G. was worried that it would be her word against AVENATTI's word, so she backed up her work files on her personal laptop in case

she needed them for proof down the road.  As noted in paragraph 79 below, I understand that these records are contained on SUBJECT DEVICE 3.

  i. Around September 2017, either AVENATTI or REGNIER told M.G. that the Tully's stores could no longer make deposits into GBUS's KeyBank account because there was a lien on the account and the money would be gone.  M.G. was instructed to tell the Tully's stores to hold all of their cash deposits.  AVENATTI later instructed M.G. to deposit the cash from Tully's stores into GB Auto's account at BofA.  M.G. said that AVENATTI texted her GB Auto's bank account information and instructed her to text him a picture of the deposit slip whenever she made a cash deposit.

  j. On or about September 7, 2017, M.G. sent AVENATTI a text message with a picture of the deposit slip for the first deposit she made to the GB Auto account.  M.G. continued to send AVENATTI a picture of the deposit slip whenever she made a cash deposit into the GB Auto account.  M.G. would give the physical copy of the deposit slip to V.S.  M.G. said that the last deposit was made in December 2017, at which point she told AVENATTI that she was not going to make any more cash deposits into the GB Auto account.  After this, the Tully's stores began depositing cash into a KeyBank account again.

  k. M.G. was shown a spreadsheet detailing approximately 27 cash deposits made into GB Auto BofA Account 7412 between September 2017 and December 2017, totaling

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 178 of 330 Page ID #:684
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 SEALED Filed 03/22/19 Page 99 of
184   Page ID #:325

approximately $882,884.  M.G. confirmed that these were the cash
deposits she made at AVENATTI's direction.

l.   M.G. said that she was aware of the IRS liens and
GBUS's non-payment of payroll taxes and withholdings when she
made the first cash deposit into GB Auto BofA Account 7412.

m.   M.G. was asked about the change in the merchant
accounts for the Tully's stores.  M.G. said that GBUS's merchant
accounts were initially with TSYS.  When TSYS eventually
terminated its agreement with GBUS, GBUS switched its merchant
accounts to Chase.  M.G. understood that the change in the
merchant IDs for the TSYS merchant account was made at
AVENATTI's direction.  M.G. said nobody at GBUS other than
AVENATTI could make that type of decision.  V.S. told M.G. that
the change in the merchant IDs for the TSYS account was done
because of the liens on the account.

n.   M.G. was responsible for overseeing the Tully's
stores at Boeing facilities.  The Boeing stores were GBUS's most
profitable stores.

o.   M.G. was shown a redlined draft of the November
2016 contract with Boeing in which the name of the contracting
party had been changed from GBUS to GB Hospitality.  M.G. said
that AVENATTI handled the Boeing contract.  When M.G. asked
AVENATTI about this change, he told her not to worry about it.
M.G. and V.S. looked to see if GB Hospitality was a Global
Baristas subsidiary, but couldn't find a record of it anywhere.
The Boeing contract was only time M.G. ever saw the name GB
Hospitality.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 179 of 330 Page ID #:685
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 179 of 330 Page ID #:685
184 Page ID #:326

p.   The Boeing contact was cancelled in September 2017.  M.G. understood that the contract was cancelled because GBUS had not paid Boeing the commissions GBUS owed.  In connection with the cancellation of the contract, GBUS agreed to sell certain equipment to Boeing as payment for the unpaid commissions GBUS owed Boeing.  Separately, GBUS agreed to sell two coffee kiosks to Boeing.  M.G. was shown redline drafts of the two bills of sale for these transactions, in which the name GB Hospitality had been replaced with GB LLC.  M.G. did not know who made that change.  M.G. had received copies of the two bills of sale from Boeing and shared them with V.S.

q.   GBUS was evicted from its corporate headquarters in Seattle, Washington, in November 2017.  All of GBUS's business records stayed at the corporate office when GBUS was evicted.  AVENATTI said he would deal with getting the business records back.[22]

r.   M.G. told AVENATTI about the summons she received from RO 1 in November 2017 and sent him a copy of the summons. AVENATTI called M.G. and asked her if she went to the hearing to which she had been summonsed, what documents she brought to the hearing, and what was said in the hearing.  When M.G. told AVENATTI she brought documents regarding the change in GBUS's bank accounts, AVENATTI was livid.  AVENATTI told her that she

---

[22]  Based on my discussions with representatives from Unico, which served as the property manager for GBUS's corporate offices, I learned that GBUS's property, including any remaining business records, were abandoned and either sold at auction or destroyed.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 180 of 330 Page ID #:686
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 180 of 330 Page ID #:
184   Page ID #:327

should not have given the records to RO 1, and should have instead sent them to AVENATTI.

  s. As of January 2018, it was getting more difficult to get answers from AVENATTI.  M.G. began copying REGNIER on emails because AVENATTI was passing GBUS matters on to REGNIER.

  t. M.G. was aware that in March 2018 AVENATTI made statements to the press indicating that he was not the owner of GBUS.  M.G.'s understanding was that AVENATTI had always been GBUS's owner and believed these statements to be false.  On March 8, 2018, M.G. sent AVENATTI a text message confronting him.  M.G. asked AVENATTI if he was not the owner of GBUS, then who should she go to for GBUS business decisions.  AVENATTI responded that everything still went through him and that M.G. should discuss all matters with him.

  u. Sometime after the Tully's stores closed in March 2018, AVENATTI called M.G. and yelled at her because a store manager had released confidential information to the press. AVENATTI told M.G., "I will fucking destroy him."  AVENATTI also said that if he was willing to sue the President then he was willing to sue an employee.  After that conversation, M.G. felt that AVENATTI was no longer responsive to GBUS employees.

  v. During her interview, M.G. consented to have the IRS retrieve text messages between her and five specific contacts that were stored on her personal cell phone, including all text messages between her and AVENATTI.  IRS SA John Medunic captured images of the text messages, returned the phone to M.G., and then mailed a copy of the images to the Privilege

Review Team AUSA assigned to this investigation. I understand that a privilege review of the text messages is ongoing.

32. On or about September 25, 2018, I participated in an interview of S.F., GBUS's former Accounts Manager. S.F. provided the following information:

    a. S.F started working for Tully's in 2008, but eventually resigned due to health reasons. In December 2013, S.F. returned to work for GBUS as an assistant store manager. In October 2015, S.F. became the office manager at GBUS's corporate headquarters. In September 2016, she was promoted to Accounts Manager and Franchise License Business Manager. S.F. resigned in September 2018, after her last paycheck bounced. S.F.'s sister, M.G., also worked at GBUS.

    b. S.F.'s role as Accounts Manager was to enter vendor invoices into GBUS's accounts payable system. Most invoices for GBUS went through S.F. S.F. had little involvement with account receivables.

    c. S.F. understood that AVENATTI was the CEO and owner of GBUS. AVENATTI operated GBUS from EA LLP's office in Newport Beach, California. S.F. used AVENATTI's EA LLP email address to communicate with him. S.F. only met AVENATTI once and did not speak to him frequently.

    d. S.F. never saw AVENATTI act as the General Counsel for GBUS. S.F. also did not prepare any payments to AVENATTI's law firm. The first time S.F. heard AVENATTI referred to as General Counsel was in connection with statements AVENATTI made to the press in 2018.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 182 of 330 Page ID #:688
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 182 of 330 Page ID #:688
184   Page ID #:329

     e.   M.G. told S.F. that GBUS was not paying its payroll taxes.  S.F. recalled seeing a detailed email to AVENATTI explaining the consequences of GBUS not paying its payroll taxes.

     f.   S.F. recalled RO 1 visiting GBUS's corporate offices in the fall of 2017.  RO 1 gave S.F. a letter during his visit.  S.F. remembered that the letter referenced a possible criminal prosecution.  S.F. said that she either scanned the letter and emailed it to AVENATTI or typed out its contents in an email to AVENATTI.  S.F. spoke to AVENATTI later that day.  AVENATTI seemed rattled and concerned.  AVENATTI asked what RO 1 wanted, what RO 1 had asked, what S.F. told RO 1, and whether RO 1 came with other people.  At the end of the conversation, AVENATTI thanked her for letting him know about the visit, and asked her to keep the situation between the two of them.

     g.   S.F. was aware of the IRS levies on the GBUS bank accounts because she had access to GBUS bank account information.  S.F. said that the State of Washington had also placed levies on GBUS's bank accounts at one point.

     h.   REGNIER worked at EA LLP, and was AVENATTI's paralegal and assistant.  S.F. said the best way to get a hold of AVENATTI was through REGNIER.

     i.   When GBUS received IRS notices, S.F. scanned and emailed the notices to AVENATTI and REGNIER.

     j.   S.F. was aware that AVENATTI told M.G. to collect the cash deposits from the Tully's stores and deposit the cash into a bank account held in the name of GB Auto.

k.   S.F. was aware that GBUS had changed its merchant accounts with TSYS.  The company associated with the TSYS merchant accounts was changed from GBUS to GB LLC.  S.F. assumed this was done to avoid liens.  Later, GBUS switched its merchant accounts from TSYS to Chase.

l.   S.F. heard from V.S. that AVENATTI was withdrawing money from GBUS's bank account.

m.   In November 2017, GBUS was evicted from its corporate offices in Seattle, Washington.  The locks were changed and GBUS did not have an opportunity to move out of the office.

n.   GBUS used Microsoft Dynamics NAV for its accounting software.  The information was stored in an AWS cloud-based server through a company called 2nd Watch.  In approximately May 2018, GBUS lost access to its cloud-based server.

33.   On November 14, 2018, I participated in an interview of B.C., who previously worked in GBUS's accounting department. B.C. provided the following information:

a.   B.C. started working for TC Global/Tully's in 2011 or 2012 as a contractor setting up its point-of-sales ("POS") system.  After GBUS took over Tully's stores, T.M. asked B.C. to come back and help with other projects.  B.C. worked part-time (20 to 25 hours a week) for GBUS until September 2018 when her final paycheck bounced.  B.C. primarily worked remotely from her home.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 *SEALED* Filed 03/22/19 Page 9 of
184   Page ID #:331
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 184 of 330 Page ID #:690

      b.   B.C.'s primary role at GBUS was to pull reports for month end sales and book them into the correct accounting entries.  B.C. pulled credit-card-sales data, tax-sales data, and reports from the POS system, then inputted this data into the general ledger.  At the end of the month, she reconciled cash to sales figures.  B.C. reported to M.B. until M.B. resigned.  After M.B. resigned, she reported to V.S.

      c.   AVENATTI was GBUS's CEO.  AVENATTI appointed T.M. as the CFO and COO.  M.B. was GBUS's Controller.  B.C. understood from M.B. that AVENATTI was very involved in the financial aspects of GBUS, and approved payments and contracts for GBUS.

      d.   B.C. did not consider AVENATTI to be GBUS's lawyer.

      e.   B.C. had seen AVENATTI before, but had never been introduced to him.  She never had a direct conversation with him.  Although she had been copied on emails to or from AVENATTI, she never had direct email communications with AVENATTI.

      f.   GBUS changed the location of its bank accounts from HomeStreet to CB&T.  Cash deposits were made at KeyBank while GBUS was banking with CB&T.  B.C. did not have direct access to bank reports from CB&T, and would instead receive the reports from M.B. or V.S.  B.C. had access to the KeyBank account, and would pull reports from the KeyBank account to do the cash reconciliation.

g. GBUS used Ceridian for payroll services. Ceridian used to handle the payroll taxes for GBUS, but later GBUS handled the payroll taxes on its own.

h. B.C. knew that GBUS was not paying its payroll taxes. B.C. knew there were levies on all of the GBUS bank accounts because she reconciled the bank accounts. V.S. told B.C. what the levies were for, but did not go into great detail. V.S. told B.C. that GBUS owed the IRS millions of dollars, that AVENATTI was aware of this, and that AVENATTI had decided not to pay the IRS.

i. B.C. said that anything and everything was sent to AVENATTI. AVENATTI made all of the decisions for GBUS and no other employees had authority to make decisions. AVENATTI approved all account payable checks, and all GBUS checks had AVENATTI's signature.

j. In 2015, GBUS switched its merchant accounts from Heartland to TSYS. TSYS Rep. 1 was GBUS's sales representative at TSYS.

k. B.C. was asked about an email TSYS Rep. 1 sent her on October 2, 2017 in which TSYS Rep. 1 said:

> Michael Avenatti called me on Friday. The accounts should be under Global Baristas LLC, not Global Baristas "US" LLC. We have to make changes as the IRS with [sic] withholding funds.

B.C. explained that if the merchant IDs were changed, then the credit card terminals at each Tully's store would need to be reprogrammed. B.C. did not understand why AVENATTI would want to make this change. TSYS Rep. 1 told B.C. that AVENATTI had

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 186 of 330 Page ID #:692
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 186 of 330 Page ID #:692
184   Page ID #:333

claimed that the merchant IDs were supposed to be under GB LLC's name and EIN, rather than GBUS's name and EIN.  AVENATTI had called TSYS Rep. 1 and authorized the name change.  B.C. believed this change was made to alter the banking deposits and avoid the IRS levies, which were occurring at the same time.

l.   TSYS Rep. 1 provided B.C. with the paperwork to fill out for the changes to the merchant accounts.  B.C. partially filed out the paperwork and then sent it to REGNIER.  B.C. was not comfortable filing out the paperwork because the change was clearly being made to avoid the levies.  She believed that she expressed this concern to V.S. and TSYS Rep. 1 over the phone.

m.   In November 2017, TSYS Rep. 1 called B.C. and told her that TSYS was dropping GBUS as a client.  TSYS Rep. 1 initially offered to help B.C. identify another credit card processing company, but was later advised not to communicate with her further.  B.C. believes that TSYS dropped GBUS as a client because of the merchant account changes to avoid the IRS levies.

n.   B.C. learned from emails between AVENATTI and M.G. that the Tully's stores had been instructed to hold cash for deposit, and then email the cash deposit amounts.  B.C. was on the email chain because she had to enter the cash deposits in the general ledger.  The cash deposits were made into a BofA account instead of the KeyBank account and then transferred to a CB&T account.

   o. B.C. believed the cash deposits were timed. AVENATTI instructed when to make the cash deposit, when to transfer the funds, and when to sweep the account. B.C. said that these actions were designed to avoid the levies.

   p. AVENATTI took money from the KeyBank account randomly. M.B. instructed B.C. on how to record the money AVENATTI was transferring in and out of GBUS's bank account in GBUS's accounting records.

   q. GBUS used Microsoft Dynamics NAV for its accounting records. The accounting data was stored and backed up on an AWS cloud-based server. Eventually, GBUS's AWS cloud account was shut down because of non-payment.

  34. On November 13, 2018, I participated in an interview with A.H., who previously worked in GBUS's accounting department. A.H. provided the following information:

   a. A.H. worked in the accounting department at GBUS from approximately April 2014 to October 2016. A.H. did basic accounting work involving accounts payable and accounts receivable.

   b. A.H. reported to M.B. and worked with V.S. on a daily basis. After M.B. left GBUS, A.H. reported to V.S. A.H. participated in weekly conference calls with AVENATTI, M.G., and V.S.

   c. A.H. was aware from discussions she had or overheard in the office that GBUS was not paying its payroll taxes. M.B. told her she was leaving GBUS because AVENATTI was not paying GBUS's payroll taxes.

     d.   A.H. recalled telling AVENATTI that GBUS had received another IRS letter. GBUS employees would ask AVENATTI to get on a payment plan with the IRS, but AVENATTI would say no. AVENATTI would say that he was negotiating with the IRS and taking care of it.

     e.   A.H. dealt with vendors who were waiting for payments. GBUS was frequently late paying its vendors. A.H. said that AVENATTI was well aware of what was owed to vendors, as well as what was owed to the IRS.

     f.   A.H. recalls telling AVENATTI that A.H. could not pay vendors because AVENATTI had pulled money out of the GBUS bank account. AVENATTI responded by saying it was his money. AVENATTI always made it clear that he was the boss and it was his company. GBUS could not pay bills without AVENATTI's approval, and he approved all vendor payments.

     g.   A.H. said that AVENATTI never wanted anything in writing. AVENATTI would not respond by email, but would instead either call or email back saying "call me."

   35.  On October 25, 2018, I participated in an interview with A.G., GBUS's former Information Technology ("IT") Manager. A.G. provided the following information:

     a.   A.G. started working for Tully's (TC Global) before GBUS took over operations. A.G. was a System Engineer and then took over as IT Manager. He stopped working for GBUS when his last paycheck bounced in September 2018.

b.   A.G. understood AVENATTI to be the owner and CEO of GBUS.  A.G. never heard of AVENATTI being GBUS's General Counsel and never had any legal discussions with him.

c.   A.G. said that AVENATTI approved the expenses at GBUS.

d.   A.G. heard that GBUS changed its bank accounts to avoid IRS levies.  A.G. also heard that GBUS owed a lot of taxes and was getting IRS notices.

e.   A.G. knew that M.G. picked up cash deposit bags from the Tully's stores and counted the cash at the corporate office.  M.G. eventually told AVENATTI that she did not want to do that anymore.

f.   In April or May 2018, AVENATTI told A.G. that, if A.G. was ever approached by the IRS, A.G. should contact AVENATTI first.

g.   AVENATTI had a GBUS email address, but instead used his law firm email account for GBUS business.

h.   GBUS's corporate computer system was setup on a hybrid environment through a managed cloud service called 2nd Watch.[23]  2nd Watch managed GBUS's desktop operating system and server.  GBUS's desktop operating system used a cloud computing service called Microsoft Azure that included programs like Microsoft Office Online 365.  GBUS used a cloud-based server

---

[23]  Based on documents received from 2nd Watch and a preliminary review of GBUS bank records, it appears that GBUS paid 2nd Watch on a monthly basis throughout the life of the contract.  The contract with 2nd Watch was, however, entered into by "Tully's Coffee."

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 190 of 330 Page ID #:696
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 190 of 330 Page ID #:696
184  Page ID #:337

called Amazon Elastic Compute Cloud (Amazon EC2) that stored its data in the AWS cloud.

       i.  A.G. showed the interviewers an email he sent to AVENATTI on April 5, 2018.  In the email, A.G. told AVENATTI that 2nd Watch had turned off GBUS's server access to AWS and that GBUS was without functioning email.  A.G. had begged AVENATTI to keep paying 2nd Watch for the cloud services.  AVENATTI initially paid for the services, but he later stopped.

       j.  J.S., an IT contractor, made a backup of GBUS's data and emails from the AWS cloud-based server before 2nd Watch turned off access to the servers.  Based on my discussions with A.G., I understand that this data is contained on SUBJECT DEVICE 5, SUBJECT DEVICE 6, and SUBJECT DEVICE 7.  (See supra ¶¶ 81-82.)

### 4.  Information Regarding TSYS Merchant Solutions

36.  IRS-CI's investigation has revealed that AVENATTI attempted to evade the collection of payroll taxes and obstruct the IRS collection case by directing TSYS to change the business name, EIN, and bank account information for GBUS's merchant accounts.

37.  On November 6, 2018, I participated in an interview with TSYS Rep. 1.  Based on my review of documents obtained from TSYS and the interview with TSYS Rep. 1, I have learned, among other things, the following information:

       a.  On or about June 29, 2015, GBUS entered into a Merchant Transaction Processing Agreement with TSYS.  The merchant name on the agreement was GBUS, and the agreement was

Case 8:19-mj-00419-DUTY  SEALED  Document 1-1  Filed 05/24/19  Page 191 of 330  Page ID #:697
Case 8:19-mj-00419-DUTY  SEALED  Document 1-1  Filed 05/24/19  Page 191 of 330  Page ID #:697
184  Page ID #:338

signed by M.B.  The sponsoring bank under the TSYS agreement was
FNB Omaha.[24]

       b.  On or about July 10, 2015, AVENATTI signed an ACH
Agreement with TSYS and provided a blank check for GBUS's CB&T
operating account ending in 2240 ("GBUS CB&T Account 2240").
GBUS CB&T Account 2240 began receiving deposits from TSYS via
FNB Omaha in or around July 2015.

       c.  On or about August 16, 2017, the IRS issued a
levy for GBUS's merchant accounts with FNB Omaha.  FNB Omaha
began withholding funds from GBUS's account by no later than
September 25, 2017.

       d.  On Friday, September 29, 2017, AVENATTI called
TSYS Rep. 1.  This was the first time TSYS Rep. 1 had ever
spoken to AVENATTI, as he primarily dealt with M.B. or B.C.
TSYS Rep. 1 believes he spoke with AVENATTI multiple times that
day.  During these calls, AVENATTI told TSYS Rep. 1 that TSYS
was holding GBUS's money, and that he did not know what was
going on.  TSYS Rep. 1 told AVENATTI that there were no normal
holds on the GBUS account.  After AVENATTI mentioned the IRS,
TSYS Rep. 1 suggested that it could be the result of an IRS
"1099 hold."  B.V. explained that a "1099 hold" related to a new
IRS reporting requirement and occurred when there were issues

---

    [24]  TSYS Rep. 1 explained that the sponsoring bank must be a
registered financial institution and is responsible to Visa and
Master Card.  TSYS processed the credit card transaction data.
The funds would be paid to FNB Omaha, and then transferred from
FNB Omaha to the GBUS's bank account, after the fees were paid
to TSYS.

with the company's name or EIN.[25]  AVENATTI told TSYS Rep. 1 that TSYS had made a mistake and placed the accounts under the wrong company name.  AVENATTI said that the merchant accounts should have been under GB LLC, not GBUS.  AVENATTI told TSYS Rep. 1 that TSYS needed to get this changed.  AVENATTI never disclosed to TSYS Rep. 1 that there was an IRS tax lien on GBUS, that the IRS had issued levies on GBUS's bank accounts, or that GBUS had outstanding payroll tax obligations.  Rather, AVENATTI suggested to TSYS Rep. 1 that he had no idea why TSYS was holding its funds.

     e.   TSYS Rep. 1 and AVENATTI also exchanged multiple emails on September 29, 2017.  TSYS Rep. 1 asked AVENATTI to confirm the "correct tax ID" and provide him with "the exact legal name as filed with the IRS."  AVENATTI responded by providing TSYS Rep. 1 with GB LLC's name and federal tax ID number (EIN).  TSYS Rep. 1 then emailed AVENATTI a list of items that would be "needed to perform the change of ownership."  TSYS Rep. 1 said that the "change in ownership will create new merchant accounts under the correct business info."  At AVENATTI's direction, V.S. also emailed TSYS Rep. 1 a spreadsheet detailing the GBUS funds that were being held by TSYS and FNB Omaha.

     f.   On October 2, 2017, TSYS Rep. 1 emailed B.C. and V.S. to obtain information he needed to change the merchant accounts, which would be a complicated process.  When B.C. asked

---

[25]  A call-log received from TSYS shows that on September 29, 2017, TSYS Rep. 1 called TSYS's client services department to check if there was a 1099 hold on GBUS's account.

Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 193 of 330 Page ID #:689
Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 193 of 330 Page ID #:689
184   Page ID #:340

TSYS Rep. 1 what he had been asked to do, TSYS Rep. 1 responded
as follows:

> Michael Avenatti called me on Friday.  The accounts
> should be under Global Baristas LLC, not Global
> Baristas "US" LLC.  We have to make changes as the IRS
> with [sic] withholding funds.  Michael has asked that
> I rush this as much as possible.

g.   On October 2, 2017, TSYS Rep. 1 emailed AVENATTI
and V.S. to request the banking information for each Tully's
store, as well as bank letters for each account.  AVENATTI
responded that the "accounts will likely change."  In a
subsequent email that day, AVENATTI told TSYS Rep. 1 that "[w]e
want to do it the same way we have done it in the past.  The
account number and ownership merely changes."

h.   Later on October 2, 2017, TSYS Rep. 1 emailed
AVENATTI and told him there "appears to be a bank levy directed
by [sic] our Sponsor Bank - First National Bank of Omaha."  TSYS
Rep. 1 explained to AVENATTI that TSYS does not "get any details
on the levy" and provided AVENATTI with the contact information
for FNB Omaha.  TSYS Rep. 1 also asked AVENATTI to "[l]et me
know what you find out and if there are any possible
implications when we set up the new accounts with the correct
TAX IDs."  During his interview, TSYS Rep. 1 said that he
believes that he learned of the levy on October 2, 2017.  TSYS
Rep. 1, however, noted that he did not have any or all of the
information from FNB Omaha, and AVENATTI was telling TSYS that
TSYS had made a mistake when it set up the merchant accounts.

i.   On October 3, 2017, TSYS Rep. 1 emailed AVENATTI
and V.S. and asked them to send him the bank letters and the

signed agreement. TSYS Rep. 1 also asked AVENATTI again to "let me know if you found out anything yesterday with First National Bank of Omaha and any possible implications or things needed on my end." This was the second time TSYS Rep. 1 had asked AVENATTI that question. AVENATTI never responded to his question or provided TSYS Rep. 1 with any information regarding the IRS levies or his discussions with FNB Omaha.

j.    Later on October 3, 2017, REGNIER emailed TSYS Rep. 1 the new Merchant Transaction Processing Agreement, which was signed by AVENATTI on behalf of GB LLC in his capacity as CEO. REGNIER also emailed TSYS Rep. 1 a bank letter identifying a GB LLC account at CB&T ending in 3730 ("GB LLC CB&T Account 3730"). Based on my review of CB&T bank records, I know that GB LLC CB&T Account 3730 was a new bank account that AVENATTI and REGNIER opened in Orange County, California, earlier that same day. AVENATTI and V.S. were copied on all of the emails REGNIER sent TSYS Rep. 1.

k.    The change in merchant accounts was completed on or about October 7, 2017.

l.    On November 7, 2017, TSYS informed AVENATTI and GBUS that it was closing GBUS's and GB LLC's merchant accounts. TSYS Rep. 1 understood that TSYS decided to close the merchant accounts because GBUS had huge tax liens and levies with the IRS.

m.    TSYS Rep. 1 does not believe that TSYS made a mistake or used the incorrect name when it opened the GBUS merchant accounts in June 2015, as AVENATTI had claimed. TSYS

85

Rep. 1 said that when the GBUS merchant accounts were first opened there were discussions as to whether the correct legal name should be GBUS or GB LLC.

n.   TSYS Rep. 1 said that had AVENATTI disclosed the existence of the IRS liens and levies to him he would have raised the issue with TSYS's legal department and risk management team.  TSYS Rep. 1 felt that information regarding the IRS tax liens and levies would have been highly valuable information to TSYS.  Indeed, TSYS ultimately cancelled the GBUS contract because of the IRS tax liens and levies.

### 5.    Information Regarding The Boeing Company

38.   The investigation has also revealed that AVENATTI attempted to evade the collection of payroll taxes and obstruct the IRS collection case by changing the company name on contracts with Boeing.  As noted above, GBUS operated a number of Tully's stores at Boeing facilities in Washington.  These stores were the most profitable part of GBUS's business.

39.   On October 23, 2018, I participated in interviews with three Boeing employees, P.K., C.M, and A.R.G.  P.K. and C.M. were both Procurement Agents at Boeing, and A.R.G. was a Senior Counsel in Boeing's legal department.  Based on these interviews and my review of documents produced by Boeing, I learned, among other thing the following information:

a.   On September 2, 2016, AVENATTI submitted a contract renewal proposal to Boeing.  AVENATTI signed the proposal as the "CEO/Chairman of Global Baristas US, LLC (dba Tully's Coffee)."

b.    On October 28, 2016, P.K. emailed AVENATTI the
proposed Shared Services contract between Boeing and GBUS.

c.    On November 15, 2016, AVENATTI emailed P.K. a
revised Shared Services contract in which he changed the
contracting party's name from "Global Baristas US LLC" to "GB
Hospitality LLC."  In the email, AVENATTI told P.K. that the
name change was "occasioned by us having formed an additional
wholly owned subsidiary that serves as the contracting party for
all our relationships where we are proving onsite coffee service
within corporate environments."

d.    On November 16, 2016, AVENATTI signed the Shared
Services contract with Boeing on behalf of "GB Hospitality LLC."
The Shared Services contract required GB Hospitality to make
$110,000 quarterly commission payments to Boeing in 2017.  The
contract identified AVENATTI's title as "Chairman/CEO."  P.K.
said that when he was responsible for the GBUS/GB
Hospitality/Tully's account he viewed AVENATTI as the CEO of the
contracting party, not as an attorney.

e.    Between May 24, 2017, and August 15, 2017, P.K.
and A.R.G. sent AVENATTI multiple emails and letters regarding
GB Hospitality's failure to make the required commission
payments for the first and second quarters of 2017.  C.M. and
A.R.G. both said that AVENATTI repeatedly failed to respond to
Boeing's emails and letters.  C.M. said that she knew AVENATTI
was a lawyer, but was communicating with him because he was the
owner of GBUS rather than because he was GBUS's lawyer.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 197 of 330 Page ID #:703
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 197 of 330 Page ID #:703
184   Page ID #:344

   f. On August 16, 2017, Boeing received an IRS Notice of Levy relating to GBUS.  On or about September 19, 2017, Boeing returned the Notice of Levy to the IRS and indicated that it did not owe GBUS any money.  As a result, the levy was closed.  A.R.G. was aware of the levy at the time and may have been responsible for filling out and returning the levy form to the IRS.

   g. On September 5, 2017, Boeing sent AVENATTI via email and FedEx a letter notifying him that Boeing was cancelling its contract with GB Hospitality due to the company's failure to make the required commission payments.  A.R.G. said that Boeing sent the cancellation notice to AVENATTI because he was the owner of GB Hospitality/GBUS.

   h. On September 6, 2017, AVENATTI responded to the cancellation letter.  Among other things, AVENATTI claimed that he had never received the prior notice of default from Boeing, even though that notice had been delivered to EA LLP's offices via FedEx.

   i. On September 7, 2017, A.R.G. spoke to AVENATTI regarding the cancellation of the contract and transition discussions.  A.R.G. said that all transition calls had to go through AVENATTI.  A.R.G. believed that she was communicating with AVENATTI both as the person operating GBUS and as the lawyer for GBUS.  A.R.G. always believed that AVENATTI was the

decision maker for GBUS.  At one point, however, AVENATTI told Boeing that he had to run a decision by the Board of Directors.[26]

j.   On or about September 18, 2017, A.R.G., C.M. and others met with AVENATTI regarding Boeing's transition from GBUS.  During this meeting, Boeing and AVENATTI discussed the sale of GBUS equipment to Boeing.  A.R.G. said that AVENATTI asked to be the point of contact for the sale of GBUS equipment.

k.   On September 20, 2017, REGNIER emailed AVENATTI a list of GBUS equipment at the Boeing stores.  AVENATTI then forwarded this email to C.M., with a copy to M.G. from GBUS. A.R.G. said that it made sense for Boeing to buy the equipment from GBUS because it still wanted to supply coffee to its employees.

l.   On September 22, 2017, AVENATTI emailed C.M. and said:  "We have discussed it internally and we propose that we assign the equipment to Boeing in exchange for any commissions due and owing to Boeing."

m.   On September 26, 2017, A.R.G. emailed AVENATTI a bill of sale relating to the GBUS equipment at the Boeing stores.  A.R.G. drafted the bill of sale.  She identified GB Hospitality as the seller on the bill of sale because that was the entity name on the contract with Boeing.  Under the terms of the proposed sale, Boeing would pay GB Hospitality $10 and forgive all remaining debt in exchange for the equipment.

---

[26]  This statement appears to have been false.  Multiple former GBUS employees have said that GBUS did not have a Board of Directors.

        n.   On September 27, 2017, A.R.G. and AVENATTI

discussed Boeing purchasing two coffee kiosks[27] from GBUS for

$155,000.  C.M. said that the kiosk discussions occurred at the

end of the transition talks.

        o.   On September 28, 2017, AVENATTI emailed A.R.G.

and agreed to sell the kiosks for $155,000.  AVENATTI asked

A.R.G. to send him a revised bill of sale.  He also indicated

that he would "need payment no later than next Friday" (_i.e._,

October 6, 2017).  Later that day, A.R.G. emailed AVENATTI two

separate bills of sale -- one for the purchase of the equipment

and one for the purchase of the kiosks.  Both Bills of Sale

identified GB Hospitality as the seller.

        p.   On September 29, 2017, A.R.G. emailed AVENATTI

revised drafts of the two Bills of Sale in which the name of the

seller was changed from GB Hospitality to "Global Baristas,

LLC."  A.R.G. said that AVENATTI asked her to change the seller

name because GB LLC was the owner of the equipment, not GB

Hospitality.  In her email, A.R.G. also wrote the following:

> As part of my due diligence, I ran a quick UCC search
> on Global Baristas, LLC.  I see one secured credit
> [sic] for office furniture that doesn't look relevant
> for our purposes. There is another secured creditor
> for equipment, Farnam Street Financial?  Can you
> confirm that is also not covering any of this
> equipment?

In an email response just a few minutes later, AVENATTI said

"You are correct - neither covers any of the equipment."

---

        [27]  I understand that the coffee kiosks were separate stand-
alone structures that were owned by GBUS, but located at
Boeing's facilities.

Case 8:19-mj-00419-DUTY SEALED Document 1-1 Filed 05/24/19 Page 200 of 330 Page ID #:706
Case 8:19-mj-00419-DUTY SEALED Document 1-1 Filed 05/24/19 Page 200 of 330 Page ID #:706
184  Page ID #:347

q.   Later on September 29, 2017, AVENATTI emailed
A.R.G. and C.M. the executed copies of the two bills of sale.
AVENATTI signed the bills of sale on behalf GB LLC and
identified his title as "Chairman."

r.   On October 2, 2017, AVENATTI emailed wiring
instructions to A.R.G. and C.M.  Specifically, AVENATTI
instructed Boeing to wire the sale proceeds to an EA LLP
attorney trust account at CB&T ending in 8671 ("EA CB&T Trust
Account 8671").  AVENATTI also asked when the wire would be
sent.  C.M. said that AVENATTI seemed anxious to receive the
wire payment from Boeing.

s.   On October 5, 2017, AVENATTI emailed A.R.G. and
C.M. a letter on GB LLC letterhead containing the same wiring
instructions.  REGNIER was copied on the email.  According to
A.R.G., Boeing had asked AVENATTI to provide Boeing the wiring
instructions on GB LLC letterhead.  Prior to receiving this
letter, neither A.R.G. nor C.M. had ever seen any other
documents on GB LLC letterhead.

t.   A.R.G. indicated that she was concerned that the
change of the entity name on the bill of sale may have violated
the tax lien or levies, but that Boeing checked and neither "GB
Hospitality, LLC" nor "Global Baristas, LLC" were identified on
the lien and levies.  Boeing determined that it was not in
violation of the lien because the lien related to GBUS and the
seller identified on the two bills of sale was a different legal
entity.  A.R.G. said that the only other entity name she had
seen on the contracts with Boeing prior to the two bills of sale

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 201 of 330 Page ID #:707
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 201 of 330 Page ID #:707
184   Page ID #:348

was GB Hospitality.  Boeing would not have paid the $155,010 if
GBUS's name had been on the two bills of sale or the 2016
contract.

40.  Based on a preliminary review[28] of bank records
relating to GBUS, GB LLC, EA LLP, A&A, and AVENATTI, I have
learned the following regarding the $155,010 payment from Boeing
for the kiosks and equipment:

a.   On October 5, 2017, Boeing transferred $155,010
via wire to EA CB&T Trust Account 8671.

b.   On October 5, 2017, EA LLP transferred $155,010
from EA CB&T Trust Account 8671 to A&A's CB&T account ending in
0661 ("A&A CB&T Account 0661").  AVENATTI then made the
following payments from A&A CB&T Account 0661, among others:

i.   $15,000 wire transfer to AVENATTI and his
wife's personal checking account at BofA ending in 5546
("Avenatti BofA Account 5446");

ii.  $8,459 payment to Neiman Marcus in Newport
Beach, California on October 10, 2017; and

iii. $13,073 payment for rent for AVENATTI's
residential apartment in Los Angeles, California on October 10,
2017.

c.   Out of the $155,010 that Boeing wired to EA CB&T
Trust Account 8671 and which was subsequently transferred to A&A

---

[28]  IRS-CI's review of the bank account records referenced
throughout this affidavit is ongoing.  The approximate amounts
referenced herein are based on a preliminary analysis of those
bank records and my discussions with an IRS-CI revenue agent.
These amounts may change as IRS-CI completes its analysis and
discovers additional bank account information.

CB&T Account 0661, it appears that only approximately half was ever transferred to bank accounts associated with GBUS.

### 6. Preliminary Review of GBUS and GB LLC Bank Account Information

41. In connection with this investigation, IRS-CI has obtained bank records relating to a number of accounts associated with GBUS and GB LLC. Based on a preliminary review of these bank account records, it appears that AVENATTI caused approximately $1.7 million to be transferred from GBUS or GB LLC to other entities AVENATTI controlled during the same time period in which GBUS failed to pay to the IRS approximately $3,121,460 in payroll taxes.

42. Based on a preliminary review of the GBUS and GB LLC bank records, I have learned, among other things, the following:

a. In February and March 2015, GBUS opened three new bank accounts with CB&T in Orange County, California, including a payroll account and an operating account (GBUS CB&T Account 2240). AVENATTI and REGNIER were the only two signatories on the GBUS CB&T accounts.

b. As noted above, on October 3, 2017, GB LLC opened GB LLC CB&T Account 3730 in Orange County, California. (See supra ¶ 37.j.) AVENATTI and REGNIER were the only two signatories on this GB LLC account.

43. Based on a preliminary review of the GBUS's CB&T bank accounts, I have learned, among other things, the following regarding the transfer of funds from GBUS or GB LLC to bank accounts associated with A&A or EA LLP:

a.    Between 2015 and 2017, there were a substantial number of wire transfers or payments between GBUS's or GB LLC's bank accounts on one hand, and EA LLP's or A&A's bank accounts on the other hand.

b.    As detailed in the below chart, between 2015 and 2017, there was a net total of approximately $1,701,800 in payments from GBUS's or GB LLC's bank accounts to A&A's or EA LLP's bank accounts.

| Transfers (Net) | 2015 | 2016 | 2017 | TOTALS |
|---|---|---|---|---|
| GBUS & GB LLC to A&A | −$576,500 | $440,500 | $1,360,250 | $1,224,250 |
| GBUS & GB LLC to EA LLP | −$127,436 | $517,400 | $87,586 | $477,550 |
| TOTALS | −$703,936 | $957,900 | $1,447,836 | $1,701,800 |

c.    There was a net transfer of approximately $703,936 from A&A and EA LLP into GBUS's or GB LLC's bank accounts in 2015.  However, there was a net transfer of approximately $2,406,006 out of GBUS's and GB LLC's bank accounts to A&A and EA LLP during 2016 and 2017, while the IRS collection case was ongoing and payroll taxes were due.

44.    As set forth further below in Section IV.D.4, it appears that portions of the approximately $1.7 million that was transferred from GBUS's and GB LLC's bank accounts to A&A or EA LLP were subsequently transferred to AVENATTI's personal bank accounts or used to pay for AVENATTI's personal expenses.

45.    It also appears that AVENATTI directly used GBUS funds to pay for personal expenses.  For example, on or about March 30, 2016, a total of $200,000 was paid to the G.P. Family Trust

from GBUS CB&T Account 2240.  These payments were for two months of rent for AVENATTI's residence in Newport Beach, California. (<u>See</u> <u>infra</u> § IV.E.3.b.)

### 7.  *GBUS Bankruptcy Proceedings*

46.  GBUS is currently the debtor in Chapter 7 bankruptcy proceedings pending in the United States Bankruptcy Court for the Western District of Washington, in <u>In re: Global Baristas US LLC</u>, No. 18-14095-TWD (the "GBUS Bankruptcy").  Based on my review of documents filed in the GBUS Bankruptcy, I have learned, among other things, the following:

a.  On October 24, 2018, a Chapter 7 involuntary bankruptcy petition was filed against GBUS.  GBUS did not appear or oppose the involuntary petition.

b.  On November 30, 2018, an Order for Relief was entered by default.  On or about that same date, Nancy L. James was appointed as the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee").

c.  On or about November 30, 2018, GBUS was also directed to file financial statements and other documents with the bankruptcy court.  To date, GBUS has not filed any such documents.

d.  On January 25, 2019, the GBUS Trustee filed a motion for an order directing three law firms, Osborn Machler PLLC; Eisenhower Carlson PLLC ("Eisenhower"); Talmadge/ Fitzpatrick/Tribe, PPLC, to turn over all files and records relating to the law firms' representation of GBUS.  Among other things, the GBUS Trustee noted that because the GBUS Trustee now

manages GBUS, the GBUS Trustee now holds the attorney-client privilege.

       e.   On January 31, 2019, the GBUS Trustee held the creditors meeting required under 11 U.S.C. § 341.  No one appeared on behalf of GBUS at the meeting.

       f.   On February 8, 2019, Eisenhower, which represented GBUS in the <u>Bellevue Square</u> Litigation, filed an opposition to the GBUS Trustee's motion for turnover. Eisenhower argued, among other things, that AVENATTI may believe that Eisenhower represented him in his personal capacity and that the motion should be denied until AVENATTI was provided notice and an opportunity to respond.  Eisenhower stated:

> During the course of the litigation, Bellevue Square LLC asserted liability against Michael Avenatti personally.  While [Eisenhower] was not formally retained by Mr. Avenatti, [Eisenhower] is concerned that Mr. Avenatti may assert attorney-client privilege as to his personal communications with [Eisenhower].

       g.   On February 15, 2018, the Bankruptcy Court held a hearing on the GBUS Trustee's motion.  I understand that during the hearing the Bankruptcy Court held that the GBUS Trustee holds the attorney-client privilege as to communications between GBUS and its lawyers, that the law firms were required to turn over their files to the GBUS Trustee, and ordered the parties to submit an agreed upon order for the Court to sign by February 22, 2018.

   47.  Although AVENATTI is not personally named in the GBUS Bankruptcy and has not appeared in it, he is aware of the proceedings.  On February 13, 2019, AVENATTI sent an email to an

attorney representing IMSA in a separate civil action, the GBUS Trustee, and the GBUS Trustee's counsel, which stated:

> It has come to my attention that you are purporting to proceed with a hearing tomorrow in a Florida collection matter in which Global Baristas US, LLC, me [sic] and others are defendants. Separate [sic] apart from the fact that service has never been properly effectuated, your attempt to proceed with this matter is entirely inappropriate as there has long been a bankruptcy stay in place as a result of the attached bankruptcy filing (the Trustee and counsel are copied above). Indeed, your continued pursuit of this matter over the last several months may subject your client to liability for violating the bankruptcy stay, which your client is well aware of.

**D.    Tax Offenses Relating to Eagan Avenatti LLP (EA LLP) and Avenatti & Associates, APC (A&A)**

48.    As discussed below, there is probable cause to believe that AVENATTI has caused his other companies, EA LLP and A&A, to evade their federal tax obligations. Between 2015 and 2017, EA LLP failed to pay to the IRS approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks. EA LLP and A&A have also repeatedly failed to file federal income tax returns or pay federal income taxes, despite generating substantial income. Indeed, despite previously filing tax returns, EA LLP has not filed federal tax returns for the 2013 through 2017 tax years, and A&A has not filed federal tax returns for the 2011 through 2017 tax years.

### 1.    The IRS Payroll Tax Collection Case

49.    In September 2015, the IRS initiated a collection case against EA LLP due to its failure to file its payroll tax returns and pay payroll taxes. Based on my review of IRS tax

information, including the ICS History, I have learned, among
other things, the following information regarding EA LLP's
payroll tax obligations:

     a.   Between 2011 and the first quarter of 2014, EA
LLP paid its federal tax deposits, including trust fund tax
payments, to the IRS on a regular basis.  During this time
period, EA LLP also filed its IRS Forms 941 each quarter and IRS
Forms 940 each year.[29]  On the various EA LLP IRS Forms 940 and
IRS Forms 941 filed with the IRS between 2011 and 2014 that I
have reviewed, AVENATTI signed the forms under penalty of
perjury as the Managing Partner of EA LLP.

     b.   On or about April 30, 2015, EA LLP filed its IRS
Form 941 for the first quarter of 2015.  The IRS Form 941
indicated that EA LLP was required to pay to the IRS
approximately $194,545 in payroll taxes, including approximately
$152,562 in trust fund payments.  EA LLP, however, did not make
the required payroll tax payments to the IRS.

     c.   On September 26, 2015, the IRS opened a
collection case against EA LLP based on a FTDA.

     d.   On September 28, 2015, the collection case was
assigned to an IRS revenue officer ("RO 2").

     e.   On October 8, 2015, RO 2 made a field visit to EA
LLP's office in Newport Beach, California.  RO 2 spoke with
AVENATTI and told him that the field call was being made because

---

[29] During this time period, Paychex was responsible for
filing EA LLP's IRS Forms 941 and paying to the IRS EA LLP's
federal tax deposits.  (See infra ¶ 52.)  These services were
discontinued at the end of 2014.  (See id.)

