email to M.E., GBUS's former Director of Human Resources, on or about December 18, 2015.

14.   As noted in my February 2019 affidavit, M.E. told IRS-CI that AVENATTI had instructed her not to file GBUS's quarterly payroll tax returns ("IRS Forms 941"). (Ex. 1, ¶ 30.1.)  The following hard-copy documents M.E. produced to IRS-CI corroborate M.E.'s statements:

a.   On July 29, 2016, M.E. sent AVENATTI and V.S. an email titled "Q2 Tax Filing Review." The email included a spreadsheet detailing amounts owed to various tax agencies, including a total of approximately $1,466,554 in federal payroll taxes due to the IRS for the fourth quarter of 2015, and the first and second quarters of 2016, as well as Federal Unemployment Tax Act ("FUTA") taxes due to the IRS for the 2015 tax year.  The email also attached a letter that GBUS had received "from the IRS referring to the FUTA Unemployment Tax from 2015."[6]  M.E. sent this email to AVENATTI over two months before AVENATTI told IRS RO 1 on October 7, 2016, that he was unaware that GBUS had failed to pay its payroll taxes, and blamed the error on GBUS's third-party payroll company. (See Ex. 1, ¶ 23(d).)

b.   On October 27, 2016, M.E. sent AVENATTI and V.S. an email titled "Q3 Tax Filing Review." The email included an updated spreadsheet detailing GBUS's outstanding tax liabilities, including a total of approximately $1,953,850 in

_____

[6] The attachment to this email was not included in the hard-copy documents that M.E. produced to IRS-CI.

federal payroll taxes due to the IRS for the fourth quarter of
2015 and the first through third quarters of 2016, as well as
FUTA taxes due to the IRS for the 2015 tax year.  M.E. appears
to have attached to the email drafts of GBUS's IRS Form 941 for
the third quarter of 2016.  AVENATTI responded later that same
day, "Thanks [M.E.]  Please do not file anything yet.  I am
having our outside CPA look at the attached and other tax
issues."

      c.    On January 30, 2017, M.E. sent AVENATTI and V.S.
an email titled "Q4 Tax filing Review."  The email included an
updated spreadsheet detailing GBUS's outstanding tax
liabilities, including a total of approximately $2,836,269 in
federal payroll taxes due to the IRS for the fourth quarter of
2015, the first through fourth quarters of 2016, and the first
quarter of 2017, as well as FUTA Unemployment taxes payments due
to the IRS for the 2015 and 2016 tax years.  AVENATTI responded
moments later:  "We are handling.  Thanks."

    15.  As noted in my February 2019 affidavit, GBUS's former
Director of Retail Operations, M.G., told IRS-CI that in
September 2017 AVENATTI had directed M.G. to deposit cash from
the Tully's stores at a Bank of America account associated with
GB Auto ("GB Auto BofA Account 7412").  (Ex. 1, ¶¶ 31.i-31.k.)
Based on my review of evidence obtained from the February 2019
search warrant, I have learned the following additional
information demonstrating that AVENATTI and REGNIER were already
aware of the IRS levy notices when AVENATTI directed the Tully's

stores to deposit all cash into GB Auto BofA Account 7412.  For
example:

     a.  On or about August 25, 2017, V.S. emailed a
KeyBank representative and said:  "There is a hold(s) on the
account #4**93 for Global Baristas Us, LLC; can you send me a
copy of what order/lien this may be for, thanks."  In response,
the KeyBank representative told V.S. that KeyBank had two levies
on the GBUS account, including one levy from the IRS.  On August
28, 2017, another KeyBank representative sent a further response
to V.S. advising V.S. that KeyBank was "required to sweep the
available funds from the account and send them to the parties in
the order" and that KeyBank "will probably be served randomly
until the judgments are satisfied."  V.S. then forwarded this
email string to AVENATTI, who responded moments later stating
"Please send me the email you sent him before his response."

16.  As noted in my February 2019 affidavit, M.G. also said
that she would send AVENATTI text messages attaching pictures of
the deposit slips after each cash deposit.  (Ex. 1, ¶¶ 31.i-
31.k.)  Text messages M.G. produced to IRS-CI confirm that
AVENATTI instructed M.G. to make these cash deposits and that
M.G. sent him pictures of the deposit slips after most of the
cash deposits.  For example:

     a.  On September 7, 2017, AVENATTI sent a text
message to M.G. with the account information for GB Auto BofA
Account 7412.  Later that day, M.G. sent AVENATTI a text message
stating:  "On my way to the bank.  If they ask is the business
address and phone number for GB Autosport the Western Avenue

address [i.e., GBUS's address]?"  AVENATTI responded via text message, "Yes."  M.G. then sent AVENATTI a text message attaching a deposit slip indicating that approximately $81,524 had been deposited into GB Auto BofA Account 7412.  AVENATTI responded, "Thanks."

      b.   On September 18, 2017, M.G. sent a text message to AVENATTI asking:  "Are stores able to deposit at Key Bank [sic] yet?"  Moments later, AVENATTI responded via text message stating:  "Not yet but hopefully in next two days.  Can you collect deposits tmrw and deposit pls?"

      c.   On September 28, 2017, AVENATTI sent a text message to M.G. and V.S. asking:  "When are we depositing again?"  V.S. responded "Friday afternoon."  Moments later, AVENATTI sent another text message asking: "When was the last deposit and what did it include?"  After V.S. responded, AVENATTI sent another text message stating: "It is important that these deposits be made regularly.  Thanks."

      d.   Between September 7, 2017, and December 1, 2017, M.G. sent AVENATTI or AVENATTI and V.S. text messages with pictures of deposit slips reflecting deposits into GB Auto BofA Account 7412 on 24 separate occasions.  On multiple occasions, AVENATTI responded to these text messages by stating, "Thanks." Based on my review of bank account information, I know that the information on the deposit slips directly corresponds to deposits that were actually made into GB Auto BofA Account 7412.

     17.   In my February 2019 affidavit, I indicated that on or about September 29, 2017, AVENATTI instructed a TSYS

representative (TSYS Rep. 1") to change the name and EIN associated with GBUS's merchant accounts from "Global Baristas US LLC" to "Global Baristas, LLC." (Ex. 1 ¶ 37.d.) During this conversation, AVENATTI suggested that he did not know why TSYS was holding GBUS's funds. Based on my review of evidence obtained from the search warrant authorized in February 2019, I have learned the following additional information demonstrating that AVENATTI and REGNIER were already aware of the IRS levy notices at that time:

     a.   On September 12, 2017, REGNIER sent an email to V.S. titled "CBT Levy." In this email, REGNIER listed the amounts of various levies on the CB&T accounts since June 1, 2017, and asked V.S. to provide information regarding levies on KeyBank and BofA. In response, V.S. said, among other things, that "IRS also hit tsys account 8-25-17, still confirming."

     b.   On or about September 28, 2017, V.S. sent an email to AVENATTI titled "IRS Levies 9/20 and 9/25 and 9/27." The email included, among other things, the following information: "9.25.17 tsys - $22,135.19 IRS levy."

     c.   On or about September 29, 2017, at approximately 10:57 a.m., V.S. sent an email to AVENATTI titled "Levies," in which he stated that "IRS took as [sic] additional $23,73.02 from tsys yesterday." Based on the timing of other emails between AVENATTI and TSYS Rep. 1 on September 29, 2017, it appears that AVENATTI received this email from V.S. before he first called TSYS Rep. 1 on September 29, 2017.

C.   **Additional Evidence Relating to AVENATTI's Scheme to
Defraud His Legal Client, G.B.**

18.   As set forth in my February 2019 affidavit, AVENATTI
engaged in a scheme to defraud his client, G.B., out of G.B.'s
portion of an approximately $1.6 million settlement payment
AVENATTI and EA LLP that received in January 2018 in connection
with an arbitration proceeding against a Colorado-based company
("Company 1").   (See Ex. 1, § IV.G.)   Specifically, in January
2018, AVENATTI arranged for the $1.6 million settlement payment
to be transferred to a City National Bank attorney trust account[7]
ending in 5566 ("CNB Trust Account 5566").   (See id.)   AVENATTI
then used the entire $1.6 million for his own purposes,
including to pay for expenses relating to GBUS.[8]   (See id.)
AVENATTI then lied to his client and claimed that the settlement
payment was not due until March 2018.   (See id.)   When the March
2018 deadline passed, AVENATTI led his client to believe that
the $1.6 million payment had never been received.   (See id.)

19.   On March 15, 2019, I participated in an interview of
G.B.   The information G.B. provided during the interview was
consistent with the information G.B. and his counsel had

---

[7]   I understand that the State Bar of California has
specific rules that apply to the proper use of attorney trust
accounts.   For example, I understand that Rule 1.15 of the State
Bar of California states that "[f]unds belonging to the lawyer
or the law firm shall not be deposited or otherwise commingled
with funds held in a trust account."

