1 up for the purportedly missing monthly settlement payments from

2 Individual 1 for July 2018 through March 2019.

3 **Embezzlement of Client 3's Funds**

4       r.   Between on or about December 22, 2017, and on or about

5 December 28, 2017, defendant AVENATTI negotiated a settlement

6 agreement with Company 1 on behalf of Client 3. The settlement

7 agreement required Company 1 to make an initial payment of $1,600,000

8 by January 10, 2018, and three additional payments of $100,000 by

9 January 10 of 2019, 2020, and 2021, respectively, for a total of

10 $1,900,000. Client 3 was entitled to receive the initial $1,600,000

11 settlement payment, less EA LLP's attorneys' fees of $760,000 (i.e.,

12 40 percent of the total $1,900,000 settlement amount), costs, and

13 expenses.

14       s.   On or about December 28, 2017, at a meeting with

15 Client 3 at EA LLP's offices in Newport Beach, California, to discuss

16 the proposed settlement agreement with Company 1, defendant AVENATTI

17 provided an altered copy of the settlement agreement to Client 3 for

18 Client 3's review, which copy falsely represented the payment

19 schedule as $1,600,000 due by March 10, 2018, and $100,000 due by

20 March 10 of each of the three subsequent years. That same day,

21 defendant AVENATTI emailed the attorney for Company 1 the signature

22 page for the actual settlement agreement, bearing Client 3's

23 signature.

24       t.   On or about December 29, 2017, defendant AVENATTI

25 received a complete copy of the fully executed settlement agreement

26 with Client 3's and Company 1's signatures from Company 1's attorney,

27 which included the payment schedule that had actually been negotiated

28 by defendant AVENATTI but had been concealed from Client 3, namely,

1    an initial $1,600,000 payment due by January 10, 2018, and additional

2    payments of $100,000 due by January 10 of each of the three

3    subsequent years.

4          u.    On or about January 2, 2018, defendant AVENATTI

5    emailed instructions to Company 1's attorney to wire the initial

6    $1,600,000 settlement payment to Avenatti Trust Account 5566.

7          v.    On or about January 5, 2018, as instructed by

8    defendant AVENATTI, Company 1 wired the initial $1,600,000 settlement

9    payment to Avenatti Trust Account 5566 to be held in trust for Client

10    3.   Defendant AVENATTI concealed and failed to disclose to Client 3

11    that defendant AVENATTI had received the initial $1,600,000

12    settlement payment from Company 1.   Further, defendant AVENATTI

13    retained Client 3's portion of the $1,600,000 settlement payment and

14    did not transfer Client 3's portion of the $1,600,000 settlement

15    payment to Client 3.

16          w.    Between on or about January 5, 2018, and on or about

17    March 14, 2018, defendant AVENATTI caused approximately $1,599,400 of

18    the initial $1,600,000 settlement payment to be used for his own

19    purposes, including to pay for expenses relating to GBUS.   Defendant

20    AVENATTI concealed and failed to disclose to Client 3 that defendant

21    AVENATTI used the settlement proceeds for his own purposes.

22          x.    In order to lull Client 3 and prevent Client 3 from

23    discovering that defendant AVENATTI had embezzled Client 3's portion

24    of the initial $1,600,000 settlement payment, defendant AVENATTI

25    committed and caused to be committed the following acts:

26          i.    Between on or about March 10, 2018, and in or

27    about November 2018, defendant AVENATTI falsely represented to Client

28    3 that Company 1 had not made the initial $1,600,000 settlement

payment, and that defendant AVENATTI was working on obtaining the purportedly missing $1,600,000 settlement payment from Company 1.

ii.   Between in or about April 2018 and in or about November 2018, defendant AVENATTI caused multiple payments totaling approximately $130,000 to be paid to Client 3 and/or Client 3's spouse, which payments defendant AVENATTI falsely claimed represented "advances" on Client 3's portion of the $1,600,000 settlement payment from Company 1, so that Client 3 could meet certain financial obligations while Client 3 was purportedly "waiting" for his portion of the $1,600,000 settlement payment from Company 1.

**Embezzlement of Client 4's Funds**

y.   On or about September 17, 2017, defendant AVENATTI negotiated a "Common Stock Repurchase Agreement" with Company 2 on behalf of Client 4 and Client 5.   Under the terms of Client 4's Common Stock Repurchase Agreement, Company 2 agreed to repurchase from Client 4 361,565 shares of Company 2 for approximately $27,478,940, and thereafter an additional 107,188 shares of Company 2 for approximately $8,146,288, which resulted in a total repurchase amount of approximately $35,625,228.

z.   On or about September 18, 2017, Company 2 wired approximately $27,414,668 to Avenatti Trust Account 4705. Approximately $2,787,651 of this amount constituted defendant AVENATTI's and/or EA LLP's attorneys' fees (i.e., 7.5 percent of the total $35,625,228 repurchase amount), costs, and expenses.   Between on or about September 21, 2017, and on or about October 3, 2017, defendant AVENATTI caused the remainder of the initial $27,414,668 payment to be transferred to bank accounts associated with Client 4.

1          aa.  On or about March 13, 2018, after Company 2 informed

2  Client 4 and Client 5 that Company 2 was ready to repurchase the

3  remaining 107,188 shares of Company 2 from Client 4 as contemplated

4  in the Common Stock Purchase Agreement, defendant AVENATTI told

5  Client 5 that Company 2 should wire the remaining $8,146,288 payment

6  due to Client 4 to Avenatti Trust Account 4705, and that defendant

7  AVENATTI would then wire the $8,146,288 payment from Avenatti Trust

8  Account 4705 to Client 4.

9          bb.  On or about March 14, 2018, following defendant

10  AVENATTI's instructions, Company 2 transferred approximately

11  $8,146,288 to Avenatti Trust Account 4705 to be held in trust for

12  Client 4.  Defendant AVENATTI retained and did not transfer the

13  $8,146,288 payment to Client 4 as defendant AVENATTI had promised to

14  do.

15          cc.  Between on or about March 15, 2018, and on or about

16  May 4, 2018, defendant AVENATTI caused approximately $4,000,000 out

17  of the $8,146,288 payment from Company 2 due to Client 4 to be used

18  for defendant AVENATTI's own purposes, including the following:

19          i.  On or about March 15, 2018, defendant AVENATTI

20  caused approximately $3,000,000 of Client 4's funds to be transferred

21  to EA Trust Account 4613.  Later that same day, defendant AVENATTI

22  then caused approximately $2,828,423 to be transferred from EA Trust

23  Account 4613 to an attorney trust account for SulmeyerKupetz, a law

24  firm representing A&A and defendant AVENATTI in bankruptcy

25  proceedings involving EA LLP, so that SulmeyerKupetz could use the

26  money to pay some of EA LLP's creditors in the bankruptcy

27  proceedings, including the Internal Revenue Service.

28

1          ii.   Between on or about March 20, 2018, and on or

2   about May 1, 2018, defendant AVENATTI caused a total of approximately

3   $780,000 of Client 4's funds to be paid to EA Trust Account 4613,

4   which defendant AVENATTI then used for his own purposes, including

5   transferring the funds to bank accounts associated with defendant

6   AVENATTI's other companies, namely, GBUS, GB LLC, A&A, and Passport

7   420.

8          iii. Between on or about March 20, 2018, and May 1,

9   2018, defendant AVENATTI caused a total of approximately $260,000 of

10  Client 4's funds to be paid to EA DIP Account 0313.

11         iv.   In order to lull Client 1 and prevent Client 1

12  from discovering that defendant AVENATTI had embezzled Client 1's

13  portion of the $4,000,000 settlement payment from the County of Los

14  Angeles, on or about April 9, 2018, defendant AVENATTI used Client

15  4's funds, which had been transferred from Avenatti Trust Account

16  4705 to EA DIP Account 0313 and then to EA Trust Account 4613, to

17  make an approximately $1,900 payment to Client 1.