EA LLP had not made its federal tax deposits.  RO 2 asked
AVENATTI if REGNIER could attend the meeting because she was the
POA on file with IRS for EA LLP and was in the office at that
time, but AVENATTI said no.  RO 2 told AVENATTI that EA LLP last
filed a payroll tax return for the first quarter of 2015, but
that it had not paid to the IRS the $194,545 in payroll taxes
that were due.  RO 2 also told AVENATTI that EA LLP had not
filed its payroll tax return or paid its federal tax deposits
for the second quarter of 2015, and that the payroll tax return
and federal tax deposits for the third quarter of 2015 were due
that same day.  RO 2 explained that unless there was a reduction
in EA LLP's payroll since the first quarter of 2015, EA LLP
would likely owe the IRS over $200,000 in payroll taxes for each
of these additional quarters as well.  AVENATTI told RO 2 that
he was not aware that the federal tax deposits were not being
paid.  When asked who prepared the payroll tax returns and made
the federal tax deposits, AVENATTI said that Paychex was
responsible for the payroll taxes.[30]  AVENATTI also said that he
was not sure what was going on with the taxes.  RO 2 set a
deadline of October 23, 2015, for EA LLP to make the outstanding
payroll tax payments.  RO 2 also set deadlines for EA LLP to
file its missing IRS Forms 940 and provide certain financial
documentation, including bank statements and a balance sheet.
Finally, RO 2 instructed AVENATTI to file any other unfiled tax

---

[30]  AVENATTI made a nearly identical statement to RO 1 when
he was contacted about GBUS failure to pay its payroll taxes one
year later on October 7, 2016.  (See supra ¶ 23.d.)

returns, including his unfiled personal income tax returns for the 2011 to 2014 tax years.

f.   On October 14, 2015, M.H. contacted RO 2 and advised her that she was the POA for EA LLP.  RO 2 advised M.H. of the deadline she had set for EA LLP to make the outstanding payroll tax payments, file its IRS Forms 941, and produce financial documents.

g.   On October 23, 2015, EA LLP filed its IRS Forms 941 for the second and third quarters of 2015.  Both IRS Forms 941 were signed by AVENATTI.  Although EA LLP filed these two IRS Forms 941 for the second and third quarters of 2015, EA LLP did not make the required outstanding payroll tax payments nor did it produce the required financial information RO S.M requested.

h.   On March 14, 2017, RO 2 filed IRS Form 6020B substitute returns for the fourth quarter of 2015 and the first, second, third, and fourth quarters of 2016.

i.   As discussed below in Section IV.D.2, in March 2017, an involuntary Chapter 11 bankruptcy petition was filed against EA LLP.  Due to the automatic stay issued in the EA Bankruptcy, RO 2's efforts to collect the outstanding payroll taxes largely ceased.

j.   In connection with the EA Bankruptcy, EA LLP and the IRS reached a settlement regarding EA LLP's unpaid payroll taxes in which EA LLP agreed to pay to the IRS approximately $2,389,005, including trust fund taxes of $1,288,277, non-trust

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 210 of 330 Page ID #:716
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 210 of 330 Page ID #:716
184   Page ID #:357

fund taxes of $311,673, penalties of $635,631, and interest of $153,424.

   k. On or about September 28, 2017, the IRS received EA LLP's IRS Forms 941 for the fourth quarter of 2015 through the fourth quarter of 2016.  The IRS Forms 941 appear to have been signed by AVENATTI.

### 2. *EA LLP Bankruptcy Proceedings*

  50. Based on my review of documents filed in connection with the EA Bankruptcy, I have learned, among other things, the following information:

   a. On or about March 1, 2017, an involuntary petition was filed against EA LLP in the Middle District of Florida.

   b. On or about March 10, 2017, EA LLP filed its answer to the involuntary petition and consented to the order for relief.

   c. In April 2017, the EA Bankruptcy was transferred to the Central District of California.

   d. In connection with the EA Bankruptcy, the United States claimed that it was a secured creditor of EA LLP due to the filing of federal tax liens.  The United States also filed a number of claims against the bankruptcy estate.

   e. On or about October 10, 2017, the United States filed its Fifth Amended Proof of Claim in the amount of approximately $2,357,202, which consisted of a secured claim in the amount of $677,410, a priority tax claim of $1,259,355, and a general unsecured claim of $420,436.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 211 of 330 Page ID #:717
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 211 of 330 Page ID #:717
184   Page ID #:358

     f.   On January 30, 2018, EA LLP, AVENATTI, and the
United States entered into a stipulation regarding the payment
of taxes, in which the parties described the terms of the
settlement reached between EA LLP, AVENATTI, and the United
States.  In the stipulation, the parties agreed that the total
amount EA LLP owed to the IRS as of February 28, 2018, would be
approximately $2,389,005, consisting of trust fund taxes of
$1,288,277, non-trust fund taxes of $311,673, penalties of
$635,631, and interest of $153,424.  Under the terms of the
settlement, EA LLP was required to make an initial payment to
the United States Treasury of $1,508,422, which consisted of all
of the $1,288,277 in trust fund taxes due to the IRS, and 20%️ of
the non-trust fund taxes, penalties, and interest in the amount
of $220,146 within 10 days of the settlement being approved and
bankruptcy being dismissed.  EA LLP was required to pay the
remaining balance of $880,583, plus accrued interest, within 120
days of the dismissal order.  Specifically, EA LLP was required
to pay $440,291, plus accrued interest of $11,709.07, on the
60th day following the dismissal order, and an additional
$440,291 on the 120th day following the dismissal order.

     g.   On March 15, 2018, the Bankruptcy Court issued an
order approving the settlement between EA LLP, AVENATTI, and the
United States, and dismissed the EA Bankruptcy.

     h.   On March 26, 2018, the IRS received the initial
settlement payment of $1,508,422 from a trust account for
SulmeyerKupetz, which was the law firm representing A&A and

AVENATTI in the EA Bankruptcy.[31]  EA LLP and AVENATTI, however, failed to make the remaining payments to the IRS as scheduled.

       i.   On July 3, 2018, the United States filed a motion to enforce the settlement agreement between EA LLP, AVENATTI, and the United States.  Among other things, the United States noted that EA LLP had failed to make the required payment of approximately $440,291, plus $11,709 by May 14, 2018, as required under the settlement agreement.

       j.   On August 20, 2018, EA LLP, AVENATTI, and the United States entered into a stipulation to resolve the United States July 2018 motion to enforce the settlement agreement. Under the stipulation, EA LLP agreed to make monthly payments to the United States in the amount of $75,000.

---

[31]  Based on information I received from the Newport Beach Police Department and a preliminary review of the relevant bank account records, it appears that this payment was derived from money that AVENATTI had received in trust for two clients, M.P. and L.T.  AVENATTI represented M.P. and L.T. in connection with the divestment and separation from M.P.'s business.  Under the engagement agreement, AVENATTI was entitled to 7.5 percent of the approximately $35.6 million transaction amount (or approximately $2.67 million).  In September 2017, the first portion of the transaction amount was wired to a City National Bank attorney trust account ending in 4704 ("Avenatti CNB Trust Account 4704").  After AVENATTI deducted his entire 7.5 percent fee, he then transferred the remaining proceeds to M.P.  On March 14, 2018, the balance of the transaction amount (approximately $8,146,288) was transferred to CNB Trust Account 4704.  But AVENATTI did not remit this entire sum to M.P. as he was required to do.  Rather, on March 15, 2018, AVENATTI transferred $3,000,000 to an EA LLP CB&T attorney trust account ending in 4613 ("EA CB&T Trust Account 4613").  AVENATTI then transferred $2,828,423 from EA CB&T Trust Account 4613 to the SulmeyerKupetz trust account later that same day.  The following day, AVENATTI's attorney from SulmeyerKupetz filed a declaration in the EA Bankruptcy indicating that he had received the approximately $2.8 million payment so that it could be distributed to creditors, including the IRS.

k.   On or about August 20, 2018, EA LLP paid the
United States Department of Treasury approximately $75,000 via a
check from one of EA LLP's CB&T bank accounts.  I understand
that no further payments have been received since August 2018
and that EA LLP and AVENATTI still owe the United States
approximately $765,015, plus accrued interest and penalties.

51.  As part of the EA Bankruptcy, EA LLP was required to
close pre-petition bank accounts and open new "debtor in
possession" bank accounts.  EA LLP and AVENATTI were also
required to file with the Bankruptcy Court a monthly operating
report ("MOR") detailing all funds received and disbursed by EA
LLP.

### 3.   Information Obtained from Paychex Regarding EA LLP's Payroll Taxes

52.  As noted above in paragraph 49.e, when AVENATTI was
first contacted by RO 2, AVENATTI claimed that Paychex was
responsible for preparing the payroll tax returns and paying to
the IRS EA LLP's federal tax deposits.  These claims appear to
have been false.  Based on documents produced by Paychex, I have
learned, among other things, the following information:

a.   On or about May 31, 2014, AVENATTI signed a
Paychex Proprietor Services Agreement as the Managing Partner of
EA LLP.

b.   On or about January 5, 2015, Paychex mailed two
letters to EA LLP and AVENATTI confirming "that your Paychex
Taxpay® service has been discontinued at your request, effective
December 28, 2014."  The letters further advised AVENATTI and EA

Case 8:19-mb-00419-DUTY*SEALED*   Document 1-1   Filed 05/24/19   Page 214 of 330   Page ID #:720
Case 8:19-mb-00419-DUTY*SEALED*   Document 1-1   Filed 05/24/19   Page 214 of 330   Page ID #:720
184   Page ID #:361

LLP that "[y]ou will be responsible for making timely tax deposits and filing tax return beginning on December 28, 2014."[32]

### 4. Other Tax Information Regarding EA LLP and A&A

53. Based on my review of IRS tax information, I have learned, among other things, the following information regarding EA LLP's filing of federal partnership income tax returns:

a. On or about August 13, 2010, Eagan O'Malley & Avenatti LLP, which later became EA LLP, filed its 2009 partnership income federal tax return (IRS Form 1065). The return stated that in the 2009 tax year Eagan O'Malley Avenatti LLP had gross receipts of $12,547,675 and ordinary business income of $5,025,947. The return listed G.M. in Encino, California, as the paid preparer, and O'Malley as the designated Tax Matters Partner ("TMP") before the IRS.

b. On or about April 15, 2011, Eagan O'Malley & Avenatti LLP, filed its 2010 partnership income federal tax return (IRS Form 1065). The return stated that in the 2010 tax year Eagan O'Malley & Avenatti LLP had gross receipts of $7,287,551 and ordinary business income of $1,691,667. The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

---

[32] At the June 12, 2017, Section 341 hearing as part of the EA Bankruptcy, AVENATTI testified under penalty of perjury that Paychex was EA LLP's payroll service since "the inception of the firm . . . may have been as long as 10 [years]." In response to a question regarding EA LLP making deposits for federal and state payroll taxes, AVENATTI testified: "Well, they're made now directly by the firm, but at some point they were being made by Paychex, or at least were to be made by Paychex." When asked when EA LLP switched from sending money to Paychex to pay the payroll taxes to paying the tax deposits directly, AVENATTI testified "sometime in 2016."

c.    On or about March 17, 2014, EA LLP filed its 2011 partnership income federal tax return (IRS Form 1065).  The return stated that in the 2011 tax year EA LLP had gross receipts of $13,819,836 and ordinary business income of $5,850,102.  The return indicated that it was "Self Prepared" and appears to have been signed by AVENATTI on March 12, 2014.  The return listed A&A as the designated TMP before the IRS, and AVENATTI as the TMP representative.

d.    On or about October 8, 2014, EA LLP filed its 2012 partnership income federal tax return (IRS Form 1065).  The return stated that in 2012 EA LLP had gross receipts of $6,212,605 and an ordinary business loss of 2,128,849.  The return appears to have been signed by AVENATTI on October 1, 2014.  The return listed M.H. as the paid preparer, and A&A as the designated TMP before the IRS.

e.    EA LLP never filed a partnership income federal tax return (IRS Form 1065) for the 2013, 2014, 2015, 2016, or 2017 tax years.

54.  Based on my review of IRS tax information, I have learned, among other things, the following information regarding A&A:

a.    A&A's 2009 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 tax year.  The return listed AVENATTI as the President of A&A and M.H.'s firm as the return preparer (the return does not state M.H.'s name, simply the firm at which she worked).

b.   A&A's 2010 IRS Form 1120S Corporate Tax Return stated that A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 tax year.  AVENATTI appears to have signed the return on September 15, 2011, as the President of A&A.  The return listed M.H. as the return preparer.

c.   A&A did not file federal corporate tax returns for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years. The last federal income tax return that A&A filed was the return for the 2010 tax year.

### 5.   Preliminary Review of EA LLP's and A&A's Bank Account Information

55.  A preliminary review of the bank records for accounts associated with EA LLP, A&A, and AVENATTI demonstrates that: (a) EA LLP generated significant income between 2013 and 2017 and would likely have been required to file federal income tax returns for the 2013 to 2017 tax years; (b) A&A generated significant income between 2011 and 2017 and would likely have been required to file income tax returns during the 2011 to 2017 tax years; and (c) EA LLP and AVENATTI had sufficient funds to make the required payroll tax payments due to the IRS in 2015 and 2016.  Specifically, based on a preliminary review of bank account records associated with EA LLP, A&A, AVENATTI, I have learned, among other things, the following information:

a.    Between 2013 and 2017, EA LLP received approximately $137,890,016 of deposits[33] into its bank accounts.

b.    Between 2011 and 2017, A&A received approximately $37,961,633 of deposits into its bank accounts, including net payments of approximately $23,820,816 from EA LLP.

c.    Between 2015 and 2017, EA LLP transferred approximately $13,360,560 to A&A's bank accounts, and A&A transferred approximately $4,424,740 to EA LLP's bank accounts. Thus, between 2015 and 2017, A&A received a net total of approximately $8,935,820 from EA LLP.

d.    Between 2015 and 2017, approximately $3,697,500 was transferred from A&A's bank accounts to AVENATTI's personal bank account, and approximately $190,000 was transferred from EA LLP's bank accounts to AVENATTI's personal bank account. Moreover, as discussed further in paragraph 58.c below, AVENATTI repeatedly used A&A funds to pay for personal expenses between 2015 and 2017.

**E.    Tax Offenses Relating to AVENATTI's Personal Income Tax Obligations**

56.    As discussed below, there is probable cause to believe that AVENATTI committed various tax offenses in connection with his personal income tax obligations.  AVENATTI failed to file personal federal income tax returns for the 2011 through 2017 tax years.  During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay

---

[33]  I understand that the $137,890,016 of deposits likely includes some transfers between different EA LLP bank accounts. Therefore, EA LLP's total receipts during this time period could be substantially lower.

any federal income tax.  AVENATTI also appears to have evaded the assessment and collection of federal income taxes during these tax years by using the entities he controlled, such as GBUS, EA LLP, and A&A, to hide and conceal his personal income.

### 1.   Information Regarding AVENATTI's Personal Income Tax Obligation

57.  Based on my review of IRS tax information, I have learned, among other things, the following regarding AVENATTI's personal income tax obligations:

a.   On or about October 15, 2010, AVENATTI filed his individual income tax return for the 2009 tax year.  The 2009 return indicated that AVENATTI had total income of $1,939,942, and a total tax due to the IRS in the amount of $570,816. According to the return, AVENATTI received $300,000 in W-2 wage income from A&A in 2009, but only had $1,186 withheld in federal taxes.  AVENATTI, therefore, owed the IRS approximately $569,630 for the 2009 tax year.  AVENATTI, however, did not pay the remaining tax due for the 2009 tax year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

b.   On or about October 11, 2011, AVENATTI filed his individual income tax return for the 2010 tax year.  The 2010 return indicated that AVENATTI had total income of $1,154,800, and a total tax due to the IRS of $275,947.  According to the return, AVENATTI had $77 of taxes withheld during 2010. AVENATTI, therefore, owed the IRS approximately $281,786 for 2010 tax year.  AVENATTI, however, did not pay the remaining

taxes due to the IRS for the 2010 tax year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

      c.    AVENATTI never filed a 2011 individual tax return.  In April 2012, however, AVENATTI or his tax preparer filed an extension request for his 2011 individual tax return in which $0 in tax liability was reported.[34]

      d.    AVENATTI never filed a 2012 individual tax return.  In April 2013, however, AVENATTI or his tax preparer filed an extension request for the 2012 individual tax return in which $0 in tax liability was reported.

      e.    AVENATTI never filed a 2013 individual tax return.  In April 2014, however, AVENATTI or his tax preparer filed an extension request for the 2013 individual tax return in which $0 in tax liability was reported.

      f.    AVENATTI never filed a 2014 individual tax return.  In April 2015, however, AVENATTI or his tax preparer filed an extension request for the 2014 individual tax return in which $0 in tax liability was reported.

      g.    On September 2, 2015, the IRS filed a federal tax lien for approximately $903,987 due to AVENATTI's non-payment of taxes due for the 2009 and 2010 tax years.

---

    [34] Based on my review of IRS tax information, I believe that AVENATTI's extension requests for the 2011 to 2015 tax years were submitted to the IRS by M.H.  Because we have not interviewed M.H. at this time, it is unclear whether AVENATTI knew the extension requests were being filed or knew what information was being provided on the extension requests.

h.   On or about October 23, 2015, AVENATTI's POA, M.H., contacted the IRS and advised it that AVENATTI would file his personal federal income tax returns for the 2012, 2013, and 2014 tax years by November 7, 2015.  However, no such returns were ever filed.

i.   On October 30, 2015, the IRS sent AVENATTI a demand letter indicating that he had an outstanding debt of $1,042,878 for the 2009 and 2010 tax years.  A copy of the demand letter was also sent to AVENATTI's POA, M.H.

j.   On November 2, 2015, as a result of the September 2015 federal tax lien, a copy of which was provided to the escrow company handling the sale of AVENATTI's Laguna Beach, California, residence, the IRS received a payment of $1,042,878 for the unpaid 2009 and 2010 taxes from the escrow company after the completion of the sale of AVENATTI's home.

k.   AVENATTI never filed a 2015 individual tax return.  In April 2016, however, AVENATTI or his tax preparer filed an extension request for the 2015 individual tax return in which $0 in tax liability was reported.

l.   AVENATTI never filed an individual tax return for the 2016 or 2017 tax years.  To date, AVENATTI has not filed requests for extensions for the 2016 or 2017 tax years.

## 2.   *Preliminary Review of AVENATTI's Bank Records*

58.  A preliminary review of AVENATTI's bank account records demonstrates that AVENATTI generated substantial personal income between 2011 and 2017.  Specifically, based on a preliminary review of bank records associated with bank accounts

for AVENATTI, GBUS, EA LLP, and A&A, I have learned, among other
things, the following:

    a.    Between 2011 and 2017, it appears that AVENATTI
received net payments of approximately $8,464,064 from EA LLP's
and A&A's bank accounts.[35]  This amount excludes any amounts that
may have been transferred to AVENATTI's personal bank accounts
from EA LLP's and A&A's attorney trust accounts.

    b.    Between 2014 and 2017, AVENATTI's personal bank
accounts appear to have received a total of approximately
$556,134 in direct payments from GBUS.

    c.    Between 2011 and 2017, approximately $37,961,633
was deposited into A&A's bank accounts, including approximately
$28,541,055 from EA LLP.  After deducting the approximately
$4,720,240 that A&A paid to EA LLP, A&A appears to have received
net payments of approximately $23,820,815 from EA LLP during
this time period.

    d.    AVENATTI appears to have used money that was
deposited into A&A's bank accounts for a variety of personal
expenses and to conceal his personal income.  For example, based
on a preliminary review of A&A CB&T Account 0661, the
investigation has identified the following payments that appear
personal in nature and would therefore constitute additional
evidence of AVENATTI's unreported personal income and tax
evasion:

-----

    [35]  During this same time period, there were total deposits
into AVENATTI's personal bank accounts of approximately
$18,025,134.

       i.    Between 2011 and 2018, A&A paid AVENATTI's ex-wife, C.C, approximately $979,590.  The investigation has not yet identified any other payments from AVENATTI to C.C, which supports the inference that these payments constituted either child support or alimony, or both.

       ii.   Between 2011 and 2017, a total of $237,985 in cash was withdrawn from A&A CB&T Account 0661 via check or ATM Withdrawal.

       iii. Between 2011 and 2017, A&A paid a total of approximately $216,720 to Neiman Marcus.

       iv.   Between March and June 2011, A&A paid approximately $10,500 to Jewelers On Time, a luxury watch store in Newport Beach, California.

       v.    Between 2013 and 2015, A&A paid a total of approximately $462,499 to Chase Home Finance in connection with the mortgage on AVENATTI's residence in Laguna Beach, California.[36]

       vi.   In June 2014, A&A paid $58,000 to Jewelers On Time.[37]

       vii. Between 2014 and 2015, A&A paid a total of approximately $1,220,201 to Gallo Builders, Inc., a custom home builder in Newport Beach, California.

---

    [36]   Based on records Chase submitted to the IRS, I know that between approximately November 2011 and November 2015 AVENATTI paid to Chase a total of approximately $698,909 in mortgage interest payments for his Laguna Beach home.

    [37]   GB Auto also paid Jewelers On Time approximately $48,500 on November 27, 2015.

viii.    Between February and March 2015, A&A
paid a total of approximately $82,236 to Porsche.

ix.  In May 2016, A&A paid approximately $195,000
to Circle Porsche in Long Beach, California.

x.  Between April 2016 and July 2016, A&A paid a
total of approximately $500,000 to the G.P. Family Trust.  Based
on my review of other records, I understand that these were rent
payments made pursuant to the lease on AVENATTI's residence in
Newport Beach, California.[38]

xi.  In September 2016, A&A paid approximately
$176,500 to Exclusive Resorts, which is described on its website
as the "World's Elite Private Vacation Club."

xii. Between January 2016 and November 2016, A&A
paid approximately $65,855 to Halaby Restoration, a custom home
painting contractor located in Lake Forest, California.

xiii.    Between February 2016 and September
2016, A&A paid a total approximately $138,611 to Vincent
Builders Inc., a custom home builder in Fountain Valley,
California.[39]  A photo of AVENATTI's former residence in Newport
Beach is shown on Vincent Builder's website under "Projects."

---

[38] Approximately $200,000 was also paid to the G.P. Family
Trust from GBUS CB&T Account 2240 in March 2016.

[39] Between December 2015 and April 2016, approximately
$187,611 in additional payments were made to Vincent Builders
from an EA LLP CB&T bank account ending in 2851 ("EA CB&T
Account 2851"), an EA LLP attorney trust account ending in 8541
("EA CB&T Trust Account 8541"), GB Auto BofA Account 7412, and
one of AVENATTI's personal bank accounts.

xiv. Between February 2017 and December 2017, A&A paid a total of approximately $39,762 to Ferrari Financial Lease.

xv.  Between March 2017 and December 2017, A&A paid a total of approximately $123,825 to Ten Thousand in Los Angeles, California, as rent for AVENATTI's residential apartment.