[8]   AVENATTI and REGNIER were the only two signatories for
CNB Trust Account 5566.   Moreover, based on a further review of
the bank records for CNB Trust Account 5566, I have learned that
REGNIER authorized at least eight of the payments from CNB Trust
Account 5566.

previously provided to IRS-CI and the Newport Beach Police Department ("NBPD").  During the interview, G.B.[9] also provided the following additional information:

a.   On or about December 28, 2017, G.B. met with AVENATTI at EA LLP's offices in Newport Beach, California, to go over the proposed settlement agreement with Company 1.  During this meeting, AVENATTI provided G.B. with a copy of the $1.9 million settlement agreement to review.  The settlement agreement AVENATTI provided to G.B. listed the payment dates as $1.6 million on March 10, 2018, and $100,000 on March 10 of each of the next three years.  As noted in my February 2019 affidavit, this information was false and the actual settlement agreement required Company 1 to pay G.B. $1.6 million on January 10, 2018, and $100,000 on January 10 of each of the three subsequent years.  (Ex. 1, ¶ 75.e.)

b.   Based on my review of documents produced by G.B.'s counsel, I know that on or about June 29, 2018, G.B. sent an email to REGNIER asking her to forward to G.B. the signed settlement agreement with Company 1.  During his interview, G.B. said that sometime after he sent this email REGNIER brought him a physical copy of the fully-executed settlement agreement while G.B. was at EA LLP's offices.  REGNIER handed AVENATTI the settlement agreement.  AVENATTI flipped through the settlement

_____

[9] G.B. previously pleaded guilty to a felony theft count in approximately September 2018 and was sentenced to probation. (See Ex. 1, ¶ 75 n.44.)  During his interview, G.B. said that AVENATTI had encouraged him to plead guilty and that AVENATTI continued working with G.B. and one of G.B.'s companies after G.B.'s guilty plea.

agreement and then handed it to G.B.  This copy of the settlement agreement also falsely stated that the settlement payments were due on March 10 of 2018 through 2021, as opposed to January 10 of 2018 through 2021.

   c.   As noted in my February 2019 affidavit, between April 2018 and November 2018, AVENATTI "advanced" G.B. approximately $130,000 to help G.B. meet certain financial obligations while he waited for his portion of the $1.6 million settlement payment from Company 1.  During his interview, G.B. said that in approximately October 2018, AVENATTI told G.B. that AVENATTI would be able to loan G.B. another $100,000 sometime during the first two weeks of January 2019.  Notably, under the terms of the true settlement agreement, Company 1 was scheduled to make an additional $100,000 settlement payment to AVENATTI's trust account on January 10, 2019.  Thus, it appears that AVENATTI was offering to loan G.B.'s own money to G.B.

   20.  During the interview on March 15, 2019, G.B's current counsel also confirmed that AVENATTI still has not turned over G.B.'s client file to his current attorneys despite repeated requests that he do so.

**D.   Additional Evidence Relating to AVENATTI's Scheme to Defraud His Legal Clients, M.P. and L.T.**

   21.  As set forth in my February 2019 affidavit, it appears that in or around March 2018 AVENATTI embezzled approximately $4 million from his client's M.P. and L.T.  (Ex. 1, ¶ 50.h n.31.) Based on a further review of information I received from NBPD, including recorded interviews of M.P. and L.T. and documents

M.P. and L.T. provided to Newport Beach Police Department ("NBPD") and IRS-CI, I have learned the following information regarding AVENATTI's scheme to defraud M.P. and L.T.:

      a.   In or around August 2017, M.P. and her business manager, L.T., hired AVENATTI to assist them in separating from one of the companies that M.P. owned ("MP Company 1").

      b.   On or about August 15, 2017, M.P. and L.T. entered into an "Attorney-Client Fee Contract (Contingency)" with AVENATTI and EA LLP.[10] Under the terms of the agreement, AVENATTI would receive 7.5 percent of the "recovery" or transaction amount. In other words, AVENATTI would receive 7.5 percent of the total amount M.P. would receive when she sold her shares in MP Company 1 back to MP Company 1. To the extent the transaction resulted in multiple payments to M.P., AVENATTI was to receive his entire 7.5 percent fee from the initial lump-sum payment. The agreement also authorized AVENATTI to retain MARCHINO, the founding partner of X-Law Group, to serve as outside or local counsel in connection with the representation.

      c.   On or about September 17, 2017, MP Company 1 entered into a "Common Stock Repurchase Agreement" with M.P. In sum, under the terms of the Common Stock Repurchase Agreement, MP Company 1 agreed to repurchase 361,565 shares of MP Company 1 from M.P. for approximately $27,478,940, and to subsequently repurchase from M.P. an additional 107,188 shares of MP Company 1 for approximately $8,146,288. Thus, M.P. was to receive a

---

[10] The Attorney-Client Fee Contract identifies "Michael Avenatti, Esq." as the attorney, but is signed by AVENATTI on behalf of EA LLP.

total of approximately $35,625,228 under the terms of the Common
Stock Repurchase Agreement. AVENATTI's fee of 7.5 percent would
amount to approximately $2,671,892 out of the $35,625,228.

d.  On or about September 18, 2017, MP Company 1
wired approximately $27,414,668 to AVENATTI's trust account at
City National Bank ending in 4705 ("Avenatti CNB Trust Account
4705").[11]  After receiving the $27,414,668 wire on September 18,
2017, AVENATTI caused approximately $2,787,650 (which
constituted AVENATTI's attorney fees for the entire $35,625,228
transaction amount) to be transferred to a separate bank account
at City National Bank under the name "Michael Avenatti, Esq."
("Avenatti CNB Account 3504").[12]  Between September 21, 2017, and
October 3, 2017, AVENATTI then caused the remaining $24,747,466
MP Company 1 had transferred to Avenatti CNB Trust Account 4705
to be transferred to M.P.'s personal bank account and the bank
account for another company M.P. controlled ("MP Company 2").

e.  On or about March 8, 2018, MP Company 1's Chief
Financial Officer ("CFO") contacted M.P. and told her that MP
Company 1 was prepared to repurchase the remaining 107,188
shares of MP Company 1 and would be making the final payment of
approximately $8,146,288.  The CFO asked M.P. to confirm that
the funds should again be wired to Avenatti CNB Trust Account
4705.  M.P. then forwarded this email to L.T.  M.P. and/or L.T.
then spoke with AVENATTI.  AVENATTI agreed that MP Company 1

---

[11] AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Trust Account 4705.

[12]  AVENATTI and REGNIER were the only two signatories on
Avenatti CNB Account 3504.

could wire the final payment to Avenatti CNB Trust Account 4705
and that he would then wire the money to M.P. and L.T.

  f. On or about March 13, 2018, M.P. emailed MP
Company 1's CFO and confirmed that the wire information for
Avenatti CNB Trust Account 4705 was correct.

  g. On or about March 14, 2018, MP Company 1 wired
approximately $8,146,288 to Avenatti CNB Trust Account 4705 to
be held in trust for M.P.

  h. AVENATTI did not immediately transfer the
$8,146,288 funds to M.P. as he had promised to do and as he was
required to do under the Attorney-Client Fee Contract.  Rather,
based on my review of bank account records, I know that AVENATTI
used substantial portions of the $8,146,288 for his own personal
purposes.  For instance:

  i. On March 15, 2018, AVENATTI caused
approximately $3,000,000 to be transferred to an EA LLP CB&T
attorney trust account ending in 4613 ("EA CB&T Trust Account
4613").[13]  AVENATTI then caused approximately $2,828,423 to be
transferred from EA CB&T Trust Account 4613 to an attorney trust
account for SulmeyerKupetz, which was the law firm representing
A&A and AVENATTI in the 2017 EA LLP bankruptcy proceedings, In
re: Eagan Avenatti, LLP, No. 8:17-BK-11961-CB (C.D. Cal.) (the
"2017 EA Bankruptcy"), later that same day.  As noted in my
February 2019 affidavit, on March 26, 2018, these funds were
then used to repay creditors in the 2017 EA Bankruptcy,

---

  [13] AVENATTI and REGNIER were the only two signatories on EA
CB&T Trust Account 4613.

including an approximately $1,508,442 payment to the IRS.  (Ex. 1, ¶ 50.h.)

    ii.   Between March 20, 2018, and May 1, 2018, AVENATTI caused a total of approximately $786,138 of M.P.'s funds to be transferred to EA CB&T Trust Account 4613 and a total of approximately $260,000 to be paid to an EA LLP CB&T debtor in possession account ending in 0313 ("EA CB&T DIP Account 0313.  Once M.P.'s funds had been transferred to EA CB&T Trust Account 4613, AVENATTI used M.P.'s funds for a variety of other improper and unauthorized purposes, including: (a) transferring a total of over $300,000 to bank accounts associated with GBUS and GB LLC; (b) transferring a total of over $275,000 to bank accounts associated with A&A; and (c) transferring a total of approximately $12,000 to his girlfriend at the time, M.M.

    i.   After AVENATTI received the $8,146,288 payment from MP Company 1 on March 14, 2018, L.T. and M.P. repeatedly asked AVENATTI when M.P. could expect to receive the funds. AVENATTI would often not respond to the L.T.'s calls or text messages.  When AVENATTI did respond, he falsely represented to M.P. and L.T. that he would transfer the money to them at a later time and failed to disclose that he had already spent a substantial portion of M.P.'s funds for his own personal purposes.  For instance:

    i.   On or about March 23, 2018, L.T. sent AVENATTI a text message stating: "Hi Michael, checking in on the

wire. Let me know when we should expect it to come our way. Thanks!"

      ii. On or about April 5, 2018, L.T. sent AVENATTI a text message stating "Good morning Michael! Just wanted to follow-up on the wire and plane[14] availability. Thanks!" AVENATTI responded that same day stating "In NYC – back tmrw and then we should be able to clear wire."

      iii. On or about April 23, 2018, L.T. sent AVENATTI a text message stating: "Good morning Michael. Please confirm after the wire is sent today. Thanks." Later that day, L.T. sent another text message later that day stating: "Can your office provide Fed Ref number for [M.P.'s] wire? It is neither posted nor pending status on our end." AVENATTI then responded "I will have [REGNIER] get it."

      iv. On or about April 24, 2018, L.T. sent AVENATTI a text message stating: "Just following up on the Fed Ref #. We haven't been able to track down [M.P.'s] wire yet." AVENATTI responded that "I've asked [REGNIER] to get you what u need."

      v. On or about April 24, 2018, M.P. met AVENATTI for lunch. M.P. asked AVENATTI if everything was okay with the money. AVENATTI responded that everything was okay and that he just needed to go to the bank once he got back to Newport Beach and sign the paperwork.