18         v.    In order to lull Client 2 and prevent Client 2

19  from discovering that defendant AVENATTI had embezzled Client 2's

20  portion of the $2,750,000 settlement payment from Individual 1, on or

21  about April 17, 2018, defendant AVENATTI used Client 4's funds, which

22  had been transferred from Avenatti Trust Account 4705 to EA Trust

23  Account 4613, to make an approximately $34,000 payment to Client 2.

24         dd.   Between on or about March 14, 2018, and on or about

25  May 3, 2018, defendant AVENATTI failed to disclose to Client 4 and

26  Client 5 that defendant AVENATTI had used approximately $4,000,000 of

27  Client 4's funds for defendant AVENATTI's own purposes.

28

1          ee.  In order to lull Client 4 and Client 5 and prevent

2  them from discovering that defendant AVENATTI had embezzled

3  approximately $4,000,000 from the approximately $8,146,288 payment

4  defendant AVENATTI received from Company 2, between on or about

5  March 14, 2018, and on or about May 3, 2018, defendant AVENATTI

6  falsely represented and promised Client 4 and Client 5 that defendant

7  AVENATTI would transfer Client 4's funds to Client 4 at a later date,

8  and that defendant AVENATTI needed to go to the bank to fill out

9  paperwork to effectuate the wire transfers.  In truth and in fact, as

10  defendant AVENATTI then well knew, he had already caused

11  approximately $4,000,000 of Client 4's funds to be transferred or

12  paid to other bank accounts defendant AVENATTI controlled, and then

13  used for defendant AVENATTI's own purposes.

14          ff.  In order to lull Client 4 and Client 5 and prevent

15  them from discovering that he had embezzled approximately $4,000,000

16  of Client 4's funds, on or about May 4, 2018, defendant AVENATTI

17  caused two wire transfers in the amounts of $4,000,000 and $146,288

18  to be sent from Avenatti Trust Account 4705 to a bank account

19  associated with Client 4.  Defendant AVENATTI retained and failed to

20  transfer to Client 4 the remainder of the $8,146,288 payment that

21  Company 2 had transferred on or about March 14, 2018, to Avenatti

22  Trust Account 4705 for the benefit of Client 4.

23          gg.  Between on or about May 4, 2018, and on or about

24  June 4, 2018, defendant AVENATTI and another attorney with whom

25  defendant AVENATTI worked ("Attorney 1") falsely represented to

26  Client 4 and Client 5 that the entire $8,146,288 payment from Company

27  2 had been transferred to Client 4 in three separate wire transfers.

28  For example, in response to a request from Client 5 that defendant

19

1  AVENATTI provide the wire transfer information for the remaining
2  $4,000,000 of Client 4's funds, on or about May 11, 2018, defendant
3  AVENATTI emailed Attorney 1 a wire transfer confirmation document
4  purporting to reflect a second $4,000,000 wire transfer to Client 4.
5  In truth and in fact, as defendant AVENATTI then well knew, defendant
6  AVENATTI had never transferred the remaining $4,000,000 to Client 4,
7  defendant AVENATTI had already used the remaining $4,000,000 for his
8  own purposes, and the wire transfer confirmation document that
9  defendant AVENATTI provided on or about May 11, 2018, related to the
10  first $4,000,000 wire transfer from Avenatti Trust Account 4705 that
11  Client 4 had already received on May 4, 2018.

12  **D.    THE USE OF THE WIRES**

13      8.    On or about the following dates, within the Central
14  District of California, and elsewhere, defendant AVENATTI, for the
15  purpose of executing the above-described scheme to defraud,
16  transmitted and caused to be transmitted by means of wire and radio
17  communications in interstate commerce the following items:

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| ONE | 1/30/2015 | Wire transfer of approximately $250,000 sent from A&A Account 0661 through the Fedwire system to GBUS's Homestreet bank account in Seattle, Washington. |
| TWO | 2/10/2015 | Wire transfer of approximately $50,000 from A&A Account 0661 through the Fedwire system to defendant AVENATTI's personal Bank of America bank account. |
| THREE | 1/26/2017 | Wire transfer of approximately $2,500,000 from EA Trust Account 8671 through the Fedwire system to Law Firm 1's JP Morgan Chase Bank, N.A. ("Chase") IOLTA trust account. |

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| FOUR | 1/5/2018 | Wire transfer of approximately $1,600,000 sent from Company 1's Silicon Valley Bank account through the Fedwire system to Avenatti Trust Account 5566. |
| FIVE | 1/10/2018 | Wire transfer of approximately $60,000 sent from Avenatti CNB Trust Account 5566 through the Fedwire system to EA Trust Account 3714. |
| SIX | 3/15/2018 | Wire transfer of approximately $3,000,000 from Avenatti Trust Account 4705 through the Fedwire system to EA CB&T Trust Account 4613. |
| SEVEN | 3/15/2018 | Wire transfer of approximately $2,828,423 from EA CB&T Trust Account 4613 through the Fedwire system to an attorney trust account for SulmeyerKupetz at CNB. |
| EIGHT | 3/20/2018 | Wire transfer of approximately $200,000 from Avenatti CNB Trust Account 4705 through the Fedwire system to EA Trust Account 4613. |
| NINE | 6/18/2018 | Wire transfer of approximately $16,000 from EA Trust Account 4613 through the Fedwire system to Client 2's Chase bank account. |
| TEN | 7/13/2018 | Wire transfer of approximately $1,900 from EA Trust Account 4613 through the Fedwire system to Client 1's Bank of America bank account. |

COUNTS ELEVEN THROUGH EIGHTEEN

[26 U.S.C. § 7202; 18 U.S.C. § 2(b)]

**A.    INTRODUCTORY ALLEGATIONS**

**Background**

9.    The Grand Jury re-alleges and incorporates by reference paragraph 1 through 7 of this Indictment as though fully set forth herein.

10.    At all relevant times:

a.    GBUS was a limited liability company organized in Washington, which operated Tully's stores in Washington and California.  Until in or around November 2017, GBUS's corporate office was in Seattle, Washington.

b.    GB LLC was a limited liability company organized in Washington.  Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was the sole managing member of GB LLC.

c.    GB Auto was a limited liability company organized in Washington.  Defendant AVENATTI was the sole manager of GB Auto.

d.    Doppio, Inc. ("Doppio") was a for-profit corporation incorporated in Washington.  Defendant AVENATTI was the sole governor of Doppio.

e.    Defendant AVENATTI was the effective owner of GBUS. In or around June 2013, defendant AVENATTI's company GB LLC acquired TC Global Inc., which previously operated Tully's, at a bankruptcy auction for approximately $9.15 million, namely, $6.95 million in cash and $2.2 million in assumed liabilities.  On or about June 25, 2013, defendant AVENATTI caused a wire transfer in the amount of $7,000,000 from EA Trust Account 8541 to a bank account for Foster Pepper PLLC, the law firm representing GB LLC in Tully's bankruptcy

auction.  A&A owned 100 percent of Doppio, which in turn owned at least 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

        f.  Defendant AVENATTI served as GBUS's CEO, for which he was paid a yearly salary of approximately $250,000.  As GBUS's CEO, defendant AVENATTI exercised control over every aspect of GBUS's business affairs, including approving payments GBUS made and controlling GBUS's bank accounts.  Defendant AVENATTI managed and exercised control over GBUS's business affairs from Orange and Los Angeles Counties, within the Central District of California, and elsewhere.

        g.  The Internal Revenue Service ("IRS") was an agency of the United States within the Department of Treasury of the United States and was responsible for enforcing and administering the tax laws of the United States.

11.  Beginning in or about February 2015 and continuing until at least in or about July 2018, GBUS maintained multiple bank accounts at CB&T in Orange County, California, including GBUS's payroll account ending in x2976 ("GBUS Payroll Account 2976") and GBUS Operating Account 2240.  Defendant AVENATTI and an EA LLP employee ("EA Employee 1") were the only signatories on GBUS Payroll Account 2976 and GBUS Operating Account 2240.