### 3.    *Information Regarding the Sale of AVENATTI's Residence in Laguna Beach and Purchase of AVENATTI's Residence in Newport Beach*

59.  As set forth below, the investigation has revealed that in November 2015 AVENATTI and L.S., AVENATTI's second wife, sold their home on McKnight Drive in Laguna Beach, California (the "Laguna Beach Residence"), for approximately $12.65 million, resulting in proceeds of approximately $5.4 million. It appears that the net proceeds of the sale were transferred to various entities AVENATTI controlled in an effort to conceal the proceeds of the sale.  Substantial portions of the sale proceeds were also used for AVENATTI's personal purposes, including to finance the purchase of a $15.75 million home on Via Lido Nord in Newport Beach, California (the "Newport Beach Residence").

a.    The Laguna Beach Residence

60.  Based on my review of mortgage records obtained from Chase, I have learned that AVENATTI and L.S. purchased the Laguna Beach Residence for approximately $7.2 million in October 2011.  AVENATTI and L.S. made a down-payment of approximately $2.2 million, and received a loan from Chase for approximately $5 million.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 225 of 330 Page ID #:731
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 225 of 330 Page ID #:372
184   Page ID #:372

61.   Based on my review of records obtained from the escrow
company that worked on the sale of the Laguna Beach Residence
("Escrow Company 1") and discussions with Escrow Company 1's
manager, J.M., I have learned, among other things, the following
information regarding the sale of AVENATTI's Laguna Beach
Residence in November 2015:

a.   On or about October 22, 2015, AVENATTI and L.S.
entered into a contract to sell the Laguna Beach Residence for
approximately $12,625,000 in cash.  Among other things, the
contract required that escrow close on or before November 2,
2015, and that the buyer make a $350,000 non-refundable deposit
that would be released to AVENATTI and L.S. on October 26, 2015.

b.   On October 23, 2015, AVENATTI emailed his real
estate broker, R.S., and instructed him to have Escrow Company 1
wire the $350,000 deposit funds to GBUS's KeyBank account ending
in 6193 ("GBUS KeyBank 6193").  This email was then forwarded to
J.M., who confirmed the wiring instructions by phone with
AVENATTI on October 26, 2015.

c.   On or about October 23, 2015, AVENATTI and L.S.
also signed a form directing Escrow Company 1 to send the sale
proceeds via wire to GBUS KeyBank 6193.

d.   On or about October 26, 2015, Escrow Company 1
wired $350,000 to GBUS KeyBank Account 6193.

e.   Escrow Company 1's files included a copy of a
demand letter the IRS sent to M.H. on October 30, 2015.  The
demand letter indicated that AVENATTI's outstanding tax debt
included on the notice of federal tax lien for the 2009 and 2010

tax years was approximately $1,042,879. J.M. did not recall having specific discussions with AVENATTI regarding the tax lien, but said that his standard practice in such situations was to discuss the issue with his client or, if his client was not challenging the lien, to instruct the client to get a demand letter or payoff amount.

f. On or about October 30, 2015, AVENATTI and L.S. electronically signed a seller's estimated closing statement, which indicated, among other things, that $1,042,879 would be disbursed to the IRS in connection with the IRS demand.

g. On November 2, 2015, Escrow Company 1 wired the remaining sale proceeds of approximately $4,553,889 to GBUS KeyBank 6193.

h. On or about November 3, 2015, Escrow Company 1 sent AVENATTI and L.S. a letter via their real estate broker confirming that escrow had closed on November 2, 2015. The letter confirmed the remaining proceeds of the sale in the amount of $4,553,889 had been wired on November 2, 2015. The letter also enclosed a copy of the final settlement and closing costs statement, as well as a copy of an IRS Form 1099-S (Proceeds From Real Estate Transactions), which indicated that the gross proceeds of the sale of the Laguna Beach property were $12,625,000.

i. When asked whether Escrow Company 1 submitted the IRS Form 1099-S to the IRS, J.M. said that Escrow Company 1's standard practice was to file each IRS Form 1099-S with the IRS through First American Title. During a subsequent conversation,

however, J.M. confirmed that the IRS Form 1099-S for the sale of AVENATTI's Laguna Beach Residence was never submitted to the IRS due to an error by Escrow Company 1.[40]

62.   Based on a preliminary analysis of bank records associated with AVENATTI, GBUS, EA LLP, and other entities, it appears that AVENATTI diverted the profits he obtained from the sale of Laguna Beach Residence to a number of different entities that he controlled and to his personal bank accounts. Specifically, I have learned, among other things, the following regarding the proceeds from the sale of the Laguna Beach Residence:

a.   On or about November 2, 2015, approximately $4,553,889 was transferred from Escrow Company 1 to GBUS KeyBank Account 6193.

b.   On or about November 2, 2015, approximately $4,620,000 was transferred from GBUS KeyBank Account 6193 to GBUS CB&T Account 2240.

c.   On or about November 2, 2015, approximately $4,600,000 was transferred from GBUS CB&T Account 2240 to an IOLTA attorney trust account associated with The X-Law Group in Los Angeles, California.

d.   On or about November 3, 2015, the X-Law Group wired approximately $3,600,000 to GB Auto BofA Account 7412.  As set forth in paragraphs 63.b and 63.c below, it appears that the

---

[40]   Based on my training and experience, I know that AVENATTI would still have been required to report the proceeds from the sale of the Laguna Beach Residence on his 2015 personal income tax return regardless of whether Escrow Company 1 filed the IRS Form 1099-S with the IRS.

remaining $1,000,000 that had been transferred to The X-Law
Group was used to pay $1,000,000 in deposits for AVENATTI's
purchase of the Newport Beach Residence.

        e.    Between on or about November 3 and November 4,
2015, $2,700,000 was paid from GB Auto Account 7412 to EA CB&T
Account 2851.

        f.    On or about November 4, 2015, approximately
$300,000 was transferred from EA CB&T Account 2851 to A&A CB&T
Account 0661.

        g.    On or about November 4, 2015, approximately
$300,000 was transferred from A&A CB&T Account 0661 to
AVENATTI's personal bank account.

        b.    <u>The Newport Beach Residence</u>

63.  Based on my review of records obtained from Escrow
Company 1 and discussions with J.M., I have learned, among other
things, the following regarding AVENATTI's Newport Beach
Residence:

        a.    On or about September 23, 2015, AVENATTI and L.S.
entered into an agreement to purchase the Newport Beach
Residence from the G.P. Family Trust for approximately
$15,750,000.  The purchase agreement required AVENATTI and L.S.
to pay an initial $200,000 deposit within three days, an
additional non-refundable deposit of $800,000 by November 15,
2015, and monthly rent of $100,000 from December 1, 2015, until
August 1, 2016, or the close of escrow.

b.   On September 28, 2015, AVENATTI paid a $200,000
deposit to Escrow Company 1 via a cashier's check from The X-Law
Group.

c.   On or about November 6, 2015, AVENATTI paid an
additional $800,000 deposit to Escrow Company 1 via two wire
transfers from The X-Law Group's IOLTA attorney trust account in
the amounts of $450,000 and $350,000.

d.   In August 2016, approximately two days before
escrow on the Newport Beach Residence was supposed to close, a
lawsuit was filed in the Superior Court of California for Orange
County by a Swiss company named Maseco, S.A., in which Maseco
claimed that it was entitled to possession and title of the
Newport Beach Residence.  As a result, the close of escrow was
delayed significantly due to litigation.

e.   Ultimately, AVENATTI and L.S. never completed
their purchase of the Newport Beach Residence.

64.   As noted above, in 2016, AVENATTI paid to the G.P.
Family Trust a total of $500,000 from A&A CB&T Account 0661 (see
supra ¶ 58.d.x) and a total of $200,000 from GBUS CB&T Account
2240 (see supra ¶ 45).

**4.   *Information from AVENATTI's Divorce Proceedings***

65.   On or about January 2, 2018, L.S. filed a declaration
in connection with the divorce proceedings regarding her
marriage to AVENATTI.  In the declaration, L.S. said, among
other things, the following:

a.   AVENATTI and L.S. were married in May 2011 and
separated in October 2017.

b.   Until November 2017, AVENATTI and L.S. "enjoyed a lavish marital lifestyle due to [AVENATTI's] multi-million dollar annual income."

c.   In November 2016, AVENATTI told L.S. he had earned $3.7 million in 2016.

d.   L.S. suspected that AVENATTI's actual earnings are "substantially higher" than $3.7 million based on his self-published verdicts, their family's monthly expenses, and the fact that AVENATTI failed to share with her his tax returns or bank account records.

e.   In 2016, L.S. spent approximately $215,643 per month on expenses for her and her son.

f.   AVENATTI and L.S. made an approximately $5.4 million profit when they sold the Laguna Beach Residence in 2015.

g.   AVENATTI's and L.S.'s home in Newport Beach was worth approximately $19 million and they were leasing the home for a monthly rent of $100,000.  L.S. said that they spent "hundreds of thousands of dollars to fully remodel the Newport Beach residence."

h.   AVENATTI and L.S. employed two nannies and various housekeepers at a cost of approximately $15,000 per month.

i.   AVENATTI made quarterly payments to L.S. in the amount of $60,000 to $80,000 that AVENATTI and L.S. agreed could be added to her personal savings.

j.    AVENATTI and L.S. spent approximately $30,000 per month on travel, entertainment, and gifts.

k.    L.S. spent approximately $20,000 per month on clothing.

l.    L.S.'s monthly American Express bill typically ranged from $60,000 to $70,000 and was always paid in full.

m.    AVENATTI and L.S. owned two different private jets -- one through A&A and one through an entity called Passport 420.  L.S. believed each private jet was worth approximately $4.5 million.

n.    AVENATTI and L.S. had an investment in Exclusive Resorts.  (See supra ¶ 58.d.xi.)  L.S. indicated that the total yearly cost for the investment in, and use of, Exclusive Resorts was approximately $158,000.

o.    In 2017, AVENATTI and L.S. bought an antique Ferrari at Ferrari Southbay.

p.    AVENATTI drives a 2016 Ferrari GT Spider, leased in L.S.'s name, valued at $410,000.

q.    AVENATTI has an extensive watch collection, including three or four Patek Phillippe watches AVENATTI told L.S. were worth $60,000 to $70,000 each.

### 5.    *AVENATTI's Statements Regarding His Net Worth*

66.    Based on my review of documents collected in connection with this investigation, I have learned that AVENATTI previously provided various banks with the following information regarding his net worth:

122

a.   On or about May 19, 2013, AVENATTI provided HomeStreet with a "Personal Balance Sheet."  The Personal Balance Sheet indicated that he had: (1) total assets of $40,039,000; (2) liabilities of $5,463,000; and (3) a net worth of $34,576,000.

b.   On or about March 11, 2014, AVENATTI provided The Peoples Bank with a "Personal Balance Sheet."  The Personal Balance Sheet indicated that AVENATTI had (1) total assets of $69,583,000; (2) total liabilities of $5,495,000; and (3) a net worth of $64,088,000.  At the bottom of the Personal Balance Sheet there is a handwritten note signed by AVENATTI which states:  "The above is true and correct to the best of my knowledge as of March 11, 2014."

c.   On or about November 1, 2014, AVENATTI provided The Peoples Bank with an updated "Personal Balance Sheet."  The updated Personal Balance Sheet stated that AVENATTI had: (1) total assets of $75,698,000; (2) total liabilities of $5,456,000; and (3) a net worth of $70,242,000.

67.   Despite claiming that he had a net worth in 2013 and 2014 ranging from $34 million to $70 million, AVENATTI did not file any personal income tax returns during these tax years.

**F.   Fraud Offenses Relating to The Peoples Bank**

68.   As discussed below, there is probable cause to believe that between approximately January 2014 and April 2016 AVENATTI engaged in a scheme to defraud The Peoples Bank in Mississippi by submitting false documents, including false tax returns and

balance sheets, in connection with three separate loans AVENATTI and his companies sought and obtained.

69.  Based on my review of publicly available information, I know that The Peoples Bank, which is located in Biloxi, Mississippi, has been federally insured by the Federal Insurance Deposit Commission ("FDIC") since approximately 1934.

70.  Based on my review of records obtained from The Peoples Bank, I have learned, among other things, that AVENATTI obtained three separate loans from The Peoples Bank during 2014: (1) a loan to GB LLC for $850,500 on January 16, 2014 to mature on April 15, 2014; (2) a loan to EA LLP for $2,750,000 on March 14, 2014 to mature on June 15, 2014; and (3) a loan to EA LLP for $500,000 on December 12, 2014 to mature on December 12, 2015.[41]  I have also reviewed IRS tax records and other bank account records that are relevant to these loans.

### 1.    $850,000 Loan to GB LLC in January 2014

71.  In or about January 2014, AVENATTI sought a three-month loan from The Peoples Bank for GB LLC in the amount of $850,500 for the specific purpose of "working capital."  I have learned, among other things, the following regarding this loan:

a.    AVENATTI personally guaranteed the loan, as did Doppio, and AVENATTI signed the loan documents as Manager of GB LLC.  AVENATTI told C.S. -- the President and CEO of The Peoples

---

[41]  Based on the interview with T.M. and the records obtained from The Peoples Bank, I have learned that M.C., an individual with whom AVENATTI had a business and litigation relationship in Seattle, Washington, introduced AVENATTI to C.S., the president and CEO of The Peoples Bank.

Case 8:19-mj-00419-DUTY SPA Document 1-1 Filed 05/24/19 Page 234 of 330 Page ID #:740
Case 8:19-mj-00419-DUTY SPA Document 1-1 Filed 05/24/19 Page 234 of 330 Page ID #:740
184   Page ID #:381

Bank -- that AVENATTI "own[ed] 90% of [GB] LLC through Doppio, Inc., which [he] wholly own[ed]."

b.    The Peoples Bank provided a list of information they would need from AVENATTI before the bank could approve the loan.  AVENATTI provided numerous documents to The Peoples Bank, including financial statements for GB LLC that listed over $41 million in assets for the company (including over $22 million in "International rights") and nearly $38 million in member's equity.  AVENATTI also provided GB LLC's Operating Agreement dated December 12, 2012, the stock certificates for GB LLC and Doppio, and an irrevocable stock transfer signing over the stock certificates as collateral for the loan.

c.    The Peoples Bank also told AVENATTI that, prior to authorizing the loan, the bank needed a "Taxpayer Statement and copy of most recent filed tax return."  The Peoples Bank had a copy in its files of AVENATTI's 2011 U.S. Individual Income Tax Return (Form 1040).  The AVENATTI 2011 Form 1040 that was provided to the bank listed AVENATTI's total income and adjusted gross income as $4,562,881, and indicated that he owed the IRS $1,506,707 in taxes for the 2011 tax year.  The 2011 Form 1040 listed M.H. as the preparer.  Based on a review of IRS records, however, I know that AVENATTI did not file any IRS Form 1040 for the 2011 tax year nor did he pay any taxes to the IRS for the 2011 tax year.

d.    The Peoples Bank approved the loan and wired the loan proceeds to GB LLC's HomeStreet account, pursuant to AVENATTI's wire instructions.  A third party, J.R.C., then

accepted assignment of the loan and became the "grantor" on the loan requiring AVENATTI to repay the loan to J.R.C.

### 2.    $2,750,000 Loan to EA LLP in March 2014

72.   In early March 2014, AVENATTI sought and obtained a three-month loan from The Peoples Bank for EA LLP in the amount of $2.75 million.  I have learned, among other things, the following information regarding this loan:

a.    AVENATTI told The Peoples Bank that the $2.75 million loan to EA LLP would be used to repay J.R.C. for the earlier $850,000 loan (plus interest), and for "working capital."

b.    When seeking the loan, AVENATTI said that his firm was due approximately $19 million shortly from the settlement of the Scott v. SCI litigation, and that EA LLP and AVENATTI would sign a commercial pledge agreement requiring the escrow company in charge of the settlement proceeds to pay off the loan from The Peoples Bank first upon disbursement of the settlement funds.  AVENATTI submitted a commercial loan application, which he signed both individually and on behalf of EA LLP.  In the loan application, AVENATTI claimed that, as of March 10, 2014, EA LLP had assets and a net worth of approximately $21 million, and had income and revenues of approximately $15.7 million.  AVENATTI also submitted Balance Sheets and Profit and Loss Statements for EA LLP through March 10, 2014, which stated, among other information, that the firm earned over $40 million in total income from January 2011 through March 10, 2014.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 236 of 330 Page ID #:742
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 236 of 330 Page ID #:142
184   Page ID #:383

     c.    Additionally, AVENATTI emailed The Peoples Bank what purported to be EA LLP's 2012 U.S. Partnership Return, Form 1065 ("Peoples Bank 2012 Form 1065").  The Peoples Bank 2012 Form 1065, which stated that it was "Firm Prepared," declared that in 2012 EA LLP had gross receipts and total income of slightly over $11.4 million, and ordinary business income (calculated after subtracting expenses and deductions from the total income) of approximately $5.8 million.  The Peoples Bank 2012 Form 1065 also attached a Schedule K-1, which showed the distribution of income or loss to the partners.  The Schedule K-1 attached to the Peoples Bank 2012 1065 showed that AVENATTI, through A&A, received $4,364,592 in income from EA LLP in 2012.

     d.    I have reviewed the 2012 U.S. Partnership Return, Form 1065, that EA LLP actually filed with the IRS ("IRS 2012 Form 1065") on October 8, 2014, and compared it to the Peoples Bank 2012 Form 1065 AVENATTI submitted in March 2014.  AVENATTI signed the IRS 2012 Form 1065 under penalty of perjury as the member manager.  The IRS 2012 Form 1065 was prepared by M.H. (the CPA in Los Angeles, California, who served as the POA for GBUS).  The IRS 2012 Form 1065 listed gross receipts and total income of approximately $6.2 million, and an ordinary business loss of approximately $2.13 million.  The Schedule K-1 attached to the IRS 2012 Form 1065 listed an ordinary loss of approximately $1.6 million to A&A.  Thus, the 2012 Form 1065 AVENATTI provided to The Peoples Bank claimed over $5.2 million more of gross receipts and nearly $8 million in additional ordinary business income (the difference between the business

127

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 237 of 330 Page ID #:743
Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 237 of 330 Page ID #:743
184 Page ID #:384

income on the Peoples Bank 2012 Form 1065 and the business loss on the IRS 2012 Form 1065) than was reported on the actual Form 1065 that was filed with the IRS.

   e. On or about March 14, 2014, the loan in the amount of $2.75 million was approved with a maturity date of June 15, 2014. In support of the loan, AVENATTI signed commercial pledge agreements on behalf of EA LLP, GB LLC, and Doppio, and a personal commercial guaranty. AVENATTI also signed a loan disbursement request, which instructed The Peoples Bank to repay J.R.C. the approximately $884,165.63 that was owed from the January 2014 $850,000 loan (plus interest), and to wire the remaining $1,824,584 to an EA LLP bank account at CB&T.

   f. On or about May 23, 2014, after the Scott v. SCI settlement was finalized, the escrow company wired approximately $2,787,430 to The Peoples Bank to pay off the outstanding balance of the March 2014 loan.

### 3. $500,000 Loan to EA LLP in December 2014

  73. In December 2014, AVENATTI obtained a $500,000 loan from The Peoples Bank to EA LLP. I have learned, among other things, the following information regarding this loan:

   a. On November 10, 2014, AVENATTI emailed C.S. at The Peoples Bank to follow up on a prior discussion in which AVENATTI sought a $2.5 million line of credit from the bank for EA LLP to provide working capital for the needs of the law firm. AVENATTI offered certain guarantees and protections to the bank, including pledging an interest in an ongoing litigation to the

bank and a full security agreement to secure the loan, and to provide any further financial information the bank needed.

b.   Two days later, on November 12, 2014, AVENATTI sent an additional email to C.S. attaching a spreadsheet that included EA LLP's "expected and estimated contingency fees in 2015." The spreadsheet indicated that the firm expected to receive approximately $165 million in gross recoveries from contingency cases, and the net costs and attorneys' fees due to EA LLP from these contingency cases would be approximately $47.6 million. AVENATTI further explained that the attached expected earnings of the firm "obviously does not reflect our projected gross hourly revenue from non-contingency cases in 2015."

c.   On November 15, 2014, the bank told AVENATTI that for the bank to consider and move forward on the credit facility, AVENATTI would need to provide: an updated personal balance sheet; personal income tax returns for 2012 and 2013; interim internal financials of EA LLP through September or October 2014; and an audited financial statement for GB LLC and its subsidiaries.

d.   Later on November 15, 2014, AVENATTI emailed back his personal balance sheet as of November 1, 2014, and stated that he would get the bank the other requested documents later. AVENATTI noted, however, that GB LLC and its subsidiaries did not have audited financials on an annual basis, but that there had been no material change to the audited GB LLC balance sheet from sixteen months earlier, which AVENATTI had previously provided to the bank. On the personal balance sheet, AVENATTI

listed over $75 million in total personal assets and a net worth
of over $70 million. (See supra ¶ 66.c.)

e.    On November 16, 2014, AVENATTI emailed The
Peoples Bank the updated financials for EA LLP, including a
Profit and Loss Statement, and a Balance Sheet for January 2014
through September 2014. The Profit and Loss Statement listed EA
LLP's total income for the year up through September 2014 as
approximately $23.4 million and its net income as approximately
$18.2 million. The EA LLP Balance Sheet for the same time
period claimed total current assets of over $31 million and net
income of over $27 million (which is $9 million more than listed
on the Profit and Loss statement for the same period). In
addition, the EA LLP Balance Sheet that AVENATTI provided the
bank indicated that EA LLP had approximately $712,729 in its
operating account with CB&T ("EA LLP CB&T Account 8461"), as of
September 30, 2014. Based on a review of the CB&T bank records,
however, I know that EA LLP CB&T Account 8461 had a balance of
approximately $27,710 as of September 30, 2014.

f.    On November 22, 2014, C.S. at The Peoples Bank
emailed AVENATTI stating that the bank still needed financial
information on GB LLC (even if not audited) and AVENATTI's
personal tax returns for 2012 and 2013. Soon thereafter,
AVENATTI replied that he "had asked that the remaining info be
forwarded to you [C.S.] and will follow-up in short order."

g.    On November 25, 2014, AVENATTI emailed C.S. and
attached a Profit and Loss Statement and Balance Sheet for GB
LLC as of November 2, 2014, which listed the company's total

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 240 of 330 Page ID #:746
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 240 of 330 Page ID #:746
184   Page ID #:387

assets as approximately $41.3 million and total equity of approximately $35.4 million.

h.   On or about December 1, 2014, AVENATTI provided The Peoples Bank with what were purported to be his 2012 and 2013 U.S. Individual Income Tax Returns (IRS Forms 1040).[42]

i.   The 2012 IRS Form 1040 that AVENATTI provided to the Peoples Bank, included the following information: AVENATTI's filing status was "single;"[43] AVENATTI's total income and adjusted gross income were $5,423,099; the total tax due was $1,790,744; AVENATTI had made $1,600,000 in estimated tax payments in 2012 and still owed $190,744 in taxes; and the return was prepared by M.H.  According to IRS records, however, AVENATTI did not file a 2012 Form 1040, and did not make any tax payments toward his 2012 individual tax liability.

j.   Both the "draft" and subsequent version of the 2013 Form 1040 that AVENATTI provided to The Peoples Bank included the following information: AVENATTI's filing status was "single;" AVENATTI's total income and adjusted gross income were $4,082,803; AVENATTI had paid $1,353,511 to the IRS in 2013 ($1,250,000 in estimated tax payments and $103,511 in

---

[42] The Peoples Bank deemed the 2013 IRS Form 1040 they received from AVENATTI via email on December 1, 2014, as a draft because they received a slightly different and updated 2013 IRS Form 1040 soon thereafter.  The Peoples Bank also received 2011 and 2012 IRS Forms 1040 for AVENATTI.  However, neither the 2011 Form 1040, 2012 Form 1040, nor the updated 2013 Form 1040 were attached to an email, so the bank is not certain if they received the documents via United States Postal Service or another method.