---

[14] As set forth in my February 2019 affidavit, AVENATTI had at least one private jet at this time. (Ex. 1, ¶ 65.m.)

vi.  On or about April 25, 2018, L.T. sent an email to REGNIER and AVENATTI stating:  "Hi Judy [REGNIER], Can you please provide me with the Fed Ref # for [M.P.'s] wire from Monday?"  AVENATTI responded less than an hour later "Pls handle."

vii. On or about April 26, 2018, L.T. sent another email to AVENATTI and REGNIER stating:

> We've been in contact with the bank all week and they have not been able to track the wire. Please provide the Fed Ref # with immediacy.  This is becoming very urgent.  There is $8M of [M.P.'s] money in the ether somewhere, and we have been given the runaround for over 6 weeks.  I'm becoming extremely concerned. Please advise asap.

viii.    On or about April 30, 2018, AVENATTI sent a text message to L.T. stating "I am dealing with getting a summons issued from the SDNY and will call you shortly.  Sorry for delay."  That same day, AVENATTI sent an email to REGNIER and L.T. stating:

> Judy [REGNIER] -- I know you are trying to dig out from last week, but please get with [L.T.] and figure out what the issue is on the CNB wire. This needs to be a priority. If I need to do something or find a branch on the East coast let me know but I want this resolved. Thanks.

ix.  On or about May 1, 2018, L.T. responded to AVENATTI's April 30, 2018, email stating:

> Hi Judy [REGNIER], The wire hasn't come through, and we can only trace it via the Fed Ref #. Please provide ASAP so we can see where it got held up.  This is very urgent.  Thank you.

REGNIER responded "I asked the bank to put a trace on it.  As soon as I get the results I will let you know ASAP."

j.   Between March 14, 2018, and May 4, 2018, L.T. also repeatedly attempted to obtain information from AVENATTI's associate, MARCHINO, regarding the $8,146,288 payment from MP Company 1.   For instance:

i.   On or about March 14, 2018, MARCHINO sent a text message to L.T. stating: "Hi — let me know when the wires have been sent by [MP Company 1].   That way we can turn around quickly."   L.T. responded that the wire had just been sent and that he would provide MARCHINO the wire information.

ii.   On or about March 20, 2018, L.T. sent a text message to MARCHINO to ask if AVENATTI received the wire. MARCHINO responded:   "Hi. No idea.   Need to ask Michael [AVENATTI].   He's knee deep in the stormy."

iii.   On or about April 22, 2019, L.T. sent a text message to MARCHINO stating:   "Please call me back."   MARCHINO then asked if it was urgent.   L.T. responded:   "Same conversation as last time, so yes I'm concerned and losing patience."

iv.   On or about May 3, 2018, L.T. sent a text message to MARCHINO stating:   "Please call me back ASAP." MARCHINO responded:   "I put a call in.   Will have news shortly. Hang tight until tomorrow and I'll get this sorted for you." MARCHINO then sent L.T. another text message stating:   "I've got you.   Don't worry."

k.   On or about May 4, 2018, AVENATTI caused two wire transfers in the amounts of $4,000,000 and $146,288 to be sent from Avenatti CNB Trust Account 4705 to one of M.P.'s companies

("MP Company 3"). This amounted to just over half of the $8,146,288 that was supposed to have been transferred to M.P on or about March 14, 2018. Yet, after making these two wire transfers, there was only $23 remaining in Avenatti CNB Trust Account 4705.

1. After M.P. received the two wire transfers totaling approximately $4,146,288 on or about May 4, 2018, L.T. repeatedly contacted AVENATTI and MARCHINO in an attempt to find out what happened to the other $4,000,000 of M.P.'s money. L.T. was largely unable to get a hold of AVENATTI. MARCHINO, however, repeatedly suggested that the third wire of $4,000,000 had already been sent. For instance:

i. On or about May 4, 2018, MARCHINO sent a text message to L.T. asking "Did the other 4 arrive?" L.T. responded that he would have to check on Monday.

ii. On or about May 7, 2018, MARCHINO sent L.T. a text message asking if there were any updates. L.T. responded: "No sign of it. Do you have the Fed Ref # for tracking?" L.T. received no further response that day.

iii. On or about May 9, 2018, MARCHINO sent a text message to L.T. stating: "I just got text from bank. We should have fed number shortly."

iv. On or about May 10, 2018, MARCHINO sent a text message to L.T. and provided him with an IMAD wire transfer reference number that purportedly corresponded to the final $4,000,000 payment.

v.   On or about May 11, 2018, AVENATTI emailed MARCHINO a wire transfer confirmation document detailing the $4,000,000 wire transfer from Avenatti CNB Trust Account 4705 that M.P. had already received on May 4, 2018.  MARCHINO then forwarded this email to L.T.  That same day MARCHINO and L.T. exchanged numerous text messages regarding the missing $4,000,000 payment.  In these text messages, L.T. told MARCHINO that he needed the reference numbers for all three purported wire transfers.  MARCHINO indicated that he had texted AVENATTI about this but had not heard back.

vi.   On or about May 24, 2018, L.T. sent a text message to AVENATTI asking him to "Please call me when you have a chance."  AVENATTI does not appear to have responded to this text message.

vii.  On or about June 4, 2018, L.T. sent a text message to AVENATTI stating:  "Hi Michael, I really need to talk to you.  Please call me back so we can figure things out." AVENATTI does not appear to have responded to this text message.

m.   On or about August 6, 2018, current counsel for M.P. and L.T. sent a letter to AVENATTI advising him that they now represented M.P. and L.T. and demanded that AVENATTI immediately disburse to M.P. the remaining $4,000,000 that was owed to M.P.  AVENATTI did not respond.  AVENATTI still has not paid over to M.P. the remaining $4,000,000 he received from MP Company 1 on her behalf.  Nor has AVENATTI turned over M.P. and L.T.'s client file to their current attorneys as they have repeatedly asked him to do.

22.  Additionally, as set forth in my February 2019 affidavit, in connection with the EA Bankruptcy, EA LLP and AVENATTI were required to close pre-petition bank accounts and open new "debtor in possession" bank accounts.  (Ex. 1, ¶ 51.) EA LLP and AVENATTI were also required to file with the Bankruptcy Court a monthly operating report ("MOR") detailing all funds received and disbursed by EA LLP.  (Id.)  AVENATTI, however, failed to disclose the existence of Avenatti CNB Trust Account 4705 or the funds he received from the Phan and Tran representation to the Bankruptcy Court or his creditors.

## E.   **Criminal Complaint and Arrest Warrant**

23.  On March 22, 2019, in case number SA 19-241M, I submitted an affidavit in support of an arrest warrant and criminal complaint charging AVENATTI with one count of bank fraud, in violation of 18 U.S.C. § 1344(1), and one count of wire fraud, in violation of 18 U.S.C. § 1343.  The Honorable Douglas F. McCormick, United States Magistrate Judge, authorized the arrest warrant that same day.  A true and correct copy of the arrest warrant and criminal complaint are attached hereto as Exhibit 2 and incorporated by reference herein.[15]

## F.   **Probable Cause to Search AVENATTI's Residence (SUBJECT PREMISES 1)**

24.  Based on the evidence collected during the course of this investigation, there is probable cause to believe that

---

[15]  A copy of the application for the February 2019 search warrant, including my February 2019 affidavit, were also incorporated by reference and attached to the criminal complaint in case number SA 19-241M.  Accordingly, I have not included a duplicate copy of the February 2019 search warrant application, as part of Exhibit 2 to this affidavit.

evidence of the SUBJECT OFFENSES will be found at SUBJECT
PREMISES 1.  For example:

a.   On or about November 14, 2018, AVENATTI was
arrested by the Los Angeles Police Department ("LAPD") on
suspicion of domestic violence.[16]  Based on my review of the LAPD
police report, I have learned that as of November 14, 2018,
AVENATTI resided in Unit 2205 at the Ten Thousand luxury
condominium complex ("Ten Thousand") located at 10000 Santa
Monica Boulevard in Los Angeles, California (i.e., SUBJECT
PREMISES 1.)

b.   Based on my review of bank records, I know that
A&A has been paying monthly rent to Ten Thousand since at least
March 2017.  Specifically, between March 2017 and August 2018,
approximately $227,736 (between $12,800 and $16,320 per month)
was paid to Ten Thousand from A&A CB&T Account 0661.
Additionally, on or about November 30, 2018, approximately
$69,119 was paid via cashier's check to Ten Thousand from an
account at City National Bank under the name "Avenatti LLP"
("Avenatti LLP CNB Account 1844").  Avenatti LLP CNB Account
1844 had been opened that very same day and the cashier's check
had been obtained by REGNIER.

c.   On March 7, 2019, in case number 8:19-MJ-151, the
Honorable Douglas F. McCormick authorized a warrant for
historical cell-site and prospective cell-site and GPS
information relating to cellular telephones used by AVENATTI and

---

[16]  AVENATTI was never formally charged with any crime in
connection with this arrest.