12.  In addition to defendant AVENATTI's yearly salary as GBUS's CEO, between as early as in or about September 2015 and continuing until at least in or about December 2017, defendant AVENATTI caused GBUS to make substantial payments for defendant AVENATTI's personal benefit and the benefit of other entities defendant AVENATTI

controlled, while, at the same time, failing to pay over to the IRS payroll taxes withheld from GBUS employees' paychecks. For example:

a. Between on or about September 1, 2015, and on or about December 31, 2017, defendant AVENATTI caused a net of approximately $2.5 million to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with A&A and EA LLP.

b. On or about March 30, 2016, defendant AVENATTI caused GBUS to transfer $200,000 to the G.P. Family Trust as payment for two months of rent for defendant AVENATTI's residence in Newport Beach, California.

c. In order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment from the County of Los Angeles, on or about April 7, 2016, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to EA Account 2851, to make an approximately $1,900 payment to Client 1.

d. In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1, defendant AVENATTI caused GBUS funds to be used to make payments to Client 2, including the following:

i. On or about April 14, 2017, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to A&A Account 0661, to make an approximately $16,000 payment to Client 2.

ii. On or about May 15, 2017, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to A&A Account 0661, to make an approximately $16,000 payment to Client 2.

**Federal Payroll Taxes**

13.   At all relevant times:

a.    Title 26 of the United States Code imposed four types of tax with respect to wages paid to employees:  (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

b.    Federal income tax was imposed upon employees based upon the amount of wages they received.

c.    Social Security tax and Medicare tax were imposed by the Federal Insurance Contributions Act (collectively referred to as "FICA taxes").  FICA taxes were imposed separately on employees and on employers.

d.    Federal unemployment tax was imposed under the Federal Unemployment Tax Act ("FUTA").  FUTA taxes were imposed solely on employers.

**GBUS's Obligation to Collect, Truthfully Account For, and Pay Over to the IRS Federal Payroll Taxes**

14.   At all relevant times:

a.    GBUS was required to withhold employee income taxes and FICA taxes from the wages paid to its employees, and to pay over the withheld amounts to the IRS.  The employee income taxes and FICA taxes that GBUS was required to withhold and pay over to the IRS were commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

b.    GBUS was required to make deposits of payroll taxes, including trust fund taxes, to the IRS on a periodic basis.  In addition, GBUS was required to file, following the end of each

25

calendar quarter, an Employer's Quarterly Federal Tax Return (Form 941), setting forth for the quarter the total amount of wages and other compensation subject to withholding paid by GBUS, the total amount of income tax withheld, the amount of Social Security and Medicare taxes (i.e., FICA taxes) due, and the total federal tax deposits.

c.   Defendant AVENATTI was a "responsible person" for GBUS, that is, defendant AVENATTI had the corporate responsibility to collect, truthfully account for, and pay over to the IRS GBUS's payroll taxes.

15.  Beginning in or about June 2013 and continuing until at least in or about October 2017, GBUS withheld tax payments from its employees' paychecks, including federal income taxes and FICA taxes.

16.  Beginning in or about September 2015 and continuing until at least in or about October 2017, GBUS failed to pay over to the IRS payroll taxes due and owing, including federal income taxes and FICA taxes GBUS withheld from its employees' paychecks. In total, between in or around September 2015 and in or around October 2017, GBUS failed to pay over to the IRS at least approximately $3,207,144 in federal payroll taxes, including at least approximately $2,390,048 in trust fund taxes that GBUS withheld from its employees' paychecks.

17.  Beginning in or about January 2016 and continuing until at least in or about October 2017, GBUS failed to timely file its quarterly employment tax returns (Forms 941) with the IRS for the fourth quarter of 2015 through the third quarter of 2017, inclusive.

**B.   FAILURE TO ACCOUNT FOR AND PAY OVER PAYROLL TAXES**

18.  Beginning in or about October 2015 and continuing until at least on or about October 31, 2017, in Orange County, within the

26

Central District of California, and elsewhere, defendant AVENATTI, a responsible person of GBUS, willfully failed and willfully caused GBUS to fail to pay over to the United States, namely, the IRS, all of the federal income taxes and FICA taxes (i.e., trust fund taxes) that GBUS withheld from GBUS employees' total taxable wages, which were due and owing to the United States by the dates set forth below and in the amounts set forth below, for each of the following calendar year quarters:

| COUNT | QUARTER AND YEAR | QUARTERLY DUE DATE | APPROXIMATE TRUST FUND TAXES DUE AND OWING |
|-------|------------------|--------------------|--------------------------------------------|
| ELEVEN | Fourth Quarter of 2015 | 1/31/2016 | $292,724 |
| TWELVE | First Quarter of 2016 | 4/30/2016 | $382,100 |
| THIRTEEN | Second Quarter of 2016 | 7/31/2016 | $297,791 |
| FOURTEEN | Third Quarter of 2016 | 10/31/2016 | $333,969 |
| FIFTEEN | Fourth Quarter of 2016 | 1/31/2017 | $277,681 |
| SIXTEEN | First Quarter of 2017 | 4/30/2017 | $309,702 |
| SEVENTEEN | Second Quarter of 2017 | 7/31/2017 | $345,094 |
| EIGHTEEN | Third Quarter of 2017 | 10/31/2017 | $150,989 |

COUNT NINETEEN

[26 U.S.C. § 7212(a)]

**A.   INTRODUCTORY ALLEGATIONS**

19.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 10 through 17 of this Indictment as though fully set forth herein.

20.   In or about September 2016, the IRS initiated a collection action relating to GBUS's failure to file its quarterly employment tax returns (Forms 941) and pay over to the IRS payroll taxes that were due and owing, including federal income taxes and FICA taxes that GBUS had withheld (collectively, "trust fund taxes") from GBUS employees' paychecks.

21.   On or about October 7, 2016, an IRS Revenue Officer ("IRS RO-1") spoke with defendant MICHAEL JOHN AVENATTI ("AVENATTI") and other GBUS employees regarding the IRS's collection action and advised them that since approximately September 2015 GBUS had not paid over to the IRS any federal payroll taxes.

22.   On or about June 26, 2017, IRS RO-1 filed a notice of federal tax lien against GBUS in King County in the State of Washington.  The federal tax lien indicated that GBUS owed the IRS approximately $4,998,227 in unpaid federal payroll taxes.  A copy of the federal tax lien notice was also mailed to GBUS.

23.   Between in or about August 2017 and in or about January 2018, IRS RO-1 issued levy notices to a number of financial institutions and companies associated with GBUS.  The levy notices indicated that GBUS owed the IRS as much as approximately $5,210,769.  Each levy notice required the recipient of the levy notice to turn over to the United States Treasury GBUS's property and rights to

28

1   property, such as money, credits, and bank deposits, that the
2   recipient of the levy had or was already obligated to pay to GBUS.
3   Banks, savings and loans, and credit unions were obligated to hold
4   any funds subject to the levy notices for 21 days before sending
5   payment to the United States Treasury.  Copies of the levy notices
6   issued by IRS RO-1 were mailed to GBUS.

7       24.  Beginning as early as in or about August 2017, defendant
8   AVENATTI knew that the IRS had issued levies to certain financial
9   institutions at which GBUS maintained bank accounts.

10  **B.   THE ATTEMPT TO OBSTRUCT AND IMPEDE THE ADMINISTRATION OF THE**
11  **INTERNAL REVENUE LAWS**

12      25.  Beginning on or about October 7, 2016, and continuing until
13  at least in or around September 2018, in Orange and Los Angeles
14  Counties, within the Central District of California, and elsewhere,
15  defendant AVENATTI corruptly obstructed and impeded, and corruptly
16  endeavored to obstruct and impede, the due administration of the
17  internal revenue laws of the United States.