[43] AVENATTI married L.S. in 2011, however, the 2012 Form 1040 listed AVENATTI as single rather than married filing jointly or separately.

withholdings from W-2s or 1099s); and the return was prepared by
M.H. The "draft" 2013 Form 1040 stated AVENATTI owed $1,305,482
in taxes for calendar year 2013, and based on his tax payments
during the year, he wanted $48,029 applied to his 2014 estimated
tax. The subsequent 2013 Form 1040 provided to The Peoples Bank
claimed AVENATTI owed $1,459,000 in taxes for calendar year
2013, and that based on his tax payments during the year, he
owed $105,489 to the IRS. According to IRS records, however,
AVENATTI did not file a 2013 Form 1040, did not make any
estimated tax payments toward his 2013 individual tax liability,
and did not have any tax withholdings in 2013.

k. Although AVENATTI initially requested a $2.5
million line of credit for EA LLP, after receiving the required
documentation from AVENATTI, The Peoples Bank issued EA LLP a
$500,000 loan on December 12, 2014, which was set to mature on
December 12, 2015. The loan was guaranteed by AVENATTI
individually and by AVENATTI on behalf of EA LLP, GB LLC, and
Doppio. AVENATTI also signed a Commercial Pledge Agreement in
which EA LLP agreed to the "Assignment of the first $500,000
plus interest of settlement proceeds in the Meridian related
cases, said attorney's fees to be $10.5 million plus out of
pocket costs for class counsel [EA] LLP." M.C., who was the
individual that initially put AVENATTI in touch with C.S. at The
Peoples Bank, was serving as the Meridian Liquidating Trustee on
the litigation. As part of the loan documents, on December 12,
2014, AVENATTI also signed a disbursement request and

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 242 of 330 Page ID #:748
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 242 of
184  Page ID #:389

authorization, which stated that the "specific purpose of this loan is: Case Costs and Working Capital."

l.  On December 12, 2014, The Peoples Bank wired the loan proceeds, $494,500, to EA CB&T Account 8461.  The same day, $350,000 was wired to a bank account for a lawyer who worked for EA LLP, and $105,000 was transferred to A&A CB&T Account 0661.

m.  On February 24, 2015, M.C. informed C.S. at The Peoples Bank that the Meridian case settled and AVENATTI would be receiving approximately $2.5 million as part of the settlement.  M.C. wanted to know if he had signed an assignment of proceeds to The Peoples Bank so he could determine where to send AVENATTI's money.  C.S. told M.C. that EA LLP was obligated to pay off the loan, and said the bank could give AVENATTI the pay-off amount if he called.

n.  On June 6, 2015, C.S. sent M.C. an email (forwarding the February 24, 2015 emails) after realizing that neither EA LLP nor AVENATTI had paid off the $500,000 loan to The Peoples Bank in February 2015 after the Meridian settlement. M.C. then forwarded the email to AVENATTI (copying C.S.) asking AVENATTI what his status or plan for the loan was.  The bank's records do not show AVENATTI replied to the email.

o.  On November 14, 2015, The Peoples Bank emailed AVENATTI regarding the $500,000 loan to EA LLP, which would be maturing on December 12, 2015.  The Peoples Bank wanted to get an update because the bank's files showed it was supposed to be paid off months earlier with the proceeds of the Meridian settlement.  Approximately 30 minutes later, C.S. emailed

Case 8:19-mj-00419-DUTY * SEALED *   Document 1-1   Filed 05/24/19   Page 243 of 330   Page ID #:749
Case 8:19-mj-00419-DUTY * SEALED *   Document 1-1   Filed 05/24/19   Page 243 of 330   Page ID #:749
184   Page ID #:390

AVENATTI thanking him for the quick response to the prior email
(presumably, AVENATTI responded by phone), and C.S. told
AVENATTI that he would need to pay off his current loan before
The Peoples Bank could establish a line of credit for EA LLP as
AVENATTI sought.  C.S. also provided a list of documentation
that AVENATTI would need to provide before the bank could
authorize a line of credit.

     p.   On December 23, 2015, C.S. responded to the above
emails and informed AVENATTI that the loan matured on December
12, 2015, and wanted to make sure the loan was paid off by the
end of the year.

     q.   From February through April 2016, C.S. and others
from The Peoples Bank reached out to AVENATTI on numerous dates
to get an update on the past-due loan and find out when AVENATTI
was going to pay off the loan.  On a couple of occasions,
AVENATTI said that a wire to pay off the loan would be coming by
a certain date, but the money was never transferred to the bank.

     r.   In April 2016, C.S. informed AVENATTI that the
bank would send the loan to its collections department on April
20, 2016, if the loan was not paid off by then, which would
result in additional costs and fees to AVENATTI.  On April 20,
2016, AVENATTI emailed the bank attaching documentation
establishing that he would soon receive proceeds from a case and
would instruct that the first part of the settlement proceeds be
used to pay The Peoples Bank.

     s.   On April 22, 2016, the $500,000 EA LLP loan was
finally paid off.

### G. Fraud Offenses Relating to the $1.6 Million G.B. Settlement

74.   As discussed below, there is probable cause to believe that AVENATTI: (a) defrauded EA LLP's client, G.B., out of his portion of an approximately $1.6 million settlement payment; (b) used the settlement proceeds for AVENATTI's own purposes; and (c) failed to disclose in the EA Bankruptcy that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

75.   On or about January 14, 2019, G.B. filed an arbitration claim alleging that AVENATTI received $1.6 million in settlement proceeds from a prior arbitration proceeding against a Colorado-based company ("Company 1") and failed to turn over G.B.'s portion of the settlement proceeds to G.B. G.B. also reported the alleged fraud to the Federal Bureau of Investigation and Newport Beach Police Department.  I have reviewed various records relating to G.B.'s claim, including, but not limited to, documents provided to the government by G.B.'s present counsel and by D.S., Company 1's counsel in the arbitration, and bank records from City National Bank.[44]  Based on my review of these documents and records, I have learned, among other things, the following:

a.   In approximately July 2014, G.B. retained EA LLP to represent him in various litigation matters, including an intellectual property dispute against Company 1.  The fee

---

[44] I have learned that G.B. pleaded guilty to a felony theft count and received a term of probation.  As such, I have relied primarily on the documentary evidence I have reviewed as it relates to possible fraud committed against G.B.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 245 of 330 Page ID #:751
Case 8:19-mj-00419-DUTY Document 4-1 Filed 05/24/19 Page 245 of 330 Page ID #:392
184  Page ID #:392

agreement entered into by G.B. and AVENATTI on behalf of EA LLP,
included a 40 percent contingency agreement based on the amount
of the recovery.  After AVENATTI and EA LLP initially filed a
civil complaint in federal court on behalf of G.B. against
Company 1, the parties agreed to handle the case through private
arbitration in Colorado.

      b.    On December 22, 2017, D.S. sent AVENATTI a draft
settlement agreement to resolve the arbitration, which required
Company 1 to pay G.B. $1.9 million, with $1.6 million due on
January 10, 2018, and $100,000 due on January 10 of the three
subsequent years.

      c.    On December 26, 2017, AVENATTI sent an email to
D.S. with a Microsoft Word document entitled, "MJA Revised
Draft," which still had the same payment amounts and dates.
AVENATTI also stated in the email that he would provide wire
instructions immediately prior to the execution of the
agreement.

      d.    On December 27, 2017, AVENATTI sent another
Microsoft Word document titled "Further Revised," to D.S., which
was a revised version of the settlement agreement, with red-
lines of the revisions AVENATTI made to the document.  This
revised settlement agreement also set the payment due dates as
January 10, 2018 through 2021.  The primary change AVENATTI made
to this draft of the settlement agreement was to remove the
requirement that the settlement payment be sent via wire
transfer to a specific account identified in the agreement and
instead required that the settlement payment be sent via wire

transfer to an account that AVENATTI would identify to D.S. via email by January 3, 2018.

      e.   On December 28, 2017, D.S. emailed AVENATTI a copy of the fully executed settlement agreement with both parties' signatures, as well as a stipulation to dismiss the matter from arbitration.  The settlement agreement again listed the payment dates as January 10, 2018 through 2021.

      f.   The copy of the settlement agreement that was provided to G.B., however, listed the payment dates for the $1.9 million settlement as $1.6 million on March 10, 2018, and $100,000 on March 10 of each of the next three years.

      g.   On January 2, 2018, AVENATTI emailed D.S. with instructions to wire the settlement money to a City National Bank attorney trust account ending in 5566 ("CNB Trust Account 5566").[45]  AVENATTI also wanted to confirm "that we are on track."  D.S. responded that they were "on track."

      h.   On January 5, 2018, Company 1 wired the $1.6 million settlement into CNB Trust Account 5566 as directed by AVENATTI.  City National Bank records confirm that the $1.6 million wire transfer was received in CNB Trust Account 5566.  Prior to the $1.6 million wire transfer, CNB Trust Account 5566 had a balance of $0.

      i.   None of the $1.6 million in settlement funds that were deposited into CNB Trust Account 5566 were ever paid to G.B.  Rather, between January 5, 2018, and March 14, 2018,

---

      [45]  City National Bank records show that AVENATTI opened CNB Trust Account 5566 on December 28, 2017, the same date the settlement agreement was finalized and executed.

AVENATTI caused approximately $1,599,058 to be paid out of CNB Trust Account 5566 for his own personal purposes, including the following payments:

      i.   approximately $617,000 to a Florida-based attorney AVENATTI worked with on an unrelated contingency case;

      ii.  a total of approximately $350,000 paid to EA LLP bank accounts;

      iii. a total of approximately $200,000 to GBUS and vendors of GBUS;

      iv.  a total of approximately $112,000 to a bank account in the name of "Michael Avenatti, Esq.";

      v.   approximately $46,000 to The X-Law Group; and

      vi.  approximately $27,000 to Dennis Brager, the lawyer who was representing GBUS in the IRS payroll collection case.

      j.  G.B. sent numerous text messages and emails to AVENATTI between January 2018 and November 2018.  These text messages are consistent with G.B.'s claims that he believed the first settlement payment was due on March 10, 2018; did not know that Company 1 had made the $1.6 million settlement payment; and did not know that AVENATTI had received the settlement payment in January 2018.

      k.  As set forth below, beginning on March 10, 2018, the date that G.B. believed the settlement proceeds from Company 1 would be arriving, G.B. repeatedly asked AVENATTI if he had received the settlement proceeds, whether AVENATTI had heard

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 248 of 330 Page ID #:754
Case 8:19-mj-00419-DUTY * SEALED * Document 4-1 Filed 05/24/19 Page 248 of 330 Page ID #:654 of
184   Page ID #:395

anything from Company 1 regarding when the money would arrive, and what, if anything, G.B. and AVENATTI could do to get the money G.B. was owed.  It appears that AVENATTI did not respond to most of the messages from G.B. to AVENATTI relating to the settlement payment from Company 1.  G.B. also made clear to AVENATTI that he had would be having financial difficulties without the settlement proceeds and that it was imperative for G.B. to get the money.

      i.   On or about March 10, 2018, G.B. sent a text message to AVENATTI stating "I was just thinking is this a big day from our friends at [Company 1]?"

      ii.   On March 12, G.B. sent AVENATTI a text message in which he said "[h]ere is my account information for the wire."

      iii. On March 13, 2018, G.B. sent AVENATTI a text message saying, among other things, "any word on that wire from [Company 1]?"

      iv.   On March 14, 2018, G.B. sent AVENATTI a text message saying that he needed the settlement money and would be in trouble without the cash because he had made investments over the last four months in reliance on the settlement money coming in.  The next day, March 15, 2018, AVENATTI replied, "Let's chat today – I'm sure it will be resolved."

      v.   Over the next couple weeks, G.B. sent several additional text messages to AVENATTI explaining how concerned G.B. was and expressing his need for the settlement money.  On March 23, 2018, AVENATTI texted G.B. back and told

Case 8:19-mj-00419-DUTY* SEALED* Document 4-1 Filed 05/24/19 Page 249 of 330 Page ID #:755
Case 8:19-mj-00419-DUTY Document 1 Filed 05/24/19 Page 249 of 330 Page ID #:396
184   Page ID #:396

him "don't worry.  Let's chat tmrw.  We will figure this out.
Michael."

        vi.  Through the rest of March to May 2018, G.B.
repeatedly asked AVENATTI about the money, whether AVENATTI had
heard from Company 1 about when the money was going to be sent,
and what actions G.B. and AVENATTI could take to cause Company 1
to pay the agreed-upon settlement.  AVENATTI never told G.B. the
money had already come in.  AVENATTI, however, agreed via text
message to provide G.B. "advances" of money to assist him with
expenses.  Based on records provided by G.B.'s attorney, it
appears that AVENATTI "advanced" G.B. approximately $130,000
between April 2018 and November 2018.

        vii. Throughout October 2018 and up until
approximately November 16, 2018, G.B. sent numerous text
messages and emails to AVENATTI again describing G.B.'s dire
financial situation and asking numerous questions about what
actions they could take going forward to get G.B. his money.
AVENATTI did not respond to most of the messages, but on a few
occasions, AVENATTI replied, saying he was working on a solution
and they could set a time to talk.  AVENATTI never responded in
writing to G.B.'s specific questions regarding the Company 1
settlement.

        l.   On or about November 16, 2018, after retaining
new counsel to attempt to collect his settlement proceeds, G.B.,
through his counsel, learned that the actual settlement
agreement had provided for the initial $1.6 million dollars to
be paid on January 10, 2018, as opposed to March 10, 2018, as

G.B. had been led to believe, and that Company 1 had in fact made the $1.6 million settlement payment on January 5, 2018.

      m.  On November 17, 2018, G.B.'s new counsel sent a letter to AVENATTI via email, which stated that G.B. had been led to believe that Company 1 had not made the initial $1.6 million payment required under the settlement agreement and sought confirmation of this fact.  The letter also requested a true and correct copy of the Settlement Agreement and any fee agreements AVENATTI and EA LLP had with G.B.  Finally, the letter requested that if the settlement money had actually already been paid, to provide an immediate accounting concerning the funds.

      n.  At approximately 10:12 p.m. on November 17, 2018, AVENATTI sent two text messages to G.B. stating "Pls call me" and "What is this all about? Pls call me ASAP."[46]  AVENATTI also called G.B.'s phone twice that night and left a voicemail at approximately 10:14 p.m., which included, in part, AVENATTI stating, "Give me a call when you get a chance.  I mean as soon as possible if you get this please it's urgent.  Thank you."  At approximately 10:26 p.m., AVENATTI sent G.B. an email saying, "I just tried you on your cell.  Please call me when you receive this.  Thanks, Michael."  To date, AVENATTI never responded to or provided documents as requested in the letter G.B.'s counsel sent AVENATTI on November 17, 2018.

---

    [46] Although AVENATTI was on notice that G.B. was represented by new counsel and had been contacted by said counsel rather than by G.B., AVENATTI contacted G.B. directly and made no known effort to communicate with G.B.'s new counsel.

Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 251 of 330 Page ID #:757
Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page ID #:457 of
184   Page ID #:398

76.   As noted in paragraph 51 above, in connection with the EA Bankruptcy, EA LLP and AVENATTI were required to file with the Bankruptcy Court a MOR each month.  AVENATTI, however, never disclosed the $1.6 million settlement payment from the G.B. case nor the existence of CNB Trust Account 5566 to the Bankruptcy Court, as he was required to do.[47]  Rather, on February 15, 2018, AVENATTI signed and filed EA LLP's January 2018 MOR under penalty of perjury, which falsely stated that EA LLP had total receipts of approximately $232,221 during January 2018, based solely on deposits into the EA LLP's DIP CB&T bank account. Additionally, approximately $141,113 out of the $232,221 reported on the MOR was made up of two cashier's checks written from CNB Trust Account 5566, which came from the settlement proceeds.  By using cashier's checks for these payments from CNB Trust Account 5566, AVENATTI hid the existence of this bank account from the Bankruptcy Court and EA LLP's creditors. Finally, based on the records it is clear that G.B. was represented by EA LLP in his case against Company 1; thus, I understand that any payment AVENATTI received from the G.B. case would be property of the bankruptcy estate.

## V.   ADDITIONAL INFORMATION REGARDING THE SUBJECT DEVICES

### A.   Collection of the Subject Devices

77.   SUBEJECT DEVICE 1:  On October 5, 2018, M.E. was served with a subpoena demanding that she produce certain

---

[47]   It appears that AVENATTI also failed to disclose in the EA Bankruptcy the payments he received in connection with his representation of M.P. and L.T. and the CNB bank account into which such payments were deposited. (See supra page 103 n. 31.)

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 252 of 330 Page ID #:758
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 252 of 330 Page ID #:758
184  Page ID #:399

records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  On October 22, 2018, M.E. met with me and IRS-CI SA John Weeks[48] to produce responsive records.  M.E. consented to have IRS-CI copy and secure evidence from her laptop computer.  SA John Weeks took possession of the laptop, created an image of the laptop's hard drive (SUBJECT DEVICE 1), and returned the laptop to M.E.  M.E. also produced a number of hard copy GBUS emails responsive to the subpoena.  The hard copy emails were sealed in an envelope, marked as potentially tainted, and sent to a PRTAUSA in Los Angeles.[49]  Neither the contents of SUBJECT DEVICE 1 nor the hard copy records produced by M.E. have been reviewed by me or any other member of the prosecution team.  Based on my discussions with M.E., however, I understand that SUBJECT DEVICE 1 contains copies of her GBUS emails and other GBUS records.

78.  SUBJECT DEVICE 2:  On October 5, 2018, S.F. was served with a subpoena demanding that she produce certain records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  On October 21, 2018, SA James Kim and I met with S.F. to obtain records responsive to the subpoena.  S.F. produced to

---

[48]  SA Weeks is an IRS Computer Investigative Specialist ("CIS").  SA Weeks is not part of the investigative team. Rather, SA Weeks involvement in this investigation has been limited to the forensic collection of digital evidence.

[49]  Because the hard copy documents were produced by M.E. in response to specific requests in the subpoena, the government is not seeking a warrant to search these documents.

Case 8:19-mj-00419-DUTY * SEALED * Document 4-1 Filed 05/24/19 Page 253 of 330 Page ID #:759
Case 8:19-mj-00419-DUTY * SEALED * Document 1 Filed 05/24/19 Page Photo 02/32/19 Page 160 of
184 Page ID #:400

us two boxes of documents, which she indicated consisted of GBUS
mail and invoices. S.F. also consented to have IRS agents copy
and secure evidence from her laptop computer, and allowed us to
take temporary custody of the computer. SA Weeks subsequently
created a forensic image of S.F.'s laptop (SUBJECT DEVICE 2),
which we returned to her on October 25, 2018. The contents of
SUBJECT DEVICE 2 have not been reviewed by me or any other
member of the prosecution team. Based on my discussions with
S.F., however, I understand that SUBJECT DEVICE 2 contains
copies of her GBUS emails and other GBUS records. The hard copy
documents were mailed to IRS-CI's office in Laguna Niguel and
reviewed by an IRS-CI privilege review SA. The privilege review
SA confirmed, after consulting with a PRTAUSA, that the hard
copy documents did not contain potentially privileged
information, and then released them to me to review.

79. <u>SUBJECT DEVICE 3</u>: On October 5, 2018, M.G. was
served with a subpoena demanding that she produce certain
records relating to GBUS and GB LLC, including any external hard
drives that she used to store business records relating to GBUS,
GB LLC, and other entities. On October 22, 2018, M.G. met with
me and SA Weeks to produce responsive records. M.G. consented
to have IRS-CI copy and secure evidence from her external hard
drive. SA Weeks took possession of the hard drive, created a
forensic image of the hard drive (SUBJECT DEVICE 3), and
returned the hard drive to M.G. M.G. also consented to have
IRS-CI secure all text messages between her and RO 1, which SA
Weeks retrieved from her cell phone. Neither the contents of

SUBJECT DEVICE 3 nor the text messages have been reviewed by me or any other member of the prosecution team.  Based on my discussions with M.G., however, I understand that SUBJECT DEVICE 3 contains copies of M.G.'s GBUS emails and other GBUS records.

80.  SUBJECT DEVICE 4:  On October 22, 2018, V.S. was served with a subpoena demanding that he produce certain records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  In response to the subpoena, on October 29, 2018, I received SUBJECT DEVICE 4 and certain hard copy records from V.S.  SUBJECT DEVICE 4 was sent to IRS-CI SA John Weeks to download and secure the evidence.  The hard copy documents were sealed and then provided to an IRS-CI privilege review SA.  The privilege review SA confirmed, after consulting with a PRTAUSA, that the hard copy documents did not contain potentially privileged information, and then released the documents to me to review.  The contents of SUBJECT DEVICE 4 have been not reviewed by me or any other member of the prosecution team.  Based on my discussions with V.S., however, I understand that SUBJECT DEVICE 4 contains copies of V.S.'s GBUS emails and other GBUS records.

81.  SUBJECT DEVICE 5 and SUBJECT DEVICE 6:  On October 25, 2018, A.G. was served with a subpoena demanding that he produce certain records relating to GBUS and GB LLC, including any digital devices used to conduct business on behalf of GBUS, GB LLC, and other related entities.  On November 13, 2018, A.G. met with me and an IRS CIS, and provided us with a Seagate external hard drive and Veeam 2GB flash drive.  A.G. consented to have

IRS-CI copy and secure the evidence from these devices.  An IRS CIS took possession of the devices, created forensic images of the hard drive (SUBJECT DEVICE 5) and the flash drive (SUBJECT DEVICE 6), and then returned the devices to A.G. the next day. Based on my discussions with A.G., I understand that SUBJECT DEVICE 5 and SUBJECT DEVICE 6 contain GBUS business records, including GBUS business records that an IT consultant, J.S., downloaded from the AWS cloud server before AWS and 2nd Watch discontinued GBUS's services for non-payment of its fees.  The contents of SUBJECT DEVICE 5 and SUBJECT DEVICE 6 have not been reviewed by me or any other member of the prosecution team.