REGNIER. Although I served the cell-site warrant on Verizon on March 7, 2019, I did not start receiving returns on the warrant until March 18, 2019. Based on IRS-CI's review of this data, I have learned the following:

   i. On or about March 21, 2019, AVENATTI returned to the Los Angeles area after travelling to another state. AVENATTI was in the vicinity of SUBJECT PREMISES 1 that night.[17]

   ii. On or about March 22, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 in the early morning hours as well during the night.

   iii. On or about March 23, 2019, AVENATTI was in the vicinity of SUBJECT PREMISES 1 early in the morning.

  d. Based on my discussions with a United States Postal Inspector ("USPI"), I know that as recently as March 6, 2019, AVENATTI was receiving mail at 10000 Santa Monica Boulevard, Unit 2205 in Los Angeles, California (i.e., SUBJECT PREMISES 1.)

  e. As noted in section VII below, based on my training and experience, I know that people who engage in fraud schemes and commit tax offenses frequently maintain hard copy and electronic records at their residences. Additionally, I know that lawyers often use portable laptop computers and cellular telephones to conduct business remotely from their

---

[17] The cell-site and GPS information IRS-CI obtained was only accurate to within approximately 900 meters of AVENATTI's cell phone.

residences and/or while traveling.  Thus, lawyers typically keep such digital devices on their person or at their residences.

f.   Here, I have reviewed numerous text messages sent by AVENATTI to GBUS employees.  I have also reviewed a number of emails AVENATTI appears to have sent after normal business hours, further suggesting that he uses his laptop and cellular telephone to conduct business.

g.   On or about March 15, 2019, I participated in an interview with G.B.  During the interview, G.B. said that he frequently saw AVENATTI using a laptop computer.

h.   I have also reviewed a profile of AVENATTI published by the New York Times Magazine on or about July 10, 2018.  This article explicitly noted that AVENATTI was using a laptop computer and an iPhone while he was being interviewed at a hotel in New York in May 2018.  See "The Fast and Furious Michael Avenatti," New York Times Magazine, July 10, 2018, available at https://www.nytimes.com/2018/07/10/magazine/michael-avenatti-stormy-daniels-donald-trump-media.html.

## G.   Probable Cause to Search REGNIER's Residence (SUBJECT PREMISES 2)

25.   As noted in my February 2019 affidavit, AVENATTI has previously described REGNIER as his office manager, chief paralegal, and bookkeeper.  (Ex. 1, ¶ 20.i.)  REGNIER was personally involved in many of the events described in my February 2019 affidavit and herein, including directing or executing the transfer of funds between various entities

Case 8:19-mj-00419-DUTY Document 4-2 Filed 05/24/19 Page 22 of 58 Page ID #:858
Case 8:19-mj-00419-DUTY *SEALED* Document 5 05/24/19 *SEALED* Page 42 of 09/24 Page ID #:379 of
100  Page ID #:379

associated with AVENATTI, directing the actions of GBUS
employees, receiving and executing directives from AVENATTI, and
transmitting signed contracts and agreements on behalf of
AVENATTI, GBUS, GB LLC, EA LLP, or A&A to other parties.

26.  Based on my review of publicly available information
and law enforcement databases, I know that REGNIER resides at
4491 Rainbow Lane, Yorba Linda, California (i.e., SUBJECT
PREMISES 2.)

27.  Based on the evidence collected during the course of
this investigation, there is probable cause to believe that
evidence of the SUBJECT OFFENSES will be found at REGNIER's
residence (i.e., SUBJECT PREMISES 2).  For example:

a.  Based on my discussions with a USPI, I understand
that since approximately December 6, 2018, EA LLP's United
States mail has been forwarded from EA LLP's prior offices in
Newport Beach to Private Mailbox number 404 ("PMB 404") at 18032
Lemon Drive, Suite C.[18]  18032 Lemon Drive, Suite C is the
address of a Postal Annex store located less than one mile from
REGNIER's residence (SUBJECT PREMISES 2).  The USPI also
provided me with a copy of the "Application for Delivery of Mail
Through Agent" for PMB 404 dated on or about December 3, 2018.
The application is signed by REGNIER on behalf of EA LLP, and
indicates the PMB 404 will be used to receive mail for REGNIER,
"Avenatti LLP," EA LLP, and A&A.  The application also lists

---

[18]  I also understand that EA LLP's United States mail was
being forwarded to X-Law Group's office in Los Angeles (i.e.,
SUBJECT PREMISES 3) for a short period of time after EA LLP was
evicted from its offices in Newport Beach, California.

AVENATTI as the corporation's officer. Due to the proximity of PMB 404 to REGNIER's residence, I believe there is a strong likelihood that REGNIER is collecting or storing EA LLP and A&A mail, as well as other relevant records at her residence.

　　　　b.　　Based on my review of text messages produced by M.G. and S.F., I know that REGNIER communicated with GBUS employees using a cellular telephone.

　　　　c.　　Based on my review of toll records for AVENATTI's and REGNIER's cell phones, I have learned the following:

　　　　　　i.　　Between January 1, 2019 and March 6, 2019,[19] there were over 100 calls between AVENATTI's cell phone number and REGNIER's cell phone number. Often times, there would be multiple calls between AVENATTI's cell phone and REGNIER's cell phone each day.

　　　　　　ii.　　This information strongly suggests that REGNIER still works for AVENATTI and that REGNIER and AVENATTI do not work at the same location since EA LLP was evicted from its law offices in Newport Beach, California, between November 2018 and January 2019.

　　　　d.　　On or about March 15, 2019, I participated in an interview with G.B. During the interview, G.B. said that in December 2018 EA LLP's receptionist, H.W., told him via an instant message that all of EA LLP's staff members were working from home because EA LLP had been evicted from its offices.

---

[19]　The toll records for AVENATTI's and REGNIER's cell phones that IRS-CI obtained from Verizon Wireless do not go past March 6, 2019.

e.     Based on IRS-CI's review of the data obtained
from the prospective cell-site and GPS information relating to a
cellular telephone used by REGNIER, I have learned that from
March 18, 2019 until March 22, 2019, REGNIER was in the vicinity
of SUBJECT PREMISES 2 and PMB 404 during daytime and/or business
hours, likely demonstrating that REGNIER has been working from
home since EA LLP was evicted from its offices.

f.     On March 22, 2019, IRS-CI SA James Kim attended a
judgment debtor examination of AVENATTI in the In re: Eagan
Avenatti, LLP, No. 8:18-CV-10644-VAP-KES, matter in Courtroom 8A
of the United States Courthouse in Los Angeles.  I learned from
SA Kim that AVENATTI testified under oath that he believed EA
LLP's QuickBooks records were likely with REGNIER.

g.     On June 12, 2017, in connection with the 2017 EA
Bankruptcy, AVENATTI testified under oath during a creditors
meeting required under 11 U.S.C. § 341 ("341 meeting").  During
this proceeding, AVENATTI testified that REGNIER was his "in-
house bookkeeper" and she used "QuickBooks and Excel" for
financial reporting.

h.     Based on my training and experience, and
investigation to date, I believe that REGNIER is working from
home at SUBJECT PREMISES 2 and likely will maintain financial
records of EA LLP and related entities at her home, as well as
digital devices at SUBJECT PREMISES 2, all of which will likely
contain evidence of the SUBJECT OFFENSES.

i.     Additionally, as noted above and in section VII
below, based on my training and experience I know that people

engaged in fraud schemes frequently maintain hard copy and electronic business records at their residences.  I also know that lawyers and those who work for law firms often use portable laptop computers and cellular telephones to conduct business and typically keep such digital devices on their person or at their residence.

**H.   Probable Cause to Search the Business Premises of X-Law Group (SUBJECT PREMISES 3)**

28.   Based on my review of publicly available information, including X-Law Group's website (www.thexlawgroup.com), I know X-Law Group is a law firm operating in Los Angeles, California. MARCHINO is X-Law Group's founding partner.  X-Law Group's business premises are located at 1910 Sunset Boulevard, Suite 450, in Los Angeles, California (i.e., SUBJECT PREMISES 3).