18      26.  The attempt to obstruct and impede the due administration
19  of the internal revenue laws of the United States operated, in
20  substance, in the following manner:

21          a.   On or about October 7, 2016, defendant AVENATTI made
22  false statements to IRS RO-1 in connection with the IRS's collection
23  action, including that:  (i) defendant AVENATTI was not personally
24  involved in GBUS's finances; and (ii) defendant AVENATTI was unaware
25  that since approximately September 2015 GBUS had failed to pay over
26  to the IRS any federal payroll taxes.  In truth and in fact, as
27  defendant AVENATTI then well knew, (i) defendant AVENATTI was
28  personally involved in GBUS's finances in that he had authority to

1  approve payments on behalf of GBUS and had control over GBUS's bank
2  accounts; and (ii) defendant AVENATTI was aware that since
3  approximately September 2015 GBUS had failed to pay over to the IRS
4  any federal payroll taxes because, among other reasons, on or about
5  November 5, 2015, GBUS's controller had sent defendant AVENATTI an
6  email explaining to defendant AVENATTI the "implications" of GBUS not
7  paying to the IRS its payroll taxes in a timely manner, and, between
8  in or about September 2015 and in or about October 2016, defendant
9  AVENATTI had refused to authorize GBUS to pay over to the IRS the
10 federal payroll taxes that GBUS had withheld from its employees'
11 paychecks.

12       b.   In order to further obstruct and impede the IRS's
13 collection action and the IRS's efforts to collect the payroll taxes
14 that GBUS owed to the IRS, defendant AVENATTI directed GBUS employees
15 to stop depositing cash receipts from the Tully's stores into GBUS
16 KeyBank Account 6193, which defendant AVENATTI knew was already
17 subject to IRS levy notices, and instructed GBUS employees to instead
18 deposit all cash receipts from Tully's stores into a little-used Bank
19 of America account for a separate entity defendant AVENATTI
20 controlled, GB Auto.  Defendant AVENATTI did so by, among other acts,
21 the following:

22            i.   In or about September 2017, defendant AVENATTI
23 directed and instructed a GBUS employee ("GBUS Employee 1") to tell
24 the Tully's stores that the stores could no longer make cash deposits
25 into GBUS KeyBank Account 6193 and should hold all of the stores'
26 cash deposits.

27            ii.  On or about September 7, 2017, defendant
28 AVENATTI sent GBUS Employee 1 a text message containing the bank

account information for the GB Auto account at Bank of America (the "GB Auto Account"), in order to cause the cash deposits from the Tully's stores to be made into the GB Auto Account.

       iii. On or about September 18, 2017, after receiving a text message from GBUS Employee 1 asking if the Tully's stores were able to deposit at KeyBank yet, defendant AVENATTI responded via text message "Not yet but hopefully in next two days. Can you collect deposits tmrw and deposit pls?"

       iv. On or about September 28, 2017, defendant AVENATTI sent a text message to GBUS Employee 1 and another GBUS employee ("GBUS Employee 2"), asking, "When are we depositing again?" and, later that same day, another text message, stating, "It is important that these deposits be made regularly. Thanks."

       v. Between on or about September 7, 2017, and in or about December 2017, GBUS Employee 1, acting at defendant AVENATTI's direction, made approximately 27 cash deposits totaling approximately $859,784 into the GB Auto Account. After approximately 24 of the cash deposits, GBUS Employee 1 sent defendant AVENATTI a text message attaching a photograph of the deposit slip.

       c. In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI caused GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts ("merchant accounts"), which defendant AVENATTI knew were already subject to IRS levy notices. Defendant AVENATTI did so by, among other acts, the following:

1      ·   i. On or about September 28, 2017, defendant
2 AVENATTI received an email from GBUS Employee 2, which stated, among
3 other things, "9.25.17 tsys – $22,135.19 IRS levy."

4      ii. On or about September 29, 2017, defendant
5 AVENATTI received an email from GBUS Employee 2 titled "Levies,"
6 which stated that "IRS took as [sic] additional $23,763.02 from tsys
7 yesterday."

8      iii. On or about September 29, 2017, defendant
9 AVENATTI directed a TSYS representative ("TSYS Rep. 1") to change the
10 company name associated with the merchant accounts from "Global
11 Baristas US LLC" to "Global Baristas, LLC" and to change the EIN from
12 GBUS's EIN to GB LLC's EIN.

13      iv. On or about October 2, 2017, defendant AVENATTI
14 sent TSYS Rep. 1 an email regarding changes to the merchant accounts
15 and said "we need this done ASAP."

16      v. On or about October 3, 2017, defendant AVENATTI
17 entered into a new Merchant Transaction Processing Agreement with
18 TSYS on behalf of GB LLC.

19      vi. On or about October 3, 2017, defendant AVENATTI
20 and EA Employee 1 opened a new bank account, GB LLC Account 3730, for
21 GB LLC at CB&T in Orange County, California.  Later that day, EA LLP
22 Employee 1 emailed TSYS Rep. 1 the bank account and routing number
23 for GB CB&T Account 3730, which was to be the new bank account into
24 which the proceeds of the credit card transactions were to be
25 deposited.

26    d. In order to further obstruct and impede the IRS's
27 collection action and the IRS's efforts to collect the payroll taxes
28 that GBUS owed to the IRS, in or about December 2017, after TSYS

closed GBUS and GB LLC's merchant accounts, defendant AVENATTI caused GBUS to open new merchant accounts with Chase for the Tully's stores under the name GB LLC and directed Chase to deposit all credit card receipts in to GB LLC Account 3730.

      e.   In order to further obstruct and impede the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI changed the name of the contracting party on various contracts with The Boeing Company ("Boeing"), which had agreed to allow GBUS to operate Tully's stores at Boeing facilities in Washington.  Defendant AVENATTI did so by, among other acts, the following:

      i.   In or about November 2016, approximately one month after defendant AVENATTI learned of the IRS's collection action, defendant AVENATTI caused the contracting party's name on a contract with Boeing to be changed from "Global Baristas US LLC" to "GB Hospitality LLC," even though, as defendant AVENATTI then well knew, GBUS operated the Tully's stores at the Boeing facilities and "GB Hospitality LLC" had never been registered with any government agency and had never operated.

      ii.   In or about September 2017 and in or about October 2017, after IRS RO-1 had issued levy notices to Boeing and numerous financial institutions at which GBUS maintained accounts, defendant AVENATTI, having agreed on behalf of GBUS to sell Boeing two Tully's coffee kiosks and other Tully's equipment in exchange for a payment from Boeing of approximately $155,010 and forgiveness of certain debts, directed a Boeing attorney to change the seller's name from "GB Hospitality, LLC" to "Global Baristas, LLC" on the two bills of sales relating to the transaction.  Defendant AVENATTI further

instructed Boeing to transfer the approximately $155,010 payment to EA Trust Account 8671, rather than to GBUS's bank account. Defendant AVENATTI then transferred the approximately $155,010 payment from EA Trust Account 8671 to A&A Account 0661, from which defendant AVENATTI used a substantial portion of the proceeds of the sale for defendant AVENATTI's personal purposes, including to: (1) transfer approximately $15,000 to a personal bank account; (2) pay approximately $13,073 for rent at defendant AVENATTI's residential apartment in Los Angeles, California; and (3) pay approximately $8,459 that defendant AVENATTI owed to Neiman Marcus.

f. After learning of the IRS's collection action, defendant AVENATTI used GBUS funds that should and could have been used to pay over to the IRS federal incomes taxes and FICA taxes that had been withheld from GBUS employees' paychecks for his own personal benefit and the benefit of other entities defendant AVENATTI controlled, including, but not limited to, the following:

i. Between in or about October 2016 and in or about December 2017, defendant AVENATTI caused a net of approximately $1.6 million to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with defendant AVENATTI's other companies, namely, A&A and EA LLP.

ii. In order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment from the County of Los Angeles, defendant AVENATTI used GBUS funds, including credit card receipts from Tully's stores that Chase deposited into GB LLC Account 3730, to make the following additional payments to Client 1:

1    (I)   On or about January 19, 2018, defendant

2  AVENATTI used GBUS funds, which had been transferred from GB LLC

3  Account 3730 and/or KeyBank Account 6193 to EA Trust Account 3714, to

4  make an approximately $1,900 payment to Client 1.