82.  SUBJECT DEVICE 7:  On November 20, 2018, SA Weeks received from A.G. a Seagate external hard drive[50] containing additional records responsive to the October 25, 2018, subpoena. SA Weeks then created a forensic image of the hard drive (described herein as SUBJECT DEVICE 7).  I then mailed the device back to A.G. on December 3, 2018.  Based on my discussions with A.G. and SA Weeks, I understand that SUBJECT DEVICE 7 contains approximately 1.5 million emails that J.S. downloaded from the AWS cloud server before GBUS's services were discontinued.  SA Weeks further advised me that SUBJECT DEVICE 7 contains a number of GBUS email mailboxes, including email mailboxes associated with the following former GBUS employees: A.G.; B.H.; M.D.; M.E.; M.G.; S.F.; T.M.; and V.S.  Notably,

---

[50]  I understand that A.G. used the same Seagate external hard drive he provided to IRS-CI on November 13, 2018, to produce this additional data to IRS-CI.

SUBJECT DEVICE 7 does not appear to contain any email mailboxes associated with AVENATTI.[51]  Although SA Weeks provided me with a list of the email mailboxes stored on SUBJECT DEVICE 7, the specific contents of SUBJECT DEVICE 7 have not been reviewed by me or any other member of the prosecution team.

> **B.    The SUBJECT DEVICES Are Unlikely to Contain Attorney-Client Privileged Communications or Records**

83.  Although AVENATTI is a licensed attorney and has previously claimed in connection with the IRS collection case that he served as GBUS's General Counsel, it is highly unlikely that the SUBJECT DEVICES will contain information protected by the attorney-client privilege for the following reasons:

a.  <u>First</u>, on February 19, 2019, the GBUS Trustee (<u>see</u> <u>supra</u> Section IV.C.7) executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI.[52]  The Trustee has also consented to a search of the

---

[51]  As noted in Section IV.C.3 above, multiple former GBUS employees indicated that although AVENATTI had a GBUS email account, he did not use it to conduct business on behalf of GBUS, and used his EA LLP email account instead.

[52]  The written waiver is limited to attorney-client communications prior to the filing of the involuntary bankruptcy petition on October 24, 2018, and does not cover communications between the GBUS Trustee and any lawyers acting on behalf of the GBUS Trustee.  Based on when the SUBJECT DEVICES were collected and my discussions with the former GBUS employees regarding the general contents of the SUBJECT DEVICES, I do not believe the SUBJECT DEVICES include any communications that occurred or records that were created after October 24, 2018, or any communications involving the GBUS Trustee.

SUBJECT DEVICES.  A copy of the Trustee's written waiver of the attorney-client privilege is attached hereto as Exhibit 1.

   b.   Second, the former GBUS employees who have been interviewed during the investigation have all indicated that AVENATTI primarily, if not exclusively, served in a business capacity, and did little to no legal work for GBUS.  Indeed, all of the former GBUS employees considered AVENATTI to be the CEO and Chairman of GBUS, as opposed to its General Counsel.  It is therefore highly unlikely that any of the former GBUS employees' emails contained on the SUBJECT DEVICES would constitute attorney-client privileged communications.  But, to the extent AVENATTI was acting as GBUS's lawyer, any of the individual GBUS employees' communications with AVENATTI are covered by the Trustee's written waiver of the attorney-client privilege referenced in paragraph 83.a above and attached hereto as Exhibit 1.

   84.  Third, I understand AVENATTI could potentially assert that he had an individual attorney-client relationship with certain lawyers that also represented GBUS, such as the Eisenhower law firm, which represented GBUS in the Bellevue Square Litigation, or The Brager Tax Law Group.  I have no reason to believe, however, that communications between AVENATTI and any lawyers representing him in an individual capacity are contained on the SUBJECT DEVICES.  Based on the evidence collected to date and witness interviews, I understand that AVENATTI exclusively used his EA LLP email account to conduct business on behalf of GBUS.  Further, to the best of my

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 258 of 330 Page ID #:764
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 258 of 330 Page ID #:764
184  Page ID #:405

knowledge, the SUBJECT DEVICES do not contain a backup of
AVENATTI's GBUS email account, which in any case GBUS employees
said AVENATTI never used.[53]

85.  For the foregoing reasons, I believe that the SUBJECT
DEVICES will contain limited, if any, attorney-client
communications and that any such attorney-client communications
on the SUBJECT DEVICES are subject to the written waiver of the
attorney-client privilege executed by the Trustee for GBUS.
Accordingly, a privilege review search protocol that encompasses
all of AVENATTI's communications with GBUS employees is
unnecessary and would significantly delay this investigation.
Nevertheless, as set forth in Attachment B to the search warrant
application, a privilege review team will conduct a limited
search of the devices for communications with the following five
law firms with which AVENATTI may claim that he had an
individual attorney-client relationship: (a) Foster Pepper PLLC;
(b) Osborn Machler PLLC; (c) Eisenhower Carlson PLLC; (d)
Talmadge/Fitzpatrick/Tribe, PPLC; and (e) The Brager Tax Law
Group.  The search team will also be advised of the possibility
that AVENATTI could claim that he had an individual attorney-
client relationship with other law firms or lawyers.  To the
extent the search team discovers any individual communications
between AVENATTI and lawyers from the five identified law firms

---

[53] To the extent any of the SUBJECT DEVICES do in fact
contain a backup of AVENATTI's GBUS email accounts, paragraph 8
of Attachment B to the search warrant application requires that
any such email accounts be immediately segregated and not
searched or reviewed absent further authorization from the
Court.

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 259 of 330 Page ID #:765
Case 8:19-mj-00419-DUTY Document 1-1 Filed 05/24/19 Page 259 of 330 Page ID #:406
184   Page ID #:406

or any other law firms, the search team will immediately cease
its review of those communications and provide them to the
PRTAUSA for further review and, if necessary, relief from the
Court.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

86.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

87.   Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 260 of 330 Page ID #:766
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 02/22/19 Page 170 of
184   Page ID #:407

a.    Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.   There are so many types of digital
devices and software programs in use today that it takes time to
conduct a thorough search.   In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

b.    Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.   As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.    Based on my discussions with IRS-CI SA John
Weeks, I understand the SUBJECT DEVICES may contain a
substantial of data.   A single megabyte of storage space is the
equivalent of 500 double-spaced pages of text.   A single
gigabyte of storage space, or 1,000 megabytes, is the equivalent
of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 261 of 330 Page ID #:767
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 261 of 330 Page ID #:767
184   Page ID #:408

onto a hard drive, deleted, or viewed via the Internet.[54]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[54] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence

153

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

       g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 264 of 330 Page ID #:770
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 264 of 330 Page ID #:770
184   Page ID #:411

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

h.   The search of the SUBJECT DEVICES will likely take a considerable amount of time for multiple reasons.  First, as noted above, the SUBJECT DEVICES contain a substantial amount of data.  For example, I understand that SUBJECT DEVICE 7 alone contains approximately 1.5 million emails.  Second, the search of the SUBJECT DEVICES will require the use of a Privilege Review Team and the search protocols set forth in Attachment B to the search warrant application.

88.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>REQUEST FOR SEALING</u>

89.  I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel.  I make this request for several reasons.

a.  <u>First</u>, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation.  Disclosure of the search warrant, application, and this affidavit could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

b.  <u>Second</u>, based on evidence collected to date and described herein, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct the IRS civil collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to RO 1, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 266 of 330 Page ID #:772
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 266 of 330 Page ID #:772
184   Page ID #:413

owned and operated by GBUS, into a bank account associated with
a separate entity to avoid liens and levies by the IRS.  If
AVENATTI were to learn of the instant investigation he might
engage in similarly obstructive conduct.

c.   Third, a number of former GBUS employees have
expressed concerns that AVENATTI might attempt to retaliate
against them if he learned they were cooperating with the
government's investigation.

d.   Fourth, there is a possibility that some evidence
relating to GBUS's operations may have already been lost when
GBUS was evicted from its corporate offices and AVENATTI refused
to pay the bill for GBUS's cloud-based server.  Although IRS-CI
has been able to obtain some GBUS records, including the data
stored on the SUBJECT DEVICES, from other sources, AVENATTI's
apparent willingness to allow GBUS records to be lost or
destroyed raises a concern that, were AVENATTI to learn of the
instant investigation, he might not hesitate to destroy any
remaining GBUS records and other relevant evidence.

e.   Fifth, the government is still attempting to
locate additional documentary evidence that is relevant to the
investigation, including emails and electronic records that may
be stored by AVENATTI, EA LLP, A&A, or other related entities.
As noted herein, AVENATTI appears to have worked primarily out
of EA LLP's office and used solely his EA LLP email address to
conduct business.  The government is still attempting to
identify the internet service provider AVENATTI used for EA
LLP's email accounts and/or the location of his email server.

Additionally, EA LLP was recently evicted from its offices in Newport Beach, California, and investigators have yet to determine where EA LLP's records are being currently stored.  If alerted to the government's investigation, it is therefore possible that AVENATTI would attempt to destroy such records and that the government would have no other means to obtain this evidence.

### VIII.    CONCLUSION

90.  For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses, as described with particularity in Attachment B, will be found on the SUBJECT DEVICES, as described with particularity in Attachment A.

/s/

Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this 22nd day of February, 2019.

**DOUGLAS F. McCORMICK**

HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

Case 8:19-mj-00419-DUTY   Document 4-1   Filed 05/24/19   Page 269 of 330   Page ID #:775
Case 8:19-mj-00103-DUTY   *SEALED*   Document 4-1   *SEALED*   Filed 02/22/19   Page 182 of
184   Page ID #:416

**LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO
SEARCH BY NANCY L. JAMES IN HER CAPACITY AS TRUSTEE
FOR GLOBAL BARISTAS US, LLC**

I, Nancy L. James, in my capacity as the Trustee for Global Baristas US LLC, hereby agree and state as follows:

1.      On or about October 24, 2018, a Chapter 7 involuntary bankruptcy petition was filed against Global Baristas US, LLC ("GBUS"), in the United States Bankruptcy Court for the Western District of Washington, in In re: Global Baristas US LLC, No. 18-14095-TWD (the "GBUS Bankruptcy").  On November 30, 2018, an Order for Relief was issued in connection with GBUS Bankruptcy, and I was appointed as the Trustee for GBUS.

2.      I understand that the Internal Revenue Service – Criminal Investigations ("IRS-CI") is in possession of certain GBUS business records and communications it obtained from former GBUS employees in both hard-copy and electronic form, as described in paragraph 3, below.

3.      In my capacity as Trustee for GBUS, I consent to the search of the following items currently in the possession of IRS-CI:

a.      A forensic image of a Dell XPS 128 GB Samsung SSD, bearing serial number S1D2NSAG5000777, provided to IRS-CI by M█ E█ on or about October 22, 2018.

b.      Hard-copy GBUS records provided by M█ E█ on or about October 22, 2018.

c.      A forensic image of a Dell Precision, Model M4800, bearing service tag number 252M262, provided to IRC-CI by S█ F█ on or about October 21, 2018.

d.      Hard-copy GBUS records provided by S█ F█ on or about October 21, 2018.

e.      A forensic image of a Seagate External Hard Drive, model number
SRD00F1, bearing serial number NA44HLQH, provided to IRS-CI by M▇▇ G▇▇ on or about
October 22, 2018.

f.      Copies of text messages between M▇▇ G▇▇ and other GBUS
employees obtained from Grice on or about September 26, 2018.

g.      A forensic image of a Samsung flash drive  provided to IRS-CI by V▇
S▇ on or about October 31, 2018.

h.      Hard-copy GBUS business records provided to IRS-CI by V▇ S▇
on or about October 31, 2018.

i.      A forensic image of a Seagate Hard Drive, bearing serial number
5VJC1GXV provided to IRS-CI by A▇ G▇ on or about November 13, 2018.

j.      A forensic image of a Veeam 2GB flash drive provided to IRS-CI by
A▇ G▇ on or about November 13, 2018.

k.      A forensic image of a Seagate Hard Drive, bearing serial number
5VJC1GXV provided to IRS-CI by A▇ G▇ on or about November 20, 2018.

4.      With respect to any GBUS business records, including those records and
communications in the possession of IRS-CI described in paragraph 3 above, in my capacity as
the Trustee for GBUS, I agree to waive any claims of the attorney-client privilege that may exist
between GBUS and any legal counsel acting on its behalf.  More specifically, and subject to the
limitations below, I agree to waive the attorney-client privilege as to any attorney-client
communications which may exist between any officer, director, employee, or agent of GBUS on
the one hand, and on the other hand any lawyer acting on behalf of GBUS, including, but not
limited to, the following individuals and law firms: Michael Avenatti; Eagan Avenatti LLP;
Avenatti & Associates APC; Foster Pepper PLLC; Osborn Machler PLLC; Eisenhower Carlson
PLLC; and Talmadge/Fitzpatrick/Tribe, PPLC.

5.      This waiver of the attorney-client privilege is limited in that it does not apply to
any attorney-client privileged communications that took place after the involuntary petition was

filed in the GBUS Bankruptcy on October 24, 2018. Nor does it apply to any communications between the Trustee of GBUS and any lawyers acting on behalf of the Trustee, including, but not limited to, Rory C. Livesey and the Livesey Law Firm. This waiver of the attorney-client privilege is further limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

6.  In my capacity as Trustee for GBUS, I also authorize any former or current officer, directors, employees, or agents of GBUS to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraphs 5 and 6 above.

7.  I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully and understand it thoroughly. I, in my capacity as Trustee for GBUS, have agreed to this Limited Waiver of the Attorney-Client Privilege and Consent to Search freely and voluntarily.

_____     2-19-19
NANCY L. JAMES                        Date

Trustee for Global Baristas US LLC

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | **WARRANT FOR** |
| PLAINTIFF, | **ARREST** |
| v. | |
| MICHAEL J. AVENATTI | ON COMPLAINT |
| DEFENDANT(S) | CASE NO.: **SA 19 - 2** 4 1 M |

To:   UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **MICHAEL J. AVENATTI** and bring

him forthwith to the nearest Magistrate Judge to answer a complaint charging him with

Bank Fraud, in violation of Title 18, United States Code, Section 1344(1), and Wire

Fraud, in violation of Title 18, United States Code, Section 1343.

REC: BY AUSAs Julian L. André and Brett A. Sagel      [Detention]

MARCH 22, 2019
_____          _____
Date                             Name of Magistrate Judge

                                 **DOUGLAS F. McCORMICK**
                                 _____
                                 Signature of Magistrate Judge

| RETURN | | |
| This warrant was received and executed with the arrest of the above-named defendant at (location): | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

**DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO**

## ADDITIONAL DEFENDANT INFORMATION

| RACE: | SEX: | HEIGHT: | WEIGHT: | HAIR: | EYES: | OTHER: | |
|---|---|---|---|---|---|---|---|

| DATE OF BIRTH: | | PLACE OF BIRTH: | | SOCIAL SECURITY NO.: | | DRIVER'S LICENSE NO. | ISSUING STATE |
|---|---|---|---|---|---|---|---|

| ALIASES: | SCARS, TATTOOS OR OTHER DISTINGUISHING MARKS: |
|---|---|

| AUTO YEAR: | AUTO MAKE: | AUTO MODEL: | AUTO COLOR: | AUTO LICENSE NO.: | ISSUING STATE |
|---|---|---|---|---|---|

| LAST KNOWN RESIDENCE: | LAST KNOWN EMPLOYMENT: |
|---|---|

FBI NUMBER:

ADDITIONAL INFORMATION:

| INVESTIGATIVE AGENCY NAME: | INVESTIGATIVE AGENCY ADDRESS: |
|---|---|

NOTES:

COPY

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>MICHAEL J. AVENATTI | DOCKET NO. |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT

MAR 2 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

MAGISTRATE'S CASE NO.

SA 19 - 2 4 1 M

Complaint for violations of Title 18, United States Code, Sections 1343 and 1344(1)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE DOUGLAS F. MCCORMICK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|

| DATE OF OFFENSES<br>Beginning in or around January 2014 and continuing through in or around March 2019 | PLACE OF OFFENSE<br>Orange County and Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

   (See attached Complaint's Statement of Facts Constituting the Offense or Violation which is incorporated as part of this Complaint)

LODGED

2019 MAR 22 PM 4: 00
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

   (See attached Affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**Remoun Karlous** /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Internal Revenue Service – Criminal Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**DOUGLAS F. McCORMICK** | DATE<br>March 22, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSAs Julian L. André 213.894.6683 and Brett A. Sagel 714.338.3598       REC: Detention

<u>Complaint's Statement of Facts</u>

<u>Constituting the Offense or Violation</u>

COUNT ONE

[18 U.S.C. § 1344(1)]

Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL J. AVENATTI ("AVENATTI"), together with others known and unknown, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

On or about December 12, 2014, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown, committed and willfully caused others to commit the following act, which constituted an execution of, or an attempt to execute, the fraudulent scheme: (1) wire transfer of approximately $494,500 from The Peoples Bank in Biloxi, Mississippi, to a California Bank & Trust bank account in the name of Eagan Avenatti LLP in Irvine, California.

COUNT TWO

[18 U.S.C. § 1343]

Beginning as early as in or around December 2017 and continuing through in or around March 2019, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant MICHAEL J. AVENATTI ("AVENATTI"), knowingly and with intent to defraud, devised participate in, and executed a scheme to defraud clients to whom defendant AVENATTI had agreed to provide legal services, as to material matters, and to obtain money and property from his legal clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

On or about January 5, 2018, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant AVENATTI, for the purpose of executing the above-described scheme to defraud, transmitted or caused the transmission of the following items by means of wire communication in interstate and foreign commerce: (1) wire transfer of approximately $1,600,000 sent from Silicon Valley Bank through the interstate Fedwire system to defendant AVENATTI's City National Bank attorney trust account in Los Angeles, California.

### AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is submitted in support of an arrest warrant for and criminal complaint charging Michael J. Avenatti ("AVENATTI") with:  (a) one count of bank fraud, in violation of 18 U.S.C. § 1344(1); and (b) one count of wire fraud, in violation of 18 U.S.C. § 1343.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and complaint, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

A.  **February 2019 Warrant to Search GBUS Digital Devices**

    4.    On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices in the custody of IRS-CI in Laguna Niguel, California (the "prior affidavit"); the seven digital devices had been produced by former Global Baristas US LLC ("GBUS") employees. The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the warrant that same day (the "February 2019 search warrant"). The application for a search warrant in case number 8:19-MJ-103, as well as my prior affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by reference. In summary, my prior affidavit stated, among other things, the following:

    a.    AVENATTI was and is an attorney licensed to practice law in the State of California. AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach, California. AVENATTI was the sole owner of A&A.

    b.    AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of GBUS, which operated Tully's Coffee ("Tully's") stores in Washington and California. In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million. AVENATTI's company,

A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC. GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

      c.   There is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including, but not limited to, the following: (i) fraud-related offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi (Ex. 1, § IV.F); and (ii) wire fraud and money laundering offenses relating to an approximately $1.6 million settlement payment AVENATTI and EA LLP received in January 2018, but failed to transfer to EA LLP's client (Ex. 1, § IV.G).

      d.   <u>First</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a FDIC insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014. In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years. In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013. He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013. However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any

estimated tax payments to the IRS during the 2012 and 2013 tax years.  In fact, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years. Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

     e.    Second, from in or about December 2017 and the present, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment.  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to a newly opened attorney trust account.  Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.  AVENATTI lied to his client and claimed that the settlement payment was not due until March 2018.  When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.

B.    **Additional Evidence Regarding AVENATTI's Scheme to Defraud His Legal Client, G.B.**

     5.    As set forth in my prior affidavit, AVENATTI engaged in a scheme to defraud his client, G.B., out of G.B.'s portion

of an approximately $1.6 million settlement payment AVENATTI and

EA LLP received in January 2018 in connection with an

arbitration proceeding against a Colorado-based company

("Company 1").  (See Ex. 1, § IV.G.)  On March 15, 2019, I

participated in an interview of G.B.  The information G.B.

provided during the interview was consistent with the

information G.B. and his counsel had previously provided to IRS-

CI and the Newport Beach Police Department ("NBPD").  During the

interview, G.B.[1] also provided the following additional

information:

      a.  On or about December 28, 2017, G.B. met with

AVENATTI at EA LLP's offices in Newport Beach, California, to go

over the proposed settlement agreement with Company 1.  During

this meeting, AVENATTI provided G.B. with a copy of the $1.9

million settlement agreement to review.  The settlement

agreement AVENATTI provided to G.B. listed the payment dates as

$1.6 million on March 10, 2018, and $100,000 on March 10 of each

of the next three years.  As noted in my prior affidavit, this

information was false and the actual settlement agreement

required Company 1 to pay G.B. $1.9 million on January 10, 2018,

and $100,000 on January 10 of each of the three subsequent

years.  (Ex. 1, ¶ 75.e.)

---

[1] G.B. previously pleaded guilty to a felony theft count in
approximately September 2018 and was sentenced to probation.
(See Ex. 1, ¶ 75 n.44.)  During his interview, G.B. said that
AVENATTI had encouraged him to plead guilty and that AVENATTI
continued working with G.B. and one of G.B.'s companies after
G.B.'s guilty plea.

b.    Based on my review of documents produced by G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent an email to an EA LLP employee ("EA Employee 1") asking her to forward to G.B. the signed settlement agreement with Company 1. During his interview, G.B. said that sometime after he sent this email EA Employee 1 brought him a physical copy of the fully-executed settlement agreement while G.B. was at EA LLP's offices.  EA Employee 1 handed AVENATTI the settlement agreement.  AVENATTI flipped through the settlement agreement and then handed it to G.B.  This copy of the settlement agreement also falsely stated that the settlement payments were due on March 10 of 2018 through 2021, as opposed to January 10 of 2018 through 2021.

c.    As noted in my prior affidavit, between April 2018 and November 2018, AVENATTI "advanced" G.B. approximately $130,000 to help G.B. meet certain financial obligations while he waited for his portion of the $1.6 million settlement payment from Company 1.  During his interview, G.B. said that in approximately October 2018, AVENATTI told G.B. that AVENATTI would be able to loan G.B. another $100,000 sometime during the first two weeks of January 2019.  Notably, under the terms of the true settlement agreement, Company 1 was scheduled to make an additional $100,000 settlement payment to AVENATTI's trust account on January 10, 2019.  Thus, it appears that AVENATTI was offering to loan G.B.'s own money to G.B.

6.    During the interview on March 15, 2019, G.B's current counsel also confirmed that AVENATTI still has not turned over

G.B.'s client file to his current attorneys despite repeated requests that he do so.