29.   There are at least three reasons to believe that evidence of the SUBJECT OFFENSES will be found at the business premises of X-Law Group (SUBJECT PREMISES 3):  (1) Since at least the summer of 2016, AVENATTI and EA LLP have been using X-Law Group's offices to conduct business; (2) X-Law Group has been involved in significant and suspicious financial transaction involving GBUS, GB LLC, EA LLP, A&A, and AVENATTI; and (3) X-Law Group's founding partner, MARCHINO, was directly involved in the representation of M.P. and L.T., and subsequent communications regarding the $4 million AVENATTI embezzled from M.P. in March 2018.

1. AVENATTI's and EA LLP's Use of SUBJECT PREMISES 3
to Conduct Business

30. IRS-CI's investigation has revealed the following
facts establishing that AVENATTI has been using SUBJECT PREMISES
3 to conduct business and practice law since at least August
2016, and that SUBJECT PREMISES 3 is EA LLP's and A&A's current
business premises:

a. During AVENATTI's June 12, 2017, 341 meeting,
AVENATTI said the following:

i. In the summer of 2016, EA LLP entered into a
written agreement with X-Law Group. Under the terms of this
agreement, X-Law Group would contribute various cases and assets
to EA LLP; EA LLP would get a percentage of the fees from those
cases; and X-Law Group would get a percentage of fees from
pending cases held by EA LLP.

ii. Some of the attorneys from X-Law Group also
worked for EA LLP.

b. On July 14, 2017, AVENATTI testified under oath
during the continued 341 meeting in connection with the 2017 EA
Bankruptcy. During this proceeding, AVENATTI said the
following:

i. Since the summer of 2016, there was an
agreement in place between EA LLP and X-Law Group relating to
various EA LLP cases and X-Law Group's right to fees from those
cases.

ii.   As part of this agreement, AVENATTI agreed
that EA LLP would pay a portion of the salaries for certain X-
Law Group attorneys.

iii. AVENATTI and/or EA LLP agreed to pay the
rent for X-Law Group's office in Los Angeles

iv.   AVENATTI has known MARCHINO for
approximately five years, and considers him a friend.

v.   MARCHINO and other X-Law Group lawyers were
previously employed by EA LLP.

c.   Based on a preliminary review of bank records, I
know the following:

i.   Between approximately September 2016 and
July 2018, A&A and EA LLP paid to the International Church of
the Foursquare a total of approximately $110,352.  Public
records reflect that the International Church of the Foursquare
owns SUBJECT PREMISES 3.

ii.   Between approximately March 2017 and June
2017, EA LLP paid MARCHINO a total of approximately $34,892.

d.   W-2 information EA LLP submitted to the IRS
reflects that MARCHINO received approximately $83,333 in gross
wages from EA LLP in 2016, and approximately $91,666 in gross
wages from EA LLP in 2017.

e.   On or about January 24, 2018, AVENATTI filed a
Substitution of Attorney form in the Superior Court of
California, San Diego County in Carthey v. Pirch et al., No. 37-
201823387.  The Substitution of Attorney form listed A&A's

Case 8:19-mj-00419-DUTY Document 4-2 Filed 05/24/19 Page 28 of 58 Page ID #:864
Case 8:19-mj-00419-DUTY SEALED Document 3 05/24/19 Filed 05/24/19 Page 4 of
100   Page ID #:385

mailing address as 1910 West Sunset Boulevard, Suite 450 in Los
Angeles, California (i.e., SUBJECT PREMISES 3).

     f.    On or about January 30, 2018, AVENATTI filed a
declaration in the 2017 EA Bankruptcy.  AVENATTI stated under
the penalty of perjury that EA LLP "maintains an office in Los
Angeles under an arrangement with The X-Law Group, P.C. ("X-Law
Group") where X-Law Group is the primary tenant."

     g.    On March 7, 2019, AVENATTI filed a Voluntary
Petition for Non-Individuals Filing for Bankruptcy on behalf of
EA LLP in In re The Trial Group, LLP a/k/a Eagan Avenatti, LLP,
No. 8:19-BK-10822 (C.D. Cal.) (the "2019 EA Bankruptcy").[20]  The
bankruptcy petition identifies the debtor's address as 1910
Sunset Boulevard, Suite 450 in Los Angeles, California (i.e.,
SUBJECT PREMISES 3).

     h.    On March 7, 2019, AVENATTI filed a Notice of
Bankruptcy Filing on behalf of EA LLP in In re: Eagan Avenatti,
LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  The attorney
caption on the Notice of Bankruptcy Filing identifies AVENATTI's
address as "1910 Sunset Boulevard, Suite 450," in Los Angeles,
California (i.e., SUBJECT PREMISES 3).

---

    [20]   The 2019 EA Bankruptcy petition identifies the debtor as
The Trial Group, LLP, but indicates that it was previously known
as EA LLP.  This petition appears to have been filed for the
specific purpose of avoiding a judgment debtor exam of AVENATTI
that had been scheduled for March 8, 2019, in In re: Eagan
Avenatti, LLP, No. 8:18-CV-10644-VAP-KES (C.D. Cal.).  AVENATTI
did not have authorization to file such a petition because in
February 2019 a receiver had been appointed to oversee EA LLP's
business affairs and had the "sole authority regarding whether
to file a petition for bankruptcy."  On March 13, 2019, the
Bankruptcy Court dismissed the 2019 EA Bankruptcy on those
grounds.

2.   X-Law Group's Involvement in Suspicious Financial
     Transactions

31.   As detailed in my February 2019 affidavit (Ex. 1),
IRS-CI's investigation to date has revealed the following facts
establishing that AVENATTI has used X-Law Group to conduct a
number of suspicious financial transactions:

a.   On or about November 2, 2015, AVENATTI caused
approximately $4,600,000 of the proceeds of the sale of his
residence in Laguna Beach, California, to be transferred from
GBUS CB&T Account 2240 to X-Law Group.  (See Ex. 1, ¶ 62.)

b.   On or about November 3, 2015, X-Law Group then
transferred approximately $3,600,000 to GB Auto BofA Account
7412.  (See id.)

c.   It appears that the remaining $1,000,000 that had
been transferred to X-Law Group was used to pay $1,000,000 in
deposits for AVENATTI's purchase of a residence in Newport
Beach, California.  (See id.)  For example:

i.   On September 28, 2015, AVENATTI paid a
$200,000 deposit to the escrow company handling the purchase of
the Newport Beach residence ("Escrow Company 1") via a cashier's
check purchased by X-Law Group.  (See Ex. 1, ¶ 63.)

ii.   On or about November 6, 2015, AVENATTI paid
an additional $800,000 deposit to Escrow Company 1 via two wire
transfers from X-Law Group's IOLTA attorney trust account in the
amounts of $450,000 and $350,000.  (See id.)

    3.    <u>X-Law Group's Involvement in the Scheme to Defraud M.P. and L.T.</u>

32. As noted in section VI.D above, X-Law Group's founding partner, MARCHINO was directly involved in discussions with L.T. regarding the approximately $4 million AVENATTI embezzled from M.P. in March 2018. MARCHINO introduced M.P.'s business manager, L.T., to AVENATTI. Moreover, between March 2018 and May 2018, MARCHINO sent L.T. well over 50 text messages regarding the money that MP Company 1 transferred to Avenatti CNB Trust Account 4705 to be held in trust for M.P.'s benefit. In a number of these text messages, MARCHINO referenced communications or attempted communications with AVENATTI. Accordingly, there is probably to believe that X-Law Group's and MARCHINO's files and digital devices will contain additional evidence regarding AVENATTI's scheme to defraud M.P.

## VII. <u>TRAINING AND EXPERIENCE REGARDING TAX OFFENSES AND FRAUD SCHEMES</u>

33. In addition to the foregoing facts, based on my training, experience, and conversations with other law enforcement agents who have investigated tax offenses and complex fraud schemes, I have learned the following:

    a.    Individuals who carry out complex fraud schemes or commit tax offenses often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent activities. For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records, and to exchange communications,

including email and text messages.  Here, as noted above, I know that AVENATTI, REGNIER, and others, such as MARCHINO from X-Law Group, frequently conducted business via email and text message.

b.   Individuals who carry out complex fraud schemes or commit tax offenses often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities.

c.   Businesses, including law firms, often maintain servers that host email accounts for their employees, and that emails may be stored exclusively on those servers.  In other instances, emails may be stored in the "cloud" or directly on employees' computers.  For example, in this case, I know that important information was exchanged over email, including communications between AVENATTI or REGNIER and GBUS employees or business partners.

d.   Individuals who engage in fraud schemes or commit tax offenses often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

e.   Businesses, including law firms, commonly maintain paper records like bank statements, wire records,

Case 8:19-mj-00419-DUTY Document 4-2 Filed 05/24/19 Page 32 of 58 Page ID #:868
Case 8:19-mj-00419-DUTY SEALED Document 6 05/24/19 SEALED Page 31 of 58/24 Page ID #:868 of
100 Page ID #:389

receipts, expense reports, ledgers, balance sheets, income
statements, investment agreements, and other financial documents
commonly used in fraudulent schemes on their premises.

f.    Lawyers and individuals who work for law firms
often use portable laptop computers, mobile smart phones, or
other digital devices to work remotely, including from their
residences or while traveling.  For example, in this case, I
have reviewed records demonstrating that AVENATTI sent emails,
text messages, or other communications late at night or while
traveling.