5    (II)  On or about February 15, 2018, defendant

6  AVENATTI used GBUS funds, which had been transferred from GB LLC

7  Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

8  4613, to make an approximately $1,900 payment to Client 1.

9    iii. In order to lull Client 2 and prevent Client 2

10  from discovering that defendant AVENATTI had embezzled Client 2's

11  portion of the initial $2,750,000 settlement payment from Individual

12  1, defendant AVENATTI used GBUS funds, including credit card receipts

13  from Tully's stores that Chase deposited into GB LLC Account 3730, to

14  make the following additional payments to Client 2:

15    (I)   On or about January 16, 2018, defendant

16  AVENATTI used GBUS funds, which had been transferred from GB LLC

17  Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

18  3714, to make an approximately $16,000 payment to Client 2.

19    (II)  On or about February 20, 2018, defendant

20  AVENATTI used GBUS funds, which had been transferred from GB LLC

21  Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account

22  4613, to make an approximately $16,000 payment to Client 2.

35

COUNTS TWENTY THROUGH TWENTY-THREE

[26 U.S.C. § 7203]

**A.   INTRODUCTORY ALLEGATIONS**

27.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, and 26 of this Indictment as though fully set forth herein.

28.  On or about October 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed his U.S. Individual Income Tax Return (Form 1040) for the 2009 calendar year, which claimed defendant AVENATTI had total income of $1,939,942 and that defendant AVENATTI owed the IRS approximately $569,630 in taxes for the 2009 calendar year.  Defendant AVENATTI, however, did not pay the remaining tax due for the 2009 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

29.  On or about October 11, 2011, defendant AVENATTI filed his U.S. Individual Income Tax Return (Form 1040) for the 2010 calendar year, which claimed defendant AVENATTI had total income of $1,154,800 and that defendant AVENATTI owed the IRS approximately $281,786 in taxes for the 2010 calendar year.  Defendant AVENATTI, however, did not pay the remaining taxes due to the IRS for the 2010 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

30.  The 2010 Form 1040 was the last U.S. Individual Income Tax Return defendant AVENATTI filed with the IRS.

**B.   THE WILLFUL FAILURES TO FILE TAX RETURNS**

31.  During the calendar years set forth below, defendant AVENATTI, who resided in Orange and Los Angeles Counties, within the

36

1  Central District of California, had and received gross income in

2  excess of the amounts ("threshold gross income amounts") set forth

3  below.  By reason of such gross income, defendant AVENATTI was

4  required by law, following the close of each of the calendar years

5  set forth below and on or before the dates set forth below ("due

6  dates"), to make an income tax return to the IRS Center, at Fresno,

7  California, to a person assigned to receive returns at the local

8  office of the IRS in the Central District of California, or to

9  another IRS officer permitted by the Commissioner of the Internal

10 Revenue, stating specifically the items of his gross income and any

11 deductions and credits to which he was entitled.  Well knowing and

12 believing all of the foregoing, defendant AVENATTI willfully failed,

13 on or about the due dates set forth below, in the Central District of

14 California and elsewhere, to make an income tax return.

| COUNT | CALENDAR YEAR | THRESHHOLD GROSS INCOME AMOUNT | DUE DATE |
|---|---|---|---|
| TWENTY | 2014 | $20,300 | October 15, 2015, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-ONE | 2015 | $20,600 | October 17, 2016, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-TWO | 2016 | $20,700 | April 15, 2017 |
| TWENTY-THREE | 2017 | $20,800 | April 16, 2018 |

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

[26 U.S.C. § 7203]

**A.   INTRODUCTORY ALLEGATIONS**

32.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, and 28 through 30 of this Indictment as though fully set forth herein.

33.   On or about March 17, 2014, EA LLP filed its 2011 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant MICHAEL JOHN AVENATTI ("AVENATTI") signed the return on or about March 12, 2014, as the general partner or member manager.   The return listed A&A as the designated Tax Matters Partner ("TMP") before the IRS, and defendant AVENATTI as the TMP representative.

34.   On or about October 8, 2014, EA LLP filed its 2012 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant AVENATTI signed the return on or about October 1, 2014, as the general partner or member manager.   The return listed A&A as the designated TMP before the IRS.

35.   The 2012 Form 1065 for EA LLP was the last U.S. Return of Partnership Income for EA LLP filed with the IRS.

**B.   THE WILLFUL FAILURES TO FILE TAX RETURNS**

36.   During the calendar years set forth below, defendant AVENATTI conducted a business as a partnership under the name of EA LLP, with its principal place of business in Orange County, within the Central District of California.   Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make, for and on behalf of the partnership, a partnership return of income to the IRS Center, at Ogden, Utah, to a person

38

assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of the partnership's gross income and the deductions and credits allowed by law.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make a partnership return.

| COUNT | CALENDAR YEAR | DUE DATE |
|-------|---------------|----------|
| TWENTY-FOUR | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-FIVE | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-SIX | 2017 | March 15, 2018. |

COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE

[26 U.S.C. § 7203]

## A.   INTRODUCTORY ALLEGATIONS

37.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, 28 through 30, and 33 through 35 of this Indictment as though fully set forth herein.

38.   On or about September 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed a 2009 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 calendar year.  The return listed defendant AVENATTI as the President of A&A.

39.   On or about September 30, 2011, defendant AVENATTI filed a 2010 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 calendar year.  The return listed defendant AVENATTI as the President of A&A.

40.   The 2010 Form 1120S for A&A was the last U.S. Income Tax Return for an S Corporation (Form 1120S) that defendant AVENATTI filed for A&A with the IRS.

## B.   THE WILLFUL FAILURE TO FILE TAX RETURN

41.   During the calendar years set forth below, defendant AVENATTI was the President and CEO of A&A, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an

40

income tax return, for and on behalf of the corporation, to the IRS
Center, at Ogden, Utah, to a person assigned to receive returns at
the local office of the IRS in the Central District of California, or
to another IRS officer permitted by the Commissioner of the Internal
Revenue, stating specifically the items of the corporation's gross
income and the deductions and credits allowed by law.  Well knowing
and believing all of the foregoing, defendant AVENATTI willfully
failed, on or about the due dates set forth below, in the Central
District of California and elsewhere, to make an income tax return at
the time required by law.

| COUNT | CALENDAR YEAR | DUE DATE |
|-------|---------------|----------|
| TWENTY-SEVEN | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-EIGHT | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-NINE | 2017 | March 15, 2018. |

COUNTS THIRTY AND THIRTY-ONE

[18 U.S.C. §§ 1344(1), 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

42.   The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, and 38 through 40 of this Indictment as though fully set forth herein.

43.   Between in or about January 2014 and in or about April 2016, defendant MICHAEL JOHN AVENATTI ("AVENATTI") operated and controlled GB LLC and EA LLP from EA LLP's offices in Newport Beach, California.

44.   At all times relevant to this Indictment, The Peoples Bank was a financial institution located in Biloxi, Mississippi, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation.

**B.   THE SCHEME TO DEFRAUD**

45.   Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

46.   The fraudulent scheme operated, in substance, in the following manner:

a.   Between in or about January 2014 and in or about December 2014, defendant AVENATTI sought and obtained the following three loans from The Peoples Bank on behalf of the following companies that defendant AVENATTI controlled:

42

1              i.   In or about January 2014, defendant AVENATTI

2 sought and obtained a $850,000 loan to GB LLC (the "January 2014 GB

3 LLC Loan");

4              ii.   In or about March 2014, defendant AVENATTI sought

5 and obtained a $2,750,000 loan to EA LLP (the "March 2014 EA LLP

6 Loan"), from which defendant AVENATTI used approximately $884,166 to

7 pay off the January 2014 GB LLC Loan; and

8              iii. In or about December 2014, defendant AVENATTI

9 sought and obtained a $500,000 loan to EA LLP (the "December 2014 EA

10 LLP Loan").

11        b.   In order to obtain the March 2014 EA LLP Loan and the

12 December 2014 EA LLP Loan from The Peoples Bank, defendant AVENATTI

13 omitted and concealed material facts, and provided The Peoples Bank

14 with materially false financial information, including, but not

15 limited to, false and fraudulent individual and partnership tax

16 returns, and false and fraudulent balance sheets and financial

17 statements, as described below.