7.   Based on my review of bank records and other documents, I have learned that on or about January 5, 2019, a wire transfer of approximately $1,600,000 was transmitted from Silicon Valley Bank through the interstate Fedwire system to a City National Bank attorney trust account ending in 5566 ("CNB Trust Account 5566") associated with AVENATTI.[2]

## IV.   REQUEST FOR SEALING

8.   I request that the criminal complaint, the arrest warrant, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until defendant makes his initial appearance on the arrest warrant.  I make this request for several reasons.

a.   First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation.  Public disclosure of the complaint, arrest warrant, and this affidavit prior to AVENATTI's arrest and initial appearance could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

---

[2]  I understand that the State Bar of California has specific rules that apply to the proper use of attorney trust accounts.  For example, I understand that Rule 1.15 of the State Bar of California states that "[f]unds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account."

b.   Second, based on evidence collected to date and described in my prior affidavit, there is probable cause to believe that AVENATTI took a number of affirmative actions to obstruct an IRS collection action relating to GBUS's unpaid payroll taxes by, among other things, lying to an IRS Revenue Officer, changing contracts, merchant accounts, and bank account information to avoid liens and levies imposed by the IRS, and instructing employees to deposit over $800,000 in cash from Tully's stores, which were owned and operated by GBUS, into a bank account associated with a separate entity to avoid liens and levies by the IRS.  If AVENATTI were to learn of the instant investigation prior to his arrest he might engage in similarly obstructive conduct.

c.   Third, a number of former GBUS employees have expressed concerns that AVENATTI might attempt to retaliate against them if he learned they were cooperating with the government's investigation.

d.   Fourth, there is a possibility that some evidence relating to GBUS's operations may have already been lost when GBUS was evicted from its corporate offices and AVENATTI refused to pay the bill for GBUS's cloud-based server.  Although IRS-CI has been able to obtain some GBUS records, including the data stored on the SUBJECT DEVICES, from other sources, AVENATTI's apparent willingness to allow GBUS records to be lost or destroyed raises a concern that, were AVENATTI to learn of the criminal complaint and arrest warrant, he might not hesitate to destroy any remaining GBUS records and other relevant evidence.

## V.  CONCLUSION

9.    For all the reasons described above, there is probable cause to believe that AVENATTI has committed bank fraud, in violation of 18 U.S.C. § 1344(1), and wire fraud, in violation of 18 U.S.C. § 1343.

_____
Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation


Subscribed to and sworn before me
this 22nd day of March, 2019.

DOUGLAS F. McCORMICK
_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**Exhibit 1 to the March 22, 2019, Criminal Complaint is attached as Exhibit 1 to this Affidavit**

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

COPY

for the

Central District of California

UNDER SEAL

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) |
| 10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 | ) ) |
| | ) |
| | ) |

Case No. 8:19-MJ-242

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B-1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat Tax |
| 26 U.S.C. § 7202 | Willful Failure to Collect or Pay Over Tax |
| 26 U.S.C. § 7203 | Willful Failure to Pay Tax or File Return |
| 26 U.S.C. § 7212 | Interference with Administration of Internal Revenue Laws |
| 18 U.S.C. § 152 | Concealment of Assets in Bankruptcy |
| 18 U.S.C. § 157 | Bankruptcy Fraud |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1014 | False Statement to a Bank or Other Federally Insured Institution |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

///

///

///

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

IRS CI Special Agent Remoun Karlous
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *March 24, 2019*

City and state: Santa Ana, CA

_____
*Judge's signature*

United States Magistrate Judge Douglas F. McCormick
*Printed name and title*

**DOUGLAS F. McCORMICK**

AUSAs:  Julian L. André (213.894.6683) & Brett A. Sagel (714.338.3598)

<u>**ATTACHMENT A-1**</u>

<u>**PREMISES TO BE SEARCHED**</u>

The premises to be searched is Unit Number 2205 of the Ten Thousand residential condominium complex, located at 10000 Santa Monica Boulevard, Los Angeles, California 90067 ("SUBJECT PREMISES 1"). The Ten Thousand condominium complex is a 40-story luxury residential tower located on Santa Monica Boulevard. The building is a modern all-glass structure with floor to ceiling windows. The Ten Thousand condominium complex sits directly on the corner of Santa Monica Boulevard and Moreno Drive. The driveway to the main entrance is off Santa Monica Boulevard, which is a one way road. The driveway into the main entrance is screened for privacy by an evergreen hedge and is accessible from both Santa Monica Boulevard and Moreno Drive. The front doors are covered by a roof canopy. The front doors to the main entrance of the building are approximately two 12-15 foot glass doors accompanied by two doormen. Unit 2205 is located on the 22nd floor.

**ATTACHMENT B-1**

## I.   ITEMS TO BE SEIZED

1.   Evidence, contraband, fruits, and/or instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the ownership of Global Baristas US, LLC ("GBUS"); Global Baristas, LLC ("GB LLC"); GB Autosport, LLC ("GB Auto"); GB Hospitality LLC ("GB Hospitality"); Doppio Inc. ("Doppio"); Eagan Avenatti LLP ("EA LLP"); and Avenatti & Associates, APC ("A&A") (collectively, the "Subject Entities").

b.   Records, documents, programs, applications, or materials from January 2011 through the present relating to Michael J. Avenatti's ("AVENATTI") control or management of any

i

of the Subject Entities and/or The X-Law Group, PC ("X-Law Group").

        c.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the organizational or management structure of any of the Subject Entities and/or X-Law Group.

        d.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the finances of any of the Subject Entities, including assets, income, liabilities, accounts receivable, accounts payable, and expenses.

        e.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the personal finances of Michael Avenatti ("AVENATTI"), including information relating to AVENATTI's assets, debts, income, expenses, and net worth.

        f.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the accounting records for AVENATTI and/or any of the Subject Entities, including any Microsoft Dynamics NAV, QuickBooks, or other electronic accounting data, files, or records.

        g.   Records, documents, programs, applications, or materials from January 201 through the present relating to any financial transactions, including any proposed or potential

ii

financial transactions, involving any of the Subject Entities, and/or AVENATTI.

     h.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any payments, checks, credits, wire transfers, commodities, services, or other things of value paid, provided, delivered, or transferred, directly or indirectly, to AVENATTI and/or any of the Subject Entities

     i.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any financial relationship between AVENATTI and/or any of the Subject Entities on one hand and X-Law Group and/or Filippo Marchino ("MARCHINO") on the other hand.

     j.   Records, documents, programs, applications, or materials from January 2011 through the present relating to financial decisions AVENATTI and/or JUDY REGNIER ("REGNIER") made on behalf of any of the Subject Entities, including decisions to authorize payments on behalf of any of the Subject Entities and transfer money to or from any of the Subject Entities.

     k.   Records, documents, programs, applications, or materials from January 2011 through the present relating to communications between AVENATTI and/or REGNIER and any financial institution regarding the transfer of funds to or from any

account associated with AVENATTI and/or any of the Subject
Entities.

l.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to any
loans or other financing agreements, including any proposed or
potential loans or other financing agreements, involving any of
the Subject Entities and/or AVENATTI.

m.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to the
payroll obligations of the Subject Entities.

n.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to the federal, state, and/or local tax obligations,
tax returns, tax liabilities, or tax payments of any of the
Subject Entities and/or AVENATTI.

o.   Non-privileged records, documents, programs,
applications, or materials from January 2011 through the present
relating to any liens, levies, garnishments, judgments,
encumbrances, or tax-related investigations or actions
associated with any of the Subject Entities and/or AVENATTI.

p.   Records, documents, programs, applications, or
materials from January 2011 through the present relating to
attorneys' fees or costs earned or collected by EA LLP, A&A,
and/or AVENATTI, including attorney-client fee contracts,

engagement letters, fee agreements, cost-sharing agreements, fee-sharing agreements, settlement agreements, and client billing records, but excluding any such records relating to the representations of Stephanie Clifford or Julie Swetnick.

q.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's contractual relationships, including drafts and final versions of any executed, proposed, or potential contracts and agreements, bills of sale, correspondence regarding payments, and correspondence regarding the cancellation or modification of contracts and/or agreements.

r.   Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' and/or AVENATTI's bank account information.

s.   Records, documents, programs, applications, or materials from January 2011 through the present relating to the physical whereabouts of AVENATTI, and/or REGNIER, including calendars and calendar entries.

t.   Records, documents, programs, applications, or materials from January 1, 2014, to the present relating to AVENATTI and/or EA LLP's representation of G.B., including the approximately $1.6 million settlement payment that was

transferred to one of AVENATTI's City National Bank attorney trust account in or around January 2018.

   u.   Records, documents, programs, applications, or materials from January 1, 2017, to the present relating to AVENATTI's, EA LLP's, X-Law Group, and/or MARCHINO's representation of M.P. and L.T., including the approximately $8,146,288 payment that was transferred to one of AVENATTI's City National Bank attorney trust accounts in or around March 2018.

   v.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Paychex provided to EA LLP and/or A&A, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Paychex.

   w.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the payroll and tax preparation services that Ceridian HCM Inc. ("Ceridian") provided to GBUS, including any records, documents, programs, applications, or materials relating to changes in the payroll and tax services to be provided by Ceridian.

   x.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the sale or purchase of TC Global, Inc. or Tully's Coffee.

      y.   Records, documents, programs, applications, or materials from January 2013 through the present relating to the purchase or sale, including any proposed or attempted purchase or sale, of GBUS, GB LLC, or Doppio.

      z.   Records, documents, programs, applications, or materials from January 2013 through the present relating to value of GBUS or GB LLC.

      aa.  Records, documents, programs, applications, or materials from January 2013 through the present relating to GBUS's and GB LLC's merchant credit card processing accounts (the "merchant accounts"), including contracts, agreements, account applications, and correspondence regarding changes to the merchant accounts.

      bb.  Records, documents, programs, applications, or materials from January 2011 through the present relating to the sale, rental, lease, purchase, maintenance, renovation, or remodeling of any of AVENATTI's residences, including his residences in Newport Beach, California; Laguna Beach, California; and Los Angeles, California.

      cc.  Records, documents, programs, applications, or materials from January 2011 through the present relating to continuing legal education ("CLE") courses taken by AVENATTI, including any professional responsibility CLE courses, ethics CLE courses, or tax CLE courses.

dd.  Records, documents, programs, applications, or materials from January 2011 through the present relating to any of the Subject Entities' employee handbooks or manuals, employment contracts, compensation records, and employee lists.

ee.  Records, documents, programs, applications, or materials relating to any locations or services used by AVENATTI and/or any of the Subject Entities to store physical or electronic records.

ff.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

gg.  With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.    The following procedures will be followed at the time
of the search in order to avoid unnecessary disclosures of any
privileged attorney-client communications or work product:

### A.   Non-Digital Evidence

5.    Law enforcement personnel conducting the investigation
("the Investigation Team") may be present at the search, but may
not search or review any item prior to it being given to them by
the "Privilege Review Team" (previously designated individual(s)
not participating in the investigation of the case).

6.    The Privilege Review Team will review documents to see
whether or not the document appears to contain or refer to
communications between AVENATTI, REGNIER, MARCHINO and/or any
other lawyers from EA LLP, A&A, and the X-Law Group on the one
hand and any person on the other hand; contain the work product

x

of AVENATTI, REGNIER, MARCHINO, and any other lawyers from EA
LLP, A&A, and the X-Law Group; or contain communications or
documents relating to the following law firms' representation of
AVENATTI, EA LLP, or A&A:  (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/ Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law (collectively, the "potentially privileged
information").  Those documents not containing or referring to
such communications or work product may be turned over to the
Investigation Team for review.

　　　7.　　In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will review any document identified
as appearing to contain potentially privileged information to
confirm that it contains potentially privileged information.  If
it does not, it may be returned to an Investigation Team member.
If a member of the Privilege Review Team confirms that a
document contains potentially privileged information, then the
member will review only as much of the document as is necessary
to determine whether or not the document is within the scope of
the warrant.  Those documents which contain potentially
privileged information but are not within the scope of the
warrant will be set aside and will not be subject to further

review or seizure absent subsequent authorization.  Those
documents which contain potentially privileged information and
are within the scope of the warrant will be seized and sealed
together in an enclosure, the outer portion of which will be
marked as containing potentially privileged information.  The
Privilege Review Team member will also make sure that the
locations where the documents containing potentially privileged
information were seized have been documented.

      8.    The seized documents containing potentially privileged
information will be delivered to the United States Attorney's
Office for further review by a PRTAUSA.  If that review reveals
that a document does not contain potentially privileged
information, or that an exception to the privilege applies, the
document may be returned to the Investigation Team.  If
appropriate based on review of particular documents, the PRTAUSA
may apply to the court for a finding with respect to the
particular documents that no privilege, or an exception to the
privilege, applies.

      **B.**    **Digital Evidence**

      9.    The Privilege Review Team will search for digital
devices capable of being used to facilitate the Subject Offenses
or capable of containing data falling within the scope of the
items to be seized.  The Privilege Review Team will then review
the identified digital devices as set forth herein.  The
Investigation Team will review only digital device data which
has been released by the Privilege Review Team.

10.   The Privilege Review Team will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.

11.   The Privilege Review Team and the Investigation Team shall complete both stages of the search discussed herein as soon as is practicable but not to exceed 180 days from the date of execution of the warrant.   The government will not search the digital device(s) beyond this 180-day period without obtaining an extension of time order from the Court.

12.   The Investigation Team will provide the Privilege Review Team and/or appropriate litigation support personnel[1] with a list of "scope key words" to search for on the digital devices, to include words relating to the items to be seized as detailed above.   The Privilege Review Team will conduct an initial review of the digital devices using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.   The Privilege Review Team may also do a more detailed quality check of this data and the results of this initial review, to ensure that the key word search is effective. Documents and data that are identified by this initial review, after quality check, as not within the scope of the warrant will

---

[1] Litigation support personnel and computer forensics agents or personnel, including IRS Computer Investigative Specialists, are authorized to assist both the Privilege Review Team and the Investigation Team in processing, filtering, and transferring documents and data seized during the execution of the warrant.

Case 8:19-mj-00412-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 305 of 330 Page ID #:811
Case 8:19-mj-00412-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 305 of 330 Page ID #:811
100   Page ID #:332

be maintained under seal and not further reviewed absent
subsequent authorization.

13.   The Investigation Team will also provide the Privilege
Review Team with a list of "privilege key words" to search for
among the documents and data that are identified by the initial
review and quality check described above as appearing to fall
within the scope of the warrant, to include specific words
associated with AVENATTI, REGNIER, MARCHINO, and any of the
following law firms (a) EA LLP; (b) A&A; (c) X-Law Group; (d)
Foster Pepper PLLC; (e) Osborn Machler PLLC; (f) Eisenhower
Carlson PLLC; (g) Talmadge/Fitzpatrick/ Tribe, PPLC; (h) The
Brager Tax Law Group; (i) SulmeyerKupetz; (j) Baker & Hostetler
LLP; (k) Shulman Hodges & Bastian LLP; (l) Legal & Tax
Consulting Group; (m) Pachulski Stang Ziehl & Jones LLP; (n)
Foley & Lardner LLP; (o) Raines Feldman, LLP; and (p) Pansky
Markle Attorneys at Law.   The privilege key words shall also
include the above referenced law firms' domain names and
lawyers' email addresses, and generic words such as
"privileged," "work product."   The Privilege Review Team will
conduct a review of these documents and data using the privilege
key words, and by using search protocols specifically chosen to
identify documents and data containing potentially privileged
information.   Documents or data which are identified by this
review as not potentially privileged may be given to the
Investigation Team.

14.   Documents or data that the privilege key word searches
identify as potentially privileged will be reviewed by a

Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 306 of 330 Page ID #:812
Case 8:19-mj-00419-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 306 of 330 Page ID #:812
100   Page ID #:333

Privilege Review Team member to confirm that they contain
potentially privileged information.  Documents or data that are
determined by this review not to be potentially privileged may
be given to the Investigation Team.  Documents or data that are
determined by this review to be potentially privileged will be
given to the United States Attorney's Office for further review
by a PRTAUSA.  Documents or data identified by the PRTAUSA after
review as not potentially privileged may be given to the
Investigation Team.  If, after review, the PRTAUSA determines it
to be appropriate, the PRTAUSA may apply to the court for a
finding with respect to particular documents or data that no
privilege, or an exception to the privilege, applies.  Documents
or data that are the subject of such a finding may be given to
the Investigation Team.

     15.  Documents or data identified by the PRTAUSA(s) after
review as privileged (that are not subject to a finding by a
court of no privilege or an exception to the privilege) or
potentially privileged and outside the scope of the items to be
seized shall be segregated and sealed together in an enclosure,
the outer portion of which will be marked as containing
potentially privileged information, and maintained by the
investigative agency.  Such data or documents shall not be
accessible by or given to the Investigation Team at any time
absent authorization of the Court.  However, the Privilege
Review Team may, in its discretion, store the privileged and
potentially privileged data and documents in a folder or a set
of folders in a document review platform database, such as

Relativity or Eclipse, that remains inaccessible to the
Investigation Team.  The Privilege Review Team's access to this
separate document review platform database shall cease upon
expiration of the warrant.  However, litigation support
personnel from the United States Attorney's Office, United
States Department of Justice, and/or the investigating agency
may continue to access this separately-maintained document
review database for the purpose of database maintenance.

16.   The Investigation Team will search only the documents
and data that the Privilege Review Team provides to the
Investigation Team at any step listed above in order to locate
documents and data that are within the scope of the search
warrant.  The Investigation Team does not have to wait until the
entire privilege review is concluded to begin its review for
documents and data that are within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for documents and data within the scope of the search warrant if
that is more efficient.  This second "scope" review is intended
only to ensure that the initial scope key word review
successfully eliminated data outside the scope of the search
warrant from seizure.

## C.   **Additional Privilege Review Procedures**

17.   The Privilege Review Team will segregate any
identifiable documents and/or data relating to Stephanie
Clifford v. Donald J. Trump, No. 2:18-CV-2217-SJO-FFM (C.D.
Cal.), the representation of Stephanie Clifford, and/or the
representation of Julie Swetnick.  Such documents and/or data

will be maintained under seal by the investigating agency
without further review as set forth in paragraphs 7 and 15 above
absent subsequent authorization from the Court.  This provision,
however, shall not preclude the Privilege Review Team or
Investigation Team from reviewing financial and accounting
records covered by paragraphs 1.d, 1.f, 1.g, and 1.r above,
which reference the representations of Ms. Clifford or Ms.
Swetnick.

    18.  To the extent that any documents and/or data covered
by paragraph 1.p above, such as attorney-client fee contracts,
engagement letters, and client billing records, contain
information that is potentially protected by the attorney-client
privileged or the attorney-work-product doctrine, the Privilege
Review Team shall redact all such potentially privileged
information from the documents or data before releasing the
documents and/or data to the Investigation Team unless the
specific client agrees to waive the attorney-client privilege.

    19.  If, upon review, a member of the Investigation Team
determines that a document or data appears to contain
potentially privileged information, the Investigation Team
member shall discontinue its review of the document or data and
shall immediately notify a member of the Privilege Review Team.
The Investigation Team member may record identifying information
regarding the potentially privileged document or data that is
reasonably necessary to identify the document or data for the
Privilege Review Team.  The Investigation Team shall not further
review any documents or data that appears to contain such

potentially privileged information until after the Privilege
Review Team has completed its review of the additional
potentially privileged information discovered by the
Investigation Team member.

20.   In performing the reviews, both the Privilege Review
Team and the Investigation Team may:

        a.   search for and attempt to recover deleted,
"hidden," or encrypted data;

        b.   use tools to exclude normal operating system
files and standard third-party software that do not need to be
searched; and

        c.   use forensic examination and searching tools,
such as "EnCase," "FTK" (Forensic Tool Kit), Nuix, Axiom,
Relativity, and Eclipse, which tools may use hashing and other
sophisticated techniques.

21.   If either the Privilege Review Team or the
Investigation Team, while searching a digital device, encounters
immediately apparent contraband or other evidence of a crime
outside the scope of the items to be seized, they shall
immediately discontinue the search of that device pending
further order of the Court and shall make and retain notes
detailing how the contraband or other evidence of a crime was
encountered, including how it was immediately apparent
contraband or evidence of a crime.

22.   If the search determines that a digital device does
not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

23.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

24.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

25.  The government may retain also a digital device if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

26.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

27. In order to search for data capable of being read or interpreted by a digital device, the Investigation Team is authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

28. During the execution of this search warrant, with respect to a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 312 of 330 Page ID #:818
Case 8:19-mj-00419-DUTY *SEALED* Document 1 Filed 03/24/19 Page 312 of 330 Page ID #:339
100  Page ID #:339

thumb- and/or fingerprints of AVENATTI, REGNIER, and/or MARCHINO
onto the fingerprint sensor of the device (only when the device
has such a sensor), and direct which specific finger(s) and/or
thumb(s) shall be depressed; and (2) hold the device in front of
the face of AVENATTI, REGNIER, and/or MARCHINO his or her eyes
open to activate the facial-, iris-, or retina-recognition
feature, in order to gain access to the contents of any such
device.

29.  The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

**III.  <u>REQUESTS FOR APPOINTMENT OF A SPECIAL MASTER</u>**

30.  To the extent that AVENATTI, REGNIER, EA LLP, A&A,
and/or X-Law Group intend to request that a special master be
appointed to handle the review of any potentially privileged
information seized during the execution of this Search Warrant,
such a request must be filed with this Court within seven days
of the execution of this Search Warrant.  The government will
then have seven days to file any opposition to such a request.

31.  Any request for the appointment of a special master
must, at a minimum, address the following issues:  (a) the legal
basis for the request; (b) the anticipated role of the special
master, should one be appointed; (c) proposed search and review
procedures to be followed by the special master, should one be
appointed; (d) proposed procedures for the selection of a

special master; (e) the names of at least three proposed special masters; and (f) the party's ability to pay for any costs and fees incurred by a special master.

## AFFIDAVIT

I, Remoun Karlous, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Internal Revenue Service-Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed since April 1995.  As an IRS-CI SA, I have investigated numerous cases involving criminal violations of Title 18, Title 21, Title 26, and Title 31 of the United States Code, which have resulted in seizure, search, and arrest warrants.  In particular, I have investigated cases involving money laundering, international money laundering, securities fraud, tax evasion (domestic and international cases), and subscribing to false tax returns.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is submitted in support of the following:

a.    An application for a warrant to search the residence of Michael J. Avenatti ("AVENATTI") located at 10000 Santa Monica Boulevard, Unit 2205, Los Angeles, California 90067 ("SUBJECT PREMISES 1"), as further described in Attachment A-1, for the list of items to be seized as set forth in Attachment B-1.

b.    An application for a warrant to search the residence of Judy K. Regnier ("REGNIER") located at 4491 Rainbow Lane, Yorba Linda, California 92886 ("SUBJECT PREMISES 2"), as

further described in Attachment A-2 for the list of items to be
seized as set forth in Attachment B-2.

      c.   An application for a warrant to search the
business premises of The X-Law Group ("X-Law Group") located at
1910 West Sunset Boulevard, Suite 450, Los Angeles, California
90026 ("SUBJECT PREMISE 3" and, collectively with SUBJECT
PREMISES 1 and SUBJECT PREMISES 2, the "SUBJECT PREMISES"), as
further described in Attachment A-3 for the list of items to be
seized as set forth in Attachment B-3.