## VIII.    **POTENTIAL PRIVILEGE ISSUES**

34.  As noted herein, AVENATTI is a licensed attorney,
REGNIER worked or works as a paralegal for AVENATTI and for EA
LLP, and X-Law Group is an active law-firm.  I also understand
that at various times AVENATTI, EA LLP, and/or A&A may have had
attorney-client relationships with other attorneys, including
the following law firms: (a) Foster Pepper PLLC; (b) Osborn
Machler PLLC; (c) Eisenhower Carlson PLLC;
(d) Talmadge/Fitzpatrick/Tribe, PPLC; (e) The Brager Tax Law
Group; (f) SulmeyerKupetz; (g) Baker & Hostetler LLP;
(h) Shulman Hodges & Bastian LLP; (i) Legal & Tax Consulting
Group; (j) Pachulski Stang Ziehl & Jones LLP; (k) Foley &
Lardner LLP; (l) Raines Feldman, LLP; and (m) Pansky Markle
Attorneys at Law.

35.  While the proposed search warrant primarily seeks
financial records and non-privileged information there is a
significant likelihood that the SUBJECT PREMISES will contain

documents and records that are covered by the attorney-client privilege or attorney-work-product doctrine.  Accordingly, Attachments B-1, B-2, and B-3 to the proposed search warrants contains specific procedures designed to avoid unnecessary disclosures of any privileged attorney-client communications or attorney-work-product.

36.  The privileged information sought by the proposed search warrant is limited to three former clients or potentials clients of AVENATTI, EA LLP, and A&A:  (a) GBUS; (b) G.B.; and (c) M.P. and L.T.  Each of these clients, however, have already executed, or indicated through counsel that they will execute, written waivers of the attorney-client-privilege.

a.   First, as noted in my February 2019 affidavit, on February 19, 2019, the Chapter 7 bankruptcy trustee for GBUS (the "GBUS Trustee") executed a written waiver of the attorney-client privilege as to any communications between GBUS's officer, directors, employees, and agents, and any lawyer acting on GBUS's behalf, including any communications with AVENATTI. (Ex. 1, ¶ 83.a.)  A copy of the GBUS Trustee's written waiver of the attorney-client privilege was attached as Exhibit 1 to my February 2019 affidavit.

b.   Second, on March 18, 2019, G.B. executed a written waiver of the attorney-client privilege and attorney-work-product protections as to any legal advice G.B. sought or received from EA LLP, AVENATTI, and any other current or former EA LLP officers, directors, employees, or agents.  G.B. also consented to the government's search of any of EA LLP's or

AVENATTI's files relating to EA LLP's and AVENATTI's
representation of G.B.  A copy of the G.B.'s written waiver of
the attorney-client privilege is attached hereto as Exhibit 3.

      c.   <u>Third</u>, counsel for M.P. and L.T. informed the
government that M.P. and L.T. are both willing to execute
written waivers of the attorney-client privilege and attorney-
work-product protections as to legal advice M.P. and L.T. sought
or received from EA LLP, AVENATTI, MARCHINO, and/or any other
current or former officers, directors, employees, or agents of
EA LLP.  M.P. and L.T. are also willing to consent to the
government's search of the files of EA LLP, AVENATTI, and
MARCHINO relating to the representation of M.P. and L.T.  M.P.
and L.T. are expected to execute the written waivers of the
attorney-client privilege within the next seven days.

    37.  I am aware that AVENATTI represented the plaintiff in
<u>Stephanie Clifford v. Donald J. Trump</u>, No. 2:18-CV-2217-SJO-FFM
(C.D. Cal.), a lawsuit against the President of the United
States.  I am also aware that AVENATTI represented Julie
Swetnick, an individual who accused United States Supreme Court
Justice Brett Kavanaugh of sexual assault in connection with
Justice Kavanaugh's confirmation hearing in or around September
2018.  Given the likelihood that the SUBJECT PREMISES may
contain privileged information regarding these representations,
which are irrelevant to this investigation, Attachments B-1, B-
2, and B-3 to the proposed search warrants specifically
requires, in addition to the procedures to avoid unnecessary
disclosure of attorney-client privileged materials and attorney-

work-product, that any materials relating to AVENATTI's representation of Ms. Clifford or Ms. Swetnick that are identified by the Privilege Review Team, other than financial and accounting records identified in paragraphs 1.d, 1.f, 1.g, and 1.r of Attachments B-1, B-2, and B-3, be segregated and not further reviewed.[21]

38. Attachments B-1, B-2, and B-3 to the proposed search warrants also set forth a procedure to allow AVENATTI and others to seek the appointment of a special master within seven days of the execution of the proposed search warrants. Although the government does not believe that the appointment of a special master would be necessary in this investigation, the government has included this provision to ensure that any such request is handled in a timely manner and does not unnecessarily delay IRS-CI's ongoing criminal investigation.

## IX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[22]

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[21] Other than non-privileged financial or accounting records that may reference these representations, the only documents or records relating to these representations that may fall within the scope of the items to be seized would likely be engagement letters and/or client billing records. Nevertheless, due the political nature of these representations and because such records are irrelevant to this investigation, the privilege review protocols set forth in Attachments B-1, B-2, and B-3 to the proposed warrants calls for any such records to be segregated and not further reviewed once identified.

[22] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

---

paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.   For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.   Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so

Case 8:19-mj-00419-DUTY Document 4-2 Filed 05/24/19 Page 38 of 58 Page ID #:874
Case 8:19-mj-00419-DUTY SEALED Document 5 *SEALED* Page 36 of 58 Page Page 38 of
100 Page ID #:395

many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

41.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after

55

a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AVENATTI's, REGNIER's, and MARCHINO's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of AVENATTI's, REGNIER's, and MARCHINO's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## X.    REQUEST FOR SEALING

42. I request that the search warrant, the search warrant application, and this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. I make this request for several reasons.

a. First, this criminal investigation is ongoing and is neither public nor known to AVENATTI and other subjects of the investigation. Disclosure of the search warrant, application, and this affidavit could cause AVENATTI and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with

Case 8:19-mj-00419-DUTY Document 4-2 Filed 05/24/19 Page 40 of 58 Page ID #:876
Case 8:19-mj-00419-DUTY SEALED Document 3 05/24/19 SEALED Page 41 of 58 Page ID #:397
100   Page ID #:397

or intimidate witnesses, change patterns of behavior, or notify
confederates.

      b.    Second, based on evidence collected to date and
described herein, there is probable cause to believe that
AVENATTI took a number of affirmative actions to obstruct the
IRS civil collection action relating to GBUS's unpaid payroll
taxes by, among other things, lying to RO 1, changing contracts,
merchant accounts, and bank account information to avoid liens
and levies imposed by the IRS, and instructing employees to
deposit over $800,000 in cash from Tully's stores, which were
owned and operated by GBUS, into a bank account associated with
a separate entity to avoid liens and levies by the IRS.  If
AVENATTI were to learn of the instant investigation he might
engage in similarly obstructive conduct.

      c.    Third, a number of former GBUS employees have
expressed concerns that AVENATTI might attempt to retaliate
against them if he learned they were cooperating with the
government's investigation.

      d.    Fourth, there is a possibility that some evidence
relating to GBUS's operations may have already been lost when
GBUS was evicted from its corporate offices and AVENATTI refused
to pay the bill for GBUS's cloud-based server.  Although IRS-CI
has been able to obtain some GBUS records, including the data
stored on the SUBJECT DEVICES, from other sources, AVENATTI's
apparent willingness to allow GBUS records to be lost or
destroyed raises a concern that, were AVENATTI to learn of the

instant investigation, he might not hesitate to destroy any remaining GBUS records and other relevant evidence.

     e.   <u>Fifth</u>, the government is still attempting to locate additional documentary evidence that is relevant to the investigation, including emails and electronic records that may be stored by AVENATTI, EA LLP, A&A, or other related entities. If alerted to the government's investigation prior to the execution of the proposed search warrants, it is therefore possible that AVENATTI would attempt to destroy such records and that the government would have no other means to obtain this evidence.

43.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## XI. CONCLUSION

44. For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 through B-3, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES, as described in Attachments A-1 through A-3.

Remoun Karlous, Special Agent
Internal Revenue Service –
Criminal Investigation

Subscribed to and sworn before me
this 24th day of March, 2019.

HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**DOUGLAS F. McCORMICK**

Exhibit 1 to the March 24, 2019,
Search Warrant Application and
Supporting Affidavit is attached as
Exhibit 1 to this Affidavit

Exhibit 2 to the March 24, 2019,
Search Warrant Application and
Supporting Affidavit is attached as
Exhibit 2 to this Affidavit

# EXHIBIT 4

©COPY

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 10 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2018 Grand Jury

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

MICHAEL JOHN AVENATTI,

    Defendant.