18        c.   In support of the application for the March 2014 EA

19 LLP Loan, defendant AVENATTI submitted to The Peoples Bank a 2011

20 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2011

21 Form 1040") stating that defendant AVENATTI had an adjusted gross

22 income for the 2011 calendar year of approximately $4,562,881, and

23 had a tax due and owing to the IRS for the 2011 calendar year of

24 approximately $1,506,707.  In truth and in fact, as defendant

25 AVENATTI then well knew, defendant AVENATTI had not filed the Peoples

26 Bank 2011 Form 1040 with the IRS, had not filed any 2011 U.S.

27 Individual Income Tax Return with the IRS, and had not paid to the

28

IRS the $1,506,707 defendant AVENATTI purportedly owed for the 2011 calendar year.

d.   In support of the application for the March 2014 EA LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to The Peoples Bank a personal financial statement as of March 11, 2014, in which defendant AVENATTI failed to disclose to The Peoples Bank that defendant AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, for the 2009 and 2010 calendar years.

e.   In support of the application for the March 2014 EA LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to The Peoples Bank a Balance Sheet for January 2014 through March 10, 2014 for EA LLP, which stated, among other things, that EA LLP had approximately $508,299 in its operating account, EA Account 8461, as of March 10, 2014.   In truth and in fact, as defendant AVENATTI then well knew, the balance in EA Account 8461 as of March 10, 2014, was approximately $43,013.

f.   In support of the application for the March 2014 EA LLP Loan, on or about March 13, 2014, defendant AVENATTI submitted to The Peoples Bank a 2012 U.S. Partnership Return (Form 1065) for EA LLP (the "Peoples Bank 2012 Form 1065"), which stated that in the 2012 calendar year EA LLP had total income of approximately $11,426,021, and ordinary business income of approximately $5,819,458.   In truth and in fact, as defendant AVENATTI then well knew, the Peoples Bank 2012 Form 1065, had not been filed with the IRS.   Rather, in or about October 2014, defendant AVENATTI caused a different 2012 U.S. Partnership Return (Form 1065) to be filed with

the IRS (the "IRS 2012 Form 1065"), which differed materially from the Peoples Bank 2012 EA 1065 in the following ways:

        i.   The Peoples Bank 2012 Form 1065 stated that in the 2012 calendar year EA LLP had total income of approximately $11,426,021, whereas the IRS 2012 Form 1065 stated that in the 2012 calendar year EA LLP had gross receipts and total income of approximately $6,212,605.

        ii.   The Peoples Bank 2012 Form 1065 stated that in the 2012 calendar year EA LLP had ordinary business income of approximately $5,819,458, whereas the IRS 2012 Form 1065 stated that EA LLP had an ordinary business loss of approximately $2,128,849.

        g.   In reliance on the false and fraudulent information defendant AVENATTI submitted to The Peoples Bank in support of the March 2014 EA LLP Loan, on or about March 14, 2014, The Peoples Bank approved the March 2014 EA LLP Loan and transferred approximately $1,824,584 to EA Account 8461.

        h.   In support of the application for the December 2014 EA LLP Loan, on or about November 16, 2014, defendant AVENATTI submitted to The Peoples Bank a Balance Sheet for January 2014 through September 2014 for EA LLP, which stated, among other things, that EA LLP had approximately $712,729 in EA Account 8461 as of September 30, 2014. In truth and in fact, as defendant AVENATTI then well knew, the balance in EA Account 8461 as of September 30, 2014, was approximately $27,710.

        i.   In support of the application for the December 2014 EA LLP Loan, on or about November 22, 2014, defendant AVENATTI submitted to The Peoples Bank a personal financial statement as of November 1, 2014, in which defendant AVENATTI failed to disclose to The Peoples

Bank that defendant AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, for the 2009 and 2010 calendar years.

j.    In support of the application for the December 2014 EA LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted to The Peoples Bank a 2012 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2012 Form 1040"), stating that defendant AVENATTI had total income for the 2012 calendar year of approximately $5,423,099, and had paid to the IRS $1,600,000 in estimated tax payments.  In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2012 Form 1040 with the IRS, had not filed any 2012 U.S. Individual Income Tax Return with the IRS, and had not made any payments to the IRS towards his 2012 individual tax liability.

k.    In support of the application for the December 2014 EA LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted to The Peoples Bank a 2013 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2013 Form 1040"), stating that defendant AVENATTI had total income for the 2013 calendar year of approximately $4,082,803, and had paid to the IRS approximately $1,250,000 in estimated tax payments and approximately $103,511 in withholdings. In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2013 Form 1040 with the IRS, had not filed any 2013 U.S. Individual Income Tax Return with the IRS, had not made any estimated tax payments to the IRS towards his 2013 individual tax liability, and did not have any tax withholdings during the 2013 calendar year.

1       l.   In order to obtain the December 2014 EA LLP Loan, on

2  or about December 12, 2014, defendant AVENATTI, on behalf of EA LLP,

3  signed a commercial pledge agreement whereby EA LLP agreed to

4  "Assignment of the First $500,000 Plus Interest of Settlement

5  Proceeds in the Meridian related cases, said attorney's fees to be

6  $10.8 million plus out of pocket costs for class counsel [EA LLP]."

7  On or about March 31, 2015, after EA LLP received a $3,034,514 wire

8  transfer from the trustee of the Meridian settlement, defendant

9  AVENATTI concealed and did not disclose, and caused EA LLP to conceal

10 and not disclose, the receipt of the funds to The Peoples Bank, and

11 did not distribute and caused EA LLP not to distribute the first

12 $500,000 to The Peoples Bank as defendant AVENATTI on behalf of EA

13 LLP had agreed to do.

14      m.   In reliance on the false and fraudulent information

15 defendant AVENATTI submitted to The Peoples Bank in support of the

16 March 2014 EA LLP Loan and the December 2014 EA LLP Loan, on or about

17 December 12, 2014, The Peoples Bank approved the December 2014 EA LLP

18 Loan and transferred approximately $494,500 to EA Account 8461.

19 **C.   EXECUTIONS OF THE SCHEME TO DEFRAUD**

20      47.  On or about the dates set forth below, in Orange County,

21 within the Central District of California, and elsewhere, defendant

22 AVENATTI, together with others known and unknown to the Grand Jury,

23 executed the fraudulent scheme by committing and willfully causing

24 others to commit the following acts:

25

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY | 3/14/2014 | Receipt of March 2014 EA LLP Loan proceeds in the amount of approximately $1,824,584. |

28

| COUNT | DATE | ACT |
|---|---|---|
| THIRTY-ONE | 12/12/2014 | Receipt of December 2014 EA LLP Loan proceeds in the amount of approximately $494,500. |

COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

48.  The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, 38 through 40, and 43 through 46 of this Indictment as though fully set forth herein.

49.  On or about December 1, 2014, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant AVENATTI knew belonged to another person, namely, the name and preparer tax identification number ("PTIN") of M.H., during and in relation to the offense of Bank Fraud, a felony violation of Title 18, United States Code, Section 1344(1), as charged in Count Thirty-One of this Indictment.

49

COUNT THIRTY-THREE

[18 U.S.C. §§ 152(3), 2(b)]

**A.    INTRODUCTORY ALLEGATIONS**

50.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 of this Indictment as though fully set forth herein.

51.   In or about February 2016, J.F., a former partner at EA LLP, filed an arbitration claim against EA LLP and defendant MICHAEL JOHN AVENATTI ("AVENATTI").  In or about February 2017, the arbitration panel ordered the depositions of defendant AVENATTI and EA Employee 1 to take place on March 3, 2017.