    3.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrants and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. <u>PROPERTY TO BE SEARCHED</u>

    4.   The property to be searched are the SUBJECT PREMISES,
including any individuals, containers, or digital devices found
therein, as described in Attachments A-1, A-2, and A-3.
Attachments A-1, A-2, and A-3 are incorporated herein by
reference.

### IV. <u>ITEMS TO BE SEIZED</u>

    5.   The requested search warrants seek authorization to
seize from the SUBJECT PREMISES any evidence, fruits, or

instrumentalities of violations of 26 U.S.C. § 7201 (attempt to evade or defeat tax); 26 U.S.C. § 7202 (willful failure to collect or pay over tax); 26 U.S.C. § 7203 (willful failure to pay tax or file return); 26 U.S.C. § 7212 (interference with administration of internal revenue laws); 18 U.S.C. § 152 (concealment of assets in bankruptcy); 18 U.S.C. § 157 (bankruptcy fraud); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1001 (false statements); 18 U.S.C. § 1014 (false statement to a bank or other federally insured institution); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (bank fraud); and 18 U.S.C. § 1957 (money laundering) (collectively, the "Subject Offenses"). The list of items to be seized is set forth in Attachments B-1, B-2, and B-3. Attachments B-1, B-2, and B-3 are incorporated by reference herein.

## V. SUMMARY OF PROBABLE CAUSE

6. AVENATTI was and is an attorney licensed to practice law in the State of California. AVENATTI practiced law through Avenatti & Associates, APC ("A&A") and Eagan Avenatti LLP ("EA LLP") in Newport Beach and Los Angeles, California. AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

7. AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California. In 2013, AVENATTI's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2

million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

8.    There is probable cause to believe that AVENATTI and others engaged in the following criminal conduct:  (a) tax offenses relating to GBUS's failure to pay to the IRS payroll taxes, including federal income taxes, Social Security taxes, and Medicare taxes (collectively, "trust fund taxes") that GBUS withheld from its employees' paychecks, and AVENATTI's subsequent efforts to obstruct a related IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including EA LLP's failure to pay to the IRS its payroll taxes, and EA LLP's and A&A's failure to file federal corporate or partnership tax returns and pay federal income taxes; (c) tax offenses relating to AVENATTI's failure to file federal individual income tax returns and pay federal income taxes between 2011 and 2017; (d) fraud-related offenses relating to loans AVENATTI and his companies obtained from The Peoples Bank in Mississippi; (e) fraud and money laundering offenses relating to a total of approximately $5 million that AVENATTI embezzled from his legal clients (G.B., M.P., and L.T.) in 2018; and (f) bankruptcy fraud offenses relating to AVENATTI's and EA LLP's efforts to conceal assets and bank accounts during federal bankruptcy proceedings involving AVENATTI and EA LLP.

9.    On March 22, 2019, in case number SA 19-241M, I submitted an affidavit in support of an arrest warrant and

4

Case 8:19-mj-00412-DUTY *SEALED* Document 1-1 Filed 05/24/19 Page 318 of 330 Page ID #:824
Case 8:19-mj-00412-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 318 of 330 Page ID #:824
100   Page ID #:345

criminal complaint charging AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the arrest warrant that same day.  IRS-CI anticipates executing the arrest warrant concurrently with the proposed search warrants.

10.  There is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES for the following reasons:

a.  First, SUBJECT PREMISES 1 is AVENATTI's personal residence.  Based on my training and experience and evidence obtained during the course of this investigation, I know that SUBJECT PREMISES 1 is likely to contain AVENATTI's personal and business records, as well as digital devices that are likely to contain such records.

b.  Second, SUBJECT PREMISES 2 is REGNIER's personal residence.  Based on my training and experience and investigation to date, as well as REGNIER's substantial involvement in the alleged criminal conduct, I believe SUBJECT PREMISES 2 is also likely to contain relevant business records and/or digital devices containing such records.  For example, I understand that EA LLP's and A&A's mail is currently being forwarded to a mailbox at a Postal Annex store less than a mile from SUBJECT PREMISES 2 and since EA LLP was evicted from their offices in Newport Beach, California, between November 2018 and

January 2019, I believe REGNIER has primarily been working from her home.

         c.    Third, SUBJECT PREMISES 3 is the business premises of The X-Law Group ("X-Law Group"). AVENATTI has been leasing SUBJECT PREMISES 3 and used it as additional office space for EA LLP since the summer of 2016. Additionally, X-Law Group was directly involved in a number of significant financial transactions with GBUS, GB LLC, GB Autosport LLC ("GB Auto"), EA LLP, and A&A. Moreover, in 2018, Filippo Marchino ("MARCHINO"), the Founding Partner of X-Law Group, was directly involved in discussions with AVENATTI's clients, M.P. and L.T., regarding the approximately $4 million that AVENATTI embezzled from M.P. and L.T. in March 2018.

## VI. STATEMENT OF PROBABLE CAUSE

### A. February 2019 Warrant to Search GBUS Digital Devices

    11.  On February 22, 2019, in case number 8:19-MJ-103, I submitted an affidavit in support of an application for a warrant to search seven digital devices in the custody of IRS-CI in Laguna Niguel, California (the "February 2019 affidavit"), which had been produced by former GBUS employees. The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the warrant that same day (the "February 2019 search warrant"). The application for a search warrant in case number 8:19-MJ-103, as well as my February 2019 affidavit in support thereof, are attached hereto as Exhibit 1 and incorporated herein by

Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 320 of 330 Page ID #:826
Case 8:19-mj-00419-DUTY * SEALED * Document 1-1 Filed 05/24/19 Page 320 of 330 Page ID #:347
100   Page ID #:347

reference.[1]  In summary, my February 2019 affidavit stated the following:

  a. AVENATTI was and is an attorney licensed to practice law in the State of California.  AVENATTI practiced law through A&A and EA LLP in Newport Beach, California.  AVENATTI was the sole owner of A&A, which owned 75 percent of EA LLP.

  b. AVENATTI was also the principal owner and Chief Executive Officer ("CEO") of GBUS, which operated Tully's stores in Washington and California.  In 2013, AVENATTI's company, GB LLC, acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  AVENATTI's company, A&A, owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

  c. There is probable cause to believe that between at least 2011 and the present AVENATTI committed federal offenses, including the following: (a) tax offenses relating to GBUS's payroll tax obligations and AVENATTI's efforts to obstruct an IRS collection action; (b) tax offenses relating to the tax obligations of EA LLP and A&A, including the payroll tax obligations of EA LLP; (c) tax offenses relating to AVENATTI's personal tax obligations; (d) fraud-related offenses relating to

---

[1]  The search warrant and application in case number 8:19-MJ-103 were filed under seal and remain under seal to protect the integrity of the government's ongoing investigation. Because the search warrants sought in connection with this application are likely to be executed concurrently with AVENATTI's arrest warrant, the government will likely be moving to unseal this application and the February 2019 search warrant after AVENATTI's arrest.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 321 of 330 Page ID #:827
Case 8:19-mj-00419-DUTY *SEALED* Document 6-1 Filed 03/22/24 Page 322 of
100   Page ID #:348

loans AVENATTI and his companies obtained from The Peoples Bank
in Mississippi; and (e) wire fraud, money laundering, and
bankruptcy fraud offenses relating to an approximately $1.6
million settlement payment AVENATTI and EA LLP received in
January 2018, but failed to transfer to EA LLP's client or
disclose in federal bankruptcy proceedings involving AVENATTI
and EA LLP.

      d.   <u>First</u>, between the fourth quarter of 2015 and the
fourth quarter of 2017, inclusive, GBUS failed to file
employment tax returns and pay approximately $3,121,460 in
federal payroll taxes, including approximately $2,390,048 in
trust fund taxes, which had been withheld from GBUS employees'
paychecks.  Multiple former GBUS employees have said that
AVENATTI was responsible for all of GBUS's significant financial
and business decisions, including the decision not to pay the
payroll and trust fund taxes that GBUS owed to the IRS.  Indeed,
AVENATTI was well aware of GBUS's outstanding tax obligations,
yet repeatedly refused to authorize the required tax payments to
the IRS.

      e.   Although GBUS failed to pay to the IRS its
payroll taxes between the fourth quarter of 2015 and the fourth
quarter of 2017, AVENATTI caused substantial amounts of money to
be transferred from GBUS's or GB LLC's bank accounts during this
same time period.  For example, a preliminary analysis of GBUS's
and GB LLC's bank account records shows that between 2015 and
2017 AVENATTI caused a net of approximately $1.7 million to be
transferred from GBUS's or GB LLC's bank accounts to bank

accounts associated with A&A or EA LLP.[2]  This money could have and should have been used to pay GBUS payroll tax obligations.

f.   Additionally, after the IRS initiated a collection action relating to GBUS's outstanding payroll tax obligations in September 2016, issued an approximately $5,000,000 tax lien against GBUS in July 2017, and levied multiple GBUS bank accounts, AVENATTI directed repeated attempts to evade collection of those payroll taxes and obstruct the IRS collection action.  Among other things, AVENATTI took the following steps to evade the collection of payroll taxes due to the IRS and obstruct the IRS collection action:

i.   In October 2016, when first contacted by an IRS Revenue Officer ("RO 1") regarding GBUS's unpaid payroll taxes, AVENATTI falsely stated that a third-party payroll company was responsible for filing GBUS's payroll tax returns and making GBUS's federal tax deposits.  AVENATTI, however, knew that GBUS's third-party payroll company, Ceridian HCM Inc., had discontinued the tax services it had previously provided to GBUS and was, therefore, no longer responsible for filing GBUS's payroll tax returns and making the necessary federal tax deposits.  AVENATTI was well aware that GBUS was not paying its payroll taxes.  GBUS employees repeatedly asked him to authorize

---

[2]  A further analysis of GBUS's and GB LLC's bank account records shows that between September 2015 and December 2017, AVENATTI caused a net of approximately $2,527,318 to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with A&A and EA LLP.  Moreover, in September 2015 and October 2015 alone, when GBUS first stopped paying its payroll taxes to the IRS, AVENATTI caused a net of approximately $501,582 to be transferred to EA LLP's and A&A's bank accounts.

Case 8:19-mj-00419-DUTY *SEALED* Document 1 Filed 05/24/19 Page 323 of 330 Page ID #:829
Case 8:19-mj-00419-DUTY *SEALED* Document 1 Filed 05/24/19 Page 323 of 330 Page ID #:829
100   Page ID #:350

the payment of GBUS's payroll taxes to the IRS, yet he refused
to do so.

      ii.   In September 2017, after IRS RO 1 advised
GBUS of the possibility of criminal proceedings and levied
multiple GBUS bank accounts, including a GBUS account at
KeyBank, AVENATTI directed GBUS employees to stop depositing
cash receipts from the Tully's stores into the account at
KeyBank.  Instead, in order to avoid the levies, AVENATTI
directed GBUS employees to deposit all cash receipts from
Tully's stores into a little-used bank account at Bank of
America associated with his car racing entity, GB Auto.  Between
September 2017 and December 2017, GBUS employees deposited
approximately $859,784 in cash into the GB Auto account at
AVENATTI's direction.

      iii. In late-September and early-October 2017, in
order to avoid IRS levies issued to the sponsoring bank for
GBUS's merchant credit card processing accounts ("merchant
accounts"), AVENATTI directed GBUS's credit card processing
company, TSYS Merchant Solutions ("TSYS"), to change the company
name and Employer Identification Number ("EIN") associated with
the merchant accounts from GBUS to GB LLC.  AVENATTI also
directed TSYS to have all credit card receipts paid to a new
bank account under the name of GB LLC, which AVENATTI and
REGNIER had opened that same day in Orange County, California,
instead of the bank accounts associated with GBUS, which were
already subject to the IRS levies.

iv.   In November 2016, approximately one month after RO 1 first contacted AVENATTI, AVENATTI changed the name of the party to a contract with The Boeing Company ("Boeing") from GBUS to "GB Hospitality LLC," a company which does not appear to have ever been registered with any government agency or operated.  Later, in September 2017, after the IRS had issued levies to Boeing and a number of banks with which GBUS had accounts, Boeing cancelled the contract because GBUS had failed to make the required commission payments.  In connection with the cancellation of the contract, Boeing agreed to purchase two existing Tully's "kiosks" at Boeing facilities and other Tully's equipment in exchange for a total of $155,010 and the forgiveness of GBUS's debt to Boeing.  Although all of the Tully's locations were operated by GBUS, AVENATTI told an attorney at Boeing to use the name GB LLC on the two bills of sale for the kiosks and equipment, and instructed Boeing to wire the $155,010 payment to an attorney trust account associated with EA LLP rather than any of the bank accounts associated with GBUS.  Had the Boeing contract and subsequent bills of sale been under the name GBUS, Boeing would not have made the $155,010 payment due to the existing GBUS tax lien.  After receiving the $155,010 payment from Boeing, AVENATTI transferred the $155,010 to an A&A bank account, from which he then transferred $15,000 to his personal checking account, paid approximately $13,073 for rent at his residential apartment in Los Angeles, California (SUBJECT PREMISES 1), and paid approximately $8,459 to Neiman Marcus.  Indeed, out of the $155,010 Boeing transferred to the

EA LLP trust account, it appears that only approximately half ever ended up in GBUS's bank accounts.

        g.   Second, AVENATTI's other companies, EA LLP and A&A, have repeatedly failed to meet their tax obligations despite generating substantial revenues. Between 2015 and 2017, EA LLP failed to file payroll tax returns and pay approximately $2.4 million in payroll taxes, including approximately $1,279,001 in trust fund taxes that had been withheld from EA LLP employees' paychecks. Just as he did in connection with GBUS, AVENATTI lied to the IRS when initially contacted regarding EA LLP's failure to pay its payroll taxes, and falsely claimed that a third-party payroll company, Paychex, was responsible for making the required tax payments even though the payroll company had notified AVENATTI in January 2015 that it was discontinuing various payroll tax services. Additionally, EA LLP has not filed partnership tax returns (IRS Form 1065) for the 2013, 2014, 2015, 2016, and 2017 tax years, even though EA LLP appears to have received approximately $137,890,016 of deposits into its bank accounts during these tax years. Indeed, AVENATTI's personal website claims that AVENATTI has recovered over one billion dollars in verdicts and settlements for his clients. Similarly, A&A has not filed corporate tax returns (IRS Form 1120S) for the 2011, 2012, 2013, 2014, 2015, 2016, or 2017 tax years, even though A&A appears to have received approximately $37,961,633 of deposits into its bank accounts during these tax years, including net payments of approximately $23,820,816 from EA LLP.

h.   <u>Third</u>, AVENATTI filed federal personal income tax returns for the 2009 and 2010 tax years indicating that he owed the IRS a total of approximately $850,438, plus interest and penalties.  AVENATTI, however, did not pay the IRS the amounts he owed for those tax years.[3]  AVENATTI then failed to file personal tax returns for the 2011 through 2017 tax years. During these tax years, AVENATTI generated substantial income and lived lavishly, yet largely failed to pay any federal income tax.  A preliminary analysis of AVENATTI's personal bank accounts reflects that AVENATTI received net payments of approximately $8,464,064 from A&A and EA LLP between 2011 to 2017.  AVENATTI also repeatedly used money that had been transferred from GBUS, GB LLC, and EA LLP to A&A to pay for personal expenses.  Further, AVENATTI received proceeds of approximately $5.4 million when he sold his home in Laguna Beach, California in 2015.  Finally, in connection with recent divorce proceedings, AVENATTI's wife said that AVENATTI told her that he earned $3.7 million dollars in 2016.  His wife also said that their family's monthly expenses were over $200,000 per month.  Financial and escrow company records show that from approximately September 2015 to September 2016, AVENATTI and his wife rented a home in Newport Beach for $100,000 per month, after making a $1,000,000 deposit.

---

[3] The tax due and owing to the IRS for the 2009 and 2010 tax years was not paid until November 2015, when AVENATTI sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

Case 8:19-mj-00419-DUTY *SEALED* Document 4-1 Filed 05/24/19 Page 327 of 330 Page ID #:833
Case 8:19-mj-00419-DUTY *SEALED* Document 1 Filed 05/24/19 Page 316 of 330 Page ID #:354
100   Page ID #:354

     i.   <u>Fourth</u>, between approximately January 2014 and December 2014, AVENATTI obtained three separate loans from The Peoples Bank, a federally insured bank in Mississippi: (1) a $850,500 loan to GB LLC in January 2014; (2) a $2,750,000 loan to EA LLP in March 2014; and (3) a $500,000 loan to EA LLP in December 2014.  In connection with these loans, AVENATTI provided The Peoples Bank with false federal personal income tax returns for the 2011, 2012, and 2013 tax years.  In these purported tax returns, AVENATTI claimed that he earned $4,562,881 in adjusted gross income in 2011, $5,423,099 in adjusted gross income in 2012, and $4,082,803 in adjusted gross income in 2013.  He also claimed that he had paid to the IRS $1,600,000 in estimated tax payments in 2012, and $1,250,000 in estimated tax payments in 2013.  However, AVENATTI never filed personal income tax returns for the 2011, 2012, and 2013 tax years, and did not make any estimated tax payments during the 2012 and 2013 tax years.  In fact, as noted above, at the time, AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, from the 2009 and 2010 tax years.  Additionally, in March 2014, AVENATTI provided The Peoples Bank with a 2012 federal tax return for EA LLP which claimed total income of $11,426,021 and ordinary business income of $5,819,456.  However, the 2012 federal tax return EA LLP actually filed with the IRS in October 2014 claimed total income of only $6,212,605 and an ordinary business loss of $2,128,849.

j.   <u>Fifth</u>, between January 2018 and November 2018, AVENATTI defrauded one of EA LLP's client, G.B., out of the client's portion of an approximately $1.6 million settlement payment.  Specifically, in January 2018, AVENATTI arranged for the $1.6 million settlement payment to be transferred to one of his attorney trust accounts.  Rather than transfer his client's portion of the settlement proceeds to his client, AVENATTI used the entire $1.6 million for his own purposes, including to pay for expenses relating to GBUS.  He then lied to his client and claimed that the settlement payment was not due until March 2018.  When the fake March 2018 deadline passed, AVENATTI led his client to believe that the $1.6 million payment had never been received.  Additionally, AVENATTI failed to disclose in federal bankruptcy proceedings involving AVENATTI and EA LLP that he had received the $1.6 million settlement payment, despite being aware that he was required to do so.

k.   AVENATTI has described REGNIER as his office manager, chief paralegal, and bookkeeper.  She appears to have worked for EA LLP (or its predecessor firm Eagan O'Malley & Avenatti LLP) in an administrative capacity since at least 2008.[4] At various times, REGNIER was a signatory on bank accounts associated with GBUS, GB LLC, GB Auto, EA LLP, and A&A.  REGNIER was personally involved in many of the events at issue in the government's investigation, including directing or executing the

---

[4] Although my February 2019 affidavit said that REGNIER worked for EA LLP since at least 2010, I have since reviewed publicly available information indicating that she worked at Eagan O'Malley & Avenatti since at least 2008.

transfer of funds between various entities associated with AVENATTI, directing the actions of GBUS employees, and transmitting signed contracts and agreements on behalf of GBUS, GB LLC, EA LLP, or A&A to other parties.

**B.   Additional Evidence Regarding the GBUS Tax Offenses**

12.  As noted in my February 2019 affidavit, between the fourth quarter of 2015 and the fourth quarter of 2017, GBUS failed to pay to the IRS approximately $3,121,460 in federal payroll taxes, including approximately $2,390,048 in trust fund taxes.  AVENATTI also repeatedly attempted to obstruct the IRS collection action arising from GBUS's failure to pay its payroll taxes.  Since I submitted my February 2019 affidavit, the investigation has uncovered additional evidence regarding this conduct.

13.  In my February 2019 affidavit, I noted that GBUS's former controller, M.B., told IRS-CI that she sent AVENATTI an email explaining the ramifications of GBUS not paying its payroll taxes to the IRS.  (Ex. 1, ¶ 26.h.)  Based on my review of evidence obtained from the February 2019 search warrant, I have learned that on November 5, 2015, M.B. sent AVENATTI an email[5] titled "Information only – Q4 2015 941 Payroll Tax."  The email stated, in full, the following:

> Michael,
>
> Per you instruction, 941 payroll tax and unemployment
> tax payments (federal withholding, Medicare and social

---

[5]  This email was sent to mavenatti@eaganavenatti.com. Based on the evidence collected during IRS-CI's investigation, I know that AVENATTI almost exclusively used his EA LLP email address mavenatti@eaganavenatti.com to conduct business on behalf of GBUS and his other companies.

security) are not to be paid on an as-we-go basis but will be paid in total at the 1/31/16 filing due date. Two implications result from this strategy:

1. Estimated total tax payment due at 1/31/16 will be about $575,000 - $600,000, exclusive of penalties and interest.

    a. 6 payrolls each with an $83,000 941 tax obligation for a total of $500,000
    b. Federal unemployment of about $8,200
    c. State (CA and WA) unemployment of about $28,000
    d. Washington L&I (workers comp) of about $50,000

2. Global Baristas is a semiweekly filer for 941 tax per the Internal Revenue Service. Per Publication 15 for semiweekly filers, if the pay day falls on a Saturday, Sunday, Monday and/or Tuesday, (Monday as the case of GB) then taxes are required to be deposited by the following Friday. Again per Publication 15 "you are required to deposit 100% of your tax liability on or before the due date". Deposit penalties are as follows:

    a. 2% - Deposit made 1-5 days late
    b. 5% - Deposit made 6-15 days late
    c. 10% - Deposit made 16 or more days late. Also applies to amounts paid within 10 days of the date of the first notice the IRS sent asking for the tax due
    d. 15% - Amounts still unpaid more than 10 days after the date of the first notice the IRS sent asking for the tax due or the day on which you received notice and demand for immediate payment, whichever is earlier.

I have attached Publication 15 for your reference. Unemployment will also carry penalties and interest.

Again, this is for your information, thus I am not looking for a response or direction. I wanted to ensure that you were aware of the implications.

A copy of the "Employer's Tax Guide," IRS Publication 15 for

2015 was attached to the email. M.B. forwarded a copy of this