SA CR No. 19 **SACR19-00061**

                 JVS

I N D I C T M E N T

[18 U.S.C. § 1343: Wire Fraud;
26 U.S.C. § 7202: Willful Failure
to Collect and Pay Over Withheld
Taxes; 26 U.S.C. § 7212(a):
Endeavoring to Obstruct the
Administration of the Internal
Revenue Code; 26 U.S.C. § 7203:
Willful Failure to File Tax
Return; 18 U.S.C. § 1344(1): Bank
Fraud; 18 U.S.C. § 1028A(a)(1):
Aggravated Identity Theft; 18
U.S.C. § 152(3): False Declaration
in Bankruptcy; 18 U.S.C. § 152(2):
False Testimony Under Oath in
Bankruptcy; 18 U.S.C. § 2(b):
Causing an Act to Be Done;
18 U.S.C. §§ 981(a)(1)(C), 982,
1028 and 28 U.S.C. § 2461(c):
Criminal Forfeiture]

The Grand Jury charges:

COUNTS ONE THROUGH TEN

[18 U.S.C. § 1343]

**A.   INTRODUCTORY ALLEGATIONS**

1.   At all relevant times:

a.   Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was a resident of Orange and Los Angeles Counties, within the Central District of California.

b.   Defendant AVENATTI was an attorney licensed to practice law in the State of California.  Defendant AVENATTI provided legal services to clients in exchange for attorneys' fees.

c.   Defendant AVENATTI practiced law through Eagan Avenatti LLP ("EA LLP") and Avenatti & Associates, APC ("A&A").  EA LLP and A&A's principal offices were located in Newport Beach and Los Angeles, California.

d.   A&A was a professional corporation organized in California.  Defendant AVENATTI was A&A's Chief Executive Officer ("CEO"), Secretary, Chief Financial Officer, and sole director.  Defendant AVENATTI owned 100 percent of A&A.

e.   EA LLP was a limited liability partnership organized in California.  Defendant AVENATTI was EA LLP's managing member and managing partner.  Through A&A, defendant AVENATTI owned at least 75 percent of EA LLP.

f.   Defendant AVENATTI was also the effective owner and controlled a number of other entities, including:

i.   Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California;

ii.   Global Baristas, LLC ("GB LLC"), which wholly owned GBUS;

2

iii. GB Autosport, LLC ("GB Auto"), which managed defendant AVENATTI's car racing team; and

iv. Passport 420, LLC ("Passport 420"), which held title to a private airplane defendant AVENATTI used.

g. Defendant AVENATTI was a signatory on and exercised control over the following bank accounts, which were all maintained in Orange and Los Angeles Counties, within the Central District of California:

i. California Bank & Trust ("CB&T") attorney trust account ending in x8541 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Fund" ("EA Trust Account 8541").

ii. CB&T attorney trust account ending in x3714 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 3714").

iii. CB&T attorney trust account ending in x4613 in the name of "State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 4613").

iv. CB&T attorney trust account ending in x8671 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 8671").

v. CB&T account ending in x2851 in the name of "Eagan Avenatti LLP" ("EA Account 2851").

vi. CB&T account ending in x8461 in the name of "Eagan Avenatti LLP, Operating Account" ("EA Account 8461").

vii. CB&T account ending in x0313 in the name of "Eagan Avenatti LLP, Debtor-in-Possession Case 8:17-BK-11961-CB, General Account" ("EA DIP Account 0313").

1                viii.    CB&T account ending in x0661 in the name of

2  "Avenatti & Assoc. A Professional Corp." ("A&A Account 0661").

3                ix.  City National Bank ("CNB") attorney trust account

4  ending in x5566 in the name of "Michael J. Avenatti, Attorney Client

5  Trust Account" ("Avenatti Trust Account 5566").

6                x.    CNB attorney trust account ending in x4705 in the

7  name of "Michael J. Avenatti, Esq., Attorney Client Trust Account"

8  ("Avenatti Trust Account 4705").

9                xi.  CB&T account ending in x2240 in the name of

10  "Global Baristas US LLC, Operating Account" ("GBUS Operating Account

11  2240").

12                xii. CB&T account ending in x3730 in the name of

13  "Global Baristas LLC" ("GB LLC Account 3730").

14        h.    Defendant AVENATTI was a signatory on and exercised

15  control over a KeyBank account ending in x6193 in the name of "Global

16  Baristas US LLC" ("GBUS KeyBank Account 6193"), which was maintained

17  in Seattle, Washington.

18        i.    As a member of the State Bar of California, defendant

19  AVENATTI was obligated to comply with the California Rules of

20  Professional Conduct.  Defendant AVENATTI was required, among other

21  things, to promptly notify a client of the receipt of any funds the

22  client was entitled to receive, and to promptly pay or deliver to the

23  client or such payees as designated by the client any such funds that

24  defendant AVENATTI held in trust for the client upon the client's

25  request.

26        j.    Money transmitted through the Fedwire Funds Transfer

27  System (the "Fedwire system") was routed from its origin to its

28  destination through Texas and New Jersey.

1        k.   A "Special Needs Trust" was a specialized trust that
2   allowed for a disabled person to maintain his or her eligibility for
3   public assistance benefits, despite having assets that would
4   otherwise make the person ineligible for those benefits.

5        2.   "Client 1" was an individual who resided in Los Angeles
6   County, within the Central District of California.  Beginning as
7   early as in or about 2012 and continuing until in or about March
8   2019, defendant AVENATTI and EA LLP had a formal attorney-client
9   relationship with Client 1.  Specifically, defendant AVENATTI and EA
10  LLP agreed to represent Client 1 in connection with a lawsuit against
11  the County of Los Angeles and others, alleging violations of Client
12  1's constitutional rights that led to severe emotional distress and
13  severe physical injuries, including paraplegia (the "L.A. County
14  Lawsuit").

15       3.   "Client 2" was an individual who resided in Los Angeles
16  County, within the Central District of California.  Beginning as
17  early as in or about December 2016 and continuing until in or about
18  March 2019, defendant AVENATTI and EA LLP had a formal attorney-
19  client relationship with Client 2.  Specifically, defendant AVENATTI
20  and EA LLP agreed to represent Client 2 in connection with potential
21  litigation against an individual with whom Client 2 had a personal
22  relationship ("Individual 1").

23       4.   "Client 3" was an individual who resided in Orange County,
24  within the Central District of California.  Beginning as early as in
25  or about July 2014 and continuing until in or about November 2018,
26  defendant AVENATTI and EA LLP had a formal attorney-client
27  relationship with Client 3.  Specifically, defendant AVENATTI and EA

28

1  LLP agreed to represent Client 3 in connection with an intellectual

2  property dispute against a Colorado-based company ("Company 1").

3      5.    "Client 4" and "Client 5" were both individuals who resided

4  in Los Angeles County, within the Central District of California.

5  Beginning as early as in or about August 2017 and continuing until in

6  or about August 2018, defendant AVENATTI had a formal attorney-client

7  relationship with both Client 4 and Client 5.  Specifically,

8  defendant AVENATTI agreed to represent both Client 4 and Client 5 in

9  connection with their separation and divestment from one of the

10 companies in which Client 4 and Client 5 owned shares ("Company 2").

11 **B.    THE SCHEME TO DEFRAUD**

12     6.    Beginning as early as in or about January 2015 and

13 continuing through at least in or about March 2019, in Orange and Los

14 Angeles Counties, within the Central District of California, and

15 elsewhere, defendant AVENATTI, knowingly and with intent to defraud,

16 devised, participated in, and executed a scheme to defraud victim-

17 clients to whom defendant AVENATTI had agreed to provide legal

18 services, including, but not limited to, Client 1, Client 2, Client

19 3, Client 4, and Client 5, as to material matters, and to obtain

20 money and property from such victim-clients by means of material

21 false and fraudulent pretenses, representations, and promises, and

22 the concealment of material facts that defendant AVENATTI had a duty

23 to disclose.

24 **C.    THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD**

25     7.    The fraudulent scheme operated, in substance, in the

26 following manner:

27

28

1            a.    Defendant AVENATTI would negotiate a settlement on

2    behalf of a client that would require the payment of funds to the

3    client.

4            b.    Defendant AVENATTI would misrepresent, conceal, and

5    falsely describe to the client the true terms of the settlement

6    and/or the disposition the settlement proceeds.

7            c.    Defendant AVENATTI would cause the settlement proceeds

8    to be deposited in or transferred to attorney trust accounts

9    defendant AVENATTI controlled.

10            d.    Defendant AVENATTI would embezzle and misappropriate

11    settlement proceeds to which he was not entitled.

12            e.    Defendant AVENATTI would lull the client to prevent

13    the client from discovering the embezzlement and misappropriation by,

14    among other things, falsely denying the settlement proceeds had been

15    paid, sending funds to the client under the false pretense that such

16    funds were "advances" on the purportedly yet-to-be received

17    settlement proceeds, and falsely claiming that payment of the

18    settlement proceeds to the client had been delayed for legitimate

19    reasons and would occur at a later time.