52.   On or about March 1, 2017, a creditor of EA LLP, filed an involuntary Chapter 11 bankruptcy petition against EA LLP in the Middle District of Florida.  By law, the filing of the bankruptcy petition created an automatic stay under Section 362 of Title 11 of the arbitration between J.F. and EA LLP and defendant AVENATTI.

53.   On or about March 8, 2017, in response to an emergency motion filed by J.F. for relief from the automatic stay, the Bankruptcy Court in the Middle District of Florida ordered that unless EA LLP consented to the bankruptcy by March 10, 2017, the Court would grant relief from the automatic stay and thereby allow the arbitration to proceed.

54.   On or about March 10, 2017, EA LLP consented to an order for relief under Chapter 11 of Title 11 and, as a result, EA LLP became a debtor in possession in bankruptcy.

55.   On or about April 11, 2017, defendant AVENATTI certified and declared under penalty of perjury as the managing partner of EA LLP that the United States Trustee Financial Requirements Checklist,

50

1  Certifications, and any Attachments Thereto, were true and correct to
2  the best of his knowledge and belief. Defendant AVENATTI on behalf
3  of EA LLP further certified that he had "read and underst[ood] the
4  United States Trustee Chapter 11 'Operating Guidelines and Reporting
5  Requirements for Debtors in Possession and Trustees'" and "agree[d]
6  to perform in accordance with said guidelines and requirements."
7  Specifically, defendant AVENATTI certified as the managing partner of
8  EA LLP that he understood, among other things, that EA LLP was
9  required to: (a) close all pre-petition bank accounts controlled by
10  the debtor, EA LLP; (b) immediately open new debtor-in-possession
11  ("DIP") operating, payroll, and tax accounts; and (c) deposit all
12  business revenues into the DIP operating account.

13      56.  On or about April 20, 2017, the EA LLP Chapter 11
14  bankruptcy was transferred from the Middle District of Florida to the
15  Central District of California as In re: Eagan Avenatti LLP, bearing
16  case number 8:17-bk-11961-CB.  In the bankruptcy case, EA LLP was the
17  debtor in possession, and all property and assets in which the debtor
18  had any ownership or interest at the time of the filing of the
19  bankruptcy petition as well as any interest in property that the
20  debtor acquired after the commencement of the bankruptcy case was the
21  "bankruptcy estate," and was under the management and control of the
22  debtor in possession.

23      57.  On or about May 12, 2017, the Office of the United States
24  Trustee in the Central District of California provided defendant
25  AVENATTI the Guidelines and Requirements for Chapter 11 Debtors in
26  Possession (the "Guidelines and Requirements"), which required EA LLP
27  to close all existing bank accounts and open new DIP general,

28

1    payroll, and tax bank accounts, and to file a declaration regarding

2    EA LLP's compliance with the Guidelines and Requirements.

3        58.   On or about May 30, 2017, defendant AVENATTI signed under

4    penalty of perjury as the managing partner of EA LLP a "Declaration

5    of Debtor Regarding Compliance with the United States Trustee

6    Guidelines and Requirements for Chapter 11 Debtors in Possession,"

7    which included the following information:

8            a.   Defendant AVENATTI, on behalf of EA LLP, confirmed

9    that EA LLP had closed all pre-petition bank accounts, and provided

10   the account information for EA LLP's three new DIP bank accounts.

11           b.   Defendant AVENATTI, on behalf of EA LLP, provided the

12   United States Trustee with evidence that EA LLP had closed EA LLP's

13   prior general account and opened three new DIP bank accounts.

14           c.   In response to the requirement that EA LLP list the

15   last two years for which EA LLP filed federal and state tax returns,

16   defendant AVENATTI, on behalf of EA LLP, stated that neither "[t]he

17   Debtor nor its accountant has copies of its 2014 and 2015 federal or

18   state income tax returns.  The Debtor will seek to obtain copies of

19   them from the IRS and the State of California."

20       59.   Pursuant to the Guidelines and Requirements, EA LLP had

21   additional and ongoing requirements during the course of the

22   bankruptcy, including the following:

23           a.   Before any insiders, including the owners, partners,

24   officers, directors, and shareholders of EA LLP and relatives of

25   insiders, could receive compensation from the bankruptcy estate, EA

26   LLP was required to provide notice to the creditors and the United

27   States Trustee.  No such compensation could be paid to any insiders

28   until 15 days after service of the notice and (i) no objection had

1  been received by the Bankruptcy Court; or (ii) if an objection had

2  been received, the Bankruptcy Court had resolved the objection.

3           b.   EA LLP was required to file Monthly Operating Reports

4  ("MOR") to include, among other things, "information regarding bank

5  accounts over which the debtor ha[d] possession, custody, control,

6  access or signatory authority, even if the account [was] not in the

7  debtor's name and whether or not the account contain[ed] only post-

8  petition income."  EA LLP was "required to report all of [its]

9  financial information in the MOR."

10     60.  From on or about May 25, 2017, through on or about February

11  15, 2018, defendant AVENATTI signed under penalty of perjury and

12  filed MORs for EA LLP for eleven months, namely, March 2017 through

13  January 2018, inclusive, which included the following information:

14          a.   The first page of each MOR stated that "All receipts

15  must be deposited into the general account," and required EA LLP to

16  itemize: (i) the beginning balance of the general account for the

17  month at issue; (ii) all receipts EA LLP obtained during the month;

18  (iii) all of the disbursements EA LLP made during the month,

19  including transfers to other DIP accounts; and (iv) the ending

20  balance of the general account for the month at issue.

21          b.   Each MOR required EA LLP to include all receipts and

22  expenditures during the monthly reporting period, as well as the

23  cumulative post-petition amounts.  On all eleven MORs that defendant

24  AVENATTI signed under penalty of perjury on behalf of EA LLP,

25  defendant AVENATTI claimed zero payroll was made to insiders.

26  Immediately above the penalty of perjury declaration, each MOR sought

27  answers to several questions, including whether EA LLP provided

28  compensation or remuneration to any officers, directors, principals,

1  or other insiders without appropriate authorization during the
2  reporting period.  On all eleven MORs that defendant AVENATTI signed
3  under penalty of perjury on behalf of EA LLP, defendant AVENATTI
4  answered "no" to the question whether any compensation or
5  remuneration was made to any officers, directors, principals, or
6  other insiders.

7  **B.   FALSE DECLARATION**

8       61.  On or about June 19, 2017, in Orange County, within the
9  Central District of California, defendant AVENATTI knowingly and
10 fraudulently made and willfully caused to be made a materially false
11 declaration and statement under penalty of perjury within the meaning
12 of Title 28, United States Code, Section 1746, in and in relation to
13 a case under Title 11 of the United States Code, namely, In re: Eagan
14 Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court
15 for the Central District of California, by submitting and declaring
16 under penalty of perjury to be true and complete the Monthly
17 Operating Report for EA LLP for the period May 1, 2017, through
18 May 30, 2017 (the "May 2017 MOR"), in which defendant AVENATTI, as
19 the Managing Partner for EA LLP, falsely stated that EA LLP's
20 "Receipts During Current Period; Accounts Receivable – Post Filing"
21 were $409,953.70, whereas, in truth and in fact, as defendant
22 AVENATTI then well knew, EA LLP's receipts during the May 2017 MOR
23 period, accounts receivable – post filing were greater than
24 $409,953.70.

25
26
27
28

54

COUNT THIRTY-FOUR

[18 U.S.C. § 152(3), 2(b)]

62.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

63.   On or about October 16, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period September 1, 2017, through September 30, 2017 ("September 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $829,635.28, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the September 2017 MOR period, accounts receivable – post filing were greater than $829,635.28.

COUNT THIRTY-FIVE

[18 U.S.C. § 152(3), 2(b)]

64.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

65.  On or about February 15, 2018, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period January 1, 2018, through January 31, 2018 ("January 2018 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $232,221.11, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the January 2018 MOR period, accounts receivable – post filing were greater than $232,221.11.

1

2

COUNT THIRTY-SIX

[18 U.S.C. § 152(2)]

3    66.   The Grand Jury re-alleges and incorporates by reference

4  paragraphs 1 through 7 and 51 through 60 of this Indictment as though

5  fully set forth herein.