20                        **Embezzlement of Client 1's Funds**

21            f.    On or about January 21, 2015, defendant AVENATTI

22    negotiated a settlement of the L.A. County Lawsuit on behalf of

23    Client 1.  Under the terms of the negotiated settlement agreement,

24    the County of Los Angeles agreed to pay $4,000,000 to Client 1 in

25    exchange for Client 1 dismissing the L.A. County Lawsuit.  Client 1

26    was entitled to receive the $4,000,000 settlement payment, less EA

27    LLP's attorneys' fees, costs, and expenses.

28

1          g.     In or around January 2015, defendant AVENATTI told

2   Client 1 that the County of Los Angeles had agreed to a settlement.

3   Defendant AVENATTI falsely represented to Client 1 that the

4   settlement agreement had to remain confidential, the County of Los

5   Angeles could not pay the settlement to Client 1 in one lump-sum, and

6   the settlement proceeds could not be paid until the County of Los

7   Angeles approved a Special Needs Trust for Client 1.  In truth and in

8   fact, as defendant AVENATTI then well knew, the settlement agreement

9   did not contain a confidentiality provision, the County of Los

10  Angeles had agreed to make a lump-sum $4,000,000 settlement payment

11  to Client 1, and the settlement payment from the County of Los

12  Angeles was not conditioned on the approval of a Special Needs Trust

13  for Client 1.

14         h.     On or about January 26, 2015, defendant AVENATTI

15  caused the approximately $4,000,000 settlement payment to be

16  deposited into EA Trust Account 8541 to be held in trust for Client

17  1.  Knowing that the full settlement amount had been paid by the

18  County of Los Angeles, defendant AVENATTI concealed and failed to

19  disclose to Client 1 that EA LLP had received the $4,000,000

20  settlement payment.  Further, defendant AVENATTI and EA LLP retained

21  and did not transfer Client 1's portion of the settlement payment to

22  Client 1.

23         i.     Between on or about January 26, 2015, and on or about

24  March 30, 2015, defendant AVENATTI caused approximately $3,125,000 of

25  the $4,000,000 settlement payment to be transferred from EA Trust

26  Account 8541 to EA Account 2851.  Thereafter, defendant AVENATTI

27  caused substantial portions of the settlement proceeds to be

28  transferred from EA Account 2851 to A&A Account 0661, and then

further transferred to other bank accounts defendant AVENATTI
controlled, including defendant AVENATTI's personal bank account and
bank accounts associated with GBUS and GB Auto, or used to pay
defendant AVENATTI's personal expenses.  By no later than July 6,
2015, defendant AVENATTI had drained all of the settlement proceeds
out of EA Trust Account 8541.  Defendant AVENATTI concealed and
failed to disclose to Client 1 that the entire $4,000,000 settlement
payment had been expended and that substantial portions of the
settlement proceeds had been used for defendant AVENATTI's own
purposes.

> j.   In order to lull Client 1 and prevent Client 1 from
discovering that defendant AVENATTI had embezzled Client 1's portion
of the $4,000,000 settlement payment, defendant AVENATTI committed
and caused to be committed the following acts:

> i.   Starting as early as in or about July 2015 and
continuing to in or about March 2019, defendant AVENATTI caused at
least 69 payments, each ranging from approximately $1,000 to
approximately $1,900 and together totaling at least approximately
$124,000, to be made to Client 1.  During this same time period,
defendant AVENATTI also caused payments to be made to various
assisted living facilities to pay for rent on Client 1's behalf.
Defendant AVENATTI falsely represented to Client 1 that the payments
made to Client 1 and to the assisted living facilities where Client 1
resided were "advances" on the settlement payment from the County of
Los Angeles, which defendant AVENATTI falsely represented had not yet
been received.

> ii.   In or about 2017, after Client 1 told defendant
AVENATTI that Client 1 wanted to purchase his own residence,

defendant AVENATTI agreed to help Client 1 find a real estate broker and purchase a house.  Defendant AVENATTI represented and promised to Client 1 that Client 1 would be able to use the settlement proceeds to fund the purchase of a house.  After Client 1 was in escrow on the purchase of a house, however, defendant AVENATTI falsely told Client 1 that Client 1 could not purchase the house after all because the County of Los Angeles still had not approved the Special Needs Trust and therefore could not make the settlement payment to Client 1. Client 1 was unable to close escrow and did not purchase the house.

iii. On or about November 26, 2018, defendant AVENATTI told Client 1 that defendant AVENATTI would respond on Client 1's behalf to a request that Client 1 provide the United States Social Security Administration ("SSA") information it requested to evaluate Client 1's continued eligibility for Supplemental Security Income ("SSI") benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from defendant AVENATTI.  Knowing full well that the requested information could lead to inquiries that could reveal that defendant AVENATTI had embezzled Client 1's portion of the settlement proceeds, defendant AVENATTI failed to provide the requested information to SSA, which resulted in Client 1's SSI benefits being discontinued in or about February 2019.

k.  On or about March 22, 2019, defendant AVENATTI was questioned regarding the alleged embezzlement of the Client 1 Settlement Proceeds during a public judgment-debtor examination conducted in federal court in Los Angeles, California.  Shortly thereafter, in order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion

10

of the $4,000,000 settlement, defendant AVENATTI falsely told Client 1 that the County of Los Angeles had finally approved the Special Needs Trust for Client 1 and that Client 1 would begin receiving settlement payments from the County of Los Angeles through the Special Needs Trust.

l.    In order to further lull Client 1 and to attempt to establish a defense against any claims Client 1 could bring against defendant AVENATTI, on or about March 23, 2019, and on or about March 24, 2019, defendant AVENATTI caused Client 1 to sign a document defendant AVENATTI claimed was necessary to effectuate the settlement agreement and finalize the Special Needs Trust that defendant AVENATTI claimed was required before Client 1 could begin receiving payments due under the settlement, and a document stating that Client 1 was satisfied with defendant AVENATTI's representation of Client 1.

### Embezzlement of Client 2's Funds

m.    On or about January 7, 2017, defendant AVENATTI negotiated a settlement on behalf of Client 2 with Individual 1. Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.  Client 2 was entitled to receive the initial $2,750,000 settlement payment, less EA LLP's attorneys' fees (i.e., 33 percent of the total $3,000,000 settlement amount), costs, and expenses.

n.    In order to conceal the true details of the settlement agreement from Client 2, defendant AVENATTI did not provide a copy of

11

the settlement agreement to Client 2.  Rather, in or about January
2017, defendant AVENATTI falsely represented to Client 2 that
Individual 1 would make an initial lump-sum payment, the entirety of
which would be used to pay EA LLP's attorney fees (i.e., 33 percent
of the total settlement amount) and costs, and then approximately 96
monthly payments over the course of the next eight years by which the
remaining settlement funds would be paid to Client 2.  In truth and
in fact, as defendant AVENATTI then well knew, the actual settlement
agreement required Individual 1 to make the initial $2,750,000
settlement payment, which far exceeded the money owed to EA LLP for
attorneys' fees, by on or about January 28, 2017, and Individual 1
was not required to make any monthly payments to Client 2 thereafter.

o.   On or about January 25, 2017, defendant AVENATTI
caused the initial $2,750,000 settlement payment from Individual 1 to
be transferred to EA Trust Account 8671 to be held in trust for
Client 2.  Defendant AVENATTI concealed and failed to disclose to
Client 2 that EA LLP had received the initial $2,750,000 settlement
payment.  Further, defendant AVENATTI and EA LLP retained and did not
transfer Client 2's portion of the $2,750,000 settlement payment to
Client 2.

p.   On or about January 26, 2017, defendant AVENATTI
caused $2,500,000 of the $2,750,000 settlement payment to be
transferred to an attorney trust account for another law firm ("Law
Firm 1").  That same day, defendant AVENATTI caused Law Firm 1 to
transfer the entire $2,500,000 to Honda Aircraft Company, LLC, to
purchase a private airplane for defendant AVENATTI's company,
Passport 420.  Defendant AVENATTI also caused the remaining $250,000
of the $2,750,000 settlement payment to be transferred first to EA

12

1  Account 2851 and then to A&A Account 0661.  Defendant AVENATTI
2  concealed and failed to disclose to Client 2 that defendant AVENATTI
3  had used the settlement proceeds in this manner.

4          q.  In order to lull Client 2 and prevent Client 2 from
5  discovering that defendant AVENATTI had embezzled Client 2's portion
6  of the initial $2,750,000 settlement payment, defendant AVENATTI
7  committed and caused to be committed the following acts:

8          i.  Between on or about March 15, 2017, and on or
9  about June 18, 2018, defendant AVENATTI caused approximately 11
10 payments totaling approximately $194,000 to be deposited into Client
11 2's bank account.  Defendant AVENATTI falsely represented to Client 2
12 that these payments constituted the monthly settlement payments that
13 were purportedly due from Individual 1.  For example, on or about
14 February 20, 2018, defendant AVENATTI caused a $16,000 cashier's
15 check drawn on EA Account 4613 to be deposited into Client 2's bank
16 account, which falsely identified Individual 1 as the "remitter."

17         ii.  Between in or about June 2018 and in or about
18 March 2019, after defendant AVENATTI stopped making the purported
19 monthly payments to Client 2, defendant AVENATTI falsely represented
20 to Client 2 that Individual 1 was not complying with the settlement
21 agreement and falsely told Client 2 that defendant AVENATTI was
22 working on obtaining the missing monthly settlement payments
23 purportedly due to Client 2 from Individual 1.

24         iii. On or about March 24, 2019, at a meeting with
25 Client 2 at defendant AVENATTI's residence in Los Angeles,
26 California, defendant AVENATTI falsely represented to Client 2 that
27 Client 2 would soon be receiving a payment from Individual 1 to make

28