6    67.   On or about June 12, 2017, in Orange County, within the

7  Central District of California, defendant MICHAEL JOHN AVENATTI

8  ("AVENATTI") knowingly and fraudulently made a false oath as to a

9  material matter in and in relation to a case under Title 11 of the

10 United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-

11 11961-CB in United States Bankruptcy Court for the Central District

12 of California, in that defendant AVENATTI testified under oath at the

13 Section 341(a) debtor's examination and stated "no" when asked

14 whether the debtor, EA LLP, received any counsel fees from the Super

15 Bowl NFL litigation.  In truth and in fact, as defendant AVENATTI

16 well knew at the time he made the false oath, defendant AVENATTI and

17 EA LLP had received fees from the Super Bowl NFL litigation, namely,

18 two wire transfers totaling approximately $1,361,000, including

19 attorneys' fees, on or about May 17, 2017.

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

68.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Ten, Thirty, Thirty-One, or Thirty-Three through Thirty-Six of this Indictment.

69.   Defendant shall forfeit to the United States of America the following:

a.   all right, title, and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, or property traceable to such proceeds; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

70.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

1   value; or (e) has been commingled with other property that cannot be

2   divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 1028, and 28 U.S.C. §2461(c)]

71. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028, and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offense set forth in Count Thirty-Two of this Indictment.

72. Defendant, if so convicted, shall forfeit to the United States of America the following:

a. All right, title and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, and any property traceable thereto;

b. Any personal property used or intended to be used to commit the offense; and

c. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

73. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

1    court; (d) has been substantially diminished in value; or (e) has

2    been commingled with other property that cannot be divided without

3    difficulty.

4                                    A TRUE BILL

5

6    _____

7                                    Foreperson

8    NICOLA T. HANNA
     United States Attorney
9

10

11   LAWRENCE S. MIDDLETON
     Assistant United States Attorney
12   Chief, Criminal Division

13   RANEE A. KATZENSTEIN
     Assistant United States Attorney
14   Chief, Major Frauds Section

15   JULIAN L. ANDRÉ
     Assistant United States Attorney
16   Major Frauds Section

17   BRETT A. SAGEL
     Assistant United States Attorney
18   Santa Ana Branch Office

19

20

21

22

23

24

25

26

27

28

                          61

# EXHIBIT 5

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮ , hereby agree and state as follows:

1.      In or about 2012, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself.  Under the terms of the Agreement, EA LLP was to represent me in connection with personal injury claims, among others, against the County of Los Angeles.

2.      Subject to the limitations set forth in paragraphs 3and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado, concerning ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.      This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Greenberg Gross LLP and Joshua M. Robbins.

4.      This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.      I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.      I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited to, Michael J. Avenatti, Judy Regnier, Scott Sims, and Carlos Colorado.

1

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully.  I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine.  No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search.  I do so knowingly and voluntarily.

_____                    _____4/4/19_____
                                                   Date

I am _____'s attorney.  I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client.  Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections.  To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____                  April 5, 2019
JOSHUA M. ROBBINS                                  Date
GREENBERG GROSS LLP
Attorneys for _____

2

# EXHIBIT 6

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮, hereby agree and state as follows:

1.     In or about December 2016, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself. Under the terms of the Agreement, EA LLP was to represent me in connection with claims relating to an individual that I had a prior relationship.

2.     Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited to, Michael J. Avenatti or Judy Regnier.

3.     This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me and any other attorneys acting on my behalf.

4.     This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.     I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.     I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me currently in possession of EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited to, Michael J. Avenatti or Judy Regnier.

1

7.     I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully.  I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine.  No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search.  I do so knowingly and voluntarily.

4/8/2019

_____          _____
                                                                      Date

I am _____'s attorney.  I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client.  Further, I have fully advised my client of her rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections.  To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

_____          4/10/2019
DAVID GAMMILL                                        Date
Attorney for _____

2

# EXHIBIT 7

## <u>LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND CONSENT TO SEARCH BY</u> ▓▓▓▓▓▓▓▓▓▓▓

I, ▓▓▓▓▓▓▓, hereby agree and state as follows:

1.  On or about July 2, 2014, I entered into an Attorney-Client Fee Contract (the "Agreement") with Eagan Avenatti LLP ("EA LLP") on behalf of myself and my company, ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Under the terms of the Agreement, EA LLP was to represent me and my company in connection with claims relating to my intellectual property rights in hardscape underlayment technology.

2.  Subject to the limitations set forth in paragraphs 3 and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice I and/or my company, ▓▓▓▓▓▓▓, sought or received from EA LLP and/or any of EA LLP's current or former officers, directors, employees, or agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

3.  This waiver of the attorney-client privilege does not apply to any attorney-client privileged documents or communications between me or ▓▓▓▓▓▓▓ and any other attorneys acting on my behalf, including, but not limited to, Larson O'Brien LLP, Stephen G. Larson, Steven E. Bledsoe, and R.C. Harlan.

4.  This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.  I further authorize any former or current officer, directors, employees, or agents of EA LLP to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.

6.  I further consent to the United States government searching any documents or materials relating to EA LLP's representation of me and ▓▓▓▓▓▓▓ currently in possession of

EA LLP and/or any of EA LLP's current or former employees and agents, including, but not limited, to Michael J. Avenatti, Judy Regnier, John Adren, and Ahmed Ibrahim.

7.      I have read this Limited Waiver of the Attorney-Client Privilege and Consent to Search carefully.  I have discussed this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my lawyer and fully understand the consequences of waiving the attorney-client privilege and attorney-work-product doctrine.  No one has threatened or forced me to execute this Limited Waiver of the Attorney-Client Privilege and Consent to Search.  I do so knowingly and voluntarily.



3-18-19

Date

I am _____'s attorney.  I have carefully and thoroughly discussed every part of this Limited Waiver of the Attorney-Client Privilege and Consent to Search with my client.  Further, I have fully advised my client of his rights and the consequences of waiving any attorney-client privilege or attorney-work-product protections.  To the best of my knowledge, my client's decision to waive the attorney-client privilege and attorney-work product protections is an informed and voluntary one.

3/18/19

Date

STEVEN E. BLEDSOE
R.C. HARLAN
Larson O'Brien LLP
Attorneys for

2

# EXHIBIT 8

## LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE
## AND CONSENT TO SEARCH BY ▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮ hereby agree and state as follows:

1.     On or about August 15, 2017, I entered into an Attorney-Client Fee Contract (the "Agreement") with Michael Avenatti, Esq. ("AVENATTI") and/or Eagan Avenatti LLP ("EA LLP"). Under the terms of the Agreement, AVENATTI and/or EA LLP were to represent me and ▮▮▮▮▮▮ in connection with our divestiture and exit from ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.

2.     Subject to the limitations set forth in paragraphs 3and 4 below, I agree to waive any claims of the attorney-client privilege or attorney-work-product doctrine relating to any legal advice or services that I sought or received from AVENATTI, EA LLP, Filippo Marchino ("MARCHINO"), any of EA LLP's current or former officers, directors, employees, or agents, and/or any current or former employees or agents of AVENATTI.

3.     This waiver of the attorney-client privilege does not apply to any attorney-client privileged or attorney-work product documents or communications between me and any other attorneys acting on my behalf, including, but not limited to, Orrick Herrington & Sutcliffe LLP, Walter Brown, William Molinski, or any attorney-client privileged or attorney-work product documents arising out of any such separate representation.

4.     This waiver of the attorney-client privilege is limited to the United States government and its employees and agents, for any purpose related to the official performance of their duties, and does not extend to any other individual, entity or third party.

5.     I further authorize AVENATTI, EA LLP, MARCHINO, any current or former officers, directors, employees, or agents of EA LLP, and/or any current or former employees or agents of AVENATTI to disclose to the United States government all materials, written or oral, relating to any attorney-client privileged communications covered by the limited attorney-client privilege waiver set forth in paragraph 2 